UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ADRIANNA WADSWORTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:19-cv-00577-JAW |
| | ) | |
| MAINE SCHOOL ADMINISTRATIVE | ) | |
| DISTRICT 40/REGIONAL SCHOOL | ) | |
| UNIT 40 et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MSAD 40/RSU 40'S MOTION TO DISMISS**

A former high school student brought a lawsuit against a school district, a school principal, and a school social worker asserting claims under 20 U.S.C. § 1681(a) (Title IX) and 42 U.S.C. § 1983, as well as state tort claims, stemming from sexual harassment she alleges the school principal committed against her. The school district moves to dismiss the plaintiff's Title IX and § 1983 claims. The school district seeks to dismiss the Title IX claim on the grounds that the plaintiff failed to plead facts sufficient to show than an official with the authority to implement corrective measures had actual knowledge of the alleged harassment and acted with deliberate indifference toward her. It seeks to dismiss the § 1983 claim on the ground that the plaintiff fails to plead facts sufficient to show that any school district policy or failure to train caused her injuries. The Court concludes that the plaintiff alleged facts sufficient to survive dismissal on both counts.

## I.   PROCEDURAL HISTORY

On December 27, 2019, Adrianna Wadsworth[1] filed suit against Maine School Administrative District 40/Regional School Unit 40 (MSAD 40/RSU 40), Medomak Valley High School, Andrew Cavanaugh, and Chuck Nguyen.   *Compl.* (ECF No. 1). She alleged a violation of Title IX and negligent hiring, training, and supervision against MSAD 40/RSU 40 and Medomak Valley High School, brought claims under 42 U.S.C. § 1983, brought common law tort and statutory claims of intentional infliction of emotional distress (IIED) and negligent infliction of emotional distress (NIED) against all the Defendants, and brought a negligence claim against Mr. Cavanaugh and Mr. Nguyen.   *Id.* ¶¶ 134-179.   On February 7, 2020, Mr. Cavanaugh answered the Complaint.   *Def., Andrew Cavanaugh's Answer to Pl.'s Compl. and Demand for Jury Trial* (ECF No. 11).   On March 11, 2020, MSAD 40/RSU 40 and Medomak Valley High School filed a motion to dismiss counts one and two of the Complaint.   *Def. MSAD 40/RSU 40's Mot. to Dismiss Counts I and II of Compl.* (ECF No. 12).   On the same day, Mr. Nguyen filed an answer to the Complaint.   *Answer and Affirmative Defenses to Compl. and Jury Trial Demand (Def. Chuck Nugyen)* (ECF No. 13).

On March 27, 2020, Ms. Wadsworth filed an amended complaint, dropping Medomak Valley High School as a defendant.   *Pl.'s Am. Compl. and Demand for Jury*

---

[1]     Ms. Wadsworth brought this lawsuit in her own name rather than under a pseudonym such as Jane Doe.   Though a balancing of factors is required, a victim of sexual harassment or sexual assault—especially a minor at the time of the offense—often has a privacy interest sufficient to allow the victim to proceed under a pseudonym.   *See, e.g., Doe v. Reg'l Sch. Unit No. 21*, Docket No. 2:19-00341-NT, 2020 WL 2833248, at 1-4 (D. Me. May 29, 2020); *Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. 2011).   However, as an adult, Ms. Wadsworth has an equal right to bring the action under her own name.

*Trial* (ECF No. 15) (*Am. Compl.*).  On April 10, 2020, Mr. Nguyen filed a motion to dismiss the Amended Complaint.  *Def. Chuck Nguyen's Mot. to Dismiss Am. Compl.* (ECF No. 16).  On April 14, 2020, Mr. Cavanaugh filed an answer to the Amended Complaint.  *Def., Andrew Cavanaugh's Answer to Pl.'s Am. Compl. and Demand for Jury Trial* (ECF No. 17).

On May 8, 2020, MSAD 40/RSU 40 filed a motion to dismiss counts one and two of the Amended Complaint, and on May 11, 2020, MSAD 40/RSU 40 withdrew its first motion to dismiss.  *Def. MSAD 40/RSU 40's Mot. to Dismiss Counts I and II of First Am. Compl.* (ECF No. 21) (*MSAD 40's Mot.*)[2] *Def. MSAD 40/RSU 40's Withdrawal of Mot. to Dismiss as Moot* (ECF No. 22).  Ms. Wadsworth filed a response on June 8, 2020.  *Opp'n of Pl., Adrianna Wadsworth, to Def. MSAD 40/RSU 40's Mot. to Dismiss for Failure to State a Claim* (ECF No. 31) (*Pl.'s Opp'n*).  On June 22, 2020, MSAD 40/RSU 40 replied.  *Def. MSAD 40/RSU 40's Reply in Supp. of Mot. to Dismiss* (ECF No. 32) (*MSAD 40's Reply*).

---

[2]      While the docket entry for this filing includes Medomak Valley High School in the description, MSAD 40/RSU 40 alone filed this motion because the Amended Complaint terminated Medomak Valley High School as a defendant.  *See Am. Compl.* ¶¶ 1-5.

## II.   FACTS[3]

### A.   The Parties

Adrianna Wadsworth is a twenty-year old female who resides in Sydney, Maine. *Am. Compl.* ¶¶ 1, 8.  She was a student at Medomak Valley High School, part of MSAD 40/RSU 40, from 2014 through her graduation in June 2018.  *Id.* at ¶ 9.

MSAD 40/RSU 40 is a school district which encompasses five towns in Maine: Friendship, Union, Waldoboro, Warren, and Washington.  *Id.* ¶ 2.  It operates and controls Medomak Valley High School in Waldoboro, Maine.  *Id.* ¶ 3.  MSAD 40/RSU 40 is a public entity within the meaning of Title IX and § 504 because it is a recipient of federal funding under applicable programs.  *Id.*

Andrew Cavanaugh is a resident of Maine who worked for MSAD 40/RSU 40 from 2003 through his resignation in December 2017.  *Id.* ¶¶ 4, 12.  He became principal of Medomak Valley High School in 2015.  *Id.* ¶ 10.

Chuck Nguyen is a resident of Maine and was a social worker at Medomak Valley High School for all times relevant to this matter.  *Id.* ¶¶ 5, 13.

### B.   The Events

Beginning in Ms. Wadsworth's junior year of high school, when she was sixteen years old, the principal, Mr. Cavanaugh, began paying special attention to her; he made sexually-based comments about her looks and clothing choices in front of

---

[3]      Considering a motion to dismiss, a court "accept[s] all well-pleaded facts in the complaint as true . . .." *Glik v. Cunniffe*, 655 F.3d 78, 79 (1st Cir. 2011) (quoting *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 36 (1st Cir. 2009)).   A court also "construe[s] all reasonable inferences in favor of the plaintiff . . .." *Sanchez*, 590 F.3d at 41 (quoting *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 320 (1st Cir. 2008); *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001)).

students and staff members and purchased personal hygiene products and gave them to her in front of other teachers and students. *Id.* ¶¶ 23-25. Ms. Wadsworth reported the gifts to the school social worker, Mr. Nguyen, and asked whether it was "normal" for the principal to be giving her gifts. *Id.* ¶¶ 26, 207. Mr. Nguyen assured Ms. Wadsworth that Mr. Cavanaugh was being nice to her and that there was nothing inappropriate about the gifts. *Id.* ¶ 27.

Subsequently, Mr. Cavanaugh advised Ms. Wadsworth that he was going to bring her to a medical examination. *Id.* ¶¶ 28-29. Ms. Wadsworth again approached Mr. Nguyen and asked whether it was appropriate for the high school principal to bring her to this appointment. *Id.* ¶ 30. Mr. Nguyen assured her that Mr. Cavanaugh was just trying to be a "father figure" to her. *Id.* On another occasion, Mr. Cavanaugh advised Ms. Wadsworth that she should be on birth control. *Id.* ¶ 31. When this was brought up to Mr. Nguyen, he told Ms. Wadsworth that this was normal. *Id.* Mr. Nguyen's advice that Mr. Cavanaugh's behavior was normal encouraged her to continue the relationship with Mr. Cavanaugh. *Id.* ¶ 207. Mr. Nguyen became aware of Mr. Cavanaugh's inappropriate behavior toward Ms. Wadsworth in 2016. *Id.* ¶ 32; *see also id.* ¶¶ 169, 206.

Mr. Cavanaugh called Ms. Wadsworth into his office on a regular basis, often causing her to miss class. *Id.* ¶¶ 33-36, 42-121, 129-42. Mr. Cavanaugh asked his assistant to excuse Ms. Wadsworth from class without making the excusal part of her school record. *Id.* ¶ 37. During 2016, Mr. Cavanaugh's assistant expressed concern about this behavior to Assistant Principals Tamra Philbrook and Linda Pease. *Id.*

5

¶ 38.  Ms. Wadsworth's teachers also complained to Ms. Philbrook and Ms. Pease about Mr. Cavanaugh pulling Ms. Wadsworth out of class to meet with him in his office.  *Id.*  ¶ 39.  Throughout this time, Mr. Cavanaugh commented on Ms. Wadsworth's clothing choices and looks in front of teachers, students, assistant principals, and Mr. Nguyen.  *Id.* ¶ 41.  During the 2016 school year, around when these complaints and comments took place, Ms. Philbrook and Ms. Pease spoke with Mr. Cavanaugh about his inappropriate relationship with Ms. Wadsworth.  *Id.* ¶ 40.  The inappropriate comments in front of staff and students continued through November 2017, when the sexual harassment ended.  *Id.* ¶¶ 41, 142.

Mr. Cavanaugh also sent Ms. Wadsworth text messages—including sexually explicit and inappropriate messages—on a regular basis at all hours of the day and night, including during school hours.  *Id.* ¶ 42.  On May 18, 2017, in one of these text messages, Mr. Cavanaugh asked Ms. Wadsworth to move in with him: "You should live here for your senior year.  It would be a stable place and i don't care about child support. . . . I think if you talked with Debbie and i about it we could take care of a lot.  I would write a letter to the superintendent and all that."  *Id.* ¶ 86.  On June 22, 2017, Mr. Cavanaugh texted, "I have a bit of bad news.  I spoke with work about you staying with me and i cant.  I feel terrible but thats what it is."  *Id.* ¶ 96.

On July 5, 2017, Mr. Cavanaugh told Ms. Wadsworth he purchased a car for her and that she could work for him to pay it off.  *Id.* ¶ 98.  In September 2017, Waldo County Police Officer Christopher Spear pulled Ms. Wadsworth over for speeding.  *Id.* ¶ 120.  Officer Spear was also the school resource officer at Medomak Valley High

School.  *Id.*  Officer Spear immediately contacted Ms. Philbrook, one of Medomak Valley's assistant principals, and expressed concern that Ms. Wadsworth was driving a vehicle registered to Mr. Cavanaugh.  *Id.* ¶ 121.  Ms. Philbrook advised Officer Spear that she and Ms. Pease had spoken with Mr. Cavanaugh during the previous school year about his inappropriate behavior toward Ms. Wadsworth and asked him to speak with Mr. Cavanaugh about the relationship as well.  *Id.* ¶¶ 122-23.  Officer Spear spoke with Mr. Cavanaugh on September 19, 2017, and reported the results of the conversation to Ms. Philbrook immediately.  *Id.* ¶ 124.

On September 20, 2017, Officer Spear sent an email titled "Pervert Principal" to the Waldoboro Chief of Police and stated that Mr. Cavanaugh was exercising extremely poor judgment in his relationship with Ms. Wadsworth.  *Id.* at ¶ 125.  He also relayed his conversation with Ms. Philbrook and noted that he had personally seen Ms. Wadsworth leaving Mr. Cavanaugh's office more than any other student. *Id.* ¶ 126.  The Chief of Police advised Officer Spear to keep a record of Mr. Cavanaugh's behavior.  *Id.* ¶ 127.  This email was shared with Ms. Philbrook the same day.  *Id.* ¶ 128.

Throughout the following six weeks, Cavanaugh continued to make inappropriate comments about Ms. Wadsworth in front of teachers, students, Mr. Nguyen, Ms. Pease, and Ms. Philbrook.  *Id.* ¶ 41.  Furthermore, Mr. Cavanaugh continued to send sexually explicit text messages to Ms. Wadsworth at all hours of the day, including during school hours.  *Id.* ¶ 42.  For example, on the day of his conversation with Officer Spear, he texted Ms. Wadsworth that he needed the car

7

back and said, "I like to help you and it does seem to cause problems.  I know you are super hot and that probably does influence me, but you must know by now that I really do like you as a person."  *Id.* ¶ 129.  The following day,  Mr. Cavanaugh texted, "Have you had the 'O' yet?"  *Id.* ¶ 130.  On October 30, 2017, Mr. Cavanaugh texted Ms. Wadsworth, "The whole school reminds you of your influence with me just about every day."  *Id.* ¶ 141.

Mr. Cavanaugh continued this behavior through November 3, 2017.  *Id.* ¶ 142.  In November 2017, a third party contacted the Waldoboro Police Department regarding the inappropriate relationship between Mr. Cavanaugh and Ms. Wadsworth and MSAD 40/RSU 40 put Mr. Cavanaugh on leave pending the results of the police investigation.  *Id.* ¶¶ 143-44.  Mr. Nguyen subsequently called Ms. Wadsworth into his office and advised her that Mr. Cavanaugh had a drinking problem.  *Id.* ¶ 145.  Mr. Cavanaugh resigned from his position as principal in December 2017.  *Id.* ¶ 147.

Ms. Wadsworth became emotionally withdrawn and alienated from her peers, sports, and classes.  *Id.* ¶ 148.  She was unable to attend school on multiple occasions because she was so depressed, and she was the subject of ridicule and bullying as a result of Mr. Cavanaugh's inappropriate relationship with her.  *Id.* ¶¶ 149-50.  Ms. Wadsworth's counselor diagnosed her with adjustment disorder, social anxiety, and worsened depression as a direct result of the emotionally traumatic relationship with Mr. Cavanaugh.  *Id.* ¶ 154.

### C.    The Policies

MSAD 40/RSU 40 has a policy prohibiting "sexual harassment," a term which is defined in the policy as including but not limited to "unwelcome sexual advances, requests for sexual favors, or pressure to engage in sexual activity, physical contact of a sexual nature, gestures, comments, or other physical, written, graphic, electronic or verbal conduct that is gender-based that interferes with a student's education." *Id.* ¶¶ 15-16.  MSAD 40/RSU 40's Student Discrimination and Harassment Complaint Procedure provides that "[a]ny individual who believes that a student has been discriminated against or harassed should report their concern promptly to the building principal" and that "[s]chool staff will report possible incidents of discrimination or harassment of students to the building principal." *Id.* ¶ 17.  The policy requires building principals to "promptly inform the Superintendent and the person(s) who is the subject of the complaint that a complaint has been received." *Id.* ¶ 18.  It further states that a student may report instances of sexual harassment to the "police, the Maine Human Rights Commission and/or the federal office of Civil Rights." *Id.* ¶ 19.

The policy outlining employee complaints of harassment and discrimination, which includes employees acting as third party complainants, instructs complainants to report to "that person's immediate supervisor or the building principal, and that such person receiving the complaint must immediately report it to the Superintendent." *Id.* ¶¶ 20-22.  The policy also allows an employee "to report

complaints to the Maine Human Rights Commission and/or the federal office of Civil Rights." *Id.* ¶ 22.

## III.   THE PARTIES' POSITIONS

### A.   MSAD 40/RSU 40's Motion to Dismiss

Pursuant to Federal Rule of Civil Procedure 12(b)(6), MSAD 40/RSU 40 asks this Court to dismiss counts one and two of the Amended Complaint, which contain the Title IX and § 1983 claims. *MSAD 40's Mot.* at 2. It then includes a statement of facts and explains the standard of review for motions to dismiss. *Id.* at 3-5.

### 1.   Failure to Plead Viable Title IX Claim

MSAD 40/RSU 40 argues that Ms. Wadsworth did not allege a viable Title IX claim because "the School District can only act upon matters of which it is actually aware" and Ms. Wadsworth "has failed to plead facts sufficient to show that an official with the authority to implement corrective measures had actual knowledge of the alleged harassment and acted with deliberate indifference toward her." *Id.* at 2. It lays out its view of the requirements a plaintiff must meet to plead a Title IX claim and emphasizes the "actual knowledge" standard for deliberate indifference. *Id.* at 5 (quoting *Santiago v. Puerto Rico*, 655 F.3d 61, 73 (1st Cir. 2011)).

According to MSAD 40/RSU 40, Mr. Cavanaugh is the only person Ms. Wadsworth pleaded had actual knowledge of the full extent of the alleged sexual harassment and his knowledge is not relevant to MSAD 40/RSU 40's liability because "knowledge of the wrongdoer himself is not pertinent to the analysis." *Id.* at 6 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1998)). It asserts

that the alleged facts do not show that any other MSAD 40/RSU 40 employee "with the authority to implement corrective measures had actual knowledge of [Mr.] Cavanaugh's alleged sexual harassment." *Id.*

MSAD 40/RSU 40 argues that Mr. Nguyen did not have actual knowledge of sexual harassment and that, even if he did, he did not have the authority to institute corrective action. *Id.* (citing *Santiago*, 655 F.3d at 74). MSAD 40/RSU 40 makes the same argument about Assistant Principals Philbrook and Pease, adding that the alleged facts do not show they acted with deliberate indifference. *Id.* at 6-7. According to MSAD 40/RSU 40, Ms. Philbrook and Ms. Pease were not on notice of possible harassment in 2016 when they learned that Mr. Cavanaugh called Ms. Wadsworth into his office "with some regularity," and even if they were, they did not act with deliberate indifference because they talked to Mr. Cavanaugh about these allegations. *Id.* at 7. MSAD 40/RSU 40 similarly asserts that Ms. Philbrook did not have actual knowledge of harassing behavior in the fall of 2017 when she learned that Ms. Wadsworth was driving a car registered in Mr. Cavanaugh's name and the school resource officer, Officer Spear, emailed her that Mr. Cavanaugh was exercising poor judgment, and that even if she did, her response—telling Officer Spear to speak with Mr. Cavanaugh—was not deliberately indifferent. *Id.* MSAD 40/RSU 40 states, as to any knowledge Ms. Philbrook had of actions the police were taking, "it was reasonable for school officials to rely on the police department to conduct an appropriate investigation if the situation warranted one" and "complaints of sexual harassment may be reported to the police." *Id.* at 7 n.3, 8. MSAD 40/RSU

40 also argues that the decision to put Mr. Cavanaugh on leave later in the fall of 2017 after a third party notified the police of Mr. Cavanaugh's behavior further supports its argument that it did not act with deliberate indifference. *Id.* at 9-10 (citing cases with examples of no deliberate indifference).

Regardless of actual knowledge and responses, MSAD 40/RSU 40 asserts, Ms. Philbrook and Ms. Pease "did not have authority over [Mr.] Cavanaugh to address the alleged discrimination or to institute corrective action" because he was their boss and because the MSAD 40/RSU 40 policy requires employees to report possible sexual harassment to the building principal, who then reports complaints to the Superintendent. *Id.* at 8-9.

### 2.   Failure to Plead Viable § 1983 Claim

MSAD 40/RSU 40 asserts that Ms. Wadsworth failed to state a claim upon which relief can be granted under § 1983 because the alleged facts do not support the "bare-bones assertion" that MSAD 40/RSU 40 failed "to enforce sexual harassment laws or to train its employees" and she did not plead facts "sufficient to show that any failure to train by the School District caused her injuries." *Id.* at 2-3. MSAD 40/RSU 40 says that Ms. Wadsworth can prevail on her § 1983 claim only if its "failure to train amounts to deliberate indifference to the rights of persons with whom the [employee] c[a]me into contact, and is closely related to, or the moving force behind, the constitutional injury." *Id.* at 10-11 (quoting *Hayden v. Grayson*, 134 F.3d 449, 456 (1st Cir. 1998) (alterations in original)).

According to MSAD 40/RSU 40, Ms. Wadsworth's general claims about failure to enforce and failure to train are insufficient because the Amended Complaint is "bereft of facts demonstrating how the School District allegedly failed" to do each and instead includes the MSAD 40/RSU 40 policy prohibiting sexual harassment and its decision to place Mr. Cavanaugh on leave "as soon as it learned of his alleged behavior." *Id.* at 11. Moreover, MSAD 40/RSU 40 argues, "the facts as alleged by [Ms. Wadsworth] do not establish that deficiencies in its training program caused the ultimate injury," especially since Mr. Cavanaugh tried to hide his interactions with Ms. Wadsworth. *Id.* at 12. MSAD 40/RSU 40 argues that Ms. Wadsworth "d[id] not allege that any additional training would have altered [Mr.] Cavanaugh's behavior, and the School District therefore cannot be liable for its alleged failure to train." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 391 (1989)).

**B.    Adrianna Wadsworth's Opposition**

Ms. Wadsworth asserts that her Amended Complaint "easily survives the standard of review for motions to dismiss" because she alleged "numerous, meritorious claims based on substantial evidence and legal theories . . .." *Pl.'s Opp'n* at 1. She then lays out the factual background and standard of review. *Id.* at 2-5.

**1.    Title IX Claim**

Ms. Wadsworth says MSAD 40/RSU 40 "would have this Court believe that because its high school principal was a perpetrator of sexual harassment (as opposed to one of its teachers, students or other personnel), it is immune from this lawsuit." *Id.* at 1. She addresses the "appropriate person" requirement first and argues that a

13

fact-based analysis must be undertaken in each case to determine if a specific administrator or official is an "appropriate person" under Title IX. *Id.* at 6 (citing *Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450 (8th Cir. 2009)). She asserts that a holding regarding who is considered an appropriate person that required a plaintiff to prove that members of the school's governing body knew of the improper conduct "would undermine the private cause of action [created by Title IX] and effectively 'eliminate the protection Congress intended for students in schools receiving Title IX funds.'" *Id.* at 6-7 (quoting *Warren ex rel. Good v. Reading Sch. Dist.*, 278 F.3d 163, 170 (3d Cir. 2002)).

Ms. Wadsworth argues that MSAD 40/RSU 40's motion suggests "that the only 'appropriate person' under Title IX would be the lead principal of the school" and that this logic would allow a high school principal "to sexually harass students with impunity because it would be virtually impossible for a plaintiff to satisfy the notice requirement." *Id.* at 10.

She asserts that Ms. Pease and Ms. Philbrook were "appropriate persons" because they spoke to Mr. Cavanaugh about his behavior in 2016 and Ms. Philbrook told Officer Spear to speak with him in September 2017, showing that they had the authority to institute corrective measures. *Id.* at 11. She states, "If Ms. Pease and Ms. Philbrook had no authority to institute corrective measures, they would not have attempted to address [Mr.] Cavanaugh's behavior at all." *Id.* According to Ms. Wadsworth, the superintendent would "clearly" be an "appropriate person" under Title IX. *Id.* Additionally, Ms. Wadsworth maintains that Mr. Nguyen is an

14

"appropriate person" because MSAD 40/RSU 40 "chose to have the school social worker report to the Director of Student Services rather than the school principal" and he is a mandatory reporter of suspected abuse. *Id.* Lastly, Ms. Wadsworth argues that Officer Spear is an "appropriate person" because MSAD 40/RSU 40's sexual harassment policy advises students that complaints may be made to the police. *Id.*

Ms. Wadsworth next addresses the "deliberate indifference" standard, stating that "[t]he First Circuit has found that a school may be deliberately indifferent when it had notice of the sexual harassment, and 'either did nothing or failed to take additional reasonable measures after it learned that its initial remedies were ineffective.'" *Id.* at 7 (quoting *Porto v. Town of Tewksbury*, 488 F.3d 67, 74 (1st Cir. 2007)).

Applying this standard to the facts, Ms. Wadsworth asserts that she "has alleged sufficient facts to show that myriad school officials had knowledge of [Mr.] Cavanaugh's harassment and discrimination of [Ms. Wadsworth] to get beyond the liberal standards of a motion to dismiss." *Id.* at 8. She lists Ms. Pease and Ms. Philbrook as being aware of Mr. Cavanaugh's harassing behavior. *Id.* She argues that as assistant principals they were "building principals" that were required to report the complaints they received to the superintendent, and she says there is no evidence that they did so and this failure to act constitutes deliberate indifference. *Id.* Further, Ms. Wadsworth states, if they did report the complaints to the superintendent, the superintendent took no action to stop Mr. Cavanaugh's

harassment of Ms. Wadsworth.  *Id.*  Although Ms. Pease and Ms. Philbrook spoke to Mr. Cavanaugh about his behavior, Ms. Wadsworth argues, "simply speaking to [Mr.] Cavanaugh" was "[c]learly" ineffective absent follow-up action or reporting, as shown by the fact that "the discrimination continued unabated."  *Id.* at 12-13. Ms. Wadsworth asserts that Ms. Philbrook's request that Officer Spear speak to Mr. Cavanaugh in September 2017, after already trying to stop the behavior through conversation and seeing that remedy be ineffective, was clearly deliberate indifference, and it led to six weeks of continued harassment.  *Id.* at 13.  She argues that even if a jury found that Ms. Pease and Ms. Philbrook acted reasonably when they spoke with Mr. Cavanaugh in 2016, "there was nothing reasonable about the School District's failure to take further action when it was apparent that the harassment continued."  *Id.*  According to Ms. Wadsworth, by September 2017, at the very least, Ms. Pease and Ms. Philbrook knew that Mr. Cavanaugh continued making comments about Ms. Wadsworth's appearance and clothing choices in front of them and others and Ms. Philbrook knew Mr. Cavanaugh purchased Ms. Wadsworth a car. *Id.* at 14.

Ms. Wadsworth also lists Officer Spear as being aware of Mr. Cavanaugh's harassing behavior as of September 20, 2017.  *Id.* at 9.  Ms. Wadsworth alleges that the six-week period after the discovery that Mr. Cavanaugh purchased a car for Ms. Wadsworth, in which Mr. Cavanaugh continued to harass her, is evidence of "the school's deliberate indifference toward the need to promptly stop the harassment suffered by" her.  *Id.*  Next, she lists the superintendent as being aware of the

harassing behavior after Mr. Cavanaugh asked if Ms. Wadsworth could move in with him in June 2017 and argues that the superintendent's failure to investigate for months constitutes deliberate indifference. *Id.* On this claim, she asserts that "[i]f the School District does not conclude that an investigation and remedial measures are warranted when a high school principal, previously accused of sexually harassing a student, later proposes that that student move in with him, it is hard to imagine what circumstances would move the School to take such actions." *Id.* at 14. Lastly, Ms. Wadsworth says Mr. Nguyen became aware of Mr. Cavanaugh's harassment of her when she approached him "numerous times" about it during her junior and senior years and that his failure to act is "yet another example of deliberate indifference that compels the denial of" the motion to dismiss, especially since Mr. Nguyen was a mandatory reporter to Maine's Department of Health and Human Services. *Id.* at 9-10.

Ms. Wadsworth reiterates that in September 2017 "[i]t should have been abundantly clear that [asking Officer Spear to speak with Mr. Cavanaugh] would be ineffective, since the School District had already tried speaking with [Mr.] Cavanaugh and he persisted in his predatory, discriminatory behavior undeterred by any expectation of consequences." *Id.* at 14. She adds that the suspension was more than six weeks after Officer Spear found Ms. Wadsworth driving Mr. Cavanaugh's car and that "[d]uring those six weeks, [Mr.] Cavanaugh continued to sexually harass [Ms. Wadsworth], prolonging her trauma and causing her to miss out on further educational opportunities." *Id.* at 14-15.

17

2.      **Section 1983 Claim**

Ms. Wadsworth acknowledges that to establish school district liability she must demonstrate that "a state employee's discriminatory actions are representative of an official policy or custom of the municipal institution, or are taken by an official with final policy making authority." *Id.* at 15 (quoting *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1249 (10th Cir. 1999)). She asserts that a school district may be liable under § 1983 for "failure to train its employees if the failure to train amounts to deliberate indifference and is closely related to the constitutional injury." *Id.* (citing *Hayden*, 134 F.3d at 456).

Ms. Wadsworth argues that given the lack of reporting to the superintendent in this case, "an inference can clearly be made that either [MSAD 40/RSU 40]'s employees were not trained on its sexual harassment policies at all, or that the training was so inadequate that nobody knew the appropriate steps to take to report harassment." *Id.* at 16. She criticizes MSAD 40/RSU 40's two-part argument, which she characterizes as (1) "notice of sexual harassment to assistant principals is not sufficient under Title IX" and (2) "the fact that it has a sexual harassment policy in place effectively bars [Ms. Wadsworth's] claims under Section 1983," and asserts that "MSAD 40[/RSU 40] does not get to have it both ways." *Id.* According to Ms. Wadsworth, if the only "appropriate person" to receive complaints is the lead principal, then MSAD 40/RSU 40's "policies and training on sexual harassment are deficient" because all of the school personnel known to have complained about Mr. Cavanaugh's behavior reported directly to the assistant principals and "a training

18

policy is deficient on its face if it can result in a situation where the only school employee who can take a complaint of discrimination is the alleged perpetrator of the discrimination." *Id.* at 16-17.

In sum, Ms. Wadsworth asserts, MSAD 40/RSU 40 failed to train school staff on how to report sexual harassment if the lead principal was the bad actor and her damages "stem directly from" this failure. *Id.* at 17.

## C.   MSAD 40/RSU 40's Reply

MSAD 40/RSU 40 admits that the alleged facts are "despicable" but reasserts that it "cannot be liable for the actions of an employee about which it does not have actual knowledge." *MSAD 40's Reply* at 1. In addition to repeating the main points from its motion, MSAD 40/RSU 40 responds to a few of Ms. Wadsworth's arguments.

First, MSAD 40/RSU 40 argues that "talking with a colleague about a concern is entirely different from having the ability to institute corrective action" and thus that Ms. Pease and Ms. Philbrook's conversation with Mr. Cavanaugh is not evidence of their authority to institute corrective action. *Id.* at 2 n.1. Second, MSAD 40/RSU 40 focuses on the text messages and states that no one with authority to institute corrective measures had actual knowledge of the messages. *Id.* at 3. Third, MSAD 40/RSU 40 rejects Ms. Wadsworth's inference from the facts alleged in the Amended Complaint that Mr. Cavanaugh actually asked the superintendent if Ms. Wadsworth could live with him or that the superintendent "knew about the alleged discrimination at all, let alone the extent of it." *Id.* at 4. It adds that it put Mr. Cavanaugh on leave "as soon as an individual with the authority to implement

corrective action gained actual knowledge of [Mr.] Cavanaugh's alleged behavior." *Id.* (citing *Am. Compl.* ¶ 144).

Regarding the § 1983 claim, MSAD 40/RSU 40 asserts that Ms. Wadsworth has not "alleged facts sufficient to show that any School District employee had sufficient knowledge of [Mr.] Cavanaugh's behavior to trigger a requirement for any further reporting or inquiry." *Id.* at 5. It argues that the first time any MSAD 40/RSU 40 employee had "*any* inkling that [Mr.] Cavanaugh had acted in a sexually inappropriate manner toward [Ms. Wadsworth] occurred in September 2017, when Ms. Philbrook allegedly saw an email titled "Pervert Principal," *id.* (emphasis in original) (quoting *Am. Compl.* ¶ 125), and that Ms. Philbrook asking the police to follow up was an appropriate method of reporting under MSAD 40/RSU 40's policy, so it "did not fail to adequately train its employees and cannot be held liable under Section 1983." *Id.*

## IV.   LEGAL STANDARD

Rule 12[b](6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted . . .." FED. R. CIV. P. 12(b)(6). To state a claim, a complaint must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief . . .." FED. R. CIV. P. 8(a)(2). In other words, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausible means "'something more than merely possible' or 'merely consistent with a defendant's liability.'" *Germanowski v. Harris*, 854 F.3d 68, 71-72 (1st Cir. 2017) (internal citation omitted) (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012); *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011)). This is a "'context-specific' job that compels [judges] 'to draw on' [their] 'judicial experience and common sense.'" *Schatz*, 669 F.3d at 55 (quoting *Iqbal*, 556 U.S. at 679).

This is a "two-step analysis . . .." *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015). "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P.R.*, 676, F.3d 220, 224 (1st Cir. 2012)). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)).

## V.   DISCUSSION

MSAD 40/RSU 40's motion to dismiss turns on whether (1) Ms. Wadsworth alleged a viable Title IX  claim by pleading that an appropriate person had actual knowledge of Mr. Cavanaugh's sexual harassment of Ms. Wadsworth and acted with

deliberate indifference and (2) Ms. Wadsworth alleged an actionable § 1983 claim due to MSAD 40/RSU 40's unconstitutional policy and/or failure to train.

### A.    Title IX Claim

Title IX of the Education Amendments of 1972 provides in pertinent part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance....

20 U.S.C. § 1681.  The statute "creates an implied private right of action against federal funding recipients for money damages caused by a recipient's violation of its obligations under the Title." *Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 7 (1st Cir. 2020). "Such a violation can occur when a Title IX funding recipient is deliberately indifferent to known acts of sexual harassment of a student by a teacher." *Id.* (citing *Gebser*, 524 U.S. at 287-88).  This standard requires "actual notice to an 'appropriate person,' 20 U.S.C. § 1682, who is 'an official of the recipient entity with authority to take corrective action to end the discrimination.'" *Id.* (quoting *Gebser*, 524 U.S. at 290).  In the educational context, courts should consider whether the school district "had notice of the sexual harassment, and either did nothing or failed to take additional reasonable measures after it learned that its initial remedies were ineffective." *Porto*, 488 F.3d at 73-74 (citing *Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999)).

The deliberate indifference standard also requires that "the funding recipient's actions—or failure to act—caused the student's subsequent harassment in some way or made the student 'liable or vulnerable' to harassment." *Pawtucket*, 969 F.3d at 9

(citing *Davis ex rel. Lashonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 645 (1999)). The causal requirement is broader than simple but-for causation, and allegations of "post-notice interactions between the victim and the harasser" can theoretically form a basis for a Title IX claim. *Id.* (quoting *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172-73 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009)). There is no causal relationship between an act of sexual harassment and the school officials' subsequent alleged indifference to that act; however, the plaintiff "may be able to make out a claim under Title IX based on the school's indifference from that point forward . . .." *Id.*

"[S]ome degree of severity or pervasiveness must be present in order for harassment to result in 'exclu[sion]' or 'discrimination' under Title IX. *Id.* at *15 (quoting 20 U.S.C. § 1681(a)). Student-on-student harassment "need only be severe enough to 'undermine[] and detract[] from the victim's educational experience' such that the victim is 'effectively denied equal access to an institution's resources and opportunities.' *Id.* at 10 (alterations in original) (quoting *Davis*, 526 U.S. at 651). Moreover, "[c]onduct that might not be actionable under Title IX if perpetrated by a student might be deemed more likely to exclude, or discriminate against, the potential targets of the conduct if perpetrated by a person in authority." *Id.* at 11.

Ms. Wadsworth lists five school officials that she argues had the requisite authority and actual knowledge to hold MSAD 40/RSU 40 liable under Title IX and acted with deliberate indifference: Ms. Philbrook, Ms. Pease, the superintendent, Mr.

23

Nguyen, and Officer Spear.[4]  *Pl.'s Opp'n* at 11-12.  The Court concludes that, based on the alleged facts, one, and possibly two, of these individuals had the necessary authority, knowledge, and deliberate indifference to support Ms. Wadsworth's Title IX claim.

### 1.   Assistant Principals Tamra Philbrook and Linda Pease (2016)

MSAD 40/RSU 40 asserts that Ms. Philbrook and Ms. Pease were not "appropriate persons" with the authority to institute corrective measures to end the discrimination because nothing in its policy indicated that they had such authority and they cannot have such authority over their boss.  *MSAD 40's Mot.* at 8-9.  Ms. Wadsworth argues that Ms. Philbrook and Ms. Pease were "appropriate persons" because of their positions as assistant principals and because they spoke to Mr. Cavanaugh about the school employees' concerns about his relationship with Ms. Wadsworth.  *Pl.'s Opp'n* at 11.  MSAD 40/RSU 40 responds that the conversation Ms. Philbrook and Ms. Pease had with Mr. Cavanaugh is "entirely different from having the ability to institute corrective action."  *MSAD 40's Reply* at 2.

Various courts have held or suggested that assistant principals qualify as "appropriate persons" under Title IX.  *See McCann on behalf of J.M. v. York Sch. Dep't*, 365 F. Supp. 3d 132, 142 (D. Me. 2019) (finding that an assistant principal was an "appropriate person" under Title IX because he or she had "disciplinary authority

---

[4]      Ms. Wadsworth does not list Mr. Cavanaugh here.  Since MSAD 40/RSU 40 addresses the possible argument that Mr. Cavanaugh had actual knowledge, *MSAD 40's Mot.* at 6, the Court notes that Ms. Wadsworth would not be able to make her claim based on his authority because "the knowledge of the wrongdoer himself is not pertinent to the analysis.  *Gebser*, 524 U.S. at 291.

over students enrolled at the school"); *Doe v. Sch. Bd. of Miami-Dade Cty.*, 403 F. Supp. 3d 1241, 1258 (S.D. Fla. 2019) (finding that, on the plaintiff's allegations, the principal and assistant principals of the plaintiff's high school had the authority to address the harassment and institute corrective measures); *Lansberry v. Altoona Area Sch. Dist.*, 318 F. Supp. 3d 739, 751 (W.D. Pa. 2018) ("Lansberry failed to allege that any 'appropriate person' at [the school district] had 'actual knowledge' of sexual harassment suffered by W.J.L.  Lansberry does not allege that the superintendent, or principal, or assistant principal knew about any sexual harassment").  While the "appropriate person" determination is a "fact-based inquiry," *Plamp*, 565 F.3d at 457 (quoting *Murrell*, 186 F.3d at 1247), these cases are instructive on the general level of authority of assistant principals.

None of these cases presents a situation where the perpetrator of the harm is the principal of the school.  However, the Court agrees with Ms. Wadsworth that it cannot be true that the only "appropriate person" under Title IX is the person committing the harassment.  As the Third Circuit pointed out in *Warren*, a holding that required a plaintiff to "prove that members of the school's governing body, perhaps even a voting majority of those members, knew of the improper conduct . . . . would undermine the private cause of action under Title IX that the Court found in *Cannon*[ *v. Univ. of Chi.*, 441 U.S. 677 (1979)], and eliminate the protection Congress intended for students in schools receiving Title IX fund." *Warren*, 278 F.3d at 170.  Thus, in this situation, where the most obvious "appropriate person" is the alleged perpetrator, common sense requires another "appropriate person."  Ms.

Philbrook and Ms. Pease are clear choices, as evidenced by Mr. Cavanaugh's assistant, teachers, and later the school resource officer all reporting the possible sexual harassment to them. For purposes of this motion to dismiss, the Court finds that Ms. Philbrook and Ms. Pease were "appropriate persons."

The next question is whether Ms. Philbrook and Ms. Pease had actual knowledge of possible sexual harassment. It is true that they did not know about Mr. Cavanaugh's text messages with Ms. Wadsworth, *MSAD 40's Reply* at 3, but Ms. Wadsworth has provided other factual allegations which plausibly establish the assistant principals knew about Mr. Cavanaugh's misconduct. The first alleged instance of actual knowledge was in 2016 after Mr. Cavanaugh's assistant and Ms. Wadsworth's teachers complained to Ms. Philbrook and Ms. Pease about Mr. Cavanaugh requiring Ms. Wadsworth to miss class to meet with him in his office and asking his assistant to not make the excusals part of Ms. Wadsworth's school record. *Am. Compl.* ¶¶ 37-39. By this time, Wadsworth alleged that Ms. Philbrook and Ms. Pease had heard Mr. Cavanaugh make comments about Ms. Wadsworth's looks and clothing. *Id.* ¶ 41. *Gebser* suggests that inappropriate comments alone are not enough to establish actual knowledge of improper sexual harassment or conduct. 524 U.S. at 291 (holding that "'inappropriate comments' made during class were insufficient to alert a school official to the possibility that the teacher was involved in a sexual relationship with the student").

Here, however, Ms. Wadsworth has painted a more detailed picture: Ms. Philbrook and Ms. Pease heard Mr. Cavanaugh make comments about Ms.

26

Wadsworth's looks and clothing, may have seen him give her personal hygiene products, heard from Ms. Wadsworth's teachers that he was pulling her out of their classes to meet with him, and heard from Mr. Cavanaugh's assistant that he did not want a record of these meetings. *Am. Compl.* ¶¶ 24-25, 37-39, 41.

Sometime during Ms. Wadsworth's junior year, Ms. Wadsworth alleges that Ms. Philbrook and Ms. Pease spoke to Mr. Cavanaugh about his "inappropriate relationship" with Ms. Wadsworth. *Id.* ¶ 40. Ms. Wadsworth's Amended Complaint later explains the basis for this allegation. In paragraph 120, Ms. Wadsworth alleges that Officer Spear pulled her over for speeding and discovered that she was driving a motor vehicle registered to Mr. Cavanaugh. *Id.* ¶ 120. Officer Spear was "concerned about the fact that Plaintiff was driving a vehicle registered to Defendant Cavanaugh" and he "immediately notified assistant principal Tamra Philbrook" of this fact and his concern. *Id.* ¶121. Ms. Wadsworth alleges that Ms. Philbrook "advised Officer Spear that both she and another assistant principal, Linda Pease, had spoken with Defendant Cavanaugh about his inappropriate behavior toward Plaintiff during the previous year." *Id.* ¶ 122. Ms. Philbrook's response to Officer Spear is evidence that both Ms. Philbrook and Ms. Pease were aware that Mr. Cavanaugh had acted inappropriately toward Ms. Wadsworth during her junior year, had concluded that his behavior was enough out of the ordinary to require a conversation with Mr. Cavanaugh, and that they were concerned enough to follow through and speak to Mr. Cavanaugh about their concerns.

*Pawtucket* is instructive on this issue.  As *Pawtucket* indicates, communicating with other parties about suspected sexual harassment or wrongdoing, gives rise to a permissible inference that the communicator had actual knowledge of the harassment.  *See* 969 F.3d at 7 (inferring that the school had actual knowledge because they called the police after the incident).   Taken together, the Court concludes that Ms. Wadsworth has plausibly alleged Ms. Pease and Ms. Philbrook had actual knowledge of possible sexual harassment.  Therefore, she has met her burden on actual knowledge at the motion to dismiss stage.

At this juncture it bears emphasis that the Court does not know exactly what Ms. Philbrook and Ms. Pease heard, how many teachers complained, what the teachers said when they complained, how Ms. Philbrook and Ms. Pease characterized the complaints when they spoke to Mr. Cavanaugh, or how Mr. Cavanaugh responded.  All these facts are relevant to whether they had actual knowledge.  As discovery progresses, it may become evident that Ms. Pease and Ms. Philbrook did not have actual knowledge.  However, the 12(b)(6) pleading standard under *Iqbal* requires mere plausibility, not factual certainty.  Thus, for now, Ms. Wadsworth has met her burden and plausibly alleged actual knowledge.

The third question is whether Ms. Philbrook and Ms. Pease acted with deliberate indifference by speaking only to Mr. Cavanaugh about the concerns and doing nothing else.  The Complaint contains only bare outlines of the District's sexual harassment policy and the obligations on persons to report such harassment to those

in authority.   The general obligation is set forth in paragraph seventeen of the
Amended Complaint:

> Any individual who believes that a student has been discriminated
> against or harassed should report their concern promptly to the building
> principal . . . School staff will report possible incidents of discrimination
> or harassment of students to the building principal.

*Am. Compl.* ¶ 17.  The policy further states:

> Building principals will promptly inform the Superintendent and the
> person(s) who is the subject of the complaint that a complaint has been
> received.

*Id.* ¶ 18 (emphasis in *Am. Compl.* deleted).  The Amended Complaint does not quote
but paraphrases the next provision: that the policy instructs complainants to report
the harassment or discrimination to that person's immediate supervisor and that
such person receiving the complaint must immediately report it to the
Superintendent.  *Id.* ¶ 22.  The Amended Complaint further alleges that the policy
provides that "building principals are required to report suspected harassment and
discrimination to the Superintendent."  *Id.* ¶ 167.

In the Court's view, the District designed these provisions to make certain that
complaints of harassment are reported through the chain of command to the
Superintendent so that the chief executive officer of the District could investigate and
resolve the complaint.  Where, as here, the alleged harasser is in the chain of
command, the Court is skeptical whether the Assistant Principals satisfied their
reporting obligations under the policy by reporting the harassment only to the alleged
harasser.  While the Assistant Principals' actions might be construed as technically
within the letter of the District's sexual harassment policy, they are arguably

29

inconsistent with its primary objective: to ensure that all concerns of sexual harassment are reported to the District's Superintendent. By necessity, when the building's principal is the alleged harasser, the spirit of the policy might be fairly construed to require school staff to skip rungs in the chain of command. For instance, the school staff might have a duty to assure that the Principal reported the harassment to the Superintendent. Alternatively, they might be obligated to go directly to the Superintendent themselves.

Moreover, by September 2017, Assistant Principal Philbrook at least was aware that the conversation she and Ms. Pease had with Mr. Cavanaugh had not altered Mr. Cavanaugh's behavior. Even assuming the Assistant Principals could argue that they fulfilled the technical requirements of the sexual harassment policy by speaking during Ms. Wadsworth's junior year to her harasser, by September 2017, they had to know that their conversation with Mr. Cavanaugh had not stopped his inappropriate relationship with Ms. Wadsworth. In view of the terms of the sexual harassment policy, it is difficult to reconcile the decision merely to tell Officer Spear to speak with Mr. Cavanaugh and not report this relationship up the chain of command as of September 2017.

To sum up, mere compliance with the letter of the sexual harassment policy does not make it implausible that the Assistant Principals were deliberately indifferent to the sexual harassment. This is especially true when the person to whom they reported was the alleged harasser who might just ignore their report. In the context of this motion, in the Court's view, this issue of whether the Assistant

Principals acted within the District's policy prevents dismissal of the lawsuit at this stage in the litigation. Viewed another way, the Court does not regard MSAD 40/RSU 40's argument that because Assistant Principals Philbrook and Pease complied with the literal language and not the obvious intent of the District's harassment policy by reporting the harassment only to the alleged harasser to provide a basis for dismissal.

Even assuming their report to Mr. Cavanaugh could be justified under the chain of command of the District policy, a harder question is how long the Assistant Principals' actions remained reasonable. The Amended Complaint does not allege a specific date for the conversation among Assistant Principals Philbrook and Pease and Mr. Cavanaugh. It says only that the conversation took place "during Plaintiff's junior year of high school, the 2016 school year." *Am. Compl.* ¶ 38. Since Ms. Wadsworth does not know and did not plead what happened during this conversation and how Mr. Cavanaugh reacted, it is unclear whether Ms. Philbrook and Ms. Pease knew or should have known that the conversation was ineffective at stopping the sexual harassment. If and when they knew, *Porto* suggests that their failure to take additional reasonable measures beyond merely reporting sexual harassment to the alleged harasser could plausibly constitute deliberate indifference. *See Porto*, 488 F.3d at 73-74. The timeframe of Mr. Cavanaugh's continued comments about Ms. Wadsworth's looks and clothing choices and continued requests for her to come to his office is not well-defined, but the Court can reasonably infer, looking at the facts in the light most favorable to Ms. Wadsworth, that these actions happened before and after Ms. Philbrook and Ms. Pease's conversation with Mr. Cavanaugh and thus that

Ms. Philbrook and Ms. Pease knew at some point before November 2017 that their conversation had not adequately stopped Mr. Cavanaugh's actions toward Ms. Wadsworth.

Since the failure to take additional measures, such as reporting the sexual harassment to the superintendent or police, allowed Mr. Cavanaugh to continue interacting with and harassing Ms. Wadsworth for another year, Ms. Wadsworth has plausibly pleaded the causal element of deliberate indifference. If Ms. Wadsworth is correct that Mr. Cavanaugh asked the superintendent if she could move in with him, Ms. Philbrook and Ms. Pease's failure to report to the superintendent also prevented the superintendent from being on alert regarding Mr. Cavanaugh, which might have led to intervention at the time of the moving request. Moreover, Ms. Wadsworth alleged that Mr. Cavanaugh's harassment took her out of class, stopped her from studying during and after school hours, and caused her to not come to school due to ridicule and depression in the aftermath. These allegations are sufficient to support the claim that she was denied equal access to Medomak Valley High School's resources and opportunities. Accordingly, Ms. Wadsworth has alleged a viable Title IX claim.

### 2. Assistant Principal Tamra Philbrook (2017)

Even if Ms. Philbrook and Ms. Pease's actions during 2016 were not as a matter of law deliberately indifferent, which discovery may reveal to be true, Ms. Philbrook's response to Officer Spear, a county law enforcement officer and school resource officer, when he told her about Ms. Wadsworth driving Mr. Cavanaugh's car is more

likely to constitute deliberate indifference.  Knowing everything that occurred in 2016 and having already attempted to speak with Mr. Cavanaugh about his relationship with Ms. Wadsworth once, Ms. Philbrook learned in September 2017 that Ms. Wadsworth was driving Mr. Cavanaugh's car.  When Officer Spear expressed his concern about this fact, Ms. Philbrook decided that the best course of action was to have Officer Spear speak to Mr. Cavanaugh, rather than to report the behavior.

Though the Amended Complaint does not describe what Officer Spear and Mr. Cavanaugh spoke about, Officer Spear's takeaway was that Mr. Cavanaugh was a "Pervert Principal," and he told Ms. Philbrook about "the results of the conversation" immediately.  *Am. Compl.* ¶¶ 124-25.  He also shared his email to the Waldoboro Police Chief with Ms. Philbrook, and in this email he stated that he had seen Ms. Wadsworth leave Mr. Cavanaugh's office more than any other student.  *Id.* ¶¶ 126, 128.  Yet, on the pleadings, Ms. Philbrook did not take any action to investigate the situation after asking Officer Spear to speak with Mr. Cavanaugh, knowing that her last attempt to end the harassment by speaking with Mr. Cavanaugh was ineffective.

While Ms. Philbrook may have thought the police were investigating the activity, the Court cannot conclude, based only on the allegations of the Amended Complaint that her reliance on Officer Spear mandates dismissal.  By September 2017, Assistant Principal Philbrook was aware that: (1) there had been prior allegations of Mr. Cavanaugh's harassment, (2) these allegations were serious enough for Assistant Principal Pease and herself to report the allegations to Mr. Cavanaugh sometime in the 2016 school year, and (3) as of September 2017, Mr. Cavanaugh's

unusual relationship with a female student had intensified to the point where he was allowing her to drive his car. Furthermore, during the next six weeks, Assistant Principal Philbrook's failure to act allowed Mr. Cavanaugh to continue texting Ms. Wadsworth inappropriate things, such asking her if she had had her first orgasm yet. *Id.* ¶ 131. On these alleged facts, Ms. Philbrook's failure to take additional action meets the deliberate indifference standard and Ms. Wadsworth's Title IX claim survives dismissal.

### 3.     The Superintendent

Ms. Wadsworth asserts that the superintendent is an "appropriate person" under Title IX, was aware of Mr. Cavanaugh's sexual harassment after Mr. Cavanaugh asked if Ms. Wadsworth could move in with him, and acted with deliberate indifference by failing to investigate for months. *Pl.'s Opp'n* at 9,11. MSAD 40/RSU 40 rejects Ms. Wadsworth's inference from the facts alleged in the Amended Complaint that Mr. Cavanaugh actually asked the superintendent if Ms. Wadsworth could live with him or that the superintendent "knew about the alleged discrimination at all, let alone the extent of it." *MSAD 40's Reply* at 4.

The Amended Complaint alleges that on May 18, 2017, Mr. Cavanaugh texted Ms. Wadsworth about the possibility of her moving in with him and his wife during her upcoming senior year. *Am. Compl.* ¶ 86. He texted that he "would write a letter to the superintendent and all that." *Id.* On June 22, 2017, Mr. Cavanaugh texted to Ms. Wadsworth that he had "a bit of bad news," that he had "spoken with work about

you staying with me," and that he "can[']t," and that he felt "terrible about it but that[']s what it is." *Id.* ¶ 96.

The Court, in making all reasonable inferences in Ms. Wadsworth's favor, concludes that it is plausible that Mr. Cavanaugh meant the Superintendent when he said he "spoke with work" after telling her he would ask the Superintendent. *Am. Compl.* ¶¶ 86, 96. This inference does not mean, however, that the Superintendent had actual knowledge of sexual harassment. A principal might ask a school district if a student can stay with him or her for legitimate reasons, such as if the student had a hard home life that impacted the student's ability to complete schoolwork and participate in school activities. Moreover, unlike when Mr. Cavanaugh asked his assistant not to put his frequent meetings with Ms. Wadsworth on her school record, Mr. Cavanaugh did not attempt to hide his desire that Ms. Wadsworth stay with him. There is no evidence that the Superintendent had any other knowledge about Mr. Cavanaugh's relationship with Ms. Wadsworth. This is not enough to plausibly establish actual knowledge of sexual harassment. Additionally, according to Mr. Cavanaugh's text message, whoever he asked about having Ms. Wadsworth move in with him said that he could not do so, which is a reasonable response to the request without further knowledge of Mr. Cavanaugh's improper relationship with Ms. Wadsworth. Thus, Ms. Wadsworth's claim based on the Superintendent's knowledge and actions fails.[5]

---

[5]      This conclusion highlights the inadequacy of Assistant Principal Philbrook and Pease's report to Mr. Cavanaugh of his harassment of Ms. Wadsworth as it appears the Superintendent who should have received the report under the District's policy, was apparently unaware of it.

### 4.   Social Worker Chuck Nguyen and School Resource Officer Christopher Spear

Ms. Wadsworth did not sufficiently plead that Mr. Nguyen and Officer Spear are "appropriate persons" with the authority to institute corrective measures under Title IX, so she cannot base her Title IX claims on their actions.   The Amended Complaint alleged that Mr. Nguyen had a direct supervisor—the Director of Social Services.  *Am. Compl.* ¶ 14.   Thus, upon hearing a sexual harassment complaint, he had to report it to either the principal or the Director of Social Services.  *Id.* ¶¶ 17, 22.   This chain of command did not put him in a position to institute corrective measures over a sexual harassment complaint against the Principal.   Moreover, the First Circuit has found that a social worker was not an "appropriate person," at least when the alleged perpetrator was the employee of an outside vendor.  *Santiago*, 655 F.3d at 74.   The First Circuit cited two cases from other circuits that held that social workers were not "appropriate persons" when there was no evidence they had control over the alleged perpetrator.  *Id.* (citing *Plamp*, 565 F.3d at 457-58; *Warren*, 278 F.3d at 173-74).   Though not determinative for the facts here, these cases support the view that where there is no evidence that Mr. Nguyen had authority over Mr. Cavanaugh, he was not an "appropriate person" under Title IX.   The same analysis applies to Officer Spear, who upon learning of Mr. Cavanaugh's possible sexual harassment, reported it to Assistant Principal Philbrook, followed her orders, and reported the results back to her.   Ms. Philbrook and Ms. Pease, in contrast, were the closest in

position to Mr. Cavanaugh and were seen by teachers, staff members, and Officer Spear as the people to handle this kind of complaint.

## B.    Section 1983 Claim

Section 1983 provides that

> [e]very person who, under color of [law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ..

42 U.S.C. § 1983.  Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  *Graham v. Connor*, 490 U.S. 386, 389-94 (1989).  The Section 1983 cause of action has two elements.  First, a plaintiff must show deprivation of a federally protected right, privilege, or immunity and a causal connection between the conduct complained of and the deprivation.  *See Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 559 (1st Cir. 1989).   Second, a plaintiff must establish that "the perpetrator of the violation was acting under color of law."  *Cruz-Erazo v. Rivera-Montañez*, 212 F.3d 617, 621 (1st Cir. 2000).

### 1.    Equal Protection Claim

The Fourteenth Amendment's Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  Ms. Wadsworth alleges that MSAD 40/RSU 40 is liable for an equal protection violation under § 1983 on two grounds: (1) "its failure to follow, apply, or enforce laws preventing harassment and discrimination in

schools" and (2) "its failure to adequately train or supervise employees about their obligation to properly investigate and address incidents of sexual harassment in public schools." *Am. Compl.* ¶ 177.

MSAD 40/RSU 40 is a municipal department. Under *Monell* and its progeny, municipalities and their departments are liable only for constitutional violations arising from municipal policies. *See Connick v. Thompson*, 563 U.S. 51, 60 ("A municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978)). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61; *see also Doe v. Reg'l Sch. Unit No. 21*, No. 2:19-00341-NT, 2020 WL 2820197, at *4 (D. Me. May 29, 2020) (citing *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989)). In short, municipal liability can only arise from a municipal act. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) ("*Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' – that is, acts which the municipality has officially sanctioned or ordered."). Municipal liability cannot arise from vicarious liability. *See id. at* 478 ("[A] municipality cannot be made liable by application of the doctrine of *respondeat superior*."). Rather, municipalities are responsible "only for their own unconstitutional acts"; there is no vicarious liability under § 1983 for the actions of a

municipality's "non-policymaking employees." *Haley*, 657 F.3d at 51. The "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Canton*, 489 U.S. at 385. The policy must be the "'moving force' behind the alleged violation of constitutional rights." *Hayden*, 134 F.3d at 456 (quoting *Monell*, 436 U.S. at 694).

These principles provide the framework within which Ms. Wadsworth's equal protection challenge must fit to survive MSAD 40/RSU 40's Motion to Dismiss. Her Amended Complaint advances two viable *Monell* claims. The first ground is that the school district's sexual harassment reporting policy was itself the "moving force" behind the alleged equal protection violation. The second is a failure-to-train claim. She claims that the school district's failure to properly train its employees on issues of sexual harassment and proper reporting was itself a policy giving rise to deprivation of her rights under the Fourteenth Amendment. The Court concludes that Ms. Wadsworth sufficiently pleaded facts to support an equal protection violation under § 1983 based on both grounds. MSAD 40/RSU 40 does not discuss the merits of either equal protection claim in particular, so the Court limits the scope of its analysis to the basis for municipal liability.

### a.   Unconstitutional Policy Claim

In the present case, there is a factual dispute central to the § 1983 claim: the meaning of "building principal" in the school sexual harassment policy. The parties agree that MSAD 40/RSU 40 has a sexual harassment policy which instructs staff

39

and students to report possible sexual harassment and discrimination to "the building principal" and instructs "[b]uilding <u>principals</u>" to notify the superintendent of the complaint. *Am. Compl.* ¶ 18 (emphasis in *Am. Comp.* deleted).  MSAD 40/RSU 40 asserts that the term is singular and applies only to the individual building principal, not assistant principals. *MSAD 40's Mot.* at 8-9.  Ms. Wadsworth asserts that that the term "building principal" includes the assistant principals, in part because the policy uses the plural at least once. *See Pl.'s Opp'n* at 16.  In response to this disagreement, Ms. Wadsworth argues that under MSAD 40/RSU 40's interpretation, the sexual harassment policy is deficient on its face because "it can result in a situation where the only school employee who can take a complaint of discrimination is the alleged perpetrator of the discrimination." *Id.* at 16-17.[6]

Though Ms. Wadsworth explains this unconstitutional policy claim in a roundabout way, the Amended Complaint encompasses this type of claim in stating that MSAD 40/RSU 40 failed to "follow, apply, or enforce laws preventing harassment and discrimination in schools . . .." *See Am. Compl.* ¶ 177.  The sexual harassment policy qualifies as an official municipal policy since it is the result of policymakers' acts.  Further, Ms. Wadsworth sufficiently alleged that it was a direct cause of her damages. *See Am. Compl.* ¶ 178.

---

[6]    Ms. Wadsworth also argues that under MSAD 40/RSU 40's interpretation of "building principal," the training program was deficient because all the school personnel known to have complained about Mr. Cavanaugh's behavior brought their complaints to the assistant principals instead of Mr. Cavanaugh. *Id.* at 17.  The Court discusses this claim in the failure to train section below.

Under MSAD 40/RSU 40's interpretation of "building principal," the sexual harassment policy as written has a glaring hole: the building principal can act with impunity because he or she stands between a school official reporting possible sexual harassment and the superintendent receiving the report.  As alleged in the Amended Complaint, the District harassment policy contains no provision for what a reporting individual is supposed to do under the terms of the policy when the individual to whom he or she is supposed to report is the alleged harasser.  Here, MSAD 40/RSU 40 asserts that Assistant Principals Philbrook and Pease can fully comply with the policy by reporting Mr. Cavanaugh's harassment to him.

Ms. Wadsworth's case exemplifies the danger that this hole poses to Medomak Valley's students.  As alleged, multiple school staff members noticed Mr. Cavanaugh's inappropriate behavior towards and concerning Ms. Wadsworth, including calling her into his office during her classes and asking his assistant not to note the absences on her record.  The staff members were concerned enough of this behavior to report it to the assistant principals.  Since the assistant principals were supposed to report to the principal, in this case the perpetrator, the chain of reporting ended there.  Ms. Philbrook and Ms. Pease spoke to Mr. Cavanaugh about the concerns, but when that proved ineffective, their job was done under the terms of the policy, and Ms. Wadsworth was left to suffer sexual harassment from Mr. Cavanaugh until the following November.  The reporting provisions of the policy may have also encouraged Mr. Cavanaugh to continue sexually harassing Ms. Wadsworth since nothing happened to him even after multiple staff reports.

41

At this stage of litigation, these facts support a plausible causal link between the sexual harassment policy and Mr. Cavanaugh's continued harassment, and this causal link is strong enough to survive a motion to dismiss. Taking Ms. Wadsworth's argument to the next logical step, MSAD 40/RSU 40's interpretation of "building principal" makes the sexual harassment policy the moving force behind the equal protection violation because the inability for school officials to effectively report Mr. Cavanaugh's harassing behavior toward Ms. Wadsworth caused Ms. Wadsworth to be subjected to sexual harassment for about a year after the first attempted reports.

The Court must make all reasonable inferences in favor of Ms. Wadsworth as the nonmovant. Normally, this would mean that the Court would accept Ms. Wadsworth's interpretation of the school policy for purposes of this Order, as it has done in finding that Ms. Philbrook and Ms. Pease are "appropriate persons" under the Title IX claim. However, since MSAD 40/RSU 40's understanding of the policy opens the door for a viable § 1983 claim, the Court refrains from making an inference in either direction here. Instead, the Court denies the motion to dismiss the § 1983 claim on unconstitutional policy grounds. Further discovery may uncover the intended meaning of "building principal," allowing the Court or a jury to make a better-informed judgment at the summary judgment or trial stage.[7]

---

[7]    The Amended Complaint also laid out a policy for employee complaints of harassment and discrimination. *Am. Compl.* ¶ 20-22. This policy instructs an employee "to report the harassment or discrimination to that person's immediate supervisor or the building principal, and that such person receiving the complaint must immediately report it to the Superintendent." *Id.* ¶ 22. It also allows an employee "to report complaints to the Maine Human Rights Commission and/or the federal office of Civil Rights." *Id.* The Court is unsure how the employee policy interacts with the Student Discrimination and Harassment Complaint Procedure, and neither party discusses these dual potential report lines. Further discovery may be beneficial to resolve this issue. As to the ability to report outside of the school, the Court does not view this as a way out of lead principal impunity issue

MSAD 40/RSU 40 also argues that Ms. Wadsworth failed to show that "any School District employee had sufficient knowledge of [Mr.] Cavanaugh's behavior to trigger a requirement for any further reporting or inquiry." *MSAD 40's Reply* at 5. The Court rejected the premise of this argument in its discussion of the Title IX claim. Moreover, MSAD 40/RSU 40's argument is belied by the alleged facts, since school employees did report possible sexual harassment to the Assistant Principals and they considered the allegations sufficiently grave to bring them to Mr. Cavanaugh's attention. Moreover, the actual knowledge of the employees does not matter because had the policy included assistant principals under "building principal," Ms. Philbrook and Ms. Pease would have been required to report the complaints to the Superintendent.

### b.   Failure to Train Claim

"There are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *Canton*, 489 U.S. at 387. As the Supreme Court has cautioned, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. "[T]he inadequacy of . . . training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of the persons with whom the [officials] come into contact." *Canton*, 489 U.S. at 388. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61

---

because the focus of this analysis is who within MSAD 40/RSU 40' school system can hear sexual harassment complaints.

(quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 410 (1997)); *see also Hayden*, 134 F. 3d at 456 ("The liability criteria for 'failure to train' claims are exceptionally stringent").   "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by [the Supreme Court's] previous cases—can a city [or school district] be liable for such a failure under § 1983." *Canton*, 489 U.S. at 390.

Deliberate indifference also requires showing that municipal policymakers had "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights . . . ." *Connick*, 563 U.S. at 61.   Ordinarily, this requires a plaintiff to demonstrate "[a] pattern of similar constitutional violations by untrained employees . . . ." *Id.* at 62 (citing *Brown*, 520 U.S. at 409); *see also Haley*, 657 F.3d at 52 ("Triggering municipal liability on a claim of failure to train requires a showing that municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies").   The United States Supreme Court in *Canton* left open the possibility that a consequence of failing to train might be so obvious that a pattern of similar violations might not be necessary to show deliberate indifference, but the Supreme Court since explained that this "hypothesized single-incident liability" applies to a "narrow range" of situations, such as training police officers on the constitutional limitation to the use of deadly force.   *Id.* at 63-64 (citing *Brown*, 520 U.S. at 409).   It does not, for example, apply to the failure of a prosecutor's office to adequately train attorneys in their

*Brady*[8] obligations, particularly when the failure to train is on a "specific scenario related to the violation in [the] case," because "attorneys, unlike police officers, are equipped with the tools to find, interpret, and apply legal principles." *Id.* at 63-70.

"In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Canton*, 489 U.S. at 390. Inadequate training of a single official will not alone establish liability on the municipality. *Id.* at 390-91. "Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury." *Id.* at 391.

Here, Ms. Wadsworth claims that MSAD 40/RSU 40 failed to train its employees on how to handle a situation in which the lead principal is the alleged perpetrator regardless of which interpretation of the sexual harassment policy prevails. Under MSAD 40/RSU 40's interpretation of "building principal," since all the school personnel known to have complained about Mr. Cavanaugh's behavior brought their complaints to the assistant principals rather than to Mr. Cavanaugh as lead principal, it is a reasonable conclusion that the training procedures were deficient. Under Ms. Wadsworth's interpretation, since MSAD 40/RSU 40 says the assistant principals did not notify the superintendent of the complaints of Mr. Cavanaugh's possible sexual harassment, "an inference can clearly be made that either [MSAD 40/RSU 40's] employees were not trained on its sexual harassment policies at all, or that the training was so inadequate that nobody knew the

---

[8]     *Brady v. Maryland*, 373 U.S. 83 (1963).

appropriate steps to take to report harassment," particularly when the school principal is the alleged sexual harasser. *Pl.'s Opp'n* at 16-17. Ms. Wadsworth argues these facts fall within the framework of *Canton*. *Id.* at 17.

Ms. Wadsworth's claim under either interpretation must meet the "exceptionally stringent" deliberate indifference standard for failure to train claims. She did not allege a "pattern of similar constitutional violations by untrained employees," which is usually required to show actual or constructive notice. *Connick*, 563 U.S. at 62 (citing *Brown*, 520 U.S. at 409). In fact, neither party mentions this requirement at all. Though both framings of the failure to train claim involve multiple MSAD 40/RSU 40 employees failing to report as required by the sexual harassment policy, this kind of a pattern is unhelpful for showing notice because policymakers for MSAD 40/RSU 40 did not know that multiple employees were failing to report to the right person. The pattern necessary for notice is a pattern of past constitutional violations based on the same training deficiency alleged in the case at hand. There is no evidence of other students in the school district bringing harassment or discrimination claims based on the lead principal's actions and MSAD 40/RSU 40's failure to train its employees on how to deal with this situation.

Thus, for her claim to be actionable, Ms. Wadsworth's pleaded facts must fit into the "narrow range" of situations that qualify for the *Canton* Court's "hypothesized single-incident liability." *Connick*, 563 U.S. at 63-64 (citing *Brown*, 520 U.S. at 409). The *Canton* Court suggested that training police officers on the constitutional limitations of deadly force was an example of a situation that did not

require a pattern of similar constitutional violations. *Canton*, 489 U.S. at 390 n.10. The First Circuit allowed a failure to train claim to survive a motion to dismiss when the plaintiff alleged that a police department's unconstitutional suppression of exculpatory evidence "was precipitated by poor training, to which the City was deliberately indifferent." *Haley*, 657 F.3d at 52. Similarly, a District of Maine court found that a failure to train claim survived a motion to dismiss when the plaintiff alleged that the school district's failure to train and supervise its employees resulted in a deficient investigation of allegations that a teacher was engaging in sexual conduct with a student. *Doe*, 2020 WL 2820197, at *4. However, the First Circuit has also rejected failure to train claims absent evidence of past violations at the summary judgment stage. *See, e.g.*, *Gray v. Cummings*, 917 F.3d 1, 13-14 (1st Cir. 2019) (holding that the plaintiff's claim that the town failed to train its police officers on proper protocols for interacting with persons suffering from mental illness "flounder[ed]" because the plaintiff did not provide evidence of past violations sufficient to put the town on notice); *Hill v. Walsh*, 884 F.3d 16, 18, 24 (1st Cir. 2018) (holding that a city's alleged failure to train officers to read warrants did not rise to the level of deliberate indifference and the violation—entering the plaintiff's home and causing damage—was "not 'so obviously' the consequence of a systemic lack of training, as opposed to the decisions of individual officers").

Whether Ms. Wadsworth's alleged facts show that her harm was such an obvious consequence of MSAD 40/RSU 40's failure to train its employees on how to report sexual harassment is a close question. Under both interpretations, failure to

47

train school employees about how to report sexual harassment will almost certainly result in a circumstance of sexual harassment being reported incorrectly and not handled quickly or at all. However, MSAD 40/RSU 40 had written policies and procedures detailing how to report possible sexual harassment, so there is an indication that there was some amount of training. The question is how much and what. Additionally, under the first interpretation, it is obvious that a system that gives impunity to lead principals will eventually lead to use of that impunity.

There is similarly not enough evidence to analyze the adequacy of MSAD 40/RSU 40's training program, how many officials received deficient training, or whether the identified deficiency in a city's training program is "closely related to the ultimate injury." *Canton*, 489 U.S. at 391.

Given the close nature of the "single-incident liability" question, the trend of First Circuit and District of Maine courts to view failure to train claims more liberally at the motion to dismiss stage than at the summary judgment stage, and Ms. Wadsworth's lack of access to details of MSAD 40/RSU 40's training program beyond its written policies, the Court errs on the side of caution and denies the motion to dismiss the failure to train claim in hopes that discovery will further develop the level of training MSAD 40/RSU 40 provided and which interpretation of the sexual harassment policy controls.

## VI.   CONCLUSION

The Court DENIES Maine School Administrative District 40/Regional School District 40's Motion to Dismiss (ECF No. 21).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 29th day of October, 2020