UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ADRIANNA WADSWORTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:19-cv-00577-JAW |
| | ) | |
| MAINE SCHOOL ADMINISTRATIVE | ) | |
| DISTRICT 40/REGIONAL SCHOOL | ) | |
| UNIT 40 et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MSAD 40/RSU 40'S MOTION FOR SUMMARY JUDGMENT**

A former high school student brought a lawsuit against a school district, a school principal, and a school social worker asserting claims under 20 U.S.C. § 1681(a) (Title IX) and 42 U.S.C. § 1983, as well as state tort claims, stemming from sexual harassment she alleges the school principal committed against her. The school district moves for summary judgment on all claims against it. The Court grants summary judgment on the Title IX claim because there are no genuine issues of material fact that could sustain the plaintiff's contention that an official with the authority to implement corrective measures had actual knowledge of the alleged harassment and acted with deliberate indifference toward her. The Court grants summary judgment on the § 1983 claim because the record similarly does not support her claim that any school district policy or failure to train caused her injuries. Finally, upon consent of the plaintiff, the Court dismisses the state tort claims because the school district is immune from liability under the Maine Tort Claims Act.

## I.   PROCEDURAL HISTORY

On December 27, 2019, Adrianna Wadsworth[1] filed suit against Maine School Administrative District 40/Regional School Unit 40 (RSU 40 or the District),[2] Medomak Valley High School (MVHS), Andrew Cavanaugh, and Chuck Nguyen. *Compl.* (ECF No. 1).  She alleged a violation of Title IX and negligent hiring, training, and supervision against the District and MVHS, brought claims under 42 U.S.C. § 1983, brought common law tort and statutory claims of intentional infliction of emotional distress (IIED) and negligent infliction of emotional distress (NIED) against all the Defendants, and brought a negligence claim against Mr. Cavanaugh and Mr. Nguyen.  *Id.* ¶¶ 134-179.  On February 7, 2020, Mr. Cavanaugh answered the Complaint.  *Def., Andrew Cavanaugh's Answer to Pl.'s Compl. and Demand for Jury Trial* (ECF No. 11).  On March 11, 2020, the District and MVHS filed a motion to dismiss counts one and two of the Complaint.  *Def. MSAD 40/RSU 40's Mot. to Dismiss Counts I and II of Compl.* (ECF No. 12).  On the same day, Mr. Nguyen filed an answer to the Complaint.  *Answer and Affirmative Defenses to Compl. and Jury Trial Demand (Def. Chuck Nugyen)* (ECF No. 13).

---

[1]    Ms. Wadsworth brought this lawsuit in her own name rather than under a pseudonym such as Jane Doe.  Though a balancing of factors is required, a victim of sexual harassment or sexual assault—especially a minor at the time of the offense—often has a privacy interest sufficient to allow the victim to proceed under a pseudonym.  *See, e.g., Doe v. Reg'l Sch. Unit No. 21*, Docket No. 2:19-00341-NT, 2020 WL 2833248, at 1-4 (D. Me. May 29, 2020); *Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. 2011).  However, as an adult, Ms. Wadsworth has an equal right to bring the action under her own name.

[2]    The filings in this case have variously referred to the District as MSAD 40/RSU 40, MSAD 40, or RSU 40.  According to the District, it was formerly known as MSAD 40 but is now known as RSU 40.  *Def. MSAD 40/RSU 40's Statement of Material Facts* ¶ 1 (ECF No. 101) (DSMF) ("Defendant Regional School Unit 40 ("RSU 40") . . . [was] formerly Maine School Administrative District 40").  The Court will refer to this party as RSU 40 or the District.

On March 27, 2020, Ms. Wadsworth filed an amended complaint, dropping MVHS as a defendant. *Pl.'s Am. Compl. and Demand for Jury Trial* (ECF No. 15) (*Am. Compl.*). On April 10, 2020, Mr. Nguyen filed a motion to dismiss the Amended Complaint. *Def. Chuck Nguyen's Mot. to Dismiss Am. Compl.* (ECF No. 16). On April 14, 2020, Mr. Cavanaugh filed an answer to the Amended Complaint. *Def., Andrew Cavanaugh's Answer to Pl.'s Am. Compl. and Demand for Jury Trial* (ECF No. 17).

On May 8, 2020, the District filed a motion to dismiss counts one and two of the Amended Complaint, and on May 11, 2020, it withdrew its first motion to dismiss. *Def. MSAD 40/RSU 40's Mot. to Dismiss Counts I and II of First Am. Compl.* (ECF No. 21);[3] *Def. MSAD 40/RSU 40's Withdrawal of Mot. to Dismiss as Moot* (ECF No. 22). Ms. Wadsworth filed a response on June 8, 2020. *Opp'n of Pl., Adrianna Wadsworth, to Def. MSAD 40/RSU 40's Mot. to Dismiss for Failure to State a Claim* (ECF No. 31). On June 22, 2020, the District replied. *Def. MSAD 40/RSU 40's Reply in Supp. of Mot. to Dismiss* (ECF No. 32).

On October 2, 2020, the Court denied Mr. Nguyen's motion to dismiss, and on October 29, 2020, the Court denied the District's motion to dismiss. *Order on Def. Chuck Nguyen's Mot. to Dismiss* (ECF No. 36); *Order on MSAD 40/RSU 40's Mot. to Dismiss* (ECF No. 39) (*Order on Mot. to Dismiss*). The District filed its Answer to the Amended Complaint on November 13, 2020 and Mr. Nguyen filed his Answer and affirmative defenses on February 4, 2021. *Def. MSAD 40/RSU 40's Answer to Pl.'s*

---

[3]    While the docket entry for this filing includes MVHS in the description, RSU 40 alone filed this motion because the Amended Complaint terminated MVHS as a defendant. *See Am. Compl.* ¶¶ 1-5.

*Am. Compl.* (ECF No. 45); *Answer and Affirmative Defense to Am. Compl. and Jury Trial Demand (Def. Chuck Nguyen)* (ECF No. 49).

On July 27, 2022, the District, Mr. Cavanaugh, and Mr. Nguyen each filed a motion for summary judgment accompanied by a statement of material facts. *Def. MSAD 40/RSU 40's Mot. for Summ. J.* (ECF No. 100) (*Def.'s Mot.*); *Def. MSAD 40/RSU 40's Statement of Material Facts* (ECF No. 101) (DSMF); *Def. Andrew Cavanaugh's Mot. for Summ. J.* (ECF No. 103); *Def. Andrew Cavanaugh's Rule 56 Statement of Material Facts in Supp. of His Mot. for Summ. J.* (ECF No. 104); *Def. Chuck Nguyen's Mot. for Summ. J.* (ECF No. 105); *Def. Chuck Nguyen's Statement of Material Facts in Supp. of Mot. for Summ. J.* (ECF No. 106). On October 19, 2022, Ms. Wadsworth filed an omnibus response to the motions for summary judgment, her own statement of additional material facts, and separate responses to each defendant's statement of material facts. *Pl. Adrianna Wadsworth's Omnibus Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 114) (*Pl.'s Resp.*); *Pl.'s Rule 56 Statement of Material Facts in Supp. of Her Omnibus Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 115) (PSAMF); *Pl.'s Resps. to Def. MSAD 40's Statement of Material Facts in Supp. of its Mot. for Summ. J.* (ECF No. 116) (PRDSMF); *Pl.'s Resps. to Def. Andrew Cavanaugh's Statement of Material Facts in Supp. of His Mot. for Summ. J.* (ECF No. 117); *Pl.'s Resps. to Def. Chuck Nguyen's Statement of Material Facts in Supp. of His Mot. for Summ. J.* (ECF No. 118).

On November 17, 2022, the District filed a reply in support of its motion for summary judgment and a reply to Ms. Wadsworth's statement of additional material

facts.  *MSAD 40/RSU 40's Reply in Supp. of Mot. for Summ. J.* (ECF No. 121) (*Def.'s Reply*); *Def. MSAD 40/RSU 40's Reply Statement of Material Facts* (ECF No. 122) (DRPSAMF).  The following day, Mr. Nguyen and Mr. Cavanaugh each filed their own replies and responses to Ms. Wadsworth's statement of additional material facts.  *Def. Chuck Nguyen's Reply Mem. of Law in Supp. of Mot. for Summ. J.* (ECF No. 123); *Def. Chuck Nguyen's Resp. to Pl.'s Rule 56 Statement of Material Facts in Supp. of Her Omnibus Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 124); *Def. Andrew Cavanaugh's Reply in Supp. of Mot. for Summ. J.* (ECF No. 125); *Def. Andrew Cavanaugh's Resps. to Pl.'s Rule 56 Statement of Material Facts in Supp. of Her Omnibus Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 126).

Finally, on December 19, 2022, Ms. Wadsworth moved to request oral argument on the defendants' motions.  *Pl.'s Request for Hearing/Oral Argument on Defs.' Mot. for Summ. J.* (ECF No. 127).  The Court granted that motion, *Order* (ECF No. 128), and heard oral arguments on March 14, 2023.  *Min. Entry* (ECF No. 137).

## II.  FACTS[4]

### A.  The Parties

Adrianna Wadsworth is a woman in her early twenties who attended MVHS, a school located within the District, between 2014 and 2018.  PSAMF ¶¶ 1-2; DRPSAMF ¶¶ 1-2; DSMF ¶¶ 3-4; PRDSMF ¶¶ 3-4.  At all pertinent times, Ms. Wadsworth was under the age of 18.  PSAMF ¶ 5; DRPSAMF ¶ 5.

---

[4]      The Court states the facts "in the light most hospitable to [non-movants] consistent with record support . . .."  *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 37 (1st Cir. 2018) (citing *Ahern v. Shinseki*, 629 F.3d 49, 51 (1st Cir. 2010); *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002)).

RSU 40, formerly MSAD 40, is a Maine school district that encompasses the towns of Friendship, Union, Waldoboro, Warren, and Washington. DSMF ¶ 1; PRDSMF ¶ 1. Stephen Nolan is the Superintendent of RSU 40 and has held that position since 2014. DSMF ¶ 2; PRDSMF ¶ 2. The Superintendent of RSU 40 is the direct supervisor of the principal of MVHS and the principal of MVHS is the direct supervisor of the assistant principals, but assistant principals do not have disciplinary authority over the principal. DSMF ¶¶ 10, 12-13; PRDSMF ¶¶ 10, 12-13. The Superintendent of RSU 40 has the power to nominate candidates to the School Board for approval for a building principal position, as well as the power to initiate an investigation into a principal's conduct, impose discipline short of dismissal, and recommend that the School Board dismiss a principal. DSMF ¶ 11; PRDSMF ¶ 11. Linda Pease was an Assistant Principal at MVHS from 2015 until she became the Interim Principal in late 2017 and then the Principal in the fall of 2018. DSMF ¶ 7; PRDSMF ¶ 7. Tamra Philbrook is currently an Assistant Principal at MVHS and has held that position for approximately eleven years. DSMF ¶ 8; PRDSMF ¶ 8.

Defendant Andrew Cavanaugh was the Principal of MVHS from 2015 until he resigned in December of 2017, and during this time he was also designated as MVHS' Affirmative Action Coordinator. PSAMF ¶ 3; DRPSAMF ¶ 3; DSMF ¶ 5; PRDSMF ¶ 5. Prior to 2015, Mr. Cavanaugh was an Assistant Principal at MVHS for approximately nine years. DSMF ¶ 6; PRDSMF ¶ 6.

Defendant Chuck Nguyen was employed as a social worker at MVHS during the four years that Ms. Wadsworth was a student there.  DSMF ¶ 9; PRDSMF ¶ 9.

## B.   Andrew Cavanaugh's Alleged Harassment of Adrianna Wadsworth

During Ms. Wadsworth's junior and senior years of high school (starting in the fall of 2016), Mr. Cavanaugh repeatedly subjected her to unwanted conduct of a sexual nature, involving sexually charged and inappropriate comments, text messages, and gifts.[5]  PSAMF ¶ 3; DRPSAMF ¶ 3.  While some RSU 40 employees witnessed instances of Mr. Cavanaugh's inappropriate conduct towards Ms. Wadsworth, Mr. Cavanaugh was not investigated or disciplined until November 2017.[6]  PSAMF ¶ 6; DRPSAMF ¶ 6.

### 1.   Adrianna Wadsworth's Initial Encounters with Andrew Cavanaugh

In the spring of 2016, when Ms. Wadsworth was a sophomore at MVHS, she was caught drinking alcohol at a party and, as a result, she was sent to Mr. Cavanaugh's office for a meeting with Mr. Cavanaugh and the MVHS Athletic Director.  DSMF ¶ 14; PRDSMF ¶ 14.  Before this meeting with the Athletic Director, Mr. Cavanaugh had met Ms. Wadsworth in passing—for example, when he presented her with awards for her academic achievements at school ceremonies—but had never

---

[5]    The District objects to PSAMF ¶ 3, contending that its allegation that Mr. Cavanaugh "sexually harassed" Ms. Wadsworth "should be stricken . . . [as] an argumentative and conclusory assertion." DRPSAMF ¶ 3.  The Court has modified PSAMF ¶ 3 to reflect factual assertions supported by the record.  *See Def.'s Mot.* at 1 (acknowledging that Mr. Cavanaugh "subjected Plaintiff to unwanted conduct of a sexual nature").  The Court has done so, despite its view that the distinction between sexual harassment and subjecting someone to unwanted conduct of a sexual nature is elusive.
[6]    The District offers the same objection to PSAMF ¶ 6, adding details about individual employees' lack of knowledge regarding the scope of Mr. Cavanaugh's inappropriate conduct.  The Court has modified PSAMF ¶ 6 to reflect factual assertions supported by the record.

had a conversation with Ms. Wadsworth.  DSMF ¶ 15; PRDSMF ¶ 15.  During the meeting in Mr. Cavanaugh's office with the Athletic Director and Ms. Wadsworth, Ms. Wadsworth discussed some difficulties that she was experiencing at home. DSMF ¶ 16; PRDSMF ¶ 16.

Shortly after Mr. Cavanaugh's first meeting with Ms. Wadsworth, Mr. Cavanaugh gave Ms. Wadsworth his cell phone number and told her to text him and to call him if she was "in a jam" or needed help.[7]  DSMF ¶ 17; PRDSMF ¶ 17.  Between Mr. Cavanaugh's first meeting with Ms. Wadsworth in the spring of 2016 and the end of the 2015-2016 school year, Mr. Cavanaugh met with Ms. Wadsworth a couple of times a week to continue to discuss the challenges Ms. Wadsworth was facing at home, as well as her academic performance, aspirations, and other topics.  DSMF ¶ 18; PRDSMF ¶ 18.  There were other students with whom Mr. Cavanaugh was meeting a couple of times a week during the same timeframe.  DSMF ¶ 19; PRDSMF ¶ 19.  At the end of the school year, Mr. Cavanaugh offered to hire Ms. Wadsworth to do work for him and his sister for the summer of 2016.  DSMF ¶ 20; PRDSMF ¶ 20. Ms. Wadsworth's parents agreed that Ms. Wadsworth could work for Mr. Cavanaugh for the summer.  DSMF ¶ 21; PRDSMF ¶ 21.  Ms. Wadsworth worked for Mr. Cavanaugh during the summers of 2016 and 2017 and was paid at a rate of $10 per hour.[8]  DSMF ¶ 22; PRDSMF ¶ 22.

---

[7]     Ms. Wadsworth qualifies DSMF ¶ 17 by adding that Mr. Cavanaugh also "told her to text him." PRDSMF ¶ 17.  Finding this assertion supported by the record, the Court adds it to DSMF ¶ 17.  *See* PSAMF, Attach. 2, *Decl. of Adrianna Wadsworth* at 1 ("when [Mr. Cavanaugh] gave me the number, he told me to text him").

[8]     Ms. Wadsworth qualifies DSMF ¶ 22 to add that she also worked for Mr. Cavanaugh during the summer of 2017.  PRDSMF ¶ 22.  The Court finds this addition supported by the record and modifies DSMF ¶ 22 to include both summers.  *See Joint R. Materials for Defs.' Mots. for Summ. J.*

### 2.   Andrew Cavanaugh's Inappropriate Comments and Gifts

Between 2016 and 2017, Mr. Cavanaugh told Ms. Wadsworth she was pretty, looked nice, and made comments about what she was wearing nearly every day while Ms. Wadsworth was in school.  PSAMF ¶ 28; DRPSAMF ¶ 28.  Mr. Cavanaugh repeatedly used pet names to refer to Ms. Wadsworth such as "cupcake," "princess," and "ladytime."  PSAMF ¶ 29; DRPSAMF ¶ 29.  This was done repeatedly in person and via text message on an almost daily basis between 2016 and 2017.[9]  PSAMF ¶ 30; DRPSAMF ¶ 30.  Mr. Cavanaugh, in a meeting in his office, told Ms. Wadsworth that she was good looking and could take anyone she wanted to prom.[10]  PSAMF ¶ 31; DRPSAMF ¶ 31.

At a school basketball game, Mr. Nguyen witnessed Mr. Cavanaugh comment on Ms. Wadsworth's looks.  PSAMF ¶ 32; DRPSAMF ¶ 32.  Mr. Nguyen was present and heard, at least once, when Mr. Cavanaugh called Ms. Wadsworth "ladytime," and, on multiple occasions, when Mr. Cavanaugh called Ms. Wadsworth "cupcake." PSAMF ¶ 33; DRPSAMF ¶ 33.  Ms. Philbrook was present when Defendant

---

(ECF No. 91) (*Joint R. Materials),* Attach. 18*, Text Messages Between Mr. Cavanaugh and Ms. Wadsworth (Text Messages)* at 2.

[9]       RSU 40 qualifies PSAMF ¶ 30, stating that "[Mr.] Cavanaugh testified that he would only use the pet names via text message and never in person at school . . . [and, f]or example, [Ms.] Pease never heard [Mr.] Cavanaugh refer to Plaintiff as 'cupcake.'" DRPSAMF ¶ 30.  However, RSU 40 later acknowledges in DRPSAMF ¶ 33 that "Mr. Nguyen was present and heard . . . on multiple occasions, when Mr. Cavanaugh called Ms. Wadsworth 'cupcake'" and in DRPSAMF ¶ 34 that "Plaintiff testified to only two specific instances when [Ms.] Philbrook was present when [Mr.] Cavanaugh allegedly [referred to Ms. Wadsworth as 'cupcake']."  The Court rejects the District's contention that Mr. Cavanaugh "never in person at school" used the pet names, *id.* ¶ 30, and admits PSAMF ¶ 30.

[10]       RSU 40 qualifies PSAMF ¶ 31, contending that "[t]he excerpt cited does not support that [Mr.] Cavanaugh told Plaintiff she was good looking."  DRPSAMF ¶ 31.  The Court agrees that the cited page does not allege that Mr. Cavanaugh called Ms. Wadsworth good looking.  However, in the same deposition, she states that "Mr. Cavanaugh said that I could take anybody in the school that I wanted [to prom] and said that I was a good looking girl."  *Joint R. Materials*, Attach. 16, *Deposition of Arianna Wadsworth Vol. I* at 194:15-17 (*Wadsworth Dep. Vol. I*).  The Court admits PSAMF ¶ 31.

Cavanaugh called Ms. Wadsworth "cupcake" on at least two occasions.[11]  PSAMF ¶ 34; DRPSAMF ¶ 34.  In the spring of 2017, around the time of Ms. Wadsworth's junior prom, Ms. Philbrook was present when Mr. Cavanaugh handed Ms. Wadsworth an envelope of money in the office and called her "cupcake" during the exchange.  PSAMF ¶ 35; DRPSAMF ¶ 35.

During this same period, Ms. Wadsworth met with Mr. Cavanaugh in his office, and on at least one occasion while Ms. Philbrook was present, Mr. Cavanaugh asked Plaintiff whom she was taking to prom, who had asked her to prom, called her "cupcake," asked about her prom dress, and advised her that she could take anyone she wanted to prom.[12]  PSAMF ¶ 36; DRPSAMF ¶ 36.  Mr. Nguyen was also present during this meeting and agreed with Mr. Cavanaugh's suggestions.[13]  PSAMF ¶ 37; DRPSAMF ¶ 37.  Ms. Philbrook was also present for a conversation during which Mr.

---

[11]     RSU 40 denies PSAMF ¶ 34, contending first that "[Ms.] Pease never heard Cavanaugh refer to Plaintiff as 'cupcake'" and, second, that "Plaintiff testified to only two specific instances when [Ms.] Philbrook was present when [Mr.] Cavanaugh allegedly said this."  DRPSAMF ¶ 34.  The Court does not view the former objection relevant to PSAMF ¶ 34 because it focuses on what Ms. Pease heard, not what Ms. Philbrook heard.  The Court accepts the latter objection as a qualification and has modified PSAMF ¶ 34 to reflect that Ms. Wadsworth identified two specific instances.

[12]     RSU 40 qualifies PSAMF ¶ 36, objecting that "[i]n Plaintiff's first deposition she testified to a slightly different version of events in which she was not clear about exactly who was present at what point when various statements were allegedly made."  DRPSAMF ¶ 36.  The Court agrees that Ms. Wadsworth may have expressed some uncertainty about who was present at this meeting in her first deposition, but the District does not dispute that Ms. Wadsworth testified to PSAMF ¶ 36's factual assertions in her second deposition.  Finding record support for the assertion, the Court admits PSAMF ¶ 36.

[13]     RSU 40 qualifies PSAMF ¶ 37, objecting that "[Mr.] Nguyen did not recall [Mr.] Cavanaugh making any comments to Plaintiff during the meeting regarding prom, nor did [Mr.] Nguyen recall making any comments himself to Plaintiff regarding prom."  DRPSAMF ¶ 37.  As the Court is required to view disputed facts in the light most favorable to the nonmovant, the Court finds that Ms. Wadsworth's testimony, as the nonmoving party, in support of the asserted fact is sufficient to justify its inclusion and admits PSAMF ¶ 37.  *See Wadsworth Dep. Vol. I* at 195:18-196:3 ("Mr. Nguyen said, yes and that they've already heard several boys who want to take me to prom and made jokes about me turning them down or saying, yes, and so Mr. Nguyen just agreed with Mr. Cavanaugh").

Cavanaugh told Ms. Wadsworth that she could bring anyone she wanted to prom.[14] PSAMF ¶ 38; DRPSAMF ¶ 38. Ms. Philbrook responded that she already knew who was talking about taking Ms. Wadsworth to prom.[15] PSAMF ¶ 39; DRPSAMF ¶ 39.

Ms. Wadsworth was embarrassed that Mr. Cavanaugh called her "cupcake," and after one of her friends found out about the nickname, Ms. Wadsworth went to Mr. Nguyen's office and advised him that Mr. Cavanaugh called her "cupcake" when they texted each other.[16] PSAMF ¶ 40; DRPSAMF ¶ 40. Ms. Philbrook came into the office during that meeting with Mr. Nguyen while Ms. Wadsworth was reporting her feelings, sat down, did not say anything, and then—after an undetermined amount of time—said "I'll leave you guys to it" and left Mr. Nguyen's office.[17] PSAMF ¶ 41; DRPSAMF ¶ 41. In the text messages between Mr. Cavanaugh and Ms.

---

[14]     RSU 40 raises the same qualification as in DRPSAMF ¶ 36. The Court overrules it for the same reason, finding that Ms. Wadsworth's slight equivocation in one instance does not justify rejecting PSAMF ¶ 38 when her other testimony supports its assertion. *See Wadsworth Dep. Vol. II* at 78:12-20 (Mr. Cavanaugh and Ms. Philbrook "were both chuckling, laughing because Mr. Cavanaugh had asked me, Miss Philbrook was present, about if I knew who I was taking to prom or who has asked me to prom and what I -- if I had my dress situation worked out, and he made another comment about how I could take several people or anyone I wanted to prom, and Miss Philbrook was definitely part of that because she had said that she knows already the people who were talking about taking me to the prom"). The Court admits PSAMF ¶ 38.

[15]     RSU 40 denies PSAMF ¶ 39, arguing that "[t]he cited excerpt does not support the assertion at all." DRPSAMF ¶ 39. The Court agrees that Ms. Wadsworth cited the incorrect page but finds the relevant assertion in the except cited by the Court in the previous footnote, and thus admits PSAMF ¶ 39. *See Wadsworth Dep. Vol. II* at 78:19-20 (Ms. Philbrook "had said that she knows already the people who were talking about taking me to the prom").

[16]     RSU 40 qualifies PSAMF ¶ 40, stating that "[Mr.] Nguyen did not know that Plaintiff and [Mr.] Cavanaugh were exchanging text messages." DRPSAMF ¶ 40. However, Ms. Wadsworth testified that she "spoke to Mr. Nguyen about [students mockingly calling her cupcake] and told him that when [she and Mr. Cavanaugh] text he calls me cupcake and all the other nicknames." *Wadsworth Dep. Vol. II* at 76:15-17. Finding record support for the assertion, the Court overrules the District's objection and admits PSAMF ¶ 40.

[17]     RSU 40 qualifies PSAMF ¶ 41, stating that "Plaintiff testified that [Ms.] Philbrook was not present during the entire meeting but that 'she popped in during that meeting and sat with us, didn't say anything, and then she said I'll just leave you guys to it, and then she left'" and therefore "[i]t is not clear what aspects of the discussion [Ms.] Philbrook did and did not hear." DRPSAMF ¶ 41. The Court modified PSAMF ¶ 41 to address the District's qualification.

Wadsworth, from the very limited period of April 20, 2017 through November 3, 2017, Mr. Cavanaugh called Ms. Wadsworth "cupcake" at least 60 times, "ladytime" at least 28 times, and "princess" at least 18 times.  PSAMF ¶ 42; DRPSAMF ¶ 42.  Mr. Cavanaugh did not try to hide the fact that he was sending text messages to Ms. Wadsworth, and according to him, while he could not remember proactively bringing up the exchanges, he may have told Ms. Philbrook, Mr. Nguyen, and Athletic Director Matt Lash, that he was exchanging text messages with Ms. Wadsworth.[18]  PSAMF ¶ 43; DRPSAMF ¶ 43.

Megan Wright, a classmate and friend of Ms. Wadsworth's, later testified that she thought Mr. Cavanaugh was creepy and that Mr. Cavanaugh commented on the length of Ms. Wadsworth's skirt when she walked into school in the morning.  PSAMF ¶ 155; DRPSAMF ¶ 155.  Ms. Wadsworth was borrowing Ms. Wright's skirt that day, and this comment made Ms. Wright so uncomfortable that she never wore it again.  PSAMF ¶ 155; DRPSAMF ¶ 155.  Ms. Wright testified that the relationship between Mr. Cavanaugh and Ms. Wadsworth was common knowledge throughout the school.[19]

---

[18]    RSU 40 qualifies PSAMF ¶ 43 to emphasize that "[Mr.] Cavanaugh only stated he 'may' have told others but that he 'didn't bring it up either'" and to highlight Ms. Philbrook and Mr. Nguyen's testimony that they were not aware of the text messages.  DRPSAMF ¶ 43.  Although this qualification does not conflict with Ms. Wadsworth's phrasing that Mr. Cavanaugh may have told others the Court modified PSAMF ¶ 43 to add that Mr. Cavanaugh did not "bring up" the exchanges.

[19]    RSU 40 objects to PSAMF ¶ 157 on the grounds that "there is no foundation to support that Wright is competent to testify to 'common knowledge' throughout school, nor is there any foundation to support what this 'relationship' was understood to be."  DRPSAMF ¶ 157.  Given that the record is replete with evidence that Mr. Cavanaugh regularly pulled Ms. Wadsworth out of class, texted her constantly, and multiple teachers and administrators noticed and complained of their interactions, the Court does not strain to envision that their relationship—however it may be characterized—provided grist for the school's rumor mill.  Ms. Wright testified that her "group of friends" would "all find [the relationship] weird" and that she first heard about it through a mutual friend while living in Wisconsin.  *Joint R. Materials*, Attach. 23, *Dep. of Megan Wright* at 31:9-32:1.  As Ms. Wright was a student at MVHS and a friend of Ms. Wadsworth at the time, the Court finds support for Ms. Wright's

PSAMF ¶ 157; DRPSAMF ¶ 157.  Mr. Cavanaugh commented on one of Ms. Wright's mother's Facebook posts—a picture of Ms. Wright and Ms. Wadsworth dressed up in Harry Potter costumes—stating that he felt slighted because he was not in the photo.[20]  PSAMF ¶ 156; DRPSAMF ¶ 156.  Mr. Cavanaugh also told Ms. Wadsworth

---

assertion that the relationship was "common knowledge throughout the school," overrules the District's objection, and admits PSAMF ¶ 157.

[20]     PSAMF ¶ 156 states:

> Defendant Cavanaugh made comments to Plaintiff in the main office, saying she looked sexy in her glasses.  Defendant Cavanaugh also commented on one of Ms. Wright's mom's Facebook posts, a picture of Ms. Wright and Plaintiff dressed up in Harry Potter costumes, stating that he felt slighted because he wasn't in the photo. This was the same costume that Plaintiff was wearing when Defendant Cavanaugh told her she looked like a playboy bunny.

PSAMF ¶ 156.  In support of these statements, Ms. Wadsworth cites the deposition testimony of Megan Wright.  *Id.* (*Dep. of Megan Wright* at 26:1-5, 28:5-21, 27:12-16).  In the first statement about the glasses, Ms. Wright says that she was not present when Mr. Cavanaugh made the comment, but that Ms. Wadsworth told Ms. Wright about the comment which took place in the main office at the beginning of their senior year.  *Id.* at 25:18-26:17.

In the second comment about the Facebook posting, Ms. Wright explained that there was a school dress-up day and Ms. Wadsworth, another female, and she dressed up as Harry Potter.  *Id.* at 27:12-28:23.  As it turned out, Mr. Cavanaugh dressed up as Harry Potter too.  *Id.* at 28:15-17.  There were two photographs: one with the three females and the other with the three females and Mr. Cavanaugh.  *Id.* at 28:11-21.  Ms. Wright's mother posted only the one of the three females on Facebook and did not post the one with the three females and Mr. Cavanaugh.  *Id.* at 27:23-28:21.  Mr. Cavanaugh commented that he felt slighted because Ms. Wright's mother had not posted the photograph in which he appeared.  *Id.* at 28:9-21.  Ms. Wright testified that Mr. Cavanaugh's comment made her feel "super uncomfortable."  *Id.* at 28:22-23.  The deposition does not clarify whether Mr. Cavanaugh made this comment directly to Ms. Wright or to Ms. Wadsworth who conveyed it to Ms. Wright.  Based on Ms. Wright's comment that Mr. Cavanaugh's comment made her feel "super uncomfortable," the Court infers that the comment was made to Ms. Wright.

The third comment involved same photograph of the three females wearing Harry Potter costumes on dress-up day.  *Id.* at 27:8-21.  Ms. Wadsworth told Ms. Wright that Mr. Cavanaugh commented on the way she held up her tie made her look like a Playboy bunny.  *Id.*  Ms. Wright did not hear Mr. Cavanaugh make this comment.  *Id.*

RSU 40 qualifies PSAMF ¶ 156 to argue that all three factual assertions—the glasses comment, the Facebook comment, and the Playboy bunny comment—are inadmissible hearsay.  DRPSAMF ¶ 156.  The District contends that "[Ms.] Wright testified that she was not present for the alleged comments about the glasses and the playboy bunny but was instead told about them by Plaintiff after they happened."  DRPSAMF ¶ 156.

The Court overrules RSU 40's evidentiary objections.  First, none of the testimony is offered for their truth and they are not hearsay—for example, the Playboy bunny comment is obviously not offered to prove that Ms. Wadsworth actually looked like a Playboy bunny.  FED. R. EVID. 801(c)(2) ("'Hearsay' means a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement").  Second, the relevance of these statements is to demonstrate how widespread knowledge of Mr. Cavanaugh's inappropriate comments was throughout the high school.

that she looked sexy in glasses, a comment that Ms. Wadsworth repeated to Ms. Wright. *Id.* Finally, Ms. Wadsworth told Ms. Wright that Mr. Cavanaugh had told her that she looked like a Playboy bunny when wearing the Harry Potter costume. *Id.*

Mr. Cavanaugh also made Ms. Wadsworth uncomfortable when he gave her gifts at school, including a box of feminine hygiene products and a winter coat. PSAMF ¶ 53; DRPSAMF ¶ 53. He often gave her gifts of money. PSAMF ¶ 54; DRPSAMF ¶ 54. Ms. Wadsworth informed Mr. Nguyen that the gifts Mr. Cavanaugh was giving her made her feel embarrassed.[21]   PSAMF ¶ 55; DRPSAMF ¶ 55. Mr.

---

In its motion, RSU 40 contends that it was not aware of Mr. Cavanaugh's inappropriate comments about Ms. Wadsworth. If credited by a jury, against RSU 40's denial rests evidence that Mr. Cavanaugh's conduct toward Ms. Wadsworth was common knowledge among her classmates and it would be a short step for a jury to infer that members of RSU 40 must have been aware that there was something amiss.

Moreover, if Mr. Cavanaugh made the statement about the Facebook posting directly to Ms. Wright, the statement is admissible as statement of a party opponent. FED. R. EVID. 801(d)(2). The Court assumes for purposes of this ruling that as principal, Mr. Cavanaugh's statements would be admissible against RSU 40 as a statement by RSU 40's employee. FED. R. EVID. 801(d)(2)(D).

Although the Court has considered PSAMF ¶ 156 for this limited purpose, the static and sequential process of a motion for summary judgment seems particularly artificial here. Presumably due to the way discovery was conducted, there is no evidence from Ms. Wadsworth that Mr. Cavanaugh made these comments to her. Even so, it seems unlikely that Ms. Wright created these comments out of whole cloth. If Ms. Wadsworth were to testify consistently with Ms. Wright, Ms. Wadsworth's testimony about what Mr. Cavanaugh said to her would be admissible as an admission of a party opponent. FED. R. EVID. 801(d)(2). Furthermore, Ms. Wright's testimony would be admissible to rebut an express or implied charge of recent fabrication. FED. R. EVID. 801(d)(1)(B)(i).

[21]   RSU 40 denies PSAMF ¶ 55, stating that "[Mr.] Nguyen testified that Plaintiff never approached him about [Mr.] Cavanaugh giving her gifts . . . [and Mr.] Nguyen did not know that [Mr.] Cavanaugh gave Plaintiff numerous gifts." DRPSAMF ¶ 55. Ms. Wadsworth has testified that "I do remember that I did discuss the hygiene products and the box of gifts that he gave me with Mr. Nguyen. I believe mentioning to [Mr. Nguyen] that I was kind of embarrassed because I don't know what people thought of that when they saw that, and once again [Mr. Nguyen] assured me that [Mr. Cavanaugh] was making sure that I had everything that I needed." *Wadsworth Dep. Vol. I* at 209:23-210:5; *see also id.* at 210:6-213:5 (describing that conversation in detail). Finding record support for the assertion and obligated to view disputed facts in the light most favorable to Ms. Wadsworth, the Court overrules the District's denial and admits PSAMF ¶ 55.

Nguyen responded by stating that Mr. Cavanaugh was just making sure she had everything she needed.[22]  PSAMF ¶ 56; DRPSAMF ¶ 56.

### 3.    The Birth Control Appointment

Mr. Cavanaugh took Ms. Wadsworth to a physical examination with her doctor so she could participate in cheerleading.[23]  PSAMF ¶ 44; DRPSAMF ¶ 44.  While at the appointment, Mr. Cavanaugh suggested Ms. Wadsworth get on birth control.  PSAMF ¶ 45; DRPSAMF ¶ 45.  Thereafter, Mr. Cavanaugh continually suggested Ms. Wadsworth get on birth control, and ultimately scheduled a medical appointment for her so that she could obtain birth control.  PSAMF ¶ 46; DRPSAMF ¶ 46.  Mr. Nguyen knew that Mr. Cavanaugh was attempting to schedule the birth control appointment.[24]  PSAMF ¶ 47; DRPSAMF ¶ 47.  Mr. Nguyen also knew that Mr. Cavanaugh intended to take Ms. Wadsworth to this birth control appointment, and

---

[22]    RSU 40 makes the same objection as in DRPSAMF ¶ 55 and the Court overrules it for the same reasons.

[23]    RSU 40 qualifies PSAMF ¶ 44, stating that "[t]he cited excerpt only supports that [Mr.] Cavanaugh took Plaintiff to a doctor's appointment."  DRPSAMF ¶ 44.  This objection is frivolous. While the paragraph Ms. Wadsworth cited may not explicitly mention cheerleading as, it is clear from the surrounding context that the physical was for cheerleading.  *Wadsworth Dep. Vol. I* at 198:4-199:23 (stating that the appointment "occurred some time in my junior year before cheerleading started because I needed a physical in order to participate in cheerleading" and reiterating at least three times that the physical was for cheerleading).  The Court overrules RSU 40's qualification and admits PSAMF ¶ 44.

[24]    RSU 40 denies PSAMF ¶ 47, contending that "[Mr.] Nguyen testified that he did not know that [Mr.] Cavanaugh was trying to arrange for Plaintiff to get on birth control, and he denied ever having told [Mr.] Cavanaugh not to take Plaintiff to an appointment for birth control."  DRPSAMF ¶ 47.

The record supports Ms. Wadsworth's assertion.  *See Joint R. Materials,* Attach. 8, *Dep. of Andrew Cavanaugh* at 107:22-108:-22 (*Cavanaugh Dep.*); *id.*, Attach. 14, *Dep. of Theresa Kenniston* at 46:20-50:4 (*Kenniston Dep.*).  At the very least, this constitutes a disputed fact where a reasonable factfinder could conclude that Mr. Nguyen was aware of the appointment, and at this stage the Court draws the inference in favor of Ms. Wadsworth.  *See Ahern*, 629 F.3d at 51 (1st Cir. 2010) (citation omitted) (at the summary judgment stage, "the nonmovants are entitled to the benefit of all reasonable inferences that the facts will bear").  The Court overrules the District's objection and admits PSAMF ¶ 47.

he advised Mr. Cavanaugh that taking Ms. Wadsworth would be a bad idea.[25] PSAMF ¶ 47; DRPSAMF ¶ 47.

In late 2016 or early 2017, Theresa Kenniston, a family friend with whom Ms. Wadsworth was living at the time, called Mr. Nguyen and complained about Mr. Cavanaugh setting up and intending to take Ms. Wadsworth to a doctor's appointment to obtain birth control, believing such action was inappropriate; the only thing Mr. Nguyen did with this information was to tell Ms. Kenniston the issue had been addressed.[26]   PSAMF ¶¶ 49-50; DRPSAMF ¶¶ 49-50.   Mr. Nguyen denies all knowledge of the birth control appointment and testified that the conversation was only about Ms. Kenniston taking Ms. Wadsworth to the doctor, with no mention of Mr. Cavanaugh.   PSAMF ¶¶ 47-50; DRPSAMF ¶¶ 47-50.   Mr. Nguyen did not inform Superintendent Nolan of the call with Ms. Kenniston or otherwise initiate any investigation relating to the call.[27]   PSAMF ¶ 51; DRPSAMF ¶ 51.   Mr. Nguyen spoke with Ms. Wadsworth about the birth control appointment, and despite the fact that Ms. Wadsworth told Mr. Nguyen that her parents did not approve of her receiving birth control, Mr. Nguyen informed her that Mr. Cavanaugh was like a father figure

---

[25]   RSU 40 denies PSAMF ¶ 48 for the same reasons as PSAMF ¶ 47.  DRPSAMF ¶ 48.  The Court overrules the objection for the reasons discussed in footnote 24 and admits PSAMF ¶ 48.

[26]   RSU 40 denies PSAMF ¶¶ 49-50 for largely the same reasons as PSAMF ¶¶ 47-48: while Ms. Kenniston testified to the assertions, Mr. Nguyen denied them in his own deposition.  DRPSAMF ¶¶ 49-50.  The Court again admits the assertions for the reasons discussed in footnote 24, although it includes Mr. Nguyen's denials in the following sentence.

[27]   RSU 40 qualifies PSAMF ¶ 51 for several reasons, including that Mr. Nguyen did not have the authority to take "corrective action" and that, consistent with his previous denials, Ms. Kenniston did not mention Mr. Cavanaugh on the call and thus there was nothing improper to investigate. DRPSAMF ¶ 51.  The Court modified PSAMF ¶ 51 to reflect these qualifications.

to her, and that Mr. Cavanaugh thought of her "as a daughter."  PSAMF ¶ 52; DRPSAMF ¶ 52.

Mr. Cavanaugh also wrote an undated and unaddressed letter for Ms. Wadsworth to give to her doctor's office and advised that he had concerns including depression, attention deficit, irregular menstrual cycle, and lack of vaccinations due to religious concerns.  PSAMF ¶ 114; DRPSAMF ¶ 114.  Mr. Cavanaugh noted that Ms. Wadsworth's medical records should be kept confidential and not shared with her parents.  PSAMF ¶ 115; DRPSAMF ¶ 115.  Mr. Cavanaugh admits he did not have the authority to prevent Ms. Wadsworth's parents from seeing her medical records, as they remained her legal guardians.  PSAMF ¶ 116; DRPSAMF ¶ 116.

### 4. Andrew Cavanaugh Asks Adrianna Wadsworth to Move in with Him

During the fall of 2016, Ms. Wadsworth left her parents' home and moved in with her friend and classmate at the home of her parents, Theresa and Darren Kenniston.  DSMF ¶ 32; PRDSMF ¶ 32.  Ms. Wadsworth lived with the Kennistons from the fall of 2016 until late in her senior year at MVHS in the spring of 2018, with the exception of a couple of weeks during that time period when Ms. Wadsworth lived with her older half-sister.  DSMF ¶ 33; PRDSMF ¶ 33.

Over the course of several months, between April 28, 2017 and June 22, 2017, Mr. Cavanaugh asked Ms. Wadsworth to move into his home on a number of

occasions.[28]   PSAMF ¶¶ 57-58; DRPSAMF ¶¶ 57-58.   During that period, Mr.

Cavanaugh sent Ms. Wadsworth the following text messages:

> **April 28:** "You need to come here tomorrow.  I will get a room ready for you and you can rest and get better.  We will take care of you.  I think you are just too stressed."
>
> **April 29:** "Do you think staying with me isnt a good idea?"
>
> **May 10:** "Would your parents freak if you lived with me?"
>
> "What about staying here for a couple days just to try it?  You might like it.  At least no one would yell at you.  What about staying here tomorrow night?"
>
> "If you decide you want to stay with me, just give a brutha a heads up."
>
> "One of these days I will get you to live with me!"
>
> **May 18:** "Move in here and we will teach you."
>
> "You should live here for your senior year.  It would be a stable place and I dont care about child support."
>
> "I have always said you were a class act.  I think if you talked with Debbie and I about it we could take care of a lot.  I would write a letter to the superintendent and all that."
>
> **June 8:** "I have told you to live with me but you don't want to do that."
>
> **June 22:** "I have a bit of bad news.  I spoke with work about you staying with me and i cant.  I feel terrible but thats what it is."

PSAMF ¶¶ 59-69; DRPSAMF ¶¶ 59-69.   While Mr. Cavanaugh was not more specific

about whom at "work" he spoke with—he may have been referring to Mr. Nguyen,

---

[28]     RSU 40 admits the substance of PSAMF ¶¶ 57-58 but argues that they should be stricken because the deposed school officials have testified that they had no knowledge of Mr. Cavanaugh's texts to Ms. Wadsworth, and thus the texts are irrelevant.  DRPSAMF ¶¶ 57-58.  However, Mr. Cavanaugh later texted Ms. Wadsworth that he spoke "with work"—presumably, a District employee—about her moving in with him and was told that she could not.  PSAMF ¶ 69; DRPSAMF ¶ 69.  On this basis, the texts are relevant, and the Court admits PSAMF ¶¶ 57-58.

whom Mr. Cavanaugh asked if Ms. Wadsworth could move in with him (Mr. Nguyen responded that he did not think it was a good idea)—he informed someone at the school about his desire to have Ms. Wadsworth live with him, and no action was taken related to this request beyond seemingly denying it.[29]  PSAMF ¶¶ 70-71; DRPSAMF ¶¶ 70-71.

### 5.   Andrew Cavanaugh's Inappropriate Text Messages

Mr. Cavanaugh began texting with Ms. Wadsworth in or around May of 2016, which is approximately when she began working for him.  DSMF ¶ 23; PRDSMF ¶ 23.  On a near daily basis, Mr. Cavanaugh would exchange text messages with Ms. Wadsworth; many inappropriate.  PSAMF ¶ 90; DRPSAMF ¶ 90.  In his text messages, Mr. Cavanaugh would ask Ms. Wadsworth to send him pictures of her in her swimsuit, ask her about her sexual relationships with boys, and even about whether she was having orgasms.  PSAMF ¶ 90; DRPSAMF ¶ 90.

---

[29]    RSU 40 has several objections to PSAMF ¶ 70.  It first argues that the assertion that Mr. Cavanaugh told someone at RSU 40 should be stricken as hearsay because Ms. Wadsworth is using his text message for the truth of the matter asserted.  DRPSAMF ¶ 70.  The Court does not find it necessary to resolve this issue because the ultimate assertion—that Mr. Cavanaugh told at least one District employee about Ms. Wadsworth potentially moving in—is corroborated by Mr. Nguyen's unambiguous testimony that Mr. Cavanaugh told him exactly that.  PSAMF ¶ 71; DRPSAMF ¶ 71.  The Court modified PSAMF ¶ 70 to include the assertion.
    RSU 40 also denies the assertion in PSAMF ¶ 70, submitting that Mr. Cavanaugh testified that he did not speak with work.  DRPSAMF ¶ 70.  Between Mr. Cavanaugh's own texts stating he "spoke with work" and Mr. Nguyen's testimony that Mr. Cavanaugh spoke with him about the issue, the record reveals sufficient factual support for the assertion.
    Finally, RSU 40 submits that PSAMF ¶ 70 is irrelevant.  DRPSAMF ¶ 70.  The Court rejects this argument for the reasons stated in footnote 28 and admits PSAMF ¶ 70.

On July 21, 2017, Mr. Cavanaugh texted her "You are like a daughter to me . . . Maybe a scandalous step daughter"[30] and "If you buy car insurance how would you afford those lacey shorts?"[31]  PSAMF ¶¶ 77-78; DRPSAMF ¶¶ 77-78.

On July 27, 2017, he texted her "How casual is sex with your friends?  Like is it no big deal or what?"  PSAMF ¶ 79; DRPSAMF ¶ 79.  Three days later, Mr. Cavanaugh texted Ms. Wadsworth "Good you should be at the beach.  I would ask for pictures, but that might be a bit much . . . Can I see the photos or would that bother you?  Only send the scandalous ones!  Ha hah."  PSAMF ¶ 80; DRPSAMF ¶ 80.  Later that day, he texted her "Do you have any more [pictures] you could send?"  PSAMF ¶ 81; DRPSAMF ¶ 81.  On August 2, 2017, he texted her "Can you help me Friday or will you be taking more nude pictures of yourself?"[32]  PSAMF ¶ 82; DRPSAMF ¶ 82.

On August 2, 2017, Ms. Wadsworth told Mr. Cavanaugh that she had been sexually assaulted by her cheerleading coach while swimming during an off-season cheerleading team trip earlier that summer.[33]  PSAMF ¶¶ 72-73; DRPSAMF ¶¶ 72-73.  Mr. Cavanaugh responded, in part:

---

[30]    RSU 40 makes three objections to PSAMF ¶ 77: that the portion that Mr. Cavanaugh abused Ms. Wadsworth's trust is conclusory, the assertion is irrelevant for the reasons discussed in footnote 28, and denying the assertion on the grounds that it is not found on the page cited by Ms. Wadsworth. DRPSAMF ¶ 77.  The Court sustains the first objection and has removed the conclusory portion of the assertion.  It overrules the relevance argument for the reasons stated in footnote 28.  Finally, the Court overrules the denial, finding that while Ms. Wadsworth's citation was off by several pages, the text message is found in the record.  *Text Messages* at 12.  The Court admits PSAMF ¶ 77 as amended.

[31]    RSU 40 makes the same relevance objection and again denies the assertion as improperly cited.  DRPSAMF ¶ 78.  The Court overrules the objections for the reasons discussed in footnote 28 and admits PSAMF ¶ 78.  *See Text Messages* at 12 ("If you buy car insurance how would you afford those lacey shorts?").

[32]    RSU 40 objects that the assertion is not found on the cited page.  DRPSAMF ¶ 82.  The Court finds the text message on the following page, overrules the objection, and admits PSAMF ¶ 82.  *See Text Messages* at 17.

[33]    PSAMF ¶¶ 72-76 and 83-88 concern allegations that Ms. Wadsworth was sexually assaulted by a cheerleading coach, told Mr. Cavanaugh about the assault, and Mr. Cavanaugh failed to report it

> Even if he [took you swimming], it should have only been swimming, a few laughs and that's it.  I mean when I go to the beach (ve[r]y rare) and i see a student in a bikini, it can be awkward.  I mean the pictures you sent me, they are great shots and well taken, but there is no mistaking that you a pretty snappy number. So to be at the beach with you alone was not t[h]e best because he is seeing you with pret[t]y much not[h]ing on. [34]

PSAMF ¶ 88; DRPSAMF ¶ 88.  This conversation continued until August 4, 2017, at which time Mr. Cavanaugh told Ms. Wadsworth to put on "her Mickey Mouse negligee" and go to bed, and then stated, "Im deleting our conversations, and the swimsuit pictures, as much as i hate to! Hah hah."[35,36]  PSAMF ¶ 89; DRPSAMF ¶ 89.

---

or take any corrective action.  RSU 40 objects to each assertion that "Plaintiff is attempting to raise a new theory of liability against RSU 40 in her opposition to RSU 40's motion for summary judgment." DRPSAMF ¶¶ 72-76 and 83-88.  In the District's view, her theory throughout the case has been that school officials failed to report or stop Mr. Cavanaugh's sexual harassment of her, but now, without amending her Complaint to include the allegations against the coach, "she is making a last-ditch effort to avoid summary judgment based on [Mr.] Cavanaugh's failure to report a coach's assault of her." DRPSAMF ¶¶ 72-76 and 83-88.  During oral argument, Ms. Wadsworth's counsel acknowledged that the Amended Complaint does not refer to this sexual assault and stated that he learned of it only through discovery.  Regardless of when Ms. Wadsworth's attorneys learned about the assault, Ms. Wadsworth certainly knew.

The Court largely sustains RSU 40's objections.  The Amended Complaint makes no reference to a sexual assault by the cheerleading coach and, as the District noted, plaintiffs may not "raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment."  *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 76 (1st Cir. 2016) (citation and internal quotations omitted).  Because Ms. Wadsworth has not alleged facts or advanced a theory of liability relating to sexual harassment or assault by the cheerleading coach, these assertions are only relevant where they relate to Mr. Cavanaugh's sexual harassment of her.  The Court admits portions of these assertions that provide context for Mr. Cavanaugh's later inappropriate text messages.  *See, e.g.,* PSAMF ¶ 88 (Mr. Cavanaugh contrasting his experiences seeing students in bikinis and calling Ms. Wadsworth "a pretty snappy number").  The Court sustains RSU 40's objections as to PSAMF ¶¶ 74-76 and 83-87 and omits those assertions.  The Court partially sustains RSU 40's objections as to PSAMF ¶¶ 72-73 and 88, admitting altered or partial versions of those assertions relevant to Mr. Cavanaugh's misconduct.

[34]    The Court admits an abridged PSAMF ¶¶ 88, as explained in footnote 33.
[35]    RSU 40 admits the substance of PSAMF ¶ 89 but makes the same relevance objection discussed in footnote 33.  DRPSAMF ¶ 89.  The Court overrules the objection, finding that—while the coach's misconduct is still not relevant—these text messages are relevant evidence of Mr. Cavanaugh's inappropriate behavior.
[36]    The Court omits PSAMF ¶ 91 as virtually identical to PSAMF ¶ 43.  *Compare* PSAMF ¶ 43 ("Shockingly, Mr. Cavanaugh did not try to hide the fact that he was sending text messages to Ms. Wadsworth, and according to him, he may have told Ms. Philbrook, Mr. Nguyen, and Athletic Director,

### 6. Andrew Cavanaugh Pulling Adrianna Wadsworth from Class

Mr. Cavanaugh would meet regularly with Ms. Wadsworth during the 2016-2017 school year and the first few months of the 2017-2018 school year.[37] DSMF ¶¶ 24-25; PRDSMF ¶¶ 24-25. Mr. Cavanaugh would regularly pull Ms. Wadsworth out of class to have meetings with her in his office.[38] PSAMF ¶ 106; DRPSAMF ¶ 106. Mr. Cavanaugh told Ms. Pease and Ms. Philbrook that the reason for these meetings was that Ms. Wadsworth was dealing with a difficult family situation and needed support. DSMF ¶ 26; PRDSMF ¶ 26. Mr. Cavanaugh would excuse Ms. Wadsworth's absences from class and school, despite not having the authority to do so.[39] PSAMF ¶ 107; DRPSAMF ¶ 107.

On October 4, 2016, Ms. Wadsworth's English teacher sent an email to Mr. Cavanaugh, Ms. Pease, Ms. Philbrook, and Mr. Nguyen stating that she and another English teacher wanted to "voice [their] concern about Anna Wadsworth being pulled from [Writing Center and AP Language classes] at the request of [Mr. Cavanaugh's]

---

Matt Lash, that he was exchanging text messages with Ms. Wadsworth") *with* PSAMF ¶ 91 ("Mr. Cavanaugh did not try to hide the fact that he was sending text messages to Ms. Wadsworth, and according to him, he may have told Ms. Philbrook, Mr. Nguyen, and Athletic Director, Matt Lash, that he was exchanging text messages with Ms. Wadsworth").

[37]    Ms. Wadsworth qualifies DSMF ¶¶ 24-25 and submits instead that "Defendant Cavanaugh met with and spoke to Plaintiff daily from the beginning of the 2016 school year until his resignation in November 2017." PRDSMF ¶¶ 24-25. The Court finds that formulation functionally equivalent to the combination of DSMF ¶¶ 24-25 and overrules Ms. Wadsworth's objections.

[38]    RSU 40 qualifies PSAMF ¶ 106 to object that it is not uncommon for teachers and principals to pull students out of class. DRPSAMF ¶ 106. The Court overrules the District's objection as beyond the scope of the fact asserted and admits PSAMF ¶ 106.

[39]    RSU 40 qualifies PSAMF ¶ 107 to object "[t]he cited excerpt does not support the assertion that [Mr.] 'Cavanaugh continued his inappropriate and sexual conversations with' Plaintiff during these meetings." DRPSAMF ¶ 107. The Court agrees, omits that portion of PSAMF ¶ 107, and admits the remainder of the assertion.

office."[40]  DSMF ¶ 27; PRDSMF ¶ 27; PSAMF ¶ 108; DRPSAMF ¶ 108.  In the email the teachers said that Ms. Wadsworth "seem[ed] stressed to be in the position of catching up" as a result of missing class and requested that administrators meet with her during study hall or another non-academic period rather than calling her out of class.  DSMF ¶ 28; PRDSMF ¶ 28.  Both School Assistant Principals, Ms. Pease and Ms. Philbrook, approached Mr. Cavanaugh and advised him not to "haul Anna [Wadsworth] out of a class or keep her from class."  PSAMF ¶ 109; DRPSAMF ¶ 109.

> Mr. Cavanaugh replied to the teachers' email, stating:
>
> Anna has some issues outside of class that we are working to resolve.  I know she is extremely conscientious regarding her coursework and you are correct regarding her stress level.  I apologize for her being removed during these important classes and I will make sure it does not happen again.[41]

DSMF ¶ 29; PRDSMF ¶ 29; PSAMF ¶ 110; DRPSAMF ¶ 110.  Mr. Cavanaugh continued to pull Ms. Wadsworth from classes, although the record is unclear whether he pulled her from the same classes referenced in the email exchange, Writing Center and AP Language.[42]  PSAMF ¶ 111; DRPSAMF ¶ 111.

As the behavior continued, Ms. Philbrook spoke with Mr. Cavanaugh a number of times about Ms. Wadsworth, including at least once to discuss Ms. Philbrook's

---

[40]      RSU 40 qualifies PSAMF ¶ 108 to request that the Court supplement additional details about the classes.  DRPSAMF ¶ 108.  The Court added that language and phrased the assertion using the District's wording from DSMF ¶ 27.

[41]      RSU 40 qualifies PSAMF ¶ 110 to object to Ms. Wadsworth's paraphrasing of the email.  DRPSAMF ¶ 110.  The Court supplies the language of the email as quoted in DSMF ¶ 29 and overrules the District's objection as moot.

[42]      RSU 40 denies PSAMF ¶ 111, contending that Mr. Cavanaugh promised not to excuse Ms. Wadsworth from Writing Center and AP Language again, and that the record does not show that he continued to pull her from those classes specifically.  DRPSAMF ¶ 111.  The Court omits the assertion that Mr. Cavanaugh "lied" and admits the remainder of PSAMF ¶ 111, supplemented to reflect the ambiguity about the classes.

concerns about him removing Ms. Wadsworth from her classes too much.[43]  PSAMF ¶ 112; DRPSAMF ¶ 112.  In October 2017, Mr. Cavanaugh instructed the school attendance secretary, Penny Morrill, to stop entering his name in the comments when he excused Ms. Wadsworth from class because "teachers didn't like it and he was getting grief for it."[44]  PSAMF ¶ 113; DRPSAMF ¶ 113.  It is not uncommon for principals, assistant principals, and guidance counselors to call students out of class to address issues the student is facing, nor is it uncommon for teachers to complain when a student is called out of class by someone else in the building, like a principal, assistant principal, or guidance counselor.[45]  DSMF ¶¶ 30-31; PRDSMF ¶¶ 30-31.

In early January 2017, Ms. Wadsworth was placed on the Student Assistance Team (SAT) for students about whom the school has some concern relating to a particular issue, which may include attendance or behavior.[46]  PSAMF ¶ 117;

---

[43]    RSU 40 qualifies PSAMF ¶ 112 to object that Mr. Cavanaugh only testified concretely to one conversation with Ms. Philbrook on the attendance topic and included his impressions about what she thought but only "might have" communicated to him.  DRPSAMF ¶ 112.  The Court altered PSAMF ¶ 112 to reflect Mr. Cavanaugh's deposition testimony, omitting the concerns that Ms. Philbrook "might have" communicated to him.  *Cavanaugh Dep.* at 121:1-122:16.

[44]    RSU 40 qualifies PSAMF ¶ 113 to contend that "[t]he cited exhibit does not support that [Mr.] 'Cavanaugh continued to receive so many complaints regarding removing Ms. Wadsworth from class,' only that 'teachers didn't like it and he was getting grief for it.'"  DRPSAMF ¶ 113.  The Court agrees, omits the reference to continued complaints, and admits the remainder of PSAMF ¶ 113 as supported by the record.

[45]    Ms. Wadsworth qualifies DSMF ¶ 31 to submit that "[w]hile not uncommon for teachers to complain, the relationship between Defendant Cavanaugh and Plaintiff Wadsworth was not a secret . . . It was very obvious that something was going on."  PRDSMF ¶ 31.  The Courts overrules the objection as beyond the scope of the fact asserted and admits DSMF ¶ 31.  Furthermore, Ms. Wadsworth has separately asserted and the Court has accepted the proposition that Mr. Cavanaugh's relationship with Ms. Wadsworth was common knowledge at MVHS.  *See* PSAMF ¶¶ 156-57.

[46]    RSU 40 qualifies PSAMF ¶ 117 to argue that "[t]he citations only support that Plaintiff was placed on the SAT due to some level of concern relating to the student," and not that attendance or Mr. Cavanaugh removing her from class were causal factors.  DRPSAMF ¶ 117.  The Court agrees and alters PSAMF ¶ 117 to explain the SAT without asserting that she was placed on it because of attendance or Mr. Cavanaugh.  *See Philbrook Dep.* at 171:19-24 (students put on the SAT are students "who the school has some concern about relating to a particular issue, be it attendance, behavior, etc. . . .").

DRPSAMF ¶ 117.  Mr. Cavanaugh instructed the SAT coordinator, Tammy Anderson, not to inform Ms. Wadsworth's parents of her placement in the group and noted specifically it "is imperative that her parents DO NOT receive any correspondence from us about her placement on the SAT."[47]  PSAMF ¶ 118; DRPSAMF ¶ 118.  Ms. Philbrook testified that this request was inappropriate.[48]  PSAMF ¶ 119; DRPSAMF ¶ 119.

### 7.     The Car and September 19, 2017 Traffic Stop

Mr. Cavanaugh purchased a car, insured that car, and gave it to Ms. Wadsworth for her personal use.  PSAMF ¶ 92; DRPSAMF ¶ 92.  On September 19, 2017, School Resource Officer, Chris Spear, a member of the Waldoboro Police Department and school staff, observed Ms. Wadsworth driving a black Hyundai vehicle, ran the plate with dispatch, and the vehicle came back as owned by Mr. Cavanaugh.  PSAMF ¶ 93; DRPSAMF ¶ 93.  Later that day, Officer Spear conducted a traffic stop on Ms. Wadsworth when he observed her speeding after school.  PSAMF ¶ 94; DRPSAMF ¶ 94.   Upon reviewing the registration information, Officer Spear asked Ms. Wadsworth why the registration showed that the vehicle was owned by Mr. Cavanaugh.  PSAMF ¶ 95; DRPSAMF ¶ 95.  Ms. Wadsworth responded that Mr. Cavanaugh was helping her out while she waited to potentially move in with her father.  PSAMF ¶ 96; DRPSAMF ¶ 96.

---

[47]     RSU 40 qualifies PSAMF ¶ 118 to state that "[Ms.] Anderson responded by noting that there would not be a letter because she was only sending letters for truancy."  DRPSAMF ¶ 118.  The Court overrules the objection as beyond the scope of the fact asserted and admits PSAMF ¶ 118.

[48]     RSU 40 qualifies PSAMF ¶ 119 to object that "[t]he cited excerpt only supports that [Ms.] Philbrook did not believe it was appropriate . . . [and] does not support that it was against school policy."  DRPSAMF ¶ 119.  The Court agrees that Ms. Philbrook did not state that the request was against school policy and omits that portion of PSAMF ¶ 119.

Following the traffic stop, Officer Spear returned to the school, where he spoke with Ms. Philbrook about the traffic stop and expressed his concern that Ms. Wadsworth was driving a vehicle owned and insured by Mr. Cavanaugh.[49]  PSAMF ¶ 97; DRPSAMF ¶ 97; DSMF ¶ 35; PRDSMF ¶ 35.  Ms. Philbrook responded that both she and Ms. Pease had received complaints that Mr. Cavanaugh was spending too much time with Ms. Wadsworth and complaints surrounding his excusing her from class too often.  PSAMF ¶ 98; DRPSAMF ¶ 98.  Ms. Philbrook also advised Officer Spear that Mr. Cavanaugh had asked Ms. Wadsworth if she was interested in moving in with him.[50]  PSAMF ¶ 99; DRPSAMF ¶ 99.  Ms. Philbrook informed Officer Spear that she and Ms. Pease had tried to have professional conversations with Mr. Cavanaugh with regard to his behavior towards Ms. Wadsworth.  PSAMF ¶ 100; DRPSAMF ¶ 100.

As a result of the traffic stop, Ms. Philbrook asked Officer Spear to have a conversation with Mr. Cavanaugh.  PSAMF ¶ 101; DRPSAMF ¶ 101.  On September 19, 2017, at 3:30 p.m., Officer Spear approached Mr. Cavanaugh, told him of the traffic stop, and advised him that staff and students had spoken about his relationship with Ms. Wadsworth, and that the perception was that she was receiving

---

[49]     Ms. Wadsworth qualifies DSMF ¶ 35 to propose adding that Ms. Philbrook also told Officer Spear that she and Ms. Pease had received complaints about Mr. Cavanaugh spending too much time with Ms. Wadsworth.  PRDSMF ¶ 35.  The Court admits those exact proposed additions as part of PSAMF ¶ 98 in the following sentence, and thus overrules Ms. Wadsworth's qualification as moot.

[50]     RSU 40 qualifies PSAMF ¶ 99 to clarify that Officer Spear did not include this information in an email he sent the police chief following his conversation with Ms. Philbrook.  DRPSAMF ¶ 99.  Officer Spear testified that he had learned during "the conversation with Tamra Philbrook . . . that Principal Cavanaugh had asked [Ms. Wadsworth] if she was interested in moving in."  *Joint R. Materials,* Attach. 12, *Dep. of Christopher P. Spear* at 33:20-24 (*Spear Dep.*).  The Court finds the District's qualification beyond the scope of the asserted fact and admits PSAMF ¶ 99.

special treatment in the form of favoritism from Mr. Cavanaugh.  PSAMF ¶ 102; DRPSAMF ¶ 102.  Mr. Cavanaugh admitted to Officer Spear that he had heard the speculation but advised that he was not really concerned.  PSAMF ¶ 103; DRPSAMF ¶ 103.  Officer Spear wrote up a summary of the stop and his conversations with Ms. Philbrook and Mr. Cavanaugh and sent an email to the Waldoboro Police Chief titled "Pervert Principal" which described many of Mr. Cavanaugh's behaviors relating to Ms. Wadsworth.[51]  PSAMF ¶ 104; DRPSAMF ¶ 104.  After the September 19, 2017 traffic stop, conversations about Mr. Cavanaugh's behavior, and "pervert principal" email, no official action was taken relating to Mr. Cavanaugh's behavior with Ms. Wadsworth for over a month.[52]  PSAMF ¶ 105; DRPSAMF ¶ 105.

### C.    The Investigation Into Andrew Cavanaugh

Eventually, Ms. Kenniston reported her concerns to law enforcement through a contact of her brother's at Homeland Security.  DSMF ¶ 37; PRDSMF ¶ 37.  On Thursday, November 2, 2017, Superintendent Nolan received a phone call from the Waldoboro Police Chief Bill Labombarde informing him about concerns reported to law enforcement regarding messages exchanged between Mr. Cavanaugh and a student at MVHS.  DSMF ¶ 38; PRDSMF ¶ 38.  During that initial phone call, Chief Labombarde asked Superintendent Nolan to give him twenty-four hours before taking any action so as to not compromise the law enforcement investigation.  DSMF

---

[51]    RSU 40 objects to what it views as conclusory allegations in PSAMF ¶ 104.  DRPSAMF ¶ 104. The Court sustains the objection in part, omitting the descriptions of Mr. Cavanaugh "perpetrating" behaviors that were "concerning" on Ms. Wadsworth and admitting the factual assertions.

[52]    RSU 40 denies PSAMF ¶ 105 as conclusory and unsupported by the facts, particularly the assertion that Ms. Philbrook and the police chief had "clear knowledge" of Mr. Cavanaugh's "harassment."  DRPSAMF ¶ 105.  The Court sustains the objection and has pared back PSAMF ¶ 105 to include only factual assertions supported by the record.

¶ 39; PRDSMF ¶ 39.  On Friday, November 3, 2017, Superintendent Nolan had a conversation with Detective Donald Murray of the Knox County Sheriff's Department during which Detective Murray asked Superintendent Nolan not to interview Mr. Cavanaugh until Detective Murray had interviewed him.  DSMF ¶ 40; PRDSMF ¶ 40.  On Sunday, November 5, 2017, Superintendent Nolan called Mr. Cavanaugh and put him on leave, instructing him not to report to MVHS the following day, Monday, November 6, 2017.  DSMF ¶ 41; PRDSMF ¶ 41.

Superintendent Nolan began an investigation into Mr. Cavanaugh.  PSAMF ¶ 120; DRPSAMF ¶ 120; DSMF ¶ 42; PRDSMF ¶ 42.  In investigating the allegations, Mr. Nolan reviewed the school's harassment policy titled, "Harassment and Sexual Harassment of Students" and made the following notes: "Interfering, pulling out of class, late nights, unwelcome, asks, shouldn't have asked."  PSAMF ¶ 120; DRPSAMF ¶ 120.  The policy notes "sexual harassment includes but is not limited to . . . gestures, comments, or other physical, written, graphic, electronic or verbal conduct that is gender-based that interferes with a student's education."  PSAMF ¶ 121; DRPSAMF ¶ 121.  In investigating the complaints against Mr. Cavanaugh, Superintendent Nolan made these notes in an effort to figure out how the situation aligned with the school's policies.[53]   PSAMF ¶ 122; DRPSAMF ¶ 122.  Additionally, Mr. Nolan,

---

[53]   RSU 40 qualifies PSAMF ¶ 122, objecting that "[t]he cited testimony does not support that Superintendent Nolan concluded the information was inconsistent with the practice, policy, and procedure" and instead "only supports that Superintendent Nolan was trying to figure out how a specific situation might align with one or more of the policies . . . ."  DRPSAMF ¶ 122.  The Court agrees with the District's interpretation of Superintendent Nolan's testimony, sustains the objection, and omits the contested portion of PSAMF ¶ 122.  *See Nolan Dep.* at 168:2-169:8 (explaining that he was "trying to figure out how a specific situation may align with one or more of our policies" but declining to state that Mr. Cavanaugh's behavior violated the policies).

testifying on behalf of the school, stated under oath that knowledge of the following would raise red flags regarding Mr. Cavanaugh's behavior: administrator excusing a student from class; school principal providing money to the attendance secretary to pay for Plaintiff's prom ticket; and principal providing money to the attendance secretary money in an envelope to give to Plaintiff. PSAMF ¶ 123; DRPSAMF ¶ 123. Mr. Nolan added that the school principal lending or giving a car to a student would be a "gray[] area" and that a school administrator making appointment for student to take birth control would be "highly unusual."[54] PSAMF ¶ 123; DRPSAMF ¶ 123.

Mr. Nolan went on to testify that individually, several of the facts asserted during the investigation would have potentially given him a reason to investigate Mr. Cavanaugh, including: the appointment about birth control, Mr. Cavanaugh providing a car to a student, Mr. Cavanaugh calling a student "cupcake," and Mr. Cavanaugh having seen nude photos of a student.[55] PSAMF ¶ 124; DRPSAMF ¶ 124. Around mid-November, after Superintendent Nolan concluded his investigation and obtained copies of the text messages between Mr. Cavanaugh and Ms. Wadsworth, Superintendent Nolan prepared a memorandum to present to the School Board summarizing the results of the investigation and recommending that the School Board dismiss Mr. Cavanaugh. DSMF ¶ 43; PRDSMF ¶ 43.

---

[54]   RSU 40 qualifies PSAMF ¶ 123 to contend that Superintendent Nolan did not specifically describe these two examples as "raising red flags." DRPSAMF ¶ 123. The Court altered these assertions to reflect the language from Mr. Nolan's testimony. *See Nolan Dep.* at 98:16-22, 117:15-17.
[55]   RSU 40 qualifies PSAMF ¶ 124 to note that Mr. Nolan was answering a question about whether these reasons would potentially give rise to the need to investigate Mr. Cavanaugh. DRPSAMF ¶ 124. The Court slightly altered PSAMF ¶ 124 to include that addition.

Mr. Cavanaugh resigned from his position as MVHS Principal before the School Board held a dismissal hearing. DSMF ¶ 44; PRDSMF ¶ 44. After resigning from his position as a result of the investigation into his behavior (and in lieu of being fired), Mr. Cavanaugh returned his school-issued MacBook but it was missing the hard drive. PSAMF ¶ 125; DRPSAMF ¶ 125. To remove the hard drive, a special tool is required. PSAMF ¶ 126; DRPSAMF ¶ 126. As a result, Mr. Cavanaugh was charged with theft by unauthorized taking and transfer for removing the hard drive. PSAMF ¶ 127; DRPSAMF ¶ 127. In addition, Mr. Cavanaugh destroyed or turned in his cellular phone so it could not be used against him. PSAMF ¶ 128; DRPSAMF ¶ 128.

Around this time, Chris McLean, an attorney representing Mr. Cavanaugh with regard to the school board investigation, went "to the school and [waited] in the parking lot" to speak with Ms. Wadsworth.[56] PSAMF ¶ 129; DRPSAMF ¶ 129. This encounter with the attorney occurred after Mr. Cavanaugh was instructed not to go to the school.[57] PSAMF ¶ 130; DRPSAMF ¶ 130. Ms. Wadsworth got into the

---

[56]   RSU 40 qualifies PSAMF ¶ 129 to contend that the attorney went "to the school in the parking lot" (apparently in contrast to Ms. Wadsworth's formulation of "on school property") and that the citation does not support the assertion that this was "while the investigation was pending." DRPSAMF ¶ 129. Although the Court is skeptical that "on school property" does not include the school parking lot, the Court has slightly altered PSAMF ¶ 129 to address these concerns and accurately reflect Ms. Wadsworth's testimony. *See Wadsworth Dep. Vol. I* at 181:14-18.

[57]   RSU 40 objects that "[t]he testimony does not support the temporal aspect of the asserted fact." DRPSAMF ¶ 130. The Court finds that Ms. Wadsworth's deposition references "around the time of September through November of 2017," *Wadsworth Dep. Vol. I* at 181:14-15, as a time frame. Superintendent Nolan first called Mr. Cavanaugh about the allegations relating to Ms. Wadsworth on November 5, DSMF ¶ 41, and informed him during that call "do not report to school," as a standing directive. *Nolan Dep.* at 190:14-191:10. Given that Mr. Cavanaugh was immediately banned from school upon learning of the investigation, there is no evidence in this record that he would have retained an attorney about this issue and had that attorney seek out Ms. Wadsworth before Superintendent Nolan issued this "standing directive." The Court admits PSAMF ¶ 130 as supported by the record.

attorney's car in the school parking lot and the attorney encouraged Ms. Wadsworth to sign an affidavit supporting Mr. Cavanaugh, repeatedly stating "Mr. Cavanaugh is a stand-up guy, wouldn't you agree?"[58]  PSAMF ¶¶ 131-32; DRPSAMF ¶¶ 131-32. Ms. Wadsworth never signed the proposed affidavit.[59]  PSAMF ¶ 133; DRPSAMF ¶ 133.

### D.    Chuck Nguyen's Conduct During and After the Investigation

After the investigation began, Mr. Nguyen reached out to Mr. Cavanaugh a few times trying to be supportive and helpful, telling Mr. Cavanaugh that that he should not have texted Ms. Wadsworth so much, but that Mr. Nguyen knew he was a good guy and assured him that things would work out.  PSAMF ¶¶ 134-35; DRPSAMF ¶¶ 134-35.  In November 2017, in reference to the investigation, the Waldoboro Police Chief advised Mr. Nolan that Mr. Nguyen thought the school should be more supportive of Mr. Cavanaugh, that Ms. Wadsworth was "bringing it on herself," and that Mr. Nguyen was trying to get her to talk about the situation with him.  PSAMF ¶ 136; DRPSAMF ¶ 136.  Mr. Nolan expressed concern that Mr. Nguyen "maybe . . . was, knowingly or unknowingly" interfering with the investigation into

---

[58]    RSU 40 qualifies PSAMF ¶ 131 to submit that "[t]he testimony only supports that Plaintiff had a conversation with an attorney for Cavanaugh at some point around September through November 2017, that the attorney went to the school in the parking lot, and that Plaintiff got in the attorney's car and talked about the potential of Plaintiff signing an affidavit."  DRPSAMF ¶ 131.  The Court slightly altered PSAMF ¶ 131 to reflect Ms. Wadsworth's testimony.  *See Wadsworth Dep. Vol. I* at 181:13-182:15.

[59]    RSU 40 qualifies PSAMF ¶ 133 to contend that "[t]he cited testimony only supports that there was a second meeting and that, at some point, Plaintiff and her parents all went to the attorney's office to talk with the attorney about the potential of signing an affidavit but that Plaintiff did not really remember the specifics of the conversation other than her parents getting upset."  DRPSAMF ¶ 133. The Court rejects the qualification as beyond the scope of the fact asserted and admits PSAMF ¶ 133.

Mr. Cavanaugh.[60]  PSAMF ¶ 137; DRPSAMF ¶ 137.  As a result, Mr. Nolan instructed Mr. Nguyen not to have any contact with Mr. Cavanaugh regarding Ms. Wadsworth and not to have contact with Ms. Wadsworth.  PSAMF ¶ 138; DRPSAMF ¶ 138.

Mr. Nguyen met with Ms. Wadsworth approximately five times after the allegations about Mr. Cavanaugh came out, although it is unclear from the record whether any or all of those meetings occurred after Mr. Nolan warned Mr. Nguyen not to have contact with her.[61]  PSAMF ¶ 139; DRPSAMF ¶ 139.  During one of the first meetings after the allegations came out, Mr. Nguyen told Ms. Wadsworth that Mr. Cavanaugh did not do anything inappropriate or have any inappropriate conversations with her, going on to say Mr. Cavanaugh was a "stand-up guy," and that "it's not what they are making it out to be."  PSAMF ¶ 140; DRPSAMF ¶ 140.  Mr. Nguyen advised Ms. Wadsworth that if she wanted to help, she could sign an affidavit and "tell the truth."  PSAMF ¶ 141; DRPSAMF ¶ 141.

In a later meeting, Ms. Wadsworth told Mr. Nguyen that Mr. Cavanaugh's family members had been sending her messages relating to Mr. Cavanaugh's harassment of her which were upsetting, and as a result she no longer wanted to go to school.  PSAMF ¶ 142; DRPSAMF ¶ 142.  Instead of reporting this further behavior to anyone at the school, Mr. Nguyen told Ms. Wadsworth that Mr. Cavanaugh's family had a right to be angry and advised Ms. Wadsworth to apologize to Mr.

---

[60]    RSU 40 qualifies PSAMF ¶ 137 to submit that Mr. Nolan only "maybe" thought Mr. Nguyen was interfering.  DRPSAMF ¶ 137.  The Court accepts the District's qualification and has modified PSAMF ¶ 137 to reflect Mr. Nolan's deposition testimony.  *See Nolan Dep.* at 207:1-5.

[61]    RSU 40 qualifies PSAMF ¶ 139 to object to the assertion that the meetings occurred "despite Mr. Nolan's warnings."  DRPSAMF ¶ 139.  The record is unclear when the meetings occurred in relation to Mr. Nolan's warnings, *see Wadsworth Dep. Vol. II* at 36:12-23, and the Court altered PSAMF ¶ 139 to address the District's concern and reflect the temporal uncertainty.

Cavanaugh's wife and niece, who was another student at the school.[62]  PSAMF ¶ 143;

DRPSAMF ¶ 143.

In another meeting with Ms. Wadsworth in his office, Mr. Nguyen stood up,

closed the door to his office, and informed Ms. Wadsworth that Mr. Cavanaugh had a

drinking problem and that he lost sight of his boundaries; he went on to tell Ms.

Wadsworth to picture a day in the future, in college, having coffee with Mr.

Cavanaugh, when "all of this would be gone and over with."[63]  PSAMF ¶ 144;

DRPSAMF ¶ 144.  On January 12, 2018, at 7:26 p.m., Ms. Wadsworth reached out to

Mr. Nguyen via Facebook messenger and complained that Mr. Cavanaugh's wife had

messaged her.  PSAMF ¶ 145; DRPSAMF ¶ 145.  Mr. Nguyen responded that Mr.

Cavanaugh's wife was mad that Ms. Wadsworth had not signed the affidavit, advised

her that Mr. Cavanaugh's wife had a right to be mad, and offered to reach out to Mr.

Cavanaugh on Ms. Wadsworth's behalf.  PSAMF ¶ 145; DRPSAMF ¶ 145.

According to Mr. Nolan, had he been aware that Mr. Nguyen continued to meet

with Ms. Wadsworth after he was instructed not to, he would have called for an

investigation and disciplined Mr. Nguyen.  PSAMF ¶ 146; DRPSAMF ¶ 146.  After

Mr. Nguyen was instructed not to have contact with Ms. Wadsworth, Mr. Spear

observed Ms. Wadsworth crying in the hallway, and Mr. Nguyen chasing her down

---

[62]     RSU 40 qualifies PSAMF ¶ 143 to object that the cited testimony does not support the assertion
that Mr. Cavanaugh's niece was another student at the school.  DRPSAMF ¶ 143.  The Court agrees
that this assertion is not referenced in the cited testimony but finds support for the assertion elsewhere
in Ms. Wadsworth's deposition and admits PSAMF ¶ 143 in its entirety.  *See Wadsworth Dep. Vol. II*
at 121:1-5 (Ms. Wadsworth had a dispute "with a girl in class . . . who's Mr. Cavanaugh's niece").
[63]     RSU 40 qualifies PSAMF ¶ 144 to object to the characterization of the meeting as "yet another
inappropriate meeting."   DRPSAMF  ¶ 144.   The Courts sustains the objection, omits that
characterization, and admits the remainder of PSAMF ¶ 144.

the hallway.  PSAMF ¶ 147; DRPSAMF ¶ 147.  In or around November 2017, Police Chief Labombarde heard that Mr. Nguyen was defending Mr. Cavanaugh's behavior and he met with Mr. Nguyen in his office.  PSAMF ¶ 148; DRPSAMF ¶ 148.  During this conversation, Mr. Nguyen defended Mr. Cavanaugh's actions and again stated that Mr. Cavanaugh was just trying to be a father figure to Ms. Wadsworth. PSAMF ¶ 149; DRPSAMF ¶ 149.  Mr. Nguyen stated to Mr. Labombarde: "You know, this could happen to you or I or anybody dealing with kids on a regular basis; somebody can make an allegation."  PSAMF ¶ 150; DRPSAMF ¶ 150.  Mr. Labombarde was shocked by this statement.  PSAMF ¶ 150; DRPSAMF ¶ 150.

### E.   Adrianna Wadsworth's Mental Health

Ms. Wadsworth has experienced anxiety and depression, which she relates in part to the actions of Mr. Cavanaugh and Mr. Nguyen.[64]  PSAMF ¶ 151; DRPSAMF ¶ 151.  In high school, Ms. Wadsworth's depression and anxiety affected her at school because she did not want to go to class anymore, and she would cry in the morning on the way to and from school.  PSAMF ¶ 152; DRPSAMF ¶ 152.  Ms. Wadsworth began going to counseling in April 2018.  PSAMF ¶ 153; DRPSAMF ¶ 153.  Ms. Wadsworth continues to suffer from anxiety and has trouble in school dealing with male professors.[65]  PSAMF ¶ 154; DRPSAMF ¶ 154.

---

[64]     RSU 40 qualifies PSAMF ¶ 151 to object that the cited testimony does not support the assertion that her depression and anxiety are "a result of Mr. Cavanaugh and Mr. Nguyen's actions."  DRPSAMF ¶ 151.  The Court disagrees, even though the cited testimony refers to depression and anxiety she experienced at college three years later, Ms. Wadsworth immediately clarified that she spoke to the college counselor in part due to "Mr. Cavanaugh and Mr. Nguyen and this situation."  *See Wadsworth Dep. Vol. II* at 23:20-24:13.

[65]     RSU 40 qualifies PSAMF ¶ 154 to object that the cited testimony does not support the assertion that Ms. Wadsworth "continues to suffer from anxiety."  DRPSAMF ¶ 154.  However, when asked whether her anxiety has "improved as [she has] gone on in [her] college career in terms of having a

### F.    District Personnel's Awareness of Andrew Cavanaugh's Behavior

Prior to the phone call that Superintendent Nolan received from Chief Labombarde on November 2, 2017, Superintendent Nolan was not aware of any concerns about the relationship between Mr. Cavanaugh and Ms. Wadsworth or any inappropriate behavior on the part of Mr. Cavanaugh.[66]  DSMF ¶ 45; PRDSMF ¶ 45. Superintendent Nolan was not aware of Mr. Cavanaugh engaging in sexual harassment in the past.[67, 68]  DSMF ¶ 46; PRDSMF ¶ 46.  Ms. Philbrook was aware that Mr. Cavanaugh and Ms. Wadsworth had communicated but did not learn of the content of some of the text messages between Mr. Cavanaugh and Ms. Wadsworth until Ms. Philbrook read them in the newspaper, and she did not know Mr.

---

comfort level dealing with all of [her] professors," Ms. Wadsworth responded "[d]efinitely not." *Wadsworth Dep. Vol. II* at 12:13-16.  The record reveals support for the assertion, and the Court overrules the District's objection and admits PSAMF ¶ 154.

[66]    Ms. Wadsworth qualifies DSMF ¶ 45 to submit that "in the course of his investigation, after learning that Defendant Cavanaugh had purchased a vehicle for the Plaintiff and that she had been working for him, Superintendent Nolan began to be concerned that there was something more going on between Plaintiff and Defendant Cavanaugh."  PRDSMF ¶ 45 (citing *Nolan Dep.* at 92:5-93:11). Because the proposed fact asserts what Mr. Nolan knew prior to the investigation and Ms. Wadsworth's objection concerns what he learned during the investigation, the Court overrules her objection as beyond the scope of the fact asserted and admits DSMF ¶ 45.

[67]    RSU 40's proposed DSMF ¶ 47 asserts that "[n]either Ms. Pease nor Ms. Philbrook had any concerns relating to the relationship between Ms. Wadsworth and Mr. Cavanaugh prior to November 2017."  Ms. Wadsworth denies this assertion, countering that, among other examples, "[Ms.] Philbrook advised Officer Spear that she and [Ms.] Pease had tried to have professional conversations with [Mr.] Cavanaugh in regard to his behavior."  PRDSMF ¶ 47.  The Court finds multiple examples of Mr. Pease and Ms. Philbrook demonstrating concern, *see, e.g., Spear Dep.* at 34:5-13 (Ms. Pease and Ms. Philbrook told Mr. Spear "we've tried to have professional conversations with [Mr. Cavanaugh] in regards to this behavior"), sustains Ms. Wadsworth's objection, and omits DSMF ¶ 47.

[68]    RSU 40's proposed DSMF ¶ 48 asserts that "The first time Ms. Philbrook learned that there was potentially an inappropriate relationship between Mr. Cavanaugh and Ms. Wadsworth was sometime in November 2017 when the school resource officer barged into her office, shut her door and closed her blinds, said Mr. Cavanaugh was under investigation (possibly about the text messages with Ms. Wadsworth), and told Ms. Philbrook not to say one word about it or she would be arrested."  Ms. Wadsworth objects, citing the same examples referenced in PRDSMF ¶ 47.  PRDSMF ¶ 48.  The Court agrees and omits DSMF ¶ 48 for the reasons described in footnote 67.

Cavanaugh messaged with Ms. Wadsworth outside of school.[69] DSMF ¶ 49; PRDSMF ¶ 49. Until she received legal documentation over a year and a half after Mr. Cavanaugh left MVHS, Ms. Pease did not know anything concrete about Mr. Cavanaugh's extensive text messaging with Ms. Wadsworth; she had only heard intimations over the course of 2018, after Mr. Cavanaugh left MVHS.[70, 71] DSMF ¶ 50; PRDSMF ¶ 50.

The school resource officer did not know about Mr. Cavanaugh's texting with Ms. Wadsworth until after the law enforcement investigation began in November 2017. DSMF ¶ 53; PRDSMF ¶ 53. Ms. Pease was not aware at any point that Ms. Wadsworth was working for Mr. Cavanaugh for compensation. DSMF ¶ 54; PRDSMF ¶ 54. Ms. Philbrook knew Ms. Wadsworth worked for Mr. Cavanaugh but, in Ms. Philbrook's experience, it was normal for a student to do work for payment from a principal.[72] DSMF ¶ 55; PRDSMF ¶ 55. Ms. Pease was not aware that Mr.

---

[69]    Ms. Wadsworth denies DSMF ¶ 49, objecting that "[Ms.] Philbrook was present in a meeting when Plaintiff advised Defendant Nguyen that Defendant Cavanaugh called her cupcake and other nicknames in text messages." PRDSMF ¶ 49. The Court altered DSMF ¶ 49 to reflect that Ms. Philbrook knew that Mr. Cavanaugh was texting Ms. Wadsworth but overrules the remainder of the objection as beyond the scope of the facts asserted.

[70]    RSU 40's proposed DSMF ¶ 51 asserts that "Mr. Nguyen did not know, prior to November 2017, that Mr. Cavanaugh was texting Ms. Wadsworth." Ms. Wadsworth counters that Mr. Nguyen was aware of the messages. PRDSMF ¶ 51. The Court sustains the objection for the reasons stated in footnote 16 and omits DSMF ¶ 51.

[71]    RSU 40's proposed DSMF ¶ 52 asserts that "[n]o person, including Ms. Wadsworth, ever raised concerns with Mr. Nguyen regarding Mr. Cavanaugh's relationship with Ms. Wadsworth." Ms. Wadsworth rejects this assertion, citing numerous examples. PRDSMF ¶ 52. The Court finds the assertion implausible on its face and clearly contradicted by—at least—the testimony of Ms. Wadsworth and Ms. Kenniston. *See Wadsworth Dep. Vol. I* at 209:19-210:5 (testifying that she told Mr. Nguyen she was "embarrassed" by Mr. Cavanaugh giving her feminine hygiene products); *Kenniston Dep.* at 46:15-25 (calling Mr. Nguyen because learning that "a male principal made an appointment for birth control for a 16-year-old girl . . . disturbed [her] greatly"). The Court sustains the objection and omits DSMF ¶ 52.

[72]    Ms. Wadsworth admits DSMF ¶ 55 but qualifies it "to the extent that Ms. Philbrook expressed concerns about Defendant Cavanaugh's relationship with Plaintiff Wadsworth to him directly and to

Cavanaugh had given Ms. Wadsworth a car that was under his insurance and registration. DSMF ¶ 56; PRDSMF ¶ 56. Ms. Philbrook learned from the school resource office that Ms. Wadsworth was pulled over by the school resource officer driving a car registered to and insured by Mr. Cavanaugh. DSMF ¶ 57; PRDSMF ¶ 57. Mr. Cavanaugh told Ms. Philbrook that Ms. Wadsworth would be buying the car from him, and Ms. Philbrook knew Ms. Wadsworth had worked for Mr. Cavanaugh in the past.[73] DSMF ¶ 57; PRDSMF ¶ 57. Ms. Pease did not learn of the frequency with which Mr. Cavanaugh was meeting with Ms. Wadsworth until December 2017 when she saw a log created by the attendance secretary outlining the frequency of the meetings. DSMF ¶ 58; PRDSMF ¶ 58.

### G. The District's Policies and Trainings

#### 1. The Sexual Harassment Policy and Complaint Procedure

Throughout the time Ms. Wadsworth was a student at MVHS, RSU 40 had policies in place prohibiting sexual harassment (the Policy) and setting forth a complaint procedure for reporting instances of sexual harassment (the Complaint Procedure). DSMF ¶ 59; PRDSMF ¶ 59. The Policy defines sexual harassment as: "Sexual harassment includes but is not limited to unwelcome sexual advances, requests for sexual favors or pressure to engage in sexual activity, physical contact of a sexual nature, gestures, comments, or other physical, written, graphic, electronic

---

Officer Spear." PRDSMF ¶ 55. The Court rejects this qualification as beyond the scope of the facts asserted and admits DSMF ¶ 55.

[73] Ms. Wadsworth denies DSMF ¶ 57, objecting to the assertion that Ms. Philbrook "was not concerned about it." PRDSMF ¶ 57. The Court agrees and rejects that assertion for the reasons described in footnote 67, sustains the objection as relating to Ms. Philbrook's concern, and admits the remainder of DSMF ¶ 57.

or verbal conduct that is gender-based that interferes with a student's education." PSAMF ¶ 7; DRPSAMF ¶ 7; DSMF ¶ 60; PRDSMF ¶ 60. It requires "[s]chool employees, fellow students, volunteers and visitors to the school, and other persons with whom students may interact in order to pursue school activities . . . to refrain from such conduct." DSMF ¶ 61; PRDSMF ¶ 61. The Policy provides: "[h]arassment/sexual harassment of students by school employees is considered grounds for disciplinary action, up to and including discharge." DSMF ¶ 62; PRDSMF ¶ 62.

The Complaint Procedure defines a "Complaint" as "an allegation that a student has been discriminated against or harassed on the basis of race, color, sex, sexual orientation, religion, ancestry, national origin, or disability." DSMF ¶ 64; PRDSMF ¶ 64. The Complaint Procedure defines "Harassment" as including "oral, written, graphic, electronic or physical conduct relating to an individual's actual or perceived membership in a protected class that is sufficiently severe, pervasive or persistent so as to interfere with or limit the individual's ability to participate in the school unit's programs or activities by creating a hostile, intimidating or offensive educational environment." DSMF ¶ 65; PRDSMF ¶ 65.

The Complaint Procedure directs "[a]ny individual who believes that a student has been discriminated against or harassed [to] report their concern promptly to the building principal and utilize this complaint procedure. . .. Individuals who are unsure whether discrimination or harassment has occurred, or who need assistance in preparing a written [complaint,] are encouraged to discuss the situation with the

38

Superintendent/designee."[74]  DSMF ¶ 66; PRDSMF ¶ 66.  Additionally, the policy states that sexual harassment complaints could be brought to the police or the Maine Human Rights Commission.  PSAMF ¶ 14; DRPSAMF ¶ 14.

The Policy mandates that "[t]he Superintendent/designee or the employee designated as the Title IX Coordinator will investigate complaints of harassment in accordance with the . . . Complaint Procedure."  PSAMF ¶ 8; DRPSAMF ¶ 8; DSMF ¶ 63; PRDSMF ¶ 63.  While the Policy does not define "designee," Superintendent Nolan testified that "it seems like it would be appropriate that it would be the principal or assistant principal."[75]  PSAMF ¶ 9; DRPSAMF ¶ 9.  The Policy goes on to state that "any individual who believes that a student has been discriminated against or harassed should report their concern to the building principal . . .."  PSAMF ¶ 10; DRPSAMF ¶ 10.  It adds further that "[s]chool staff shall report possible incidents of discrimination or harassment of students to [the] building principal. Parents and other adults are also encouraged to report any concerns about possible discrimination and harassment of students."  PSAMF ¶ 11; DRPSAMF ¶ 11; DSMF ¶ 67; PRDSMF ¶ 67.

When a complaint is received, the Policy provides that "the building principal shall promptly inform the Superintendent and the person(s) who is the subject of the

---

[74]     Ms. Wadsworth qualifies DSMF ¶ 66 to supply definitions for building principal and designee, and to add that the policy also allows reports to be made to the police.  PRDSMF ¶ 66.  The Court includes each of these requested additions elsewhere in this section by admitting PSAMF ¶¶ 9 and 13-14, and thus rejects Ms. Wadsworth's qualification as moot.

[75]     RSU 40 qualifies PSAMF ¶ 9 to submit that the policy is not specific and that Mr. Nolan was not certain who would qualify as his designee.  DRPSAMF ¶ 9.  The Court admits PSAMF ¶ 9 as altered to address the District's concerns and reflect Mr. Nolan's exact testimony.  *Nolan Dep.* at 178:1-10 ("it seems like it would be appropriate that [the designee] would be the principal or assistant principal").

Complaint." PSAMF ¶ 12; DRPSAMF ¶ 12; DSMF ¶ 68; PRDSMF ¶ 68. While the term "building principal" is undefined in the policy, Superintendent Nolan testified that "building principal" means either the School Principal (Mr. Cavanaugh) or the School Assistant Principals (Ms. Philbrook and Ms. Pease). PSAMF ¶ 13; DRPSAMF ¶ 13.

The Complaint Procedure states that "[t]he Complaint will be investigated by the Superintendent unless the Superintendent designates another person to investigate it on the Superintendent's behalf. Any Complaint about an employee who holds a supervisory position shall be investigated by a person who is not subject to that supervisor's authority." DSMF ¶ 68; PRDSMF ¶ 68. Under the Policy, a staff person who had knowledge of a student being sexually harassed would ordinarily make a complaint to the principal, but if the principal was the perpetrator of the harassment, the staff person would be expected to make a report to the Superintendent.[76] DSMF ¶ 70; PRDSMF ¶ 70. In that scenario, a student being harassed by a principal who is also the affirmative action officer could report the harassment to the principal, any staff person, assistant principal, or counselor, and that person could then report the harassment.[77] PSAMF ¶ 21; DRPSAMF ¶ 21.

## 2. Sexual Harassment Training

---

[76] Ms. Wadsworth denies DSMF ¶ 70, objecting that Mr. Nolan "testified that if the affirmative action officer and the principal were the same person, then a student could report sexual harassment to any staff person, assistant principal, or counselor." PRDSMF ¶ 70. The Court notes that DSMF ¶ 70 focuses entirely on how a staff person could report harassment, while Ms. Wadsworth denies this assertion on the grounds there are additional options for students to report *to* staff persons. The Court overrules Ms. Wadsworth's objection as beyond the scope of the fact asserted and admits DSMF ¶ 70.

[77] RSU 40 qualifies PSAMF ¶ 21 to note that Mr. Nolan was speaking of a scenario where the harassing principal is also the affirmative action officer. DRPSAMF ¶ 21. The Court slightly altered PSAMF ¶ 21 to reflect Mr. Nolan's testimony.

As RSU 40's Affirmative Action Coordinator, Mr. Cavanaugh was responsible for training staff on the District's sexual harassment policies. PSAMF ¶ 15; DRPSAMF ¶ 15. Each year during the relevant period, Mr. Cavanaugh provided a PowerPoint presentation to staff on the topic, although he felt he "wasn't qualified" to give trainings on the sexual harassment policies.[78,79] PSAMF ¶ 16; DRPSAMF ¶ 16; DSMF ¶ 74; PRDSMF ¶ 74. The District does not have a copy of the presentations because they were on the hard drive Mr. Cavanaugh removed from his computer, nor does it have other written evidence relating to the content of Mr. Cavanaugh's trainings. PSAMF ¶ 16; DRPSAMF ¶ 16; DSMF ¶ 74; PRDSMF ¶ 74. The District

---

[78]    The parties disagree about a number of factual issues relating to the sexual harassment trainings. The District submits that "[f]rom 2015 through the period relevant to this litigation, RSU 40 provided sexual harassment training to administrators and staff on a yearly basis and also provided new employees with copies of the sexual harassment policy." DSMF ¶ 74. Ms. Wadsworth makes numerous objections and rejoins that the District "has no evidence of the content of the sexual harassment training that Mr. Cavanaugh allegedly provided to staff, claiming that he created a PowerPoint presentation and maintained it on his work computer, but that Mr. Cavanaugh never gave the School a copy of such presentation." PSAMF ¶ 16; PRDSMF ¶ 74.

First, the parties agree that Mr. Cavanaugh testified that he presented a PowerPoint presentation to staff relating to the District's sexual harassment policies and also that the District does not have a copy of that PowerPoint because he removed the hard drive from his school-issued computer before returning it. DPSAMF ¶ 16; PRDSMF ¶ 74. The parties also do not appear to dispute that the District has no written evidence relating to Mr. Cavanaugh's trainings. *Compare* PSAMF ¶ 16; *with* DRPSAMF ¶ 16.

Second, while Ms. Wadsworth expresses skepticism that these presentations took place, *see* PSAMF ¶ 16 ("no evidence" of the training Mr. Cavanaugh "allegedly provided"), the record supports the assertion that Mr. Cavanaugh provided the presentations and that—even if he may have considered each session "just a presentation"—the rest of the staff viewed them as trainings. *See Pease Dep.* at 19:23-20:19 (recounting Mr. Cavanaugh providing sexual harassment training "every year"); *Philbrook Dep.* at 18:17-19:18 (same); *Cavanaugh Dep.* at 173:12-22 (describing giving the presentation).

For these reasons, the Court sustains in part and overrules in part Ms. Wadsworth's objections to DSMF ¶ 74, and sustains in part and overrules in part Mr. Cavanaugh's objections to PSAMF ¶ 16. It admits the portions of PSAMF ¶ 16 and DSMF ¶ 74 that it has found to be supported by the record.

[79]    Ms. Wadsworth's proposed PSAMF ¶ 19 states that "Mr. Cavanaugh testified that he did not provide sexual harassment training to staff and he was not qualified to give any such training." The District denies this assertion, citing staff members' recollections of the trainings. DRPSAMF ¶ 19. The Court admits Mr. Cavanaugh's assertion that he was unqualified but omits the remainder of PSAMF ¶ 19 for the reasons discussed in footnote 78.

does not have written records of staff members acknowledging that they received Mr. Cavanaugh's training, but multiple staff members remember attending.[80] PSAMF ¶ 17; DRPSAMF ¶ 17. Superintendent Nolan was not aware of whether Mr. Cavanaugh had received training to prepare him for training District staff on sexual harassment and reporting.[81] PSAMF ¶ 20; DRPSAMF ¶ 20.

Superintendent Nolan testified that he did not believe that Mr. Cavanaugh's training contained any information regarding reporting sexual harassment when the affirmative action officer was the harasser and expected assistant principals would report sexual harassment to the principal, testifying: "I think if there was a conflict of that . . . they would report it to me." PSAMF ¶ 20; DRPSAMF ¶ 20.

According to Ms. Pease, if the Principal was the harasser, she was to report it to the Superintendent; however, she noted that nobody in the school did that or knew to do that.[82] PSAMF ¶ 23; DRPSAMF ¶ 23; DSMF ¶ 71; PRDSMF ¶ 71. It was Ms. Pease's understanding of the policy that if a student was being sexually harassed, any adult in the school would move a report up the chain of command, to the assistant

---

[80]   RSU 40 qualifies PSAMF ¶ 17, noting that multiple staff members testified to attending the annual training. DRPSAMF ¶ 17. The Court agrees for the reasons stated in footnote 78 and altered PSAMF ¶ 17 to include the staff members' recollections.

[81]   RSU 40 qualifies PSAMF ¶ 20 to object that Mr. Cavanaugh was already the affirmative action officer when Mr. Nolan arrived and that Mr. Cavanaugh received some training as an affirmative action officer. DRPSAMF ¶ 20. The Court largely overrules the District's objection as beyond the scope of the facts asserted but alters PSAMF ¶ 20 slightly to more accurately reflect Mr. Nolan's testimony.

[82]   Ms. Wadsworth qualifies DSMF ¶ 71 to propose adding details about Ms. Pease's understanding. PRDSMF ¶ 71. The proposed additions are identical to Ms. Wadsworth's proposed PSAMF ¶ 23, which the District did not object to. Because the Court admits PSAMF ¶ 23, it rejects Ms. Wadsworth's qualification as moot.

principals, the principal, or to the superintendent, if needed, for complaints to be made and an investigation to occur.  PSAMF ¶ 23; DRPSAMF ¶ 23.

According to Ms. Philbrook, if the Principal was the harasser, she was to report it to the Superintendent or the police.[83]  PSAMF ¶ 24; DRPSAMF ¶ 24; DSMF ¶ 72; PRDSMF ¶ 72.  Ms. Philbrook testified that her understanding of the sexual harassment policy was that students could make initial reports to any staff member they felt comfortable talking to, and then the staff member would report it to the school counselor, the school resource officer, the assistant principal, or the principal. PSAMF ¶ 25; DRPSAMF ¶ 25.

Mr. Nguyen testified that his understanding of the sexual harassment policy was that the reports of sexual harassment were to go to a district-level affirmative action officer in the Superintendent's office.[84]  PSAMF ¶ 26; DRPSAMF ¶ 26; DSMF ¶ 73; PRDSMF ¶ 73.  At the time, Mr. Cavanaugh was RSU 40's district-level affirmative action officer.  PSAMF ¶ 27; DRPSAMF ¶ 27.

### 3.   The District's Insurance Policy

RSU 40 maintains, and did maintain during the period relevant to this litigation, a general liability insurance policy through Trident Insurance.  DSMF ¶ 75; PRDSMF ¶ 75.  The insurance policy provides:

> [c]overage is limited to those areas for which governmental immunity has been expressly waived by 14 M.R.S.A. 8104-A, as limited by 14

[83]    Ms. Wadsworth qualifies DSMF ¶ 72 to propose adding details about Ms. Philbrook's understanding.  PRDSMF ¶ 72.  Because the Court admits PSAMF ¶ 23, it rejects Ms. Wadsworth's qualification as moot for the reasons explained in footnote 82.

[84]    Ms. Wadsworth qualifies DSMF ¶ 73 to raise the same issues discussed in footnotes 82 and 83.  PRDSMF ¶ 73.  The Court again adopts Ms. Wadsworth's proposed language and overrules her objection as moot.

> M.R.S.A. 8104-B and 14 M.R.S.A. 8111. Coverage amount for causes of action seeking tort damages pursuant to the provisions of the Maine Tort Claims Act are limited to those specified in 14 M.R.S.A. 8105 and 8104-D. Liability coverage shall not be deemed a waiver of any immunities or limitation of damages available under the Maine Tort Claims Act, other Maine statutory law, judicial precedent or common law.

DSMF ¶ 76; PRDSMF ¶ 76.

## III.   THE PARTIES' POSITIONS

### A.   MSAD 40/RSU 40's Motion for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, RSU 40 asks this Court to grant summary judgment in its favor and against Adrianna Wadsworth on all counts pleaded against it in the Amended Complaint: the Title IX, § 1983, and state law tort claims. *Def.'s Mot.* at 1. The District argues that it is entitled to summary judgment because: (1) no "appropriate person" within the District ever had actual knowledge of Mr. Cavanaugh's conduct before the Superintendent was notified of it by law enforcement, at which point Mr. Cavanaugh was removed from his position; (2) Ms. Wadsworth's alleged constitutional injuries were not the result of any RSU 40 policy or custom; and (3) RSU 40 is immune from her state law tort claims under the Maine Tort Claims Act. *Id.* at 2.

#### 1.   The Title IX Claim

The District contends that it is entitled to summary judgment on Ms. Wadsworth's Title IX claim because she has failed to show that "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf ha[d] actual knowledge of

44

discrimination in the recipient's programs and fail[ed] adequately to respond." *Id.* at 8 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).

RSU 40 notes that Title IX prohibits discrimination "on the basis of sex" in federally funded educational programs and activities, *id.* at 7 (quoting 20 U.S.C. § 1681(a)), and that an administrator sexually harassing a student "can constitute gender-based discrimination actionable under Title IX" where the acts of sexual harassment are "sufficiently severe and pervasive to compromise or interfere with educational opportunities normally available to students." *Id.* (quoting *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65 (1st Cir. 2002)).  It adds, however, that "remedial scheme under Title IX is predicated upon notice to an appropriate person and an opportunity to rectify any violation."  *Id.* (citation and internal quotations omitted).

The first prong of the District's argument is that no "appropriate person" had notice of any harassment.  *Id.* at 8.  "A school official is an 'appropriate person' to receive notice of harassment for the purpose of determining liability under Title IX when that person, 'at a minimum, has the authority to institute corrective measures' and has 'customary disciplinary authority' over the alleged harasser."  *Id.* (quoting *McCann on behalf of J.M. v. York Sch. Dep't*, 365 F. Supp. 3d 132, 142 (D. Me. 2019)). It submits that, because different school districts have different structures, whether a particular school official qualifies as an "appropriate person" to receive notice of harassment under Title IX is a fact-based and case-specific inquiry.  *Id.*

RSU 40 acknowledges that Superintendent Nolan would qualify as an "appropriate person" for Title IX purposes, as he has "the power to initiate an investigation into the principal's conduct, impose discipline short of dismissal, and recommend that the School Board dismiss the principal." *Id.* at 9. It contends, however, that "Superintendent Nolan was completely unaware of any concerns regarding Cavanaugh until November 2, 2017, when he received the call from the Chief of the Waldoboro Police," and he then "immediately took steps to ensure that Cavanaugh was removed from MVHS." *Id.*

The District then submits that, because Ms. Wadsworth will not be able to—in its view—show that Superintendent Nolan had notice of the harassment, she instead "will fall back on alleged knowledge of the two assistant principals, Pease and Philbrook." *Id.* It argues that these claims are similarly unavailing because "neither Pease nor Philbrook had any supervisory responsibilities over Cavanaugh and thus neither are 'appropriate persons' for the purposes of the Title IX analysis." *Id.* (citing *Gebser*, 524 U.S. at 290). RSU 40 added further that, while the Court noted in denying its motion to dismiss that assistant principals have qualified as appropriate persons, those cases have involved student-on-student harassment and assistant principals customarily have disciplinary authority over students. *Id.* at 10.

In contrast, the District suggests that the "appropriate persons" are different for cases involving harassment by a staff member. *Id.* The test is "whether a person with disciplinary authority over the harasser had actual knowledge of the harassment," and submits that "[a]lthough Pease and Philbrook may very well be

46

appropriate persons for the purpose of a Title IX claim involving student-to-student harassment because they have disciplinary authority over students . . . it is undisputed that they have no authority over the principal and are not 'appropriate persons.'" *Id.* at 10-11.  The District adds further that "the fact that Pease and Philbrook could have reported harassment to the Superintendent or law enforcement" does not "make them appropriate persons."  *Id.* at 11.  It concludes that Superintendent Nolan was "the only 'appropriate person' for Title IX purposes" and, because he did not have knowledge of the harassment until November 2, 2017, the District cannot be liable for a Title IX violation.  *Id.* at 11-12.

The second prong of the District's Title IX argument is that, even if Ms. Pease and/or Ms. Philbrook were "appropriate persons" under Title IX, they did not have "actual knowledge" of sexual harassment because "there is no record evidence to support that either of them acted with deliberate indifference to known acts of harassment as is required for liability under Title IX."  *Id.* at 12.  The District lays out that "[t]o establish deliberate indifference on the part of the funding recipient, a plaintiff must show *actual knowledge* of the harassment."  *Id.* (citing *Santiago v. Puerto Rico*, 655 F.3d 61, 73 (1st Cir. 2011)) (emphasis in *Def.'s Mot.*).  Actual knowledge "means just that: actual knowledge of the sexual harassment itself, not merely reason to suspect harassment may be occurring."  *Id.*

The District cites a recent Eighth Circuit Title IX case where the school prevailed on summary judgment after a student was sexually harassed by a teacher. *Id.* at 12-13 (citing *KD v. Douglas Cnty. Sch. Dist. No. 001*, 1 F.4th 591, 598 (8th Cir.

2021)).  The *KD* Court noted that, regarding actual knowledge, "favoritism towards the student; inordinate time spent with the student; unprofessional conduct towards the student; and vague complaints about the teacher's behavior toward the student . . . fall short of creating actual notice." *Id.* at 12 (quoting *KD*, 1 F.4th at 598).  The District submits that "[t]he facts regarding notice to school personnel in KD are far worse than the facts of this case where at most the only evidence Plaintiff has here is that both Pease and Philbrook knew that Cavanaugh was pulling Plaintiff out of class . . . and that Philbrook knew that Plaintiff had been spotted in Cavanaugh's car by the School Resource Officer." *Id.* at 13.  It concludes that "[c]ompared to the facts of *KD* there can be no question that no one in the RSU 40 administration had actual knowledge of sexual harassment" and "RSU 40 is thus entitled to summary judgment on Count I of the Complaint." *Id.*

### 2.    The § 1983 Claim

RSU 40 contends that it "is entitled to summary judgment on Plaintiff's § 1983 claim (Count II) because Plaintiff's injuries were not caused by RSU 40 policy or custom."[85] *Id.*  At the outset, it notes that it cannot be held vicariously liable under § 1983 for Mr. Cavanaugh's actions and that "liability can be imposed on a local government only where that government's policy or custom is responsible for causing the constitutional violation or injury." *Id.* (quoting *Kelley v. LaForce*, 288 F.3d 1, 9 (1st Cir. 2002)).  The District explains that the Supreme Court has identified two paths under which a "policy or custom" can be subject to a § 1983 claim: "first, where

---

[85]    The District clarifies that it takes no position on Ms. Wadsworth's § 1983 claims against Mr. Nguyen and Mr. Cavanaugh.  *Id.* at 13 n.3.

an established policy or action by a municipal decision-maker directly causes the constitutional injury, and, second, where a facially lawful municipal action nonetheless led an employee to violate a person's constitutional rights." *Id.* at 14 (citing *Bd. of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404-07 (1997)).

The first prong of the District's § 1983 argument is that its harassment policy and procedure were not the "moving force" behind Ms. Wadsworth's alleged constitutional injuries. *Id.* It states that "there can be no serious contention that the District's Sexual Harassment Policy and/or Complaint Procedure, were themselves illegal." *Id.* at 15. The District further submits that these policies, if followed, "would not violate Plaintiff's equal protection rights" and thus "it is undisputed that it was not any policy or practice of RSU 40 that violated Plaintiff's federally protected rights but rather the actions of a single individual: Cavanaugh." *Id.* at 16. Nor is there, the District argues, a "'hole' in the policy (the failure to directly address to whom one should report to if the principal is the harasser) [that] caused the Plaintiff's alleged injuries." *Id.* Instead, "school employees were expected to and believed they were required to report concerns of sexual harassment committed by the 'building principal' directly to the Superintendent." *Id.* The District concludes that "there is no causal link between the harassment policy and procedure and Plaintiff's alleged constitutional injuries" and thus its policy cannot support Ms. Wadsworth's § 1983 claim. *Id.* at 16-17.

The second prong of the District's § 1983 argument contends that "[t]here is no evidence that RSU 40 was deliberately indifferent to Plaintiff's rights due to an

ostensible failure to train employees to report sexual harassment." *Id.* at 17.  It explains that "although courts have recognized that a governmental entity's failure to train its employees may constitute the requisite policy or custom" for a § 1983 violation, "[a] failure to train will only rise to the level of an official custom or policy where the conduct amounts to deliberate indifference to the rights of the person and is 'closely related' to or 'the moving force' behind the constitutional injury." *Id.* (citing *Hayden v. Grayson*, 134 F.3d 449, 456 (1st Cir. 1998)).  The District adds that to prevail on a failure to train claim, "the plaintiff must show that the constitutional violation had a 'direct causal link' to the deficiency in training." *Id.* at 17-18 (quoting *Jones v. City of Bos.*, 752 F.3d 38, 59 (1st Cir. 2014)).

The District submits that there was no such training deficiency, and instead "employees knew and were expected to report directly to the Superintendent complaints of the 'building principal' engaging in sexual harassment of a student." *Id.* at 18.  In the District's view, "[t]here is no evidence whatsoever of any employee being confused about who to report to in this instance, and more importantly no evidence that anyone failed to report sexual harassment of Plaintiff because of the District's policy." *Id.*  Contending that Ms. Wadsworth has identified neither a flaw in its harassment policy nor a failure to train, the District asks the Court to grant summary judgment on her § 1983 claim.

### 3.    The State Law Tort Claims

Finally, the District argues that it is "entitled to summary judgment on Plaintiff's state law tort claims because RSU 40 is immune from liability under the

Maine Tort Claims Act [MTCA]." *Id.* at 19.  Ms. Wadsworth has asserted three state law tort claims against the District: negligent hiring, training, and supervision (Count III); intentional infliction of emotional distress (Count IV); and negligent infliction of emotional distress (Count V).

Under the MTCA, the general rule is that "all governmental entities shall be immune from suit on any and all tort claims seeking recovery of damages." *Id.* (quoting 14 M.R.S.A. § 8103).  The District notes that, while immunity can be waived in certain circumstances, "a governmental entity is liable for property damage, bodily injury or death" only in four specifically delineated areas (primarily relating to vehicle use, construction, and pollutants).  *Id.* (quoting 14 M.R.S.A. § 8104-A).  It submits that "[n]one of Plaintiff's state law tort claims fall within the four narrow exceptions to MTCA immunity." *Id.* at 19-20.

The District adds that "[a] governmental entity can waive MTCA immunity by procuring insurance coverage for matters that the MTCA otherwise provides that the governmental entity is immune," but states that "[w]hile RSU 40 maintains a policy of liability insurance, that insurance only provides coverage in areas for which RSU 40 is *not* immune under the MTCA." *Id.* at 20 (emphasis in *Def.'s Mot.*).  The District asserts that RSU 40 has not waived its immunity to Ms. Wadsworth's state law tort claims here and thus "[t]he Court must grant RSU 40 summary judgment on Counts III, IV, and V of Plaintiff's Complaint due to RSU 40's immunity pursuant to the MTCA." *Id.*

### B.   Adrianna Wadsworth's Opposition

51

Ms. Wadsworth submitted an omnibus opposition memorandum responding to all three defendants' motions to dismiss. The Court recounts here only the arguments relating to the District's motion. Ms. Wadsworth agrees to dismiss her state law tort claims against RSU 40 but rejoins that "[disputed] issues of fact, taken with all inferences in Ms. Wadsworth's favor, compel this Court to deny [RSU] 40's summary judgment motion" as to the Title IX and § 1983 claims. *Pl.'s Opp'n* at 32, 58.

### 1.    The Title IX Claim

Ms. Wadsworth submits that "[a] myriad of material facts remain in dispute regarding Ms. Wadsworth's Title IX Claims which require this Court to deny MSAD 40/RSU 40's Motion for Summary Judgment." *Id.* at 21. She contends that questions of material fact exist as to whether an appropriate person at RSU 40 had actual knowledge and as to whether the school acted with deliberate indifference. *Id.* at 22-29.

Ms. Wadsworth first counters that the District's interpretation of "appropriate person" is too narrow and that "there is no requirement in Title IX that the official have authority to take corrective action against the accused harasser; instead, the requirement is that the official have authority to take corrective action to stop the harassment." *Id.* at 22. She interprets the statute to indicate that "the individual who receives notice only needs to be someone who has the ability to take corrective action in some manner, which can take many forms[,] including passing the report up the chain of responsibility," and also that "[c]orrective action could also include conducting an independent investigation or reporting the alleged conduct to the

School Board or to law enforcement." *Id.* (citations and internal quotation marks omitted).

In Ms. Wadsworth's view, RSU 40's "argument that Assistant Principals Pease and Philbrook are not 'appropriate persons' ignores this Court's decision on the School's Motion to Dismiss, and contradicts [the District's] own statements in the record." *Id.* at 23. She points out that Superintendent Nolan, testifying for RSU 40 under a Rule 30(b)(6) notice, stated that school policy was for harassment to be reported to "the building principal." *Id.* Ms. Wadsworth observes that RSU 40 defined "the building principal" as either Mr. Cavanaugh as principal or Ms. Pease and/or Ms. Philbrook as assistant principals. *Id.* Ms. Wadsworth also reiterates that the Court stated in its Order denying the District's motion to dismiss that "it cannot be true that the only 'appropriate person' under Title IX is the person committing the harassment" and thus, because "common sense requires another 'appropriate person,'" Ms. Pease and Ms. Philbrook qualified for the purposes of resolving the motion to dismiss. *Id.* (quoting *Order on Mot. to Dismiss* at 25-26).

Ms. Wadsworth contends that now the District "has doubled down on its original position, already rejected by this Court, that no other staff within the School would be appropriate persons under the law because none had disciplinary authority over Mr. Cavanaugh—but that is not what the law requires." *Id.* at 24. She adds that "the law only requires that the staff could take some sort of corrective measures, not disciplinary action against Mr. Cavanaugh," and here Ms. Pease and Ms. Philbrook could have taken corrective steps such as demanding an investigation or

reporting their concerns to the Superintendent. *Id.* Ms. Wadsworth concludes that "at the very least there exists a triable issue of material fact as to whether Ms. Pease and Ms. Philbrook were appropriate persons," sufficient to defeat summary judgment. *Id.*

Next, Ms. Wadsworth turns to Title IX's actual notice requirement. She emphasizes that "[p]recedent is imprecise about exactly how *much* an appropriate person must know in order to satisfy the actual knowledge prong of the test." *Id.* (quoting *Does v. Southeast Delco Sch. Dist.*, 272 F. Supp. 3d 656, 688 (E.D. Pa. 2017)) (emphasis in *Does*). Ms. Wadsworth acknowledges that "numerous courts have held that [t]o have actual knowledge of an incident, school officials must have witnessed it or received a report of it," but submits that "[t]he actual notice standard does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student." *Id.* at 25 (citations and internal quotations omitted).

Given this standard, Ms. Wadsworth submits that "it belies credulity that [RSU] 40 is now arguing that witnessing Mr. Cavanaugh refer to Ms. Wadsworth as 'cupcake' on numerous occasions does not give rise to actual knowledge of harassment." *Id.* at 26. She cites a number of interactions in the record and contends that "when looked at together, [they] strongly suggest that Ms. Philbrook and Ms. Pease had actual knowledge of Mr. Cavanaugh's policy violations with respect to Ms. Wadsworth, or at least create an issue of material fact that a jury must decide." *Id.* at 27.

54

Ms. Wadsworth also offers an alternative theory of Title IX liability based not on harassment by Mr. Cavanaugh, but rather on the alleged sexual assault of Ms. Wadsworth by her cheerleading coach. *Id.* She contends that, because Mr. Cavanaugh was an "appropriate person" and had actual knowledge of the assault, "this Court should find that Mr. Cavanaugh himself had knowledge of a sexual assault by a school staff member, thereby satisfying the Title IX requirements and requiring [RSU] 40's Motion for Summary Judgment be dismissed." *Id.*

Finally, Ms. Wadsworth turns to the deliberate indifference prong, arguing that "[t]he standard is plainly met here." *Id.* at 28. She contends that, "[a]ccording to [RSU] 40, any number of issues relating to Mr. Cavanaugh's treatment of Ms. Wadsworth . . . should have prompted an investigation," but instead "the only actions prompted by any of these issues were ineffectual conversations with Mr. Cavanaugh in which he was instructed to stop his behavior." *Id.* at 28-29. Thus, in her view, "[a]t a minimum, there exist issues of material fact in this regard that preclude the entry of summary judgment." *Id.* at 29.

## 2. The Section 1983 Claim

Ms. Wadsworth argues that the District's sexual harassment policy was unconstitutional and, alternatively, that it is liable for failure to train its employees. *Id.* at 29-34.

First, she submits that "[c]learly, the sexual harassment policy at issue has a glaring hole," specifically that it fails to define the term "building principal." *Id.* at 31. While Mr. Nolan has testified that the term refers to the principal and assistant

principals, "the written policy is silent on the issue." *Id.* In her view, this silence "created a situation where all complaints of sexual harassment were required to go to the school principal—in this case Mr. Cavanaugh, who also happened to be the harasser." *Id.*

Ms. Wadsworth offers that "Ms. Pease, Ms. Philbrook, and Mr. Nguyen all spoke with Mr. Cavanaugh directly about his inappropriate behavior, but none of them ever reported the harassment to anyone else higher in the chain of command," and argues that "[t]echnically, they all followed the written policy of the School, and Ms. Wadsworth continued to suffer harassment, as a result of their adherence to that policy." *Id.*

Ms. Wadsworth concludes that "[h]ad the School crafted a clear written policy, there would be no question of the chain of reporting, and it can be inferred that the great harm Ms. Wadsworth suffered would have stopped far sooner," and thus the District should be denied summary judgment. *Id.* at 32.

Next, Ms. Wadsworth turns to her failure to train claim. She submits that "[w]hether the School provided training on its sexual harassment policies at all, as opposed to whether that training was faulty in any way, is a question of fact foreclosing the entry of summary judgment." *Id.* at 33. Noting that Mr. Cavanaugh testified that he did not provide trainings, she contends that "the School never provided training to any of its staff, which led to the multiple reporting failures regarding Mr. Cavanaugh's treatment of Ms. Wadsworth." *Id.* She concludes that this failure to train should defeat summary judgment on her § 1983 claim. *Id.* at 34.

56

### 3.     The State Law Tort Claims

Ms. Wadsworth concedes to the District's motion as to the tort claims, stating that she affirmatively "agrees to dismiss her tort claims against MSAD 40 considering the Maine Tort Claims Act immunity conferred to the School." *Id.* at 45.

## C.     MSAD 40/RSU 40's Reply

The District reiterates that Ms. Wadsworth's Title IX claim must fail because no appropriate person had knowledge of the harassment and that her § 1983 claim must fail because its sexual harassment policy is constitutional and because there is no evidence that additional training would have prevented the harassment. *Def.'s Reply* at 1-8.

First, it submits that "when an appropriate person within RSU 40 had knowledge of the harassment, prompt and effective remedial action was taken and the harasser was removed from the school." *Id.* at 1.  It rejoins that: as Mr. Cavanaugh's subordinates, Ms. Pease and Ms. Philbrook were not "appropriate persons"; Ms. Wadsworth's cited authority is inapt because the cases involved persons with the authority to discipline the harasser; and that, under her definition of the term, *any* person would qualify as an appropriate person and the term would be meaningless. *Id.* at 3-4 (emphasis in *Def,'s Reply*).  Regarding actual knowledge, the District counters that Ms. Wadsworth offers "nothing more than alleged knowledge by one or both of [the assistant principals] of information that could be questionable, such as calling Plaintiff 'cupcake.'" *Id.* at 4.

The District also argues that Ms. Wadsworth's "eleventh-hour claim based on a cheerleading coach should be rejected" because it was not pleaded in the complaint and raised for the first time in her opposition. *Id.* at 5. It cites caselaw stating that a "[p]laintiff[] may not raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment" and "[a]llowing a plaintiff to proceed on new, unpled theories after the close of discovery would prejudice defendants, who would have focused their discovery efforts on the theories actually pled." *Id.* (quoting *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 76 (1st Cir. 2016)).

The District also addresses Ms. Wadsworth's § 1983 claim. First, it responds that "although Plaintiff purports to advance an unconstitutional policy claim, she does so without citation to any authority for the proposition that RSU 40's sexual harassment policy is unconstitutional." *Id.* at 6. Instead, in its view, "all she does is argue that the policy has a 'glaring hole' and thus does not go far enough in protecting students from harassment," which is "insufficient to establish that the policy is unconstitutional." *Id.* Second, regarding her failure to train claim, it contends that "[t]he record is absolutely devoid of evidence that had there been additional training, Plaintiff would not have been sexually harassed by [Mr.] Cavanaugh, much less that any deficiency in training *caused* the harassment." *Id.* at 7 (emphasis in *Def.'s Reply*).

## IV.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could

resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)). Then, a "court views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)). "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## V.      DISCUSSION

### A.      Title IX Claim

Title IX of the Education Amendments of 1972 provides in pertinent part:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance

20 U.S.C. § 1681.  The statute "creates an implied private right of action against federal funding recipients for money damages caused by a recipient's violation of its obligations under the Title." *Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 7 (1st Cir. 2020). "Sexual harassment . . . 'can constitute discrimination on the basis of sex under Title IX.'" *Sonoiki v. Harvard Univ.*, 37 F.4th 691, 697 n.3 (1st Cir. 2022) (quoting *Doe v. Brown Univ.*, 896 F.3d 127, 132 (1st Cir. 2018) (quoting *Gebser*, 524 U.S. at 283)). "Such a violation can occur when a Title IX funding recipient is deliberately indifferent to known acts of sexual harassment of a student by a teacher." *Pawtucket*, 969 F.3d at 7  (citing *Gebser*, 524 U.S. at 287-88).  This standard requires "actual notice to an 'appropriate person,' 20 U.S.C. § 1682, who is 'an official of the recipient entity with authority to take corrective action to end the discrimination.'" *Id.* (quoting *Gebser*, 524 U.S. at 290).  In the educational context, courts should consider whether the school district "had notice of the sexual harassment, and either did nothing or failed to take additional reasonable measures after it learned that its initial remedies were ineffective." *Porto v. Town of Tewksbury*, 488 F.3d 67, 73-74 (1st Cir. 2007) (citing *Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999)).

The deliberate indifference standard also requires that "the funding recipient's actions—or failure to act—caused the student's subsequent harassment in some way or made the student 'liable or vulnerable' to harassment." *Pawtucket*, 969 F.3d at 9 (citing *Davis ex rel. Lashonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 645 (1999)). The causal requirement is broader than simple but-for causation, and allegations of "post-notice interactions between the victim and the harasser" can theoretically form a basis for a Title IX claim. *Id.* (quoting *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172-73 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009)). There is no causal relationship between an act of sexual harassment and the school officials' subsequent alleged indifference to that act; however, the plaintiff "may be able to make out a claim under Title IX based on the school's indifference from that point forward . . .." *Id.*

"[S]ome degree of severity or pervasiveness must be present in order for harassment to result in 'exclu[sion]' or 'discrimination' under Title IX." *Id.* at 10 (quoting 20 U.S.C. § 1681(a)). Student-on-student harassment "need only be severe enough to 'undermine[] and detract[] from the victim's educational experience' such that the victim is 'effectively denied equal access to an institution's resources and opportunities." *Id.* (alterations in original) (quoting *Davis*, 526 U.S. at 651). Moreover, "[c]onduct that might not be actionable under Title IX if perpetrated by a student might be deemed more likely to exclude, or discriminate against, the potential targets of the conduct if perpetrated by a person in authority." *Id.* at 11.

The inquiry into whether an appropriate person had actual knowledge and acted with deliberate indifference focuses on the roles and actions of Ms. Pease and Ms. Philbrook.  *See Pl.'s Opp'n* at 24 (identifying only Ms. Pease and Ms. Philbrook as appropriate persons).  The District acknowledges that Superintendent Nolan also qualifies as an appropriate person, *Def.'s Mot.* at 9, but Ms. Wadsworth does not dispute that he only learned about the harassment on November 2, 2017 and then took prompt action to investigate and remove Mr. Cavanaugh.[86]  *Id.*  The Court also found in its Order on the District's motion to dismiss that neither Mr. Nguyen nor Officer Spear qualified because they did not have the authority to take corrective action, and Ms. Wadsworth has not claimed otherwise in her response.  *Order on Mot. to Dismiss* at 36.

Additionally, while Ms. Wadsworth does not contend that Mr. Cavanaugh's knowledge of his own harassment could sustain a Title IX claim, she instead attempts to make out a Title IX claim based on his alleged failure to report Ms. Wadsworth's accusation that she was sexually assaulted by a cheerleading coach.  *Pl.'s Opp'n* at 27.  As the District noted, First Circuit precedent provides that "[p]laintiffs may not raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment," because "[a]llowing a plaintiff to proceed on new, unpled theories after the close of discovery would prejudice defendants, who would have focused their discovery efforts on the theories actually pled."  *Miranda-Rivera*, 813 F.3d at 76 (citations and internal quotations omitted).  Here, the Amended

---

[86]   Ms. Wadsworth's counsel confirmed this concession during oral argument.

Complaint contains one hundred and forty-seven separate paragraphs of factual allegations. *Am. Compl.* ¶¶ 8-155. Ms. Wadsworth's participation in the sport of cheerleading is obliquely mentioned. *Id.* ¶¶ 28, 133. But there is no allegation or intimation that Ms. Wadsworth was subjected to a sexual assault by the cheerleading coach, that Mr. Cavanaugh was aware of any such allegation, or that he failed to act when he learned of it.

The line between pled and unpled theories can sometimes be imprecise. *See Conn. Gen. Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 622 (1st Cir. 1988) (finding that plaintiff's failure to "plead [a] particular legal theory, when it did plead two related theories" would not bar relief, especially because the defendant raised specific defenses regarding the unpled theory). In addition, if Ms. Wadsworth had wished to proceed with this new theory of liability, she could have moved to amend her complaint even after the filing of the motions for summary judgment. *Adorno v. Crowley Towing & Transp. Co.,* 443 F.3d 122, 126 (1st Cir. 2006) (reaffirming that a plaintiff can tender an amended complaint after a motion for summary judgment has been filed if they show "that the proposed amendments were supported by substantial and convincing evidence").

But here the line seems easily drawn because there is no connection between Ms. Wadsworth's most unfortunate experience with her cheerleading coach and the allegations in the Amended Complaint, and Ms. Wadsworth has not moved to further amend her complaint to makes these new allegations while the motion has been pending. With no facts in the Amended Complaint to support this theory, Ms.

Wadsworth may not raise it for the first time in opposition to the District's motion for summary judgment.

The Court thus focuses only on the District's response to Mr. Cavanaugh's alleged harassment, and specifically whether Ms. Pease and Ms. Philbrook had the requisite authority, knowledge, and indifference to support a Title IX claim.

### 1.  Whether Assistant Principals Tamra Philbrook and Linda Pease Were "Appropriate Persons"

The inquiry begins with determining whether Ms. Pease and Ms. Philbrook, as assistant principals, were "appropriate persons" in the Title IX context.  Section 1682 of title 20 provides for a notice requirement:

> Provided, however, that no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means.

20 U.S.C. § 1682.  In *Gebser*, the United States Supreme Court addressed sexual harassment by a male high school teacher against a female student, which resulted in the teacher initiating sexual contact, leading to sexual intercourse.  524 U.S. at 277-78.  Alida Star Gebser, the student, had not reported their relationship to school officials because "she was uncertain how to react and she wanted to continue having him as a teacher."  *Id.* at 278.  Their relationship was discovered when a police officer discovered Frank Waldrop, the teacher, engaged in sexual intercourse with Ms. Gebser, and arrested Mr. Waldrop.  *Id.*  Ms. Gebser and her mother sued the school district and Mr. Waldrop, raising claims under Title IX.  *Id.*  The school defended the

Title IX claims on the ground that it did not have "actual or constructive notice that Waldrop was involved in a sexual relationship with a student." *Id.* at 279.

The *Gebser* Court reviewed the statutory and judicial history of Title IX. *Id.* at 280-88. Given this history, the Supreme Court wrote that "it would 'frustrate the purposes' of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principals of *respondeat superior* or constructive notice, *i.e.*, without actual notice to a school district official." *Id.* at 285. The Court explained that "it does not appear that Congress contemplated unlimited recovery in damages against a funding recipient where the recipient is unaware of discrimination in its programs." *Id.* Noting that "Title IX focuses more on 'protecting' individuals from discriminatory practices carried out by recipients of federal funds," the Supreme Court summarized the purpose of the notice requirement:

> [A] central purpose of requiring notice of the violation "to the appropriate person" and an opportunity for voluntary compliance before administrative enforcement proceedings can commence . . . is to avoid diverting education funding from beneficial uses where a recipient was unaware of discrimination in its programs and is willing to institute prompt corrective measures.

*Id.* at 287, 289. The focus is on whether the district had "actual knowledge of the teacher's conduct" and "an opportunity to take action to end the harassment or to limit further harassment." *Id.* at 289.

With these concepts in mind, the Supreme Court turned to the question of notice to an "appropriate person":

> Because the express remedial scheme under Title IX is predicated upon notice to an "appropriate person" and an opportunity to rectify any violation, 20 U.S.C. § 1682, we conclude, in the absence of further direction from Congress, that the implied damages remedy should be fashioned along the same lines. An "appropriate person" under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination. Consequently, in cases like this one that do not involve official policy of the recipient entity, we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.

*Id.* at 290.

In its motion and in oral argument, RSU 40 relies heavily on *Santiago*, where the First Circuit addressed the *Gebser* requirement of actual knowledge and wrote that "Title IX's 'actual knowledge' requirement demands that the official who is informed of the alleged harassment be a person who, at a minimum, has the authority to institute corrective measures." 655 F.3d at 74. The *Santiago* Court stated that "[a] school principal may, at least in some instances, be considered an appropriate person for the receipt of such notice." *Id.* But in rejecting a Title IX claim against sexual abuse by a bus driver who was employed by an independent contractor, the First Circuit noted that "the alleged harasser is not a person subject to the principal's customary disciplinary authority." *Id.*

The broader context of this inquiry is that a plaintiff may recover "only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity" and the plaintiff must prove the school's "deliberate indifference to known acts of harassment in its programs or

activities." *Victim Rights Law Ctr. v. Cardona*, 552 F. Supp. 3d 104, 116 (D. Mass. 2021) (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999)).  To meet this standard, a plaintiff must prove that she notified an "appropriate person" under 20 U.S.C. § 1682, which in *Gebser*, the United States Supreme Court defined as "at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination."  524 U.S. at 290.

RSU 40 makes the same argument here as in its motion to dismiss: that "neither Pease nor Philbrook had any supervisory responsibilities over Cavanaugh and thus neither are 'appropriate persons.'"[87] *Def.'s Mot.* at 9.  RSU 40's argument, however, runs counter to RSU 40's own policy as interpreted by its Superintendent. As noted earlier, throughout the time Ms. Wadsworth was a student at MVHS, RSU 40 had policies in place prohibiting sexual harassment (the Policy) and setting forth a complaint procedure for reporting instances of sexual harassment (the Complaint Procedure).  DSMF ¶ 59; PRDSMF ¶ 59.  The Complaint Procedure directs "[a]ny individual who believes that a student has been discriminated against or harassed [to] report their concern promptly to the building principal and utilize this complaint procedure. . . .  Individuals who are unsure whether discrimination or harassment has occurred, or who need assistance in preparing a written [complaint,] are encouraged

---

[87]    This situation is unusual since the otherwise "appropriate person" is the harasser.  It would solve the notice and knowledge issue if the principal's knowledge of his own harassment were deemed notice to "an official of the recipient entity with authority to take corrective action to end the discrimination."  *Gebser*, 524 U.S. at 290.  Taken literally, Mr. Cavanaugh was such an official: he had actual knowledge of the harassment because he was the harasser, he had the authority under RSU 40 policy to take corrective action, and he failed to do so.  However logical this approach, it is blocked by *Gebser*.  The *Gebser* Court wrote that "[w]here a school district's liability rests on actual notice principles . . ., the knowledge of the wrongdoer himself is not pertinent to the analysis."  *Id.* at 291.

to discuss the situation with the Superintendent/designee." DSMF ¶ 66; PRDSMF ¶ 66.

The Policy mandates that "[t]he Superintendent/designee or the employee designated as the Title IX Coordinator will investigate complaints of harassment in accordance with the . . . Complaint Procedure." PSAMF ¶ 8; DRPSAMF ¶ 8; DSMF ¶ 63; PRDSMF ¶ 63. While the Policy does not define "designee," Superintendent Nolan testified that "it seems like it would be appropriate that it would be the principal or assistant principal." PSAMF ¶ 9; DRPSAMF ¶ 9. The Policy goes on to state that "any individual who believes that a student has been discriminated against or harassed should report their concern to the building principal . . .." PSAMF ¶ 10; DRPSAMF ¶ 10. Thus, by the express language of the Policy as interpreted by the Superintendent, an appropriate person to receive a complaint of sexual harassment would include Mr. Cavanaugh as Principal or Ms. Pease and Ms. Philbrook as Assistant Principals.

RSU 40 insists, however, that when the harasser is the Principal, deliberate indifference by the Assistant Principals would not implicate the District under *Gebser*, because the Assistant Principals would not have "authority to take corrective action" against their superior "to end the discrimination." 524 U.S. at 290.

First, the Policy nowhere says that the Assistant Principals would be without authority to act when the harasser is the Principal. To the contrary, as interpreted by both the Superintendent and the Assistant Principals, the Policy contemplates that the Principal and Assistant Principals are the Superintendent's designees for

purposes of the Policy.  The Superintendent conceded that the Assistant Principals are properly his designees under this Policy.

Second, to remove the Assistant Principals from school officials whose knowledge of the harassment would be attributable to the school district would effectively leave the students with limited protection against harassment by a Principal since it would leave only the Superintendent, who is less frequently present in any specific school, as the single person within the RSU whose deliberate indifference would be attributable to the RSU.[88]

As the Supreme Court explained in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), liability arose in *Gebser* from "an official decision by the recipient not to remedy the violation."  *Id.* at 642 (quoting *Gebser*, 524 U.S. at 290).  The *Gebser* Court used two subtly different standards.  The first is whether the school official had "authority to take corrective action to end the discrimination" and the second, more general holding is the one the *Gebser* Court itself described:

> We conclude that damages may not be recovered in those circumstances unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct.

*Id.* at 277, 290.  The emphasis here is a "school official" as opposed to a rank-and-file teacher.  Although one way of distinguishing between a "school official" and someone who is not, is to determine whether the school official could actually mete out

---

[88]      Under RSU 40's formulation, if the Superintendent were the harasser, there could be no action against the RSU because no one, absent the members of the Board, would be in a position to take corrective against the top administrative person in the school hierarchy.  Thus, if RSU 40's argument were accepted, the more administrative responsibility the less liability for a violation of Title IX.

discipline against the harasser, the broader point is to distinguish between school officials, where by virtue of their position, it is appropriate to hold the district accountable for their failure to act and others, where it is not. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) ("[A] Title IX plaintiff can establish school district liability by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference"). *Gebser* infuses the concepts of actual notice, authority, corrective measures, and deliberate indifference in "an official of the school district." Thus, RSU 40's argument is compelling that the Assistant Principals did not fit all the components of the *Gebser* holding because neither had the authority to institute corrective action against their superior. RSU 40 may well be correct, but given the other language in *Gebser* and the policy implications of so narrowly limiting the range of appropriate persons when the harasser is a high administration official, the Court has arrived at a different conclusion.

Here, consistent with *Gebser* and with the Superintendent's description of the Assistant Principals' authority, the Court concludes that the position of Assistant Principal in RSU 40 is an "official of the school district" with sufficient authority to fit within the definition of "appropriate person" under Title IX, even though the Assistant Principals could not have imposed discipline against their superior. Had they acted, they were sufficiently high officials within RSU 40's administration to bring into effect the Policy that would have ensured "voluntary compliance." *Id.* at 289.

The Court therefore rejects RSU 40's attempt to insulate itself from the provisions of Title IX by unduly narrowing the definition of "appropriate person" in the rare instance where a superintendent or principal violates the law by sexually harassing a student. The Court concludes that consistent with *Gebser* and the District's own Policy, Assistant Principals at RSU 40 fit within the definition of "appropriate person."

> ### 2. Whether Assistant Principals Tamra Philbrook and Linda Pease Had Actual Notice of Sexual Harassment

The actual knowledge prong is where Ms. Wadsworth's Title IX claim fails to pass muster. The actual knowledge requirement imposes a higher standard for Title IX claims than for claims arising under § 1983, where deliberate indifference can follow actual or constructive knowledge. *Doe v. Bradshaw*, 203 F. Supp. 3d 168, 185 (D. Mass. 2016); *see also Gebser*, 524 U.S. at 291 (complaints about inappropriate comments during class were "plainly insufficient" to establish actual knowledge); *Doe v. Flaherty*, 623 F.3d 577, 585 (8th Cir. 2010) (text messages that were not clearly sexual were insufficient for actual notice of harassment); *Escue v. N. OK Coll.*, 450 F.3d 1146, 1154 (10th Cir. 2006) (inappropriate name-calling and past dates with older non-traditional students insufficient for actual notice of harassment). Courts have generally interpreted "actual knowledge" as requiring highly reliable and similar reports of inappropriate teacher behavior and, for example, "rumors, investigations, and student statements" have been held not to constitute "actual knowledge." *Bradshaw*, 203 F. Supp. 3d at 185.

In *Bradshaw,* the school received three initial sets of reports about a teacher's concerning behavior with a student, including a report that "everybody knows" the teacher was dating a student. *Id.* at 174. Nonetheless, the district court concluded at that point that "[w]hile the school perhaps ought to have known that [the teacher] was behaving inappropriately, given the quantity and consistency of rumors about him, even viewing the facts in the light most favorable to the plaintiff, it cannot be said that the school actually knew of his sexual harassment . . .." *Id.* at 185. Similarly, the Court of Appeals for the Eighth Circuit recently held that "[t]he actual notice standard is quite onerous, and favoritism towards the student; inordinate time spent with the student; unprofessional conduct towards the student; and vague complaints about the teacher's behavior toward the student (which do not *expressly* allege sexual abuse of that student) fall short of creating actual notice." *KD*, 1 F.4th at 598 (collecting cases finding that inappropriate and suggestive text messages or "conduct of spending too much time with [the student] causing [the student] to be absent from or tardy to classes" did not establish actual notice absent reports of actual or suspected sexual contact) (emphasis in *KD*).

The facts in this case—at least those known to school officials—are significantly less egregious than the facts in *Bradshaw* and *KD*. Focusing on the knowledge of Ms. Pease and Ms. Philbrook, the record reveals the following. Both Assistant Principals were aware that Mr. Cavanaugh had been pulling Ms. Wadsworth out of class to meet with him and that teachers had complained. PSAMF ¶¶ 106, 108; DRPSAMF ¶¶ 106, 108. Mr. Cavanaugh told them these meetings were

to help support her with a difficult family situation, DSMF ¶ 26; PRDSMF ¶ 26, and it is not uncommon for teachers to call students out of class for such meetings nor for teachers to complain about them, DSMF ¶¶ 30-31; PRDSMF ¶¶ 30-31, but Ms. Pease and Ms. Philbrook nonetheless spoke with Mr. Cavanaugh to ask him to stop pulling Ms. Wadsworth from class.  PSAMF ¶ 109; DRPSAMF ¶ 109.  Ms. Philbrook was present for at least part of a conversation where Mr. Cavanaugh asked Ms. Wadsworth who she was taking to prom and who had asked her to prom, called her "cupcake," asked about her prom dress, and advised her that she could take anyone she wanted to prom.  PSAMF ¶ 36; DRPSAMF ¶ 36.  Ms. Philbrook also briefly "popped in" to a meeting during which Ms. Wadsworth expressed at some point to Mr. Nguyen that she was embarrassed by Mr. Cavanaugh's nicknames for her. PSAMF ¶ 41; DRPSAMF ¶ 41.

Additionally, Ms. Philbrook was aware that Mr. Cavanaugh had asked Ms. Wadsworth if she was interested in moving in with him and his wife, PSAMF ¶ 99; DRPSAMF ¶ 99, and informed Officer Spear that she and Ms. Pease had tried to have professional conversations with Mr. Cavanaugh with regard to his behavior towards Ms. Wadsworth.  PSAMF ¶ 100; DRPSAMF ¶ 100.  Ms. Philbrook was aware that Mr. Cavanaugh and Ms. Wadsworth had communicated by text but did not learn of the content of some of the text messages between Mr. Cavanaugh and Ms. Wadsworth until Ms. Philbrook read them in the newspaper, and she did not know Mr. Cavanaugh messaged with Ms. Wadsworth outside of school.  DSMF ¶ 49; PRDSMF ¶ 49.  Ms. Philbrook also knew Ms. Wadsworth worked for Mr. Cavanaugh but, in

Ms. Philbrook's experience, it was normal for a student to do work for payment from a principal. DSMF ¶ 55; PRDSMF ¶ 55. Finally, Ms. Philbrook learned that Ms. Wadsworth was driving a car registered to and insured by Mr. Cavanaugh, DSMF ¶ 57; PRDSMF ¶ 57, but was told by Mr. Cavanaugh that Ms. Wadsworth would be buying the car from him. DSMF ¶ 57; PRDSMF ¶ 57.

In sum, while there was some smoke regarding Mr. Cavanaugh's behavior, there is no evidence of the type of fire necessary to satisfy the "actual notice" standard. Generally, Ms. Pease and/or Ms. Philbrook were aware that Mr. Cavanaugh was pulling Ms. Wadsworth out of class, had called her "cupcake" and had communicated with her by text message, had considered inviting her to move in with him and his wife, and that she was working with him and driving a car he owned—which he had explained she was working to buy from him. While teachers and Officer Spear may have expressed concerns to Ms. Pease and Ms. Philbrook that Mr. Cavanaugh's relationship with Ms. Wadsworth may have been concerningly close or "that the perception was that she was receiving special treatment in the form of favoritism," PSAMF ¶ 102; DRPSAMF ¶ 102, there is no evidence in the record to suggest that either was aware of reports of any type of actual or suspected sexual contact or harassment. Finally, while Ms. Philbrook appears to have been aware that Mr. Cavanaugh had been texting Ms. Wadsworth, there is no evidence suggesting that she was aware of the frequency or sexually explicit nature of his messages.

The "actual notice" standard is demanding, and Ms. Pease and Ms. Philbrook's knowledge falls short of meeting it. The caselaw is clear that inappropriate

74

comments, text messages that are not clearly sexual, and spending too much time with a student—even causing her to miss class—are insufficient. *See Gebser*, 524 U.S. at 291; *Flaherty*, 623 F.3d at 585; *P.H. v. Sch. Dist. of Kansas City, Missouri*, 265 F.3d 653, 659 (8th Cir. 2001). Instead, "actual knowledge" generally requires highly reliable and similar reports of inappropriate teacher behavior, meaning that "rumors, investigations, and student statements" do not qualify. *Bradshaw*, 203 F. Supp. 3d at 185. Ultimately, the Court concludes here, as did the *Bradshaw* Court, that "[w]hile the school perhaps ought to have known that [Mr. Cavanaugh] was behaving inappropriately, given the quantity and consistency of rumors about him, even viewing the facts in the light most favorable to the plaintiff, it cannot be said that the school actually knew of his sexual harassment . . .." *Id.* Because Ms. Wadsworth cannot demonstrate actual notice, she cannot prevail on her Title IX claim and the Court must grant the District's motion as to Count I and award RSU 40 judgment on Adrianna Wadsworth's Title IX claim.

### B. Section 1983 Claim

Section 1983 provides that:

> [e]very person who, under color of [law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ..

42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 389-94 (1989). The Section 1983 cause of action has two

elements.   First, a plaintiff must show deprivation of a federally protected right, privilege, or immunity and a causal connection between the conduct complained of and the deprivation.   *See Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 559 (1st Cir. 1989).   Second, a plaintiff must establish that "the perpetrator of the violation was acting under color of law."   *Cruz-Erazo v. Rivera-Montañez*, 212 F.3d 617, 621 (1st Cir. 2000).

### 1.   Equal Protection Claim

The Fourteenth Amendment's Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.  Ms. Wadsworth alleges that RSU 40 is liable for an equal protection violation under § 1983 on two grounds: (1) "its failure to follow, apply, or enforce laws preventing harassment and discrimination in schools" and (2) "its failure to adequately train or supervise employees about their obligation to properly investigate and address incidents of sexual harassment in public schools." *Am. Compl.* ¶ 177.

RSU 40 is a municipal department.   Under *Monell* and its progeny, municipalities and their departments are liable only for constitutional violations arising from municipal policies.   *See Connick v. Thompson*, 563 U.S. 51, 60 ("A municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978)).   "Official municipal policy includes the

76

decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick,* 563 U.S. at 61; *see also Doe v. Reg'l Sch. Unit No. 21*, No. 2:19-00341-NT, 2020 WL 2820197, at *4 (D. Me. May 29, 2020) (citing *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989)).   In short, municipal liability can only arise from a municipal act.   *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) ("*Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' – that is, acts which the municipality has officially sanctioned or ordered").   Municipal liability cannot arise from vicarious liability.   *See id. at* 478 ("[A] municipality cannot be made liable by application of the doctrine of *respondeat superior*").   Rather, municipalities are responsible "only for their own unconstitutional acts"; there is no vicarious liability under § 1983 for the actions of a municipality's "non-policymaking employees."   *Haley*, 657 F.3d at 51.   The "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Canton*, 489 U.S. at 385.   The policy must be the "'moving force' behind the alleged violation of constitutional rights." *Hayden*, 134 F.3d at 456 (quoting *Monell*, 436 U.S. at 694).

These principles provide the framework within which Ms. Wadsworth's § 1983 claim must fit to survive RSU 40's dispositive motion.   Her Amended Complaint advances two potential *Monell* claims.   The first is that the school district's sexual harassment reporting policy was itself the "moving force" behind the alleged equal

protection violation.  The second is a failure-to-train claim, alleging that the school district's failure to properly train its employees on issues of sexual harassment and proper reporting was itself a policy giving rise to deprivation of her rights under the Fourteenth Amendment.

Relying only on the well-pleaded facts in Ms. Wadsworth's Amended Complaint, the Court previously denied the District's motion to dismiss these claims, noting that it was "err[ing] on the side of caution" at the more liberal motion to dismiss stage because factual ambiguities remained about the District's sexual harassment policies and training procedures.  *Order on Mot. to Dismiss* at 42, 49 (stating that "[f]urther discovery may uncover the intended meaning of 'building principal,' allowing the Court or a jury to make a better-informed judgment at the summary judgment or trial stage" and that the Court "denies the motion to dismiss . . . in hopes that discovery will further develop the level of training MSAD 40/RSU 40 provided and which interpretation of the sexual harassment policy controls").  Now equipped with a summary judgment record that offers much greater detail about the District's policies and training, the Court finds that there is no unconstitutional deficiency in its sexual harassment policy and that no failure-to-train—if any— amounted to deliberate indifference or the moving force behind Ms. Wadsworth's injury.

### a.     Unconstitutional Policy Claim

The dispute around Ms. Wadsworth's unconstitutional policy claim centers on whether there was an infirmity in the District's sexual harassment policy where a

principal's sexual harassment could only be reported to the principal himself. *See id.* at 39-43. The parties agree that the District has a sexual harassment policy which instructs staff and students to report possible sexual harassment and discrimination to "the building principal" and instructs the building principal to notify the superintendent of the complaint but does not specify whether "building principal" includes assistant principals or only the head principal. *Id.* at 29. Resolving that ambiguity in Ms. Wadsworth's favor and assuming that "building principal" referred to only the head principal, the Court found at the motion to dismiss stage that the policy had a plausibly unconstitutional "glaring hole" where "the building principal can act with impunity because he or she stands between a school official reporting possible sexual harassment and the superintendent receiving the report." *Id.* at 41. The Court also noted, however, that "[f]urther discovery may uncover the intended meaning of 'building principal,' allowing the Court or a jury to make a better-informed judgment at the summary judgment or trial stage." *Id.* at 42.

The development of the summary judgment record has allayed the Court's concerns about a potential deficiency in the policy. Ms. Wadsworth maintains that the "policy's silence regarding whether 'building principal' included assistant principals, along with a strict adherence to that policy, created a never-ending loop whereby all instances of sexual harassment were being reported to the harasser, and then the harasser was not passing them along to the superintendent as the policy required." *Pl.'s Opp'n* at 31. The record, however, does not support this contention.

Superintendent Nolan testified that "building principal" means either the School Principal or the School Assistant Principals. PSAMF ¶ 13; DRPSAMF ¶ 13. He testified further that, under the policy, a staff person who had knowledge of a student being sexually harassed would ordinarily make a complaint to the principal, but if the principal was the perpetrator of the harassment, the staff person would be expected to make a report to the Superintendent. DSMF ¶ 70; PRDSMF ¶ 70.

Ms. Pease testified that if the Principal was the harasser, her understanding was that she was to report it to the Superintendent, PSAMF ¶ 23; DRPSAMF ¶ 23; DSMF ¶ 71; PRDSMF ¶ 71, and Ms. Philbrook testified that in that situation she was to report it to the Superintendent or to the police. PSAMF ¶ 24; DRPSAMF ¶ 24; DSMF ¶ 72; PRDSMF ¶ 72. They also both testified that, in general, any adult in the school would move a student up the chain of command, to the assistant principals, the principal, or to the Superintendent, if needed, for complaints to be made and an investigation to occur.[89] PSAMF ¶ 23, 25; DRPSAMF ¶ 23, 25.

The Court does not find any dead end in this chain of reporting. As the Court understands the Policy, in general, sexual harassment was to be reported either to Mr. Cavanaugh as the head principal or to Ms. Pease or Ms. Philbrook as the assistant principals—collectively, the building principals. In a case where the head

---

[89] There is some irony in this conclusion because RSU 40 took the legal position in this litigation that the Assistant Principals were not "appropriate person[s]" under Title IX. But the standards of Title IX liability and § 1983 liability are not the same. *Bradshaw*, 203 F. Supp. 3d at 185 ("The actual knowledge requirement imposes a higher standard for Title IX claims than for claims arising under § 1983, where deliberate indifference can follow actual or constructive knowledge").

Regardless of what RSU 40's lawyers have been arguing about the technical application of Title IX, the Assistant Principals themselves testified that they knew that under the Policy, they could report the Principal to the Superintendent.

principal was the perpetrator of the harassment, the policy does not prevent reporting; instead, students or staff could report harassment to an assistant principal. The policy directs assistant principals, as building principals, to elevate reports of harassment to the Superintendent, and both Ms. Pease and Ms. Philbrook confirmed that this was their understanding of the policy. The Superintendent then has the power to discipline the principal, as Superintendent Nolan did in this case. There is thus no break or dead end in the chain of reporting and a principal cannot act with impunity simply because there is no other person to whom harassment can be reported.

The Court recognizes that the definition of "building principal" and the chain for reporting a principal harassing a student are not spelled out in the District's written policy. But Ms. Wadsworth offers no evidence suggesting that Mr. Nolan, Ms. Pease, and Ms. Philbrook's testimonies under oath about the policy and their understandings of it were incorrect or untruthful—beyond the assertion that Ms. Pease, Ms. Philbrook, and Mr. Nguyen speaking to Mr. Cavanaugh about their concerns implied that they felt his behavior amounted to harassment but that he was the only person to whom they could report it. *Pl.'s Opp'n* at 3. The Court does not find record support for this contention.

To the contrary, while Ms. Pease and Ms. Philbrook expressed concern regarding Mr. Cavanaugh's behavior, there is no indication in the record that they— or any other staff member or student—believed that Mr. Cavanaugh was sexually harassing Ms. Wadsworth. Mr. Cavanaugh presumably violated the District's sexual

harassment policy through his constant and sexually explicit text messages to Ms. Wadsworth, but there is no suggestion that any staff member knew the content of those messages.  Even resolving all reasonable inferences in Ms. Wadsworth's favor, the record does not support Ms. Wadsworth's assertion that staff members viewed Mr. Cavanaugh's behavior as sexual harassment and sought to report it but were stymied by an unconstitutional sexual harassment policy that only permitted them to report sexual harassment to the perpetrator.

The Court finds no "hole" in the District's sexual harassment and reporting policies that could support a § 1983 claim, and even if the Court were to find a deficiency, the record does not support the conclusion that the infirmity could have been the "moving force" behind Ms. Wadsworth's injury, as § 1983 requires.  *Hayden*, 134 F.3d at 456 (quoting *Monell*, 436 U.S. at 694).  Accordingly, the Court grants the motion for summary judgment in favor of RSU 40 as to Ms. Wadsworth's § 1983 unconstitutional policy claim.

### b.    Failure to Train Claim

"There are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *Canton*, 489 U.S. at 387.  As the Supreme Court cautioned, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.  "[T]he inadequacy of . . . training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of the persons with whom the [officials] come into contact." *Canton*, 489 U.S. at 388.  "'[D]eliberate

indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 410 (1997); *see also Hayden*, 134 F. 3d at 456 ("The liability criteria for 'failure to train' claims are exceptionally stringent").  "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by [the Supreme Court's] previous cases—can a city [or school district] be liable for such a failure under § 1983." *Canton*, 489 U.S. at 390.

Deliberate indifference also requires showing that municipal policymakers had "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights . . .." *Connick*, 563 U.S. at 61.  Ordinarily, this requires a plaintiff to demonstrate "[a] pattern of similar constitutional violations by untrained employees . . .." *Id.* at 62 (citing *Brown*, 520 U.S. at 409); *see also Haley*, 657 F.3d at 52 ("Triggering municipal liability on a claim of failure to train requires a showing that municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies").  The United States Supreme Court in *Canton* left open the possibility that a consequence of failing to train might be so obvious that a pattern of similar violations might not be necessary to show deliberate indifference, but the Supreme Court since explained that this "hypothesized single-incident liability" applies to a "narrow range" of situations, such as training police officers on the constitutional limitation to the use

of deadly force. *Id.* at 63-64 (citing *Brown*, 520 U.S. at 409). It does not, for example, apply to the failure of a prosecutor's office to adequately train attorneys in their *Brady*[90] obligations, particularly when the failure to train is on a "specific scenario related to the violation in [the] case," because "attorneys, unlike police officers, are equipped with the tools to find, interpret, and apply legal principles." *Id.* at 63-70.

"In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Canton*, 489 U.S. at 390. Inadequate training of a single official will not alone establish liability on the municipality. *Id.* at 390-91. "Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury." *Id.* at 391.

In denying the District's motion to dismiss, the Court noted that "because there is no evidence of other students in the school district bringing harassment or discrimination claims based on" the District's failure to train, Ms. Wadsworth's claim "must fit into the 'narrow range' of situations that qualify for the *Canton* Court's 'hypothesized single-incident liability.'" *Order on Mot. to Dismiss* at 46 (quoting *Connick*, 563 U.S. at 63-64).[91] The Court found that the District "had written policies and procedures detailing how to report possible sexual harassment, so there is an indication that there was some amount of training" but "[t]he question is how much and what." *Id.* at 48. With the assistance of the summary judgment record, the Court

---

[90]     *Brady v. Maryland*, 373 U.S. 83 (1963).
[91]     The Court's Order also outlined in detail the First Circuit's application of the single-incident standard. *See Order on Mot. to Dismiss* at 46-47.

now has a better understanding of "how much and what" training was provided and concludes that it was not so inadequate as to meet the stringent standard of "deliberate indifference."

Ms. Wadsworth contends that "[t]he record here is clear . . . that the School never provided training to any of its staff, which led to the multiple reporting failures regarding Mr. Cavanaugh's treatment of Ms. Wadsworth." *Pl.'s Opp'n* at 33. The Court disagrees. Ms. Wadsworth's contention is grounded in Mr. Cavanaugh's testimony that he did not provide training and was not qualified to do so. The record reveals, however, that each year during the relevant period, Mr. Cavanaugh provided a PowerPoint presentation to staff on the topic and Mr. Nguyen, Ms. Pease, and Ms. Philbrook each recalls attending these presentations and considered them to be trainings. *See Pease Dep.* at 19:23-20:19 (recounting Mr. Cavanaugh providing sexual harassment training "every year"); *Philbrook Dep.* at 18:17-19:18 (same); *Cavanaugh Dep.* at 173:12-22 (describing giving the presentation). The District is not able to produce copies of the PowerPoint because Mr. Cavanaugh removed his hard drive from his laptop after resigning.

The record thus shows that RSU 40's principal, who had received some training as an affirmative action officer, gave the staff at the beginning of each year a PowerPoint presentation on the school's sexual harassment policy, which staff members viewed as a training. Whether this annual training is a "best practice" for how a school should train its teachers to identify and report sexual harassment is not before the Court. But the standard for deliberate indifference in training is

85

exceptionally demanding. *See Canton*, 489 U.S. at 390 ("Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by [the Supreme Court's] previous cases—can a city [or school district] be liable for such a failure under § 1983"); *Lucia v. City of Peabody*, 971 F. Supp. 2d 153, 167 (D. Mass. 2013) (court awarded summary judgment to defendant municipality where officer had not been trained on the policy and was only provided a copy in a department manual, stating "[s]uch a method of training, while perhaps not an ideal practice, does not constitute deliberate indifference to the constitutional rights of those [ultimately harmed]"); *Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 462 (8th Cir. 2009) (regarding a school district that had sexual harassment policies and reporting procedures in place: "[w]hile [plaintiff] presented some evidence that personnel never received training specifically addressing teacher-on-student harassment, such testimony only raises concerns about the administration of the Board's policies . . . [t]his would, at most, raise a question about whether the program was negligently administered, but it is not alone a sufficient basis upon which to find liability for failure to train").

Finally, even if the Court had found that the District's training was so egregiously inadequate as to clear the "exceptionally stringent" bar for deliberate indifference, Ms. Wadsworth's claim would still fail because—as the Court has discussed—there is no indication that any staff member believed Ms. Wadsworth was being sexually harassed or that a staff member was confused about how to report sexual harassment, and thus any training deficiency was not the cause of her injuries.

*See Canton*, 489 U.S. at 391 ("for liability to attach . . . the identified deficiency in a city's training program must be closely related to the ultimate injury"); *Office of the Pub. Guardian v. Elliot Hosp.*, No. 21-cv-705-LM, 2022 U.S. Dist. LEXIS 161799, at *24 (D.N.H. Sep. 8, 2022) ("the failure to train [must be] connected to the alleged deprivation of constitutional rights"). Finding no failure to train, causal connection between the District's sexual harassment training and Ms. Wadsworth's injuries, or deliberate indifference to her constitutional rights, the Court grants RSU 40's motion for summary judgment as to Ms. Wadsworth's § 1983 failure to train claim and grants judgment in favor of RSU 40 and against the Plaintiff on Count II of the Amended Complaint.

###     C.     State Law Tort Claims

Ms. Wadsworth asserted three state law tort claims against the District: negligent hiring, training, and supervision (Count III); intentional infliction of emotional distress (Count IV); and negligent infliction of emotional distress (Count V). The District contends that it is entitled to summary judgment on all three claims because it is immune from liability under the MTCA. *Def.'s Mot.* at 19-20. Ms. Wadsworth agrees, stating that she "agrees to dismiss her tort claims against MSAD 40 considering the Maine Tort Claims Act immunity conferred to the School." *Pl.'s Opp'n* at 45.

The Court construes Ms. Wadsworth's agreement to dismiss her tort claims as a motion to dismiss Counts III, IV and V pursuant to Federal Rule of Civil Procedure 41(a)(2). Under the Rule, a court may order a dismissal "on terms the court considers

proper." *Id.* Here, where the Plaintiff agreed to the dismissal of her state tort claims only after RSU 40 moved for summary judgment on those claims and in her response to RSU 40's dispositive motion, the Court determines that the dismissal should be with prejudice.

## VI. CONCLUSION

The Court GRANTS Maine School Administrative District 40/Regional School Unit 40's Motion for Summary Judgment (ECF No. 100) as to Counts I and II as they pertain to the District.   In addition, pursuant to the Plaintiff's motion to dismiss the state tort claims, Court DISMISSES with prejudice Counts III-V of Adriana Wadsworth's Amended Complaint as against Maine School Administrative District 40/Regional School Unit 40.  The Court directs the Clerk to enter judgment in favor of Maine School Administrative District 40/Regional School Unit 40 and against Adrianna Wadsworth.

SO ORDERED.

<u>/s/ John A. Woodcock, Jr.</u>
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 20th day of March, 2023