UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ADRIANNA WADSWORTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:19-cv-00577-JAW |
| | ) | |
| MAINE SCHOOL ADMINISTRATIVE | ) | |
| DISTRICT 40/REGIONAL SCHOOL | ) | |
| UNIT 40 et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON ANDREW CAVANAUGH'S MOTION FOR
SUMMARY JUDGMENT**

A former high school student brought a lawsuit against a school principal asserting claims under 42 U.S.C. § 1983, as well as state tort claims, stemming from sexual harassment she alleges the school principal committed against her. The principal moves for summary judgment on all claims. The Court grants summary judgment on the § 1983 substantive due process claim because there are no genuine issues of material fact that could support the plaintiff's contention that the alleged harassment amounted to a violation of the student's rights to substantive due process and, in any event, the principal is entitled to qualified immunity. The Court grants summary judgment on the § 1983 equal protection claim because the principal is entitled to qualified immunity. The Court denies summary judgment on the tort claims because the plaintiff established the essential elements of each claim, and the principal is not entitled to intentional act immunity under the Maine Tort Claims Act.

# I.   PROCEDURAL HISTORY

On December 27, 2019, Adrianna Wadsworth[1] filed suit against Maine School Administrative District 40/Regional School Unit 40 (RSU 40 or the District),[2] Medomak Valley High School (MVHS), Andrew Cavanaugh, and Chuck Nguyen, a school social worker.  *Compl.* (ECF No. 1).  She alleged a violation of Title IX and negligent hiring, training, and supervision against the District and MVHS, brought claims under 42 U.S.C. § 1983, brought common law tort and statutory claims of intentional infliction of emotional distress (IIED) and negligent infliction of emotional distress (NIED) against all the Defendants, and brought a negligence claim against Mr. Cavanaugh and Mr. Nguyen.  *Id.* ¶¶ 134-179.  On February 7, 2020, Mr. Cavanaugh answered the Complaint.  *Def., Andrew Cavanaugh's Answer to Pl.'s Compl. and Demand for Jury Trial* (ECF No. 11).  On March 11, 2020, the District and MVHS filed a motion to dismiss counts one and two of the Complaint.  *Def. MSAD 40/RSU 40's Mot. to Dismiss Counts I and II of Compl.* (ECF No. 12).  On the same day, Mr. Nguyen filed an answer to the Complaint.  *Answer and Affirmative Defenses to Compl. and Jury Trial Demand (Def. Chuck Nugyen)* (ECF No. 13).

---

[1]     Ms. Wadsworth brought this lawsuit in her own name rather than under a pseudonym such as Jane Doe.  Though a balancing of factors is required, a victim of sexual harassment or sexual assault—especially a minor at the time of the offense—often has a privacy interest sufficient to allow the victim to proceed under a pseudonym.  *See, e.g., Doe v. Reg'l Sch. Unit No. 21*, Docket No. 2:19-00341-NT, 2020 WL 2833248, at 1-4 (D. Me. May 29, 2020); *Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. 2011).  However, as an adult, Ms. Wadsworth has an equal right to bring the action under her own name.

[2]     The filings in this case have variously referred to the District as MSAD 40/RSU 40, MSAD 40, or RSU 40.  According to the District, it was formerly known as MSAD 40 but is now known as RSU 40.  *Def. MSAD 40/RSU 40's Statement of Material Facts* ¶ 1 (ECF No. 101) ("Defendant Regional School Unit 40 ("RSU 40") . . . [was] formerly Maine School Administrative District 40").  The Court will refer to this party as RSU 40 or the District.

On March 27, 2020, Ms. Wadsworth filed an amended complaint, dropping MVHS as a defendant. *Pl.'s Am. Compl. and Demand for Jury Trial* (ECF No. 15) (*Am. Compl.*). On April 10, 2020, Mr. Nguyen filed a motion to dismiss the Amended Complaint. *Def. Chuck Nguyen's Mot. to Dismiss Am. Compl.* (ECF No. 16). On April 14, 2020, Mr. Cavanaugh filed an answer to the Amended Complaint. *Def., Andrew Cavanaugh's Answer to Pl.'s Am. Compl. and Demand for Jury Trial* (ECF No. 17).

On May 8, 2020, the District filed a motion to dismiss counts one and two of the Amended Complaint, and on May 11, 2020, it withdrew its first motion to dismiss. *Def. MSAD 40/RSU 40's Mot. to Dismiss Counts I and II of First Am. Compl.* (ECF No. 21); *Def. MSAD 40/RSU 40's Withdrawal of Mot. to Dismiss as Moot* (ECF No. 22). Ms. Wadsworth filed a response on June 8, 2020. *Opp'n of Pl., Adrianna Wadsworth, to Def. MSAD 40/RSU 40's Mot. to Dismiss for Failure to State a Claim* (ECF No. 31). On June 22, 2020, the District replied. *Def. MSAD 40/RSU 40's Reply in Supp. of Mot. to Dismiss* (ECF No. 32).

On October 2, 2020, the Court denied Mr. Nguyen's motion to dismiss, and on October 29, 2020, the Court denied the District's motion to dismiss. *Order on Def. Chuck Nguyen's Mot. to Dismiss* (ECF No. 36) (*Order on Nguyen Mot. to Dismiss*); *Order on MSAD 40/RSU 40's Mot. to Dismiss* (ECF No. 39). The District filed its Answer to the Amended Complaint on November 13, 2020 and Mr. Nguyen filed his Answer and affirmative defenses on February 4, 2021. *Def. MSAD 40/RSU 40's Answer to Pl.'s Am. Compl.* (ECF No. 45); *Answer and Affirmative Defense to Am. Compl. and Jury Trial Demand (Def. Chuck Nguyen)* (ECF No. 49).

On July 27, 2022, the District, Mr. Cavanaugh, and Mr. Nguyen each filed a motion for summary judgment accompanied by a statement of material facts. *Def. MSAD 40/RSU 40's Mot. for Summ. J.* (ECF No. 100); *Def. MSAD 40/RSU 40's Statement of Material Facts* (ECF No. 101); *Def. Andrew Cavanaugh's Mot. for Summ. J.* (ECF No. 103) (*Def.'s Mot.*); *Def. Andrew Cavanaugh's Rule 56 Statement of Material Facts in Supp. of His Mot. for Summ. J.* (ECF No. 104) (DSMF); *Def. Chuck Nguyen's Mot. for Summ. J.* (ECF No. 105); *Def. Chuck Nguyen's Statement of Material Facts in Supp. of Mot. for Summ. J.* (ECF No. 106). On October 19, 2022, Ms. Wadsworth filed an omnibus response to the motions for summary judgment, her own statement of additional material facts, and separate responses to each defendant's statement of material facts. *Pl. Adrianna Wadsworth's Omnibus Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 114) (*Pl.'s Opp'n*); *Pl.'s Rule 56 Statement of Material Facts in Supp. of Her Omnibus Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 115) (PSAMF); *Pl.'s Resps. to Def. MSAD 40's Statement of Material Facts in Supp. of its Mot. for Summ. J.* (ECF No. 116); *Pl.'s Resps. to Def. Andrew Cavanaugh's Statement of Material Facts in Supp. of His Mot. for Summ. J.* (ECF No. 117) (PRDSMF); *Pl.'s Resps. to Def. Chuck Nguyen's Statement of Material Facts in Supp. of His Mot. for Summ. J.* (ECF No. 118).

On November 17, 2022, the District filed a reply in support of its motion for summary judgment and a reply to Ms. Wadsworth's statement of additional material facts. *MSAD 40/RSU 40's Reply in Supp. of Mot. for Summ. J.* (ECF No. 121); *Def. MSAD 40/RSU 40's Reply Statement of Material Facts* (ECF No. 122) (RSU 40's

DRPSAMF).  The following day, Mr. Nguyen and Mr. Cavanaugh each filed their own replies and responses to Ms. Wadsworth's statement of additional material facts.  *Def. Chuck Nguyen's Reply Mem. of Law in Supp. of Mot. for Summ. J.* (ECF No. 123); *Def. Chuck Nguyen's Resp. to Pl.'s Rule 56 Statement of Material Facts in Supp. of Her Omnibus Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 124); *Def. Andrew Cavanaugh's Reply in Supp. of Mot. for Summ. J.* (ECF No. 125) (*Def.'s Reply*); *Def. Andrew Cavanaugh's Resps. to Pl.'s Rule 56 Statement of Material Facts in Supp. of Her Omnibus Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 126) (DRPSAMF).

Finally, on December 19, 2022, Ms. Wadsworth moved to request oral argument on the defendants' motions.  *Pl.'s Request for Hearing/Oral Argument on Defs.' Mot. for Summ. J.* (ECF No. 127).  The Court granted that motion, *Order* (ECF No. 128), and heard oral arguments on March 14, 2023.  *Min. Entry* (ECF No. 137).

## II.   FACTS[3],[4]

---

[3]    The Court states the facts "in the light most hospitable to [non-movants] consistent with record support . . .."  *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 37 (1st Cir. 2018) (citing *Ahern v. Shinseki*, 629 F.3d 49, 51 (1st Cir. 2010); *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002)).

[4]    The Court notes at the outset that the parties have submitted between them 321 proposed facts for the record.  *See* DSMF (164 facts); PSAMF (157 facts).  The Court finds many of these facts to be largely or entirely immaterial to Ms. Wadsworth's claims against Mr. Cavanaugh and his motion for summary judgment.

For example, Ms. Wadsworth has filed a single statement of additional facts to support her omnibus opposition to all three defendants' motions to dismiss.  That statement of facts includes assertions that may be essential to her claims against Mr. Nguyen and/or the District but are largely irrelevant to her claim against Mr. Cavanaugh—e.g., detailed allegations relating to the District's sexual harassment policies and trainings and other District employees' knowledge of the harassment.

The focus of the motion before the Court is on Mr. Cavanaugh's alleged harassment of Ms. Wadsworth.  Aside from occasionally providing narrative cohesion or context, the knowledge and beliefs of other actors is generally not relevant to these claims.  Accordingly, the Court will omit or abridge proposed facts it finds irrelevant to Mr. Cavanaugh's motion for summary judgment.  *See CFTC v. JBW Capital, LLC*, 812 F.3d 98, 110 n.19 (1st Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (at the summary judgment stage, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment" and thus "[f]actual disputes that are irrelevant or unnecessary will not be counted").

### A.      The Parties

Adrianna Wadsworth, a woman now in her early twenties, attended MVHS, a school located within the District, between 2014 and 2018.   PSAMF ¶¶ 1-2; DRPSAMF ¶¶ 1-2; DSMF ¶ 1; PRDSMF ¶ 1.  At all pertinent times, Ms. Wadsworth was under the age of 18.  PSAMF ¶ 5; DRPSAMF ¶ 5.

Andrew Cavanaugh began his career with RSU 40 in 2001, was promoted to Assistant Principal of MVHS in 2006 and to Principal in 2014.[5]   DSMF ¶¶ 2-4; PRDSMF ¶¶ 2-4.  He served as Principal until he was placed on a leave of absence on November 5, 2017, and then later resigned prior to a School Board meeting addressing the results of RSU 40's investigation.   PSAMF ¶¶ 120, 125, 130; DRPSAMF ¶¶ 120, 125, 130.

Chuong "Chuck" Nguyen was at all relevant times the social worker at MVHS. DSMF ¶ 5; PRDSMF ¶ 5.  RSU 40 is a school district consisting of the following Maine towns:  Friendship, Union, Waldoboro, Warren, and Washington.   DSMF ¶ 6; PRDSMF ¶ 6.  At all relevant times, Stephen Nolan was the Superintendent of the District and Linda Pease and Tamra Philbrook were Assistant Principals at MVHS. DSMF ¶¶ 8-10; PRDSMF ¶¶ 8-10.

### B.      Andrew Cavanaugh's Alleged Harassment of Adrianna Wadsworth

---

[5]      Ms. Wadsworth qualifies DSMF ¶ 4 to note that Mr. Cavanaugh was unclear in his deposition testimony whether he was promoted to Principal in 2014 or 2015.  PRDSMF ¶ 4.  The Court rejects that qualification as irrelevant because neither party disputes that Mr. Cavanaugh was Principal at all relevant times, and it appears that the events Ms. Wadsworth alleges did not begin until 2016.

During Ms. Wadsworth's junior and senior years of high school (starting in the fall of 2016), Mr. Cavanaugh repeatedly subjected her to conduct of a sexual nature, involving sexually charged and inappropriate comments, text messages, and gifts.[6] PSAMF ¶ 3; DRPSAMF ¶ 3.  While some RSU 40 employees, including Mr. Nguyen, witnessed instances of Mr. Cavanaugh's inappropriate conduct towards Ms. Wadsworth, RSU 40 did not investigate or discipline him until November 2017.[7] PSAMF ¶ 6; DRPSAMF ¶ 6.

### 1.   Adrianna Wadsworth's Background and Initial Encounters with Andrew Cavanaugh

Ms. Wadsworth's home life was very challenging.  DSMF ¶ 12; PRDSMF ¶ 12. Her parents separated and got back together multiple times throughout her childhood, including at least two occasions—once when Ms. Wadsworth was two years old and again when she was twelve years old—where she and her mother moved to temporary accommodations while her parents separated for several months.  DSMF ¶¶ 13-15; PRDSMF ¶¶ 13-15.  There were domestic violence incidents between Ms. Wadsworth's parents, resulting in police and child protective services involvement. DSMF ¶¶ 12, 16; PRDSMF ¶¶ 12-16.  In one instance, Ms. Wadsworth's mother struck her in the face, causing a bloodied lip, and Ms. Wadsworth moved out of the family home when she was sixteen.[8]  DSMF ¶ 17; PRDSMF ¶ 17.  Ms. Wadsworth

---

[6]     Mr. Cavanaugh objects to PSAMF ¶ 3, contending that the allegation that Mr. Cavanaugh "sexually harassed" Ms. Wadsworth should be stricken as conclusory.  DRPSAMF ¶ 3.  The Court has modified PSAMF ¶ 3 to reflect factual assertions supported by the record.

[7]     Mr. Cavanaugh offers the same objection to PSAMF ¶ 6, again arguing that Ms. Wadsworth's proposed assertion should be stricken as conclusory.  DRPSAMF ¶ 6.  The Court has modified PSAMF ¶ 6 to reflect factual assertions supported by the record.

[8]     Ms. Wadsworth qualifies DSMF ¶ 17 to—as the Court understands the qualification—object that she did not testify that the incident in question was "part of the reason she moved out of her

also reported that her mother had deep religious beliefs that tended to conflict with the normal life of a teenager and Ms. Wadsworth experienced numerous issues with her mother that caused her to rethink her living arrangements.  DSMF ¶¶ 18-19; PRDSMF ¶¶ 18-19.

Ms. Wadsworth first informed Mr. Cavanaugh of these issues during her sophomore year, when she met with him after being caught drinking at a party, and she told Mr. Cavanaugh and MVHS athletic director Matthew Lash that if her parents found out about this infraction, they would take extreme measures, including sending her away to a religious school in Arizona.  DSMF ¶¶ 20-21; PRDSMF ¶¶ 20-21.  Ms. Wadsworth also explained to Mr. Cavanaugh that her mother was very mean to her, excluded her from family activities, and refused to permit her to participate in other activities.[9]  DSMF ¶ 22; PRDSMF ¶ 22.

After this initial meeting with Ms. Wadsworth during her sophomore year, Mr. Cavanaugh asked Ms. Wadsworth to work for him, gave her his cell phone number,

---

family home."  PRDSMF ¶ 17.  The Court interprets Ms. Wadsworth's testimony to state that "these physical incidents" were part of the reason she moved out, but not necessarily this incident in particular.  *See Joint R. Materials for Defs.' Mots. for Summ. J.* (ECF No. 91) (*Joint R. Materials),* Attach. 16, *Dep. of Adrianna Wadsworth Vol. I* at 48:20-49:2 (*Wadsworth Dep. Vol. I*).  The Court does not view this issue of which specific instance(s) of physical abuse motivated Ms. Wadsworth to leave home to be relevant to her claims against Mr. Cavanaugh but has pared back DSMF ¶ 17 to reflect her testimony.

[9]      Ms. Wadsworth denies DSMF ¶ 22, contending that her mother did not call her names or use drugs.  PRDSMF ¶ 22.  The Court omits those assertions, finding that in addition to being factually disputed they are irrelevant for the reasons discussed in footnote 4, and admits the remainder of DSMF ¶ 22.

and told her to text him.[10],[11]   DSMF ¶ 23; PRDSMF ¶ 23.   Mr. Cavanaugh also spoke with Mr. Nguyen and informed him that Ms. Wadsworth needed his professional assistance.[12]   DSMF ¶ 26; PRDSMF ¶ 26.   She was formally referred to Mr. Nguyen due to her risk of leaving her home and consulted him a few times during her sophomore year to discuss some of her family issues.[13]   DSMF ¶¶ 27-28; PRDSMF ¶¶ 27-28.   Mr. Cavanaugh also continued to meet a few times a week with Ms. Wadsworth towards the end of her sophomore year.   DSMF ¶ 29; PRDSMF ¶ 29.

In the summer of 2016, Ms. Wadsworth started working for Mr. Cavanaugh at the houses that he fixed up, babysat his nephew, and also worked as a hostess at the waterfront in Camden and for two women at a catering company.   DSMF ¶ 30; PRDSMF ¶ 30.   She described how she came to work for Mr. Cavanaugh:

> It first came about when they found out about the situation between me and my parents, and Mr. Cavanaugh asked if there was some way that he could help me escape from the house, try to get away from the house, and he said that he had a few jobs that he had for me that would get me away from the house, and so then he asked my mom if I could work for him occasionally, and that's when we exchanged numbers.

---

[10]     Ms. Wadsworth qualifies DSMF ¶ 23 to assert that "[Mr.] Cavanaugh provided [her] his cell phone number when he asked her to work for him, and told her that she should text him."   PRDSMF ¶ 23 (quoting PSAMF, Attach. 2, *Decl. of Adrianna Wadsworth* ¶ 3 (*Wadsworth Decl.*)).   Because the Court finds that a reasonable jury could believe Ms. Wadsworth's statements, it—as it must at this stage—adopts those statements as fact for the summary judgment record and admits DSMF ¶ 23 as modified by her qualification.

[11]     Ms. Wadsworth denies DSMF ¶¶ 24-25, citing her sworn statement that Mr. Cavanaugh did not call her until after she started working for him.   PRDSMF ¶¶ 24-25.   The Court sustains the objections for the reasons discussed in the previous footnote and omits DSMF ¶¶ 24-25.

[12]     Ms. Wadsworth qualifies DSMF ¶ 26 only to deny the assertion to the extent that it refers to DSMF ¶¶ 24-25.   PRDSMF ¶ 26.   Because the Court has omitted those assertions, it rejects Ms. Wadsworth's qualification as moot.

[13]     Ms. Wadsworth admits DSMF ¶ 27, but DSMF ¶ 27 and Mr. Nguyen's corroborating testimony are phrased in the passive, not the active voice, so the Court cannot be certain who made the referral. *See Joint R. Materials,* Attach. 2, *Dep. of Chuck Nguyen* at 36:14-17 (*Nguyen Dep.*).

DSMF ¶ 30; PRDSMF ¶ 30.  Ms. Wadsworth would go with Mr. Cavanaugh to rental houses he fixed up, and she would help him with either spray painting things, disposing wood piles, or general cleaning.  DSMF ¶ 31; PRDSMF ¶ 31.  On occasion, she would watch his nephew.  DSMF ¶ 31; PRDSMF ¶ 31.  Ms. Wadsworth's mother approved of this arrangement and was aware that they had exchanged cell phone numbers.  DSMF ¶ 32; PRDSMF ¶ 32.

Ms. Wadsworth was alone with Defendant Cavanaugh at times during these workdays and formed a relationship that she described as an adult she could trust but one in which it was "like talking to a teenage friend."[14]  DSMF ¶ 33; PRDSMF ¶ 33.  Mr. Cavanaugh repeatedly asked Ms. Wadsworth to call him "Andy" and assured her she could trust him, which made her think of the relationship as a friendship rather than a formal relationship between principal and student.  DSMF ¶ 33; PRDSMF ¶ 33.  Their conversations included adult and sex-based topics, but Ms. Wadsworth was often uncomfortable with sex-based topics and did not initiate conversations about them with Mr. Cavanaugh.  DSMF ¶ 33; PRDSMF ¶ 33.  Ms. Wadsworth thought of Mr. Cavanaugh as a "father figure," but only because Mr. Nguyen used that term to describe Mr. Cavanaugh to her.  DSMF ¶ 33; PRDSMF ¶ 33.

In fall 2016, Ms. Wadsworth moved in with her friend Ashley Kenniston and the Kenniston family and lived there until after Mr. Cavanaugh's resignation, except

---

[14]     Ms. Wadsworth qualifies DSMF ¶ 33 to offer different characterizations of and caveats to Mr. Cavanaugh's assertions.  PRDSMF ¶ 33; *Wadsworth Decl.* ¶ 5.  For the reasons discussed in footnote 10, the Court accepts Ms. Wadsworth's qualifications and admits an altered DSMF ¶ 33.

for a brief period when she lived with her sister.[15,16] DSMF ¶ 35; PRDSMF ¶ 35. She decided to move out of her home because her parents frequently fought, her father was in and out of the home, they had to leave the home a few times, and her mother kept talking about how they would be leaving again. DSMF ¶ 36; PRDSMF ¶ 36. Ms. Wadsworth loved school and felt she was building a life for herself at school. DSMF ¶ 36; PRDSMF ¶ 36. She wanted to focus on school and make that her priority, so she felt that she needed to leave her family home, which was an unstable environment. DSMF ¶ 36; PRDSMF ¶ 36. After Ms. Wadsworth moved out, she fought and lost frequent touch with two of her siblings, but maintained a good relationship with her third sibling.[17] DSMF ¶ 37; PRDSMF ¶ 37.

Ms. Wadsworth recalls that her decision to move out made her sad, stating:

It was sad sometimes because I felt like my family that I disappointment my family and that our relationship wouldn't be the same again and that I wasn't as close with them and there were a lot of arguments about the choices and decisions that I was making when I moved out, and that was hard.

I was sad and conflicted being in high school and not having my family to turn to and not really being able to communicate with my family as much because they didn't agree with my decision to leave, and I didn't really feel that I had anybody at the time to talk to when I couldn't talk to my family as much, and also was conflicted because I didn't know if I was making the right choice to stay away and leave home or if I should

---

[15] Ms. Wadsworth qualifies DSMF ¶ 35 to assert that she also lived with her sister and then her father during her junior and senior years. PRDSMF ¶ 35. The Court accepts the qualification as to her sister but rejects it as to her father, because she did not move in with him until 2018—well after Mr. Cavanaugh's resignation. *See Wadsworth Dep. Vol.* I at 16:11-20.

[16] Ms. Wadsworth qualifies DSMF ¶ 42, which asserts that the Kennistons acted as her foster parents, to state that "[t]here was no formal or informal arrangement or agreement for the Kenniston's to act as Plaintiff Wadsworth's foster parents." PRDSMF ¶ 42. The Court omits DSMF ¶ 42 as unsupported by the record.

[17] Ms. Wadsworth qualifies DSMF ¶ 37 to add that she only testified to losing "frequent touch" with two of the siblings and that she maintained a good relationship with the third sibling. PRDSMF ¶ 37. The Court accepts these qualifications.

go back home with my family, and I wasn't sure if I was making a big mistake or if I was doing what was best for me.

DSMF ¶ 38; PRDSMF ¶ 38.  Ms. Wadsworth's parents divorced during her stay with the Kenniston family.  DSMF ¶ 39; PRDSMF ¶ 39.  Ms. Wadsworth reported the move to Mr. Nguyen, and he and Mr. Cavanaugh then met with the Kennistons to ensure Ms. Wadsworth was living in a healthy environment.  DSMF ¶¶ 40-41; PRDSMF ¶¶ 40-41.

### 2.   Andrew Cavanaugh's Inappropriate Comments and Gifts

Between 2016 and 2017, Mr. Cavanaugh told Ms. Wadsworth she was pretty, looked nice, and made comments about what she was wearing nearly every day while Ms. Wadsworth was in school.[18]  PSAMF ¶ 28; DRPSAMF ¶ 28.  Mr. Cavanaugh repeatedly used pet names to refer to Ms. Wadsworth such as "cupcake," "princess," "ladytime," "Sports Illustrated swimsuit model," and handsome.[19]  PSAMF ¶ 29; DRPSAMF ¶ 29; DSMF ¶ 110; PRDSMF ¶ 110.  This was done repeatedly in person

---

[18]   Mr. Cavanaugh denies PSAMF ¶ 28, objecting that it should be stricken as conclusory, violating the rule that statements of fact must be separate, short, and concise, and inadmissible at trial.  DRPSAMF ¶ 28.  None of these objections is availing.

These assertions of fact are not conclusory, argumentative, or overly lengthy.  To the extent that Mr. Cavanaugh argues that the comments she describes are inadmissible hearsay, the Court rejects that argument for two reasons.  First, because the comments are not offered for their truth (whether Ms. Wadsworth actually was pretty) but rather for their harassing impact on her, they are not hearsay.  FED. R. EVID. 801(c)(2) ("'Hearsay' means a statement that . . . a party offers to prove the truth of the matter asserted in the statement").  Second, even if the comments were offered for their truth they would be admissible against Mr. Cavanaugh as statements of a party opponent.  FED. R. EVID. 801(d)(2).  The Court overrules the objections and admits PSAMF ¶ 28.

[19]   Mr. Cavanaugh qualifies PSAMF ¶ 29 to object that the assertions contain inadmissible characterizations and conclusions, and that they do not fully capture the context of their relationship at the time Mr. Cavanaugh made these statements.  DRPSAMF ¶ 29.  The Court admits PSAMF ¶ 29, rejecting the former objection because these are factual assertions and rejecting the latter objection as beyond the scope of the fact asserted.

and via text message on an almost daily basis between 2016 and 2017.[20]  PSAMF ¶ 30; DRPSAMF ¶ 30.  Ms. Kenniston and some of Ms. Wadsworth's friends were aware of the "cupcake" nickname.  DSMF ¶¶ 111-12; PRDSMF ¶¶ 111-12.  Her friends teased her about it, but Ms. Kenniston was concerned about the nickname because she was not sure of the nature of the relationship.[21]  *Id.*

Mr. Cavanaugh, in a meeting in his office, told Ms. Wadsworth that she was good looking and could take anyone she wanted to prom.[22]  PSAMF ¶ 31; DRPSAMF ¶ 31.  At a school basketball game, Mr. Nguyen witnessed Mr. Cavanaugh comment on Ms. Wadsworth's looks in the middle of the gym and in the presence of everyone attending the game.  PSAMF ¶ 32; DRPSAMF ¶ 32.  In the spring of 2017, around the time of Ms. Wadsworth's junior prom, Mr. Cavanaugh handed her an envelope of money in the office and called her "cupcake" during the exchange.[23]  PSAMF ¶ 35; DRPSAMF ¶ 35.

---

[20]  Mr. Cavanaugh offers the same qualifications as in DRPSAMF ¶ 29 and the Court rejects them for the same reasons.  Mr. Cavanaugh incorporates these same context objections into DRPSAMF ¶¶ 30-38, 40, 42-43, 51, 53-54, 105, 120, 122-24, 151.  To the degree that those objections offer only that Ms. Wadsworth's factual proposed assertion does not fully capture the context of the relationship, without any further explanation or support, the Court rejects the objections as beyond the scope of the fact(s) asserted.

[21]  DSMF ¶ 112 states: "The Plaintiff, [Ms.] Kenniston and the Plaintiff's friends joked about the nickname."  Ms. Wadsworth qualifies DSMF ¶ 112 to submit that "Ms. Kenniston was concerned about the nickname because she was not sure of the nature of the relationship."  PRDSMF ¶ 112.  The Court accepts this qualification as supported by the record.  *See Kenniston Dep.* at 38:6-12 (expressing "concern" because she "wasn't sure about the nature of the relationship").

[22]  Mr. Cavanaugh denies PSAMF ¶ 31 as unsupported by Ms. Wadsworth's record citation. DRPSAMF ¶ 31.  The Court agrees that the cited page does not allege that Mr. Cavanaugh called Ms. Wadsworth good looking.  However, in the same deposition, she states that "Mr. Cavanaugh said that I could take anybody in the school that I wanted [to prom] and said that I was a good looking girl." *Wadsworth Dep. Vol. I* at 194:15-17.  The Court overrules the objection and admits PSAMF ¶ 31.

[23]  Ms. Wadsworth's proposed PSAMF ¶¶ 34-41 assert facts relating to Mr. Nguyen's and Ms. Philbrook's awareness of Mr. Cavanaugh's behavior.  As the Court explained in footnote 4, Ms. Wadsworth submitted an omnibus statement of alternative material facts to also support her claims against Mr. Nguyen and RSU 40.  Assertions relating to the knowledge of those officials may be relevant to those other claims, but they are generally not relevant to the claims against Mr. Cavanaugh

Ms. Wadsworth was embarrassed that Mr. Cavanaugh called her "cupcake," and after one of her friends found out about the nickname, Ms. Wadsworth went to Mr. Nguyen's office and advised him that Mr. Cavanaugh called her "cupcake" when they texted each other.  PSAMF ¶ 40; DRPSAMF ¶ 40.

In the text messages between Mr. Cavanaugh and Ms. Wadsworth, from the limited period of April 20, 2017 through November 3, 2017, Mr. Cavanaugh called Ms. Wadsworth "cupcake" at least 60 times, "ladytime" at least 28 times, and "princess" at least 18 times.[24]  PSAMF ¶ 42; DRPSAMF ¶ 42.

Megan Wright, a classmate and friend of Ms. Wadsworth's, later testified that she thought Mr. Cavanaugh was creepy and that Mr. Cavanaugh commented on the length of Ms. Wadsworth's skirt when she walked into school in the morning.[25]  PSAMF ¶ 155; DRPSAMF ¶ 155.  Ms. Wadsworth was borrowing Ms. Wright's skirt that day, and this comment made Ms. Wright so uncomfortable that she never wore it again.  *Id.*  Ms. Wright testified that the relationship between Mr. Cavanaugh and

---

except where they describe his behavior or its effect on Ms. Wadsworth.  The Court admits the assertions or portions of assertions relating to Mr. Cavanaugh's behavior, but omits asserted facts that address the potential liability of other actors.  *See, e.g.,* PSAMF ¶ 35 (Ms. Wadsworth asserts that "Ms. Philbrook was present when Mr. Cavanaugh handed Plaintiff an envelope of money . . ." but the Court admits "Mr. Cavanaugh handed [Ms. Wadsworth] an envelope of money . . .").

[24]   Ms. Wadsworth's proposed PSAMF ¶ 43 asserts only other school officials' awareness of the text messages and the Court omits it for the reasons described in footnote 23.

[25]   Mr. Cavanaugh offers virtually identical objections to PSAMF ¶¶ 155-56 (and similar objections to ¶ 157), objecting that the assertions are unsupported by the record, irrelevant, hearsay, impermissible character evidence, and inadmissible at trial for unspecified reasons.  DRPSAMF ¶¶ 155-57.  While some objections may be reasonable as to certain assertions, many are wholly inapplicable.  The Court concludes that PSAMF ¶ 155 is clearly supported by Ms. Wright's deposition testimony, not impermissible hearsay because the comment is admissible either as a statement of a party opponent or for its impact on the declarant, relevant to Ms. Wadsworth's claims that Mr. Cavanaugh sexually harassed her, and not impermissible character evidence because it describes an incident of him sexually harassing Ms. Wadsworth.  *See Joint R. Materials*, Attach. 23, *Dep. of Megan Wright* at 25:20-27:4.  The Court overrules all objections and admits PSAMF ¶ 155.

Ms. Wadsworth was common knowledge throughout the school.[26]  PSAMF ¶ 157;

DRPSAMF ¶ 157.  Mr. Cavanaugh commented on one of Ms. Wright's mother's

Facebook posts—a picture of Ms. Wright and Ms. Wadsworth dressed up in Harry

Potter costumes—stating that he felt slighted because he was not in the photo.[27]

---

[26]     Mr. Cavanaugh objects to PSAMF ¶ 157 on the grounds that it is unsupported, conclusory, and otherwise inadmissible.  DRPSAMF ¶ 157.  The Court views these objections as plausible only as they relate to the foundation of Ms. Wadsworth's statement.

Given that the record is replete with evidence that Mr. Cavanaugh regularly pulled Ms. Wadsworth out of class, texted her constantly, and multiple teachers and administrators noticed and complained of their interactions, the Court does not strain to infer that their relationship—however it may be characterized—provided grist for the school's rumor mill.  Ms. Wright testified that her "group of friends" would "all find [the relationship] weird" and that she first heard about it through a mutual friend while living in Wisconsin.  *Wright Dep.* at 31:9-32:1.  The Court finds support for Ms. Wright's assertion that the relationship was "common knowledge," overrules Mr. Cavanaugh's objections, and admits PSAMF ¶ 157.

[27]     PSAMF ¶ 156 states:

> Defendant Cavanaugh made comments to Plaintiff in the main office, saying she looked sexy in her glasses.  Defendant Cavanaugh also commented on one of Ms. Wright's mom's Facebook posts, a picture of Ms. Wright and Plaintiff dressed up in Harry Potter costumes, stating that he felt slighted because he wasn't in the photo. This was the same costume that Plaintiff was wearing when Defendant Cavanaugh told her she looked like a playboy bunny.

PSAMF ¶ 156.  In support of these statements, Ms. Wadsworth cites the deposition testimony of Megan Wright.  *Id.* (quoting *Wright Dep.* at 26:1-5, 28:5-21, 27:12-16).  In the first statement about the glasses, Ms. Wright says that she was not present when Mr. Cavanaugh made the comment, but that Ms. Wadsworth told Ms. Wright about the comment which took place in the main office at the beginning of their senior year.  *Id.* at 25:18-26:17.

In the second comment about the Facebook posting, Ms. Wright explained that there was a school dress-up day and Ms. Wadsworth, another female, and she dressed up as Harry Potter.  *Id.* at 27:12-28:23.  As it turned out, Mr. Cavanaugh dressed up as Harry Potter too.  *Id.* at 28:15-17.  There were two photographs: one with the three females and the other with the three females and Mr. Cavanaugh.  *Id.* at 28:11-21.  Ms. Wright's mother posted only the one of the three females on Facebook and did not post the one with the three females and Mr. Cavanaugh.  *Id.* at 27:23-28:21.  Mr. Cavanaugh commented that he felt slighted because Ms. Wright's mother had not posted the photograph in which he appeared.  *Id.* at 28:9-21.  Ms. Wright testified that Mr. Cavanaugh's comment made her feel "super uncomfortable."  *Id.* at 28:22-23.  The deposition does not clarify whether Mr. Cavanaugh made this comment directly to Ms. Wright or to Ms. Wadsworth who conveyed it to Ms. Wright.  Based on Ms. Wright's comment that Mr. Cavanaugh's comment made her feel "super uncomfortable," the Court infers that the comment was made to Ms. Wright.

The third comment involved the same photograph of the three females wearing Harry Potter costumes on dress-up day.  *Id.* at 27:8-21.  Ms. Wadsworth told Ms. Wright that Mr. Cavanaugh commented that the way she held up her tie made her look like a Playboy bunny.  *Id.*  Ms. Wright did not hear Mr. Cavanaugh make this comment.  *Id.*

PSAMF ¶ 156; DRPSAMF ¶ 156.  Mr. Cavanaugh also told Ms. Wadsworth that she looked sexy in glasses, a comment that Ms. Wadsworth repeated to Ms. Wright.  *Id.*  Finally, Ms. Wadsworth told Ms. Wright that Mr. Cavanaugh told her that she looked like a Playboy bunny when wearing the Harry Potter costume.  *Id.*

Mr. Cavanaugh also made Ms. Wadsworth uncomfortable when he gave her gifts at school, including a box of feminine hygiene products and toiletries, as well as a winter coat.[28]  PSAMF ¶ 53; DRPSAMF ¶ 53; DSMF ¶¶ 74, 77; PRDSMF ¶¶ 74, 77. He gave her gifts of money "a lot of times" to pay for school lunches and essentials, as well as non-essentials like clothing and trips.[29]  PSAMF ¶ 54; DRPSAMF ¶ 54; DSMF ¶ 73; PRDSMF ¶ 73.  Mr. Cavanaugh paid for Ms. Wadsworth's school photos because her parents had never purchased them for her and offered to pay for her to take the SAT.  DSMF ¶¶ 75-76; PRDSMF ¶¶ 75-76.

Ms. Wadsworth informed Mr. Nguyen that the gifts Mr. Cavanaugh was giving her made her feel embarrassed, and Mr. Nguyen responded by stating that Mr.

---

Mr. Cavanaugh offers the same slew of objections he made to PSAMF ¶ 155.  DRPSAMF ¶ 156.  The Court rejects all but the hearsay objections for the reasons stated in footnote 25 and addresses the hearsay objections below.

First, none of the testimony is offered for its truth and is not hearsay—for example, the Playboy bunny comment is obviously not being offered to prove that Ms. Wadsworth actually looked like a Playboy bunny.  FED. R. EVID. 801(c)(2) ("'Hearsay' means a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement").  Furthermore, it seems unlikely that Ms. Wright created these comments out of whole cloth.  If Ms. Wadsworth were to testify consistently with Ms. Wright, Ms. Wadsworth's testimony about what Mr. Cavanaugh said to her would be admissible as an admission of a party opponent.  FED. R. EVID. 801(d)(2).  Finally, Ms. Wright's testimony would be admissible to rebut an express or implied charge of recent fabrication. FED. R. EVID. 801(d)(1)(B)(i).  The Court overrules the objections and admits PSAMF ¶ 156.

[28]   Mr. Cavanaugh qualifies PSAMF ¶ 53 to assert that Ms. Wadsworth testified that she was "kind of embarrassed" by the gifts.  DRPSAMF ¶ 53.  The Court does not find this phrasing materially different than "uncomfortable" and rejects the qualification.

[29]   Mr. Cavanaugh objects to Ms. Wadsworth's use of "often" as a conclusory term.  DRPSAMF ¶ 54.  The Court substituted the exact language from her deposition testimony.  *See Wadsworth Dep. Vol. I* at 135:17-136:16.

Cavanaugh was just making sure she had everything she needed. PSAMF ¶¶ 55-56; DRPSAMF ¶¶ 55-56. Ms. Wadsworth's family was aware of some of Mr. Cavanaugh's assistance and would comment on it, with her father asking her to "ask Mr. Cavanaugh if he could do this or that" and her mother sarcastically saying "if you need help why don't you go ask Mr. Cavanaugh."[30] DSMF ¶¶ 78-79; PRDSMF ¶¶ 78-79. Neither of Ms. Wadsworth's parents complained to the District of any wrongdoing by Mr. Cavanaugh, regarding the financial assistance or any other issues. DSMF ¶ 80; PRDSMF ¶ 80.

Other teachers and administrators have financially assisted students in need, and Ms. Philbrook testified:

> We buy sneakers for kids; we give them scholarships and help them pay for driver's ed. If a student – I've bought ties for students and shirts for students [for the prom]. Our students are needy. That in itself would not cause any sort of concern . . .. I'm not going to speculate what she was in need of, and if Mr. Cavanaugh knew she was in need of something, he would give the shirt off his back for somebody.

DSMF ¶ 80; PRDSMF ¶ 80. Mr. Cavanaugh assisted other students who were in need or struggling, particularly around the holidays, and ensured that families had gifts; had previously bought another student a coat after the passing of her father; and had given cash and gifts to other students and paid for students' prom dresses.[31] DSMF ¶¶ 82-84; PRDSMF ¶¶ 82-84. Ms. Philbrook testified that the staff and

---

[30]   Ms. Wadsworth qualifies DSMF ¶ 78 to note that her parents were only aware of certain instances of Mr. Cavanaugh supporting her. PRDSMF ¶ 78. The Court modified DSMF ¶ 78 to clarify that they were aware of some of the assistance.

[31]   Ms. Wadsworth qualifies DSMF ¶ 84 to note that "[i]t was [her] understanding during the relationship that [Mr.] Cavanaugh did not provide cash and gifts to other students." PRDSMF ¶ 84. Even if the Court accepted the assumption that this information was within her knowledge, the fact asserts that Mr. Cavanagh had given gifts in the past—a period not limited to their relationship. The Court rejects the qualification as beyond the scope of the fact asserted.

administrators go out of their way to help kids in need and that such instances of assistance are not inherently concerning.  DSMF ¶ 85; PRDSMF ¶ 85.

### 3.      The Birth Control Appointment

During Ms. Wadsworth's junior year, while she was living with the Kennistons, Mr. Cavanaugh took Ms. Wadsworth to a physical examination with her doctor so she could participate in cheerleading.  PSAMF ¶ 44; DRPSAMF ¶ 44; DSMF ¶ 43; PRDSMF ¶ 43.  At the time, Ms. Wadsworth was estranged from her parents and they had not signed off on the physical or signed other permission slips she needed for cheerleading.[32]  DSMF ¶¶ 43-44; PRDSMF ¶¶ 43-44.  Mr. Cavanaugh offered to bring Ms. Wadsworth but she replied that Ms. Kenniston could take her.[33]  DSMF ¶ 45; PRDSMF ¶ 45.   Mr. Cavanaugh insisted and ultimately took her to the appointment.  DSMF ¶¶ 45-46, 50; PRDSMF ¶¶ 45-46, 50.

While at the appointment, Mr. Cavanaugh suggested Ms. Wadsworth get on birth control.[34]  PSAMF ¶ 45; DRPSAMF ¶ 45; DSMF ¶ 47; PRDSMF ¶ 47.  While she saw him approach the person sitting at the front desk, she was not present for

---

[32]      Ms. Wadsworth qualifies DSMF ¶¶ 43-45 to clarify that she does not recall if she asked her parents to sign off on the form or take her to the examination.  PRDSMF ¶¶ 43-45.  The Court has slightly reframed the assertions to reflect her deposition testimony, but otherwise overrules her objections as beyond the scope of the fact asserted.  *See Wadsworth Dep. Vol. I* at 198:11-15 ("I didn't have my parents to sign off on it or on my physical or any other permission slips that I needed for cheer").

[33]      Ms. Wadsworth qualifies DSMF ¶ 45 to add that she advised Mr. Cavanaugh that Ms. Kenniston could take her, but Mr. Cavanaugh insisted on taking her himself.  PRDSMF ¶ 45.  The Court admits this qualification as supported by the record.  *See Joint R. Materials*, Attach. 20, *Pl. Adrianna Wadsworth's Answer to Def. Chuck Nguyen's Interrogs.* at 4 (*Wadsworth Interrogs.*).

[34]      Mr. Cavanaugh denies PSAMF ¶ 45, contending that Ms. Wadsworth's assertion that Mr. Cavanaugh suggested she get on birth control is unsupported by the record.  DRPSAMF ¶ 45.  The Court disagrees, overrules the objection, and admits PSAMF ¶ 45.  *See Wadsworth Dep. Vol. I* at 201:4-8 ("I remember [Mr. Cavanaugh] telling me while we were there that he would look into the topic of birth control for me and how we can get that").

any conversation that may have taken place.   DSMF ¶ 51; PRDSMF ¶ 51.   Ms. Wadsworth does not recall having any conversation with the healthcare provider about birth control, nor was she prescribed birth control as a result of this visit, but Mr. Cavanaugh wrote a letter to the doctor's office advising the doctor of issues he perceived she had with her menstruation.[35]   DSMF ¶¶ 51-52; PRDSMF ¶¶ 51-52.

That letter advised that Mr. Cavanaugh had concerns about Ms. Wadsworth's health that included depression, attention deficit, irregular menstrual cycle, and lack of vaccinations due to religious concerns.   PSAMF ¶ 114; DRPSAMF ¶ 114.   Mr. Cavanaugh noted in the letter that Ms. Wadsworth's medical records should be kept confidential and not shared with her parents, but later admitted that he did not have the authority to prevent Ms. Wadsworth's parents from seeing her medical records, as they remained her legal guardians.   PSAMF ¶¶ 115-16; DRPSAMF PSAMF ¶¶ 115-16.

Ms. Wadsworth did not do any research on her own or consult the female school nurse regarding birth control to address her menstruation issues, as she "felt like Mr. Cavanaugh gave [her] all the knowledge [she] needed," but she did speak to Ms. Kenniston, who advised her that they could make a decision together without Mr. Cavanaugh's involvement.[36]   DSMF ¶¶ 53-54, 59; PRDSMF ¶¶ 53-54, 59.

---

[35]   Ms. Wadsworth qualifies DSMF ¶ 51 to add that Mr. Cavanaugh wrote a letter to the doctor's office about issues he perceived her to have with menstruation.   PRDSMF ¶ 51.   The Court accepts this qualification.   *See Joint R. Materials*, Attach. 36, *Letter from Andrew Cavanaugh to Pl.'s Doctor* at 2 (*Cavanaugh Letter*).

[36]   Ms. Wadsworth qualifies DSMF ¶ 53 to add her discussion with Ms. Kenniston.   The Court accepts that qualification as supported by the record.

After the physical, Mr. Cavanaugh continually suggested Ms. Wadsworth get on birth control and ultimately scheduled a medical appointment for Ms. Wadsworth so that she could obtain birth control.[37]   PSAMF ¶ 46; DRPSAMF ¶ 46.   Mr. Cavanaugh made these suggestions after speaking with Ms. Wadsworth about her menstruation issues and about intercourse with other persons her age.[38]   DSMF ¶¶ 48-49; PRDSMF ¶¶ 48-49.

Mr. Nguyen knew that Mr. Cavanaugh was attempting to schedule and take Ms. Wadsworth to a birth control appointment, and he advised Mr. Cavanaugh that taking Ms. Wadsworth "wouldn't be a good idea; don't take her."[39]   PSAMF ¶¶ 47-48; DRPSAMF ¶¶ 47-48.   Mr. Nguyen spoke with Ms. Wadsworth about the birth control appointment and whether it was normal for Mr. Cavanaugh to be discussing birth control with her, with Mr. Nguyen informing her that Mr. Cavanaugh was like a father figure to her, and that Mr. Cavanaugh thought of her "as a daughter."[40]   PSAMF ¶ 52; DRPSAMF ¶ 52; DSMF ¶ 57; PRDSMF ¶ 57.   During this conversation, Ms. Wadsworth first said that she "didn't know" if she was okay with Mr. Cavanaugh

---

[37]   Mr. Cavanaugh denies PSAMF ¶ 46, contending again that Ms. Wadsworth's assertions are unsupported by the record.  The Court again overrules the objection and admits PSAMF ¶ 46.  *See Wadsworth Dep. Vol. I* at 203:15-20 (recalling Mr. Cavanaugh repeatedly reminded her that she should "be on [birth control]").

[38]   Mr. Cavanaugh submits that he suggested birth control as a potential solution for Ms. Wadsworth's menstruation issues.  DSMF ¶¶ 48-49.  She counters that they had also discussed her being sexually active and she primarily associated birth control with intercourse.  PRDSMF ¶¶ 48-49.  The Court views Mr. Cavanaugh's motive to be a disputed issue of fact and—as it must at this stage—draws the inference in Ms. Wadsworth's favor, modifying DSMF ¶ 48 and omitting ¶ 49.

[39]   Mr. Cavanaugh qualifies PSAMF ¶ 48 to assert that instead of saying it was a bad idea, Mr. Nguyen said it was not a good idea.  DRPSAMF ¶ 48.  The Court accepts the qualification and modified PSAMF ¶ 48 to reflect Mr. Cavanaugh's testimony.

[40]   The Court omits PSAMF ¶¶ 49-51 and DSMF ¶¶ 55-56 for the reasons stated in footnote 4, as irrelevant to the claims against Mr. Cavanaugh, but admits Mr. Nguyen's comments in PSAMF ¶ 52 and DSMF ¶¶ 57-58 as relevant to Ms. Wadsworth's feelings about Mr. Cavanaugh's behavior.

discussing birth control and asked Mr. Nguyen for his opinion, but after he affirmed Mr. Cavanaugh's behavior as a "father figure," Ms. Wadsworth then responded "yeah, you're right, I agree."[41] DSMF ¶ 58; PRDSMF ¶ 58.

Ms. Wadsworth "relied on" Defendant Cavanaugh and Defendant Nguyen for "all of her private issues" because she thought she could trust them and had been reassured by Mr. Nguyen that Mr. Cavanaugh's behavior was not inappropriate.[42] DSMF ¶ 61; PRDSMF ¶ 61.   Mr. Nguyen testified that it was not abnormal for administrators at the high school to ask him about birth control for students but that an administrator asking about taking a student to get birth control would "raise alarm bells" as a "violation of professional and personal boundaries."[43,44]   DSMF ¶ 62; PRDSMF ¶ 62.

### 4.   Andrew Cavanaugh Asks Adrianna Wadsworth to Move in with Him

Over the course of several months, while Ms. Wadsworth was living with the Kennistons, Mr. Cavanaugh asked her to move into his home on a number of

---

[41]     Ms. Wadsworth objects that DSMF ¶ 58, characterizing her response as agreeing with Mr. Nguyen's comments, does not capture the dynamics of the conversation. The Court agrees and admits DSMF ¶ 58 as supplemented to reflect more accurately Ms. Wadsworth's deposition testimony. *See Wadsworth Dep. Vol. I* at 208:17-209:8.

[42]     The Court accepts Ms. Wadsworth's qualification to supplement DSMF ¶ 61 to add why she relied on Mr. Cavanaugh and Mr. Nguyen.

[43]     Ms. Wadsworth qualifies DSMF ¶ 62 to object that the proposed assertion omitted key parts of Mr. Nguyen's testimony on this issue. PRDSMF ¶ 62. The Court supplemented DSMF ¶ 62 to fairly represent Mr. Nguyen's testimony. *See Nguyen Dep.* at 102:16-103:9.

[44]     The Court omits DSMF ¶ 60, asserting that Mr. Cavanaugh played no role in Ms. Wadsworth ultimately obtaining birth control, as contradicted by the record. *See Kenniston Dep.* at 39:5-6 ("[Mr.] Cavanaugh made an appointment for [Ms. Wadsworth] to go on birth control").

occasions.[45]   PSAMF ¶¶ 57-58; DRPSAMF ¶¶ 57-58.   During that period, Mr. Cavanaugh sent Ms. Wadsworth the following text messages:

**April 28:** "You need to come here tomorrow.  I will get a room ready for you and you can rest and get better.  We will take care of you.  I think you are just too stressed."

**April 29:** "Do you think staying with me isnt a good idea?"

**May 10:** "Would your parents freak if you lived with me?"

"What about staying here for a couple days just to try it?  You might like it.  At least no one would yell at you.  What about staying here tomorrow night?"

"If you decide you want to stay with me, just give a brutha a heads up."

"One of these days I will get you to live with me!"

**May 18:** "Move in here and we will teach you."

"You should live here for your senior year.  It would be a stable place and I dont care about child support."

"I have always said you were a class act.  I think if you talked with Debbie and I about it we could take care of a lot.  I would write a letter to the superintendent and all that."

**June 8:** "I have told you to live with me but you don't want to do that."

**June 22:** "I have a bit of bad news.  I spoke with work about you staying with me and i cant.  I feel terrible but thats what it is."

---

[45]     Mr. Cavanaugh objects that "[o]ver the course of several months" should be stricken as conclusory.   DRPSAMF ¶ 57.   The Court overrules this objection as frivolous, given that Mr. Cavanaugh goes on to admit the veracity of nearly a dozen such text messages over a two-month period.  DRPSAMF ¶¶ 58-69.

         Mr. Cavanaugh also qualifies PSAMF ¶ 57 to object that the assertion "again ignores the context of the communications and their relationship."  DRPSAMF ¶ 57.  He offers this same objection to PSAMF ¶¶ 58-71.  The Court overrules each context objection as beyond the scope of the fact(s) asserted.

PSAMF ¶¶ 59-69; DRPSAMF ¶¶ 59-69.  While Mr. Cavanaugh was not more specific about whom at "work" he spoke with—he may have been referring to Mr. Nguyen, whom Mr. Cavanaugh asked if Ms. Wadsworth could move in with him (Mr. Nguyen responded that he did not think it was a good idea)—he informed someone at the school about his desire to have Ms. Wadsworth live with him, and no action was taken related to this request beyond seemingly denying it.[46]  PSAMF ¶¶ 70-71; DRPSAMF ¶¶ 70-71.

### 5.    Andrew Cavanaugh's Inappropriate Text Messages

On a near daily basis, Mr. Cavanaugh would exchange text messages with Ms. Wadsworth; many inappropriate.[47]  PSAMF ¶ 90; DRPSAMF ¶ 90.  In his text messages, Mr. Cavanaugh would ask Ms. Wadsworth to send him pictures of her in her swimsuit, ask her about her sexual relationships with boys, and even about whether she was having orgasms.  PSAMF ¶ 90; DRPSAMF ¶ 90.

On July 21, 2017, Mr. Cavanaugh texted her "You are like a daughter to me . . . Maybe a scandalous step daughter"[48] and "If you buy car insurance how would you afford those lacey shorts?"  PSAMF ¶¶ 77-78; DRPSAMF ¶¶ 77-78.

---

[46]    Mr. Cavanaugh objects that PSAMF ¶ 70 should be stricken because it "would be inadmissible at the time of trial," without elaborating on his reasoning.  DRPSAMF ¶ 70.  Mr. Cavanaugh, however, admitted the substance of the underlying text message in DRPSAMF ¶ 69.  To the extent that he is now arguing that the assertion that he told someone at school is hearsay, the Court overrules the objection because the text message is admissible against him as a statement of a party opponent.  *See* FED. R. EVID. 801(d)(2).

[47]    As with the text messages about moving in, Mr. Cavanagh does not deny the veracity of the text messages cited in this section, but instead qualifies each to state that "Plaintiff is again ignoring the context of the communications and their relationship."  DRPSAMF ¶ 77.  The Court again overrules each context objection as beyond the scope of the fact(s) asserted.  *See* DRPSAMF ¶¶ 77-91.

[48]    PSAMF ¶ 77 begins by saying, "Mr. Cavanaugh abused Ms. Wadsworth's trust".  The Court sua sponte strikes this introductory phrase as a legal conclusion.  The Court admits the remainder of PSAMF ¶ 77.

On July 27, 2017, he texted her "How casual is sex with your friends?  Like is it no big deal or what?"  PSAMF ¶ 79; DRPSAMF ¶ 79.  Three days later, Mr. Cavanaugh texted Ms. Wadsworth, "Good you should be at the beach.  I would ask for pictures, but that might be a bit much . . . Can I see the photos or would that bother you?  Only send the scandalous ones!  Ha hah."  PSAMF ¶ 80; DRPSAMF ¶ 80.  Later that day, he texted her "Do you have any more [pictures] you could send?"  PSAMF ¶ 81; DRPSAMF ¶ 81.  On August 2, 2017, he texted her "Can you help me Friday or will you be taking more nude pictures of yourself?"[49]  PSAMF ¶ 82; DRPSAMF ¶ 82.

On August 2, 2017, Ms. Wadsworth told Mr. Cavanaugh that she had been sexually assaulted by her cheerleading coach while swimming during an off-season cheerleading team trip earlier that summer.[50]  PSAMF ¶¶ 72-73; DRPSAMF ¶¶ 72-

---

[49]     During oral argument, Mr. Cavanaugh's counsel vigorously objected when the Court referenced nude photographs, denying that Mr. Cavanaugh ever asked Ms. Wadsworth for nude photographs or that she ever sent any nude photographs to him.  Be this as it may, the record reflects that Mr. Cavanaugh, the principal of the high school, was texting Ms. Wadsworth, a female high school student, about nude photographs of herself.  Furthermore, Mr. Cavanaugh's text message about whether Ms. Wadsworth would be taking more photographs of herself followed a rather extended and detailed text discussion in which Mr. Cavanaugh quizzed Ms. Wadsworth about whether she had ever sent nude pictures of herself to anyone.  *See Joint R. Materials,* Attach. 18*, Text Messages Between Mr. Cavanaugh and Ms. Wadsworth* at 15-16.

[50]     PSAMF ¶¶ 72-76 and 83-88 concern allegations that Ms. Wadsworth was sexually assaulted by a cheerleading coach, told Mr. Cavanaugh about the assault, and Mr. Cavanaugh failed to report it or take any corrective action.  Mr. Cavanaugh objects to each assertion that "to the extent the record Plaintiff is attempting to raise a new theory of liability against Defendant Cavanaugh in her opposition to his motion for summary judgment is improper."  DRPSAMF ¶ 72 (citing *Miranda-Rivera v. Toledo-Davila,* 813 F.3d 64, 76 (1st Cir. 2016)) (citation and internal quotations omitted).

         The Court agrees that Ms. Wadsworth cannot use these assertions to raise a new theory of liability at this point.  However, Ms. Wadsworth's telling Mr. Cavanaugh about this assault corroborates the trust she placed in Mr. Cavanaugh.  The Court admits these assertions as relevant to Ms. Wadsworth's existing claims.

         Additionally, Mr. Cavanaugh objects that Ms. Wadsworth "communicated with Defendant Cavanaugh privately and in confidence about being inappropriately touched by one of her cheerleading coaches at the beach, not during school hours . . . [t]he communication was not made to him in his capacity as School principal, and specifically asked him not to tell anyone about the incident."

73; DSMF ¶ 87; PRDSMF ¶ 87.  Following the incident, on July 11, 2017, Ms. Wadsworth advised Mr. Cavanaugh—as the second person she told, after a friend—that something had happened but that she did not want to talk about it.  PSAMF ¶ 75; DRPSAMF ¶ 75; DSMF ¶¶ 88-89; PRDSMF ¶¶ 88-89.  She described Mr. Cavanaugh as the only person she could trust at the time.[51,52]  DSMF ¶ 90; PRDSMF ¶ 90.  Mr. Cavanaugh responded, "Ok, You will want [t]o talk with someone about what happened. If you talk with me it will go no further and i will give you some constructive options."  PSAMF ¶ 75; DRPSAMF ¶ 75.  Several days later, Mr. Cavanaugh texted Ms. Wadsworth, "I dont like that someone took advantage of you. I have my suspicions."  PSAMF ¶ 76; DRPSAMF ¶ 76.

On August 2, 2017, Mr. Cavanaugh told Ms. Wadsworth that he wanted to know more about what happened the day Ms. Wadsworth called him crying.  PSAMF ¶ 83; DRPSAMF ¶ 83.  Ms. Wadsworth responded that her school cheerleading coach

---

DRPSAMF ¶ 72.  The Court is not convinced that these assertions are inadmissible if they were conveyed to Mr. Cavanaugh in his personal capacity, but even if that were true there is at the very least a dispute of material fact as to whether she reported the allegation to him in his capacity as principal—especially where she was reporting an assault by a coach presumably under his direct authority as principal.

        Finally, Mr. Cavanaugh objects that Ms. Wadsworth "also claims herein that Defendant Cavanaugh 'discovered' the incident and questioned her about it . . . [but h]er deposition testimony reflects the opposite."  *Id.*  Despite his employment of quotation marks, the terms "discover" or "discovered" do not appear in Ms. Wadsworth's statement of additional material facts.  Instead, she asserts that "[f]ollowing the incident, on July 11, 2017, *Ms. Wadsworth advised Mr. Cavanaugh* that something had happened . . .," PSAMF ¶ 74 (emphasis added), and that "Mr. Cavanaugh told Ms. Wadsworth that he wanted to know more about what happened the day *Ms. Wadsworth called him* crying." PSAMF ¶ 83 (emphasis added).  The Court overrules this objection as contradicted by the record and admits PSAMF ¶¶ 72-76 and 83-88.

[51]    Mr. Cavanaugh qualifies DSMF ¶ 90, offering more context about her feelings at the time but ultimately acknowledging the assertion that "[s]he felt, at the time, that she could only trust Defendant Cavanaugh."  PRDSMF ¶ 90.  The Court rejects Ms. Wadsworth's qualifications as beyond the scope of the fact asserted and admits DSMF ¶ 90.

[52]    The Court omits DSMF ¶ 108 as redundant to DSMF ¶ 90.  *See* DSMF ¶ 108 ("She described him during this timeframe of her life as the one person she could trust").

"tried something in the water."  PSAMF ¶ 84; DRPSAMF ¶ 84.  Mr. Cavanaugh replied, "Like put his hands in your suit? ... I assume this was your bikini bottoms. What he say or did he just make the move?"  PSAMF ¶ 85; DRPSAMF ¶ 85.  Ms. Wadsworth responded:

> It just sucked he always stretches me in cheering and has to touch me all the time and right after we went swimming I had practice but I had been crying and didn't want anyone to notice so I was late to cheer and of course it was in the middle of warm ups when we all had to have partners and everyone already had partners so just my luck coach told me to be partners with him.  And my hands started shaking and he could see my eyes were red and he just kept silently reminding me not to say anything.  He kept giving me special treatment at first and telling me he could make sure I had all of those special positions in cheering and then I told him I didn't want it and that he was my coach and that's all and then he immediately turned cold.  And he always comes back for winter season and it's all just ruined.

PSAMF ¶ 86; DRPSAMF ¶ 86.

Over the ensuing days and weeks, Mr. Cavanaugh and Ms. Wadsworth continued texting about the sexual assault and ultimately Ms. Wadsworth stated that she believed that what happened was her fault.  PSAMF ¶ 87; DRPSAMF ¶ 87.  To that point, Mr. Cavanaugh responded:

> I can understand why you feel that way, but at the same time he is your coach an[d] that is precisely why its not allowed.  Its complicated but he should not have taken you swimming.  Even if he did, it should have only been swimming, a few laughs and that's it.  I mean when I go to the beach (ve[r]y rare) and i see a student in a bikini, it can be awkward.  I mean the pictures you sent me, they are great shots and well taken, but there is no mistaking that you a pretty snappy number.  So to be at the beach with you alone was not t[h]e best because he is seeing you with pret[t]y much not[h]ing on.  Still if he is stretching you at practice, that can be pretty revealing, so i would think he would be used to it and be able to think a bit more clearly.

PSAMF ¶ 88; DRPSAMF ¶ 88.  Ms. Wadsworth specifically asked him not to tell anyone about the incident.  DSMF ¶ 91; PRDSMF ¶ 91.  This conversation continued until August 4, 2017, at which time Mr. Cavanaugh told Ms. Wadsworth to put on "her Mickey Mouse negligee" and go to bed, and then stated, "Im deleting our conversations, and the swimsuit pictures, as much as i hate to! Hah hah."[53]  PSAMF ¶ 89; DRPSAMF ¶ 89.

### 6.   Andrew Cavanaugh Pulling Adrianna Wadsworth from Class

Mr. Cavanaugh would regularly pull Ms. Wadsworth out of class to have meetings with her in his office.[54]  PSAMF ¶ 106; DRPSAMF ¶ 106.  Mr. Cavanaugh would excuse Ms. Wadsworth's absences from class and school, despite not having the authority to do so.[55]  PSAMF ¶ 107; DRPSAMF ¶ 107.

---

[53]    The Court omits PSAMF ¶ 91 as virtually identical to PSAMF ¶ 43.  *Compare* PSAMF ¶ 43 ("Shockingly, Mr. Cavanaugh did not try to hide the fact that he was sending text messages to Ms. Wadsworth, and according to him, he may have told Ms. Philbrook, Mr. Nguyen, and Athletic Director, Matt Lash, that he was exchanging text messages with Ms. Wadsworth") *with* PSAMF ¶ 91 ("Mr. Cavanaugh did not try to hide the fact that he was sending text messages to Ms. Wadsworth, and according to him, he may have told Ms. Philbrook, Mr. Nguyen, and Athletic Director, Matt Lash, that he was exchanging text messages with Ms. Wadsworth").

[54]    Mr. Cavanaugh denies PSAMF ¶ 106, objecting that the assertion is not supported by the record and that the cited conversation is hearsay.  DRPSAMF ¶ 106.  The Court finds the cited deposition testimony to clearly read that a teacher asked Ms. Wadsworth who kept calling her from class and she responded that it was Mr. Cavanaugh calling her to come talk with him.  *See Wadsworth Dep. Vol. I* at 187:9-18.  Even if the teacher's questions were inadmissible hearsay, Ms. Wadsworth's statement that Mr. Cavanaugh was calling her out of class is admissible.  Furthermore, this factual assertion is not seriously in dispute.  *See* DRPSAMF ¶ 110 (Mr. Cavanaugh admitting that he sent her concerned teachers an email stating that "I apologize for [Ms. Wadsworth] being removed during these important classes and I will make sure it does not happen again").  The Court overrules the objections and admits PSAMF ¶ 106.

[55]    Mr. Cavanaugh denies PSAMF ¶ 107, objecting that the cited testimony quotes Mr. Nolan saying "there are reasons in law for why students can be absent" but this "testimony has nothing to do with nor does it factually support the statement in this paragraph and should be stricken pursuant to Local Rule 56(e)."  DRPSAMF ¶ 107.  The Court disagrees.  In the cited excerpt, Mr. Nolan goes on to say "there are reasons in law for why students can be absent . . . and I don't believe they include having a school administrator excuse them for – for the student."  *Nolan Dep.* at 105:5-11.  A reasonable juror could find that this testimony supports the assertion that Mr. Cavanaugh did not have the authority to excuse Ms. Wadsworth's absences.

On October 4, 2016, Ms. Wadsworth's English teacher sent an email to Mr. Cavanaugh, Assistant Principal Linda Pease, Ms. Philbrook, and Mr. Nguyen stating that she and another English teacher wanted to "voice [their] concern about Anna Wadsworth being pulled from [Writing Center and AP Language classes] at the request of [Mr. Cavanaugh's] office."[56]   PSAMF ¶ 108; DRPSAMF ¶ 108; *Joint R. Materials*, Attach. 31, *Email Forward from Tamra Philbrook to Chuck Nguyen Dated November 17, 2020.*   Both School Assistant Principals, Ms. Pease and Ms. Philbrook, approached Mr. Cavanaugh and advised him not to "haul Anna out of a class or keep her from class."[57]   PSAMF ¶ 109; DRPSAMF ¶ 109.

---

Mr. Cavanaugh also contends that the assertion is conclusory, which the Court interprets to refer to the portion stating that "[d]uring these meetings, Mr. Cavanaugh continued his inappropriate and sexual conversations with Ms. Wadsworth."  PSAMF ¶ 107.  The Court omits this language as conclusory and admits the remainder of PSAMF ¶ 107 as supported by the record.

[56]   Mr. Cavanaugh objects that PSAMF ¶ 108 is hearsay, asserting that the emails are out of court statements offered for the truth of the matters asserted.  DRPSAMF ¶ 108.  This objection is unavailing.  First, this is a brief email string between a teacher to and from the principal of the school concerning a student and her attendance at classes.  The emails use school email addresses and copy the assistant principals and the school counselor.  As such, they fall well within the hearsay exception of Federal Rule of Evidence 803(6).

Moreover, in the specific context of this motion, PSAMF ¶ 108 is more relevant for its effect on Mr. Cavanaugh than for the truth of the matter asserted by the teacher—that Mr. Cavanaugh had been pulling Ms. Wadsworth from class.  There is no serious dispute as to the truth of the latter allegation.  *See* DRPSAMF ¶ 110 (Mr. Cavanaugh admitting that he sent her concerned teachers an email stating that "I apologize for [Ms. Wadsworth] being removed during these important classes and I will make sure it does not happen again").

Instead, the Court finds PSAMF ¶ 108 relevant to the claim against Mr. Cavanaugh as evidence that he was aware that other teachers were concerned about his behavior with Ms. Wadsworth.  Because the email is not offered for its truth it is not hearsay.  FED. R. EVID. 801(c)(2) ("'Hearsay' means a statement that . . . a party offers to prove the truth of the matter asserted in the statement").  Either way for purposes of this motion, the Court overrules the objection and admits PSAMF ¶ 108.

[57]   Mr. Cavanaugh qualifies PSAMF ¶ 109 to object that the assertion is "unreliable hearsay."  DRPSAMF ¶ 108.  The assertions in PSAMF ¶ 109 are supported by Ms. Philbrook's testimony about his own statements to Mr. Cavanaugh.  *See Philbrook Dep.* at 130:20-23 (she and Ms. Pease "went into [Mr. Cavanaugh's office] and said, you know, don't haul Anna [Wadsworth] out of a class or keep her from her class").  The Court thus does not understand the basis of Mr. Cavanaugh's hearsay objection.  While deposition testimony may (or may not) be hearsay when offered at trial, Federal Rule of Civil Procedure 56 clearly provides that for summary judgment a party can support an assertion by "citing to particular parts of materials in the record, *including depositions* . . . ."  FED. R. CIV. P. 56(c) (emphasis added).  The Court overrules the objection and admits PSAMF ¶ 109.

Mr. Cavanaugh replied to the teachers' email, stating:

> Anna has some issues outside of class that we are working to resolve. I know she is extremely conscientious regarding her coursework and you are correct regarding her stress level. I apologize for her being removed during these important classes and I will make sure it does not happen again.[58]

PSAMF ¶ 110; DRPSAMF ¶ 110. Despite this assurance, Mr. Cavanaugh continued to pull Ms. Wadsworth from classes.[59]   PSAMF ¶ 111; DRPSAMF ¶ 111.

### 7.    The Car and September 19, 2017 Traffic Stop

At some point, not long after moving in with the Kenniston family, Ms. Wadsworth's mother ceased letting her use her vehicle. DSMF ¶ 63; PRDSMF ¶ 63. Ms. Wadsworth raised the issue with her father and with Mr. Cavanaugh, telling both that she needed a car and telling her father that she had raised the issue with Mr. Cavanaugh and that Mr. Cavanaugh had offered to assist her. DSMF ¶¶ 63-66; PRDSMF ¶¶ 63-66. At the time Ms. Wadsworth was still working for Mr. Cavanaugh babysitting and fixing properties, and he sought to assist her with a vehicle so she could drive to her jobs. DSMF ¶ 67; PRDSMF ¶ 67. Mr. Cavanaugh purchased a vehicle from his sister, who operated a car dealership, and advised Ms. Wadsworth

---

[58]    Mr. Cavanaugh admits sending an email but denies the remainder of PSAMF ¶ 110. DRPSAMF ¶ 110. The Court supplies the language of the email and overrules Mr. Cavanaugh's objection. *Email Forward from Tamra Philbrook to Chuck Nguyen Dated November 17, 2020.*

[59]    Mr. Cavanaugh denies PSAMF ¶ 111 as unreliable hearsay and unsupported by the record. DRPSAMF ¶ 111. The Court omits the assertion that Mr. Cavanaugh "lied" but admits the remainder of PSAMF ¶ 111 as supported by the record. *See Joint R. Materials*, Attach. 29, *Email exchange with Penny Morrill, Tamra Philbrook and others dated December 4, 2017* (listing fifteen times Mr. Cavanaugh excused Ms. Wadsworth's absence or tardiness after his "I will make sure it does not happen again" email). Even if the email was prepared for the investigation of Mr. Cavanaugh, the attendance records fall well within the hearsay exception of Federal Rule of Evidence 803(6). *See Philbrook Dep.* at 102:10-12 (stating that the school attendance secretary "has to run a state report regarding attendance every quarter").

that he would pay for half the car and that she could work for him to pay for the other half of the cost of the vehicle.[60]   DSMF ¶¶ 68-69; PRDSMF ¶¶ 68-69; PSAMF ¶ 92; DRPSAMF ¶ 92.  Mr. Cavanaugh specifically made Ms. Wadsworth's father aware of the plan and obtained his permission before proceeding with the purchase.  DSMF ¶¶ 70-71; PRDSMF ¶¶ 70-71.  Ms. Wadsworth's father was aware that Mr. Cavanaugh was assisting her with a number of items while she was at school, beyond just the vehicle.[61]  DSMF ¶ 72; PRDSMF ¶ 72.

On September 19, 2017, School Resource Officer, Chris Spear, a member of the Waldoboro Police Department and School staff, observed Ms. Wadsworth driving a black Hyundai vehicle, ran the plate with dispatch, and the vehicle came back as owned by Mr. Cavanaugh.  PSAMF ¶ 93; DRPSAMF ¶ 93; DSMF ¶ 11; PRDSMF ¶ 11.  Later that day, Officer Spear conducted a traffic stop on Ms. Wadsworth when he observed her speeding after school.  PSAMF ¶ 94; DRPSAMF ¶ 94; DSMF ¶ 115; PRDSMF ¶ 115.  Upon reviewing the registration information, Officer Spear asked Ms. Wadsworth why the registration showed that the vehicle was owned by Mr. Cavanaugh.  PSAMF ¶ 95; DRPSAMF ¶ 95; DSMF ¶¶ 116-17; PRDSMF ¶¶ 116-17. Ms. Wadsworth responded that Mr. Cavanaugh was helping her out while she waited to potentially move in with her father.  PSAMF ¶ 96; DRPSAMF ¶ 96.

---

[60]     Ms. Wadsworth qualifies DSMF ¶ 69 to add that Mr. Cavanaugh only asked her to work to pay off half of the sale price.  PRDSMF ¶ 69.  The Court accepts this qualification as supported by the record.

[61]     Ms. Wadsworth qualifies DSMF ¶ 72 to—as the Court understands the qualification—note that she did not testify that the assistance was specifically financial.  PRDSMF ¶ 72.  The Court does not view this distinction to be particularly significant but accepts the clarification and omits "financially." *See Wadsworth Dep. Vol. I* at 139:18-20 ("my dad knew that Mr. Cavanaugh was helping me while I was at school").

Following the traffic stop, Officer Spear returned to the school, where he spoke with Ms. Philbrook about the traffic stop and expressed his concern that Ms. Wadsworth was driving a vehicle owned and insured by Mr. Cavanaugh.[62] PSAMF ¶ 97; DRPSAMF ¶ 97.   Mr. Cavanaugh had informed Ms. Philbrook that Ms. Wadsworth was purchasing the car from him.  DSMF ¶ 121; PRDSMF ¶ 121.  Ms. Philbrook responded that both she and Ms. Pease had received complaints that Mr. Cavanaugh was spending too much time with Ms. Wadsworth and complaints surrounding his excusing her from class too often.  PSAMF ¶ 98; DRPSAMF ¶ 98. Ms. Philbrook also advised Officer Spear that Mr. Cavanaugh had asked Ms. Wadsworth if she was interested in moving in with him.[63]  PSAMF ¶ 99; DRPSAMF ¶ 99.  Ms. Philbrook informed Officer Spear that she and Ms. Pease had tried to have professional conversations with Mr. Cavanaugh with regard to his behavior towards Ms. Wadsworth.[64]  PSAMF ¶ 100; DRPSAMF ¶ 100; DSMF ¶ 120; PRDSMF ¶ 120.

[62]    Ms. Wadsworth qualifies DSMF ¶ 35 to propose adding that Ms. Philbrook also told Officer Spear that she and Ms. Pease had received complaints about Mr. Cavanaugh spending too much time with Ms. Wadsworth.  PRDSMF ¶ 35.  The Court admits those exact proposed additions as part of PSAMF ¶ 98 in the following sentences, and thus overrules Ms. Wadsworth's qualification as moot.

[63]    Mr. Cavanaugh incorporates the District's response to PSAMF ¶ 99, which qualified the assertion to clarify that Officer Spear did not include this information in an email he sent the police chief following his conversation with Ms. Philbrook.  DRPSAMF ¶ 99; RSU 40's DRPSAMF ¶ 99. Officer Spear testified that he had learned during "the conversation with Tamra Philbrook . . . that Principal Cavanaugh had asked [Ms. Wadsworth] if she was interested in moving in."  *Joint R. Materials,* Attach. 12, *Dep. of Christopher P. Spear* at 33:20-24 (*Spear Dep.*).  The Court finds the qualification beyond the scope of the asserted fact and admits PSAMF ¶ 99.

[64]    Mr. Cavanaugh denies PSAMF ¶ 100, objecting that the assertion is inadmissible hearsay. DRPSAMF ¶ 100.  The Court disagrees.  The Court views the assertion as relevant primarily for its effect on Mr. Spear—and as context for his later "Pervert Principal" email, *see* PSAMF ¶ 104—and, if offered for that reason, it would not be hearsay.  To the extent that it is offered for the truth of the underlying assertion, that Ms. Philbrook and Ms. Pease had expressed their concerns to Mr. Cavanaugh about his behavior with Ms. Wadsworth, the Court has already found that assertion supported by the record for the reasons explained in footnote 57.  *See Philbrook Dep.* at 130:20-23 (Ms. Philbrook and Ms. Pease "went into [Mr. Cavanaugh's office] and said, you know, don't haul Anna [Wadsworth] out of a class or keep her from her class").  Regardless of how PSAMF ¶ 100 is characterized, it is not inadmissible hearsay and the Court overrules Mr. Cavanaugh's objection.

As a result of the traffic stop, Ms. Philbrook asked Officer Spear to have a conversation with Mr. Cavanaugh.  PSAMF ¶ 101; DRPSAMF ¶ 101.  On September 19, 2017, at 3:30 p.m., Officer Spear approached Mr. Cavanaugh, told him of the traffic stop, and advised him that staff and students had spoken about his relationship with Ms. Wadsworth, and that the perception was that she was receiving special treatment in the form of favoritism from Mr. Cavanaugh.  PSAMF ¶ 102; DRPSAMF ¶ 102; DSMF ¶ 118; PRDSMF ¶ 118.  Mr. Cavanaugh admitted to Officer Spear that he had heard the speculation but advised that he was not really concerned and that he was helping Ms. Wadsworth out with a vehicle.[65]   PSAMF ¶ 103; DRPSAMF ¶ 103; DSMF ¶ 119; PRDSMF ¶ 119.  Officer Spear wrote up a summary of the stop and his conversations with Ms. Philbrook and Mr. Cavanaugh and sent an email to the Waldoboro Police Chief titled "Pervert Principal" which described many of Mr. Cavanaugh's behaviors relating to Ms. Wadsworth.[66]   PSAMF ¶ 104; DRPSAMF ¶ 104.

Ms. Wadsworth's father communicated directly with Mr. Cavanaugh and asked to meet with him about purchasing the car after she had been pulled over by Officer Spear.  DSMF ¶ 122; PRDSMF ¶ 122.  Ms. Philbrook did not view the

---

[65]    Ms. Wadsworth qualifies DSMF ¶ 119 to propose adding additional detail about the arrangement with the car.  PRDSMF ¶ 119.  That information has been admitted elsewhere and the Court rejects the qualification as beyond the scope of the fact asserted.

[66]    Mr. Cavanaugh objects to what he views as conclusory allegations in PSAMF ¶ 104. DRPSAMF ¶ 104.  The Court sustains the objection in part, omitting the descriptions of Mr. Cavanaugh "perpetrating" behaviors that were "concerning" on Ms. Wadsworth and admitting the factual assertions.  Mr. Cavanaugh also objects that "[t]he statement contained in this paragraph is unreliable hearsay."  DRPSAMF ¶ 104.  The Court disagrees, noting that even if the email itself is hearsay, Mr. Spear verified its authenticity in his deposition testimony.  *See Spear Dep.* at 22:8-12.

arrangement with the car as inappropriate and did not investigate this incident any further.[67]  DSMF ¶ 123; PRDSMF ¶ 123.

After the September 19, 2017 traffic stop, conversations about Mr. Cavanaugh's behavior, and the "pervert principal" email, no official action was taken relating to Mr. Cavanaugh's behavior with Ms. Wadsworth for over a month.[68] PSAMF ¶ 105; DRPSAMF ¶ 105.

### 8.    The State of the Harassment Prior to the Investigation

The record includes a number of assertions regarding Ms. Wadsworth's views on and other persons' knowledge of the harassment that do not fit neatly into the timeline of specific incidents.

During this time, Mr. Cavanaugh made Ms. Wadsworth feel like he was someone that she could tell anything to and that she should never feel uncomfortable with him.[69]  DSMF ¶ 86; PRDSMF ¶ 86.  Ms. Wadsworth felt at the time that Mr. Cavanaugh was one of the only people she could trust, and their communications often involved joking and adult themed humor.  DSMF ¶ 92; PRDSMF ¶ 92.  She expressed discomfort with some of these conversations "several times personally in

---

[67]    Ms. Wadsworth qualifies DSMF ¶ 123 to submit that Ms. Philbrook had expressed concern regarding some of Mr. Cavanaugh's other behaviors with Ms. Wadsworth.  PRDSMF ¶ 123.  The Court alters DSMF ¶ 123 slightly to reflect that by "this situation" Ms. Philbrook was referring to the arrangement with the car but otherwise rejects the qualification as beyond the scope of the fact asserted.

[68]    Mr. Cavanaugh denies PSAMF ¶ 105 as conclusory, hearsay, and unsupported by the facts. DRPSAMF ¶ 105.  The Court sustains the objection to the extent that the assertions that Ms. Philbrook and the police chief had "clear knowledge" of Mr. Cavanaugh's "harassment" are conclusory and has pared back PSAMF ¶ 105 to include only factual assertions supported by the record.

[69]    Ms. Wadsworth qualifies DSMF ¶ 86 to submit that she testified that Mr. Cavanaugh "**made me feel**" that way.  PRDSMF ¶ 86 (emphasis in PRDSMF ¶ 86).  The Court accepts the qualification and modified DSMF ¶ 86 to reflect her testimony.

person and [she did not] know if [she] was super blatant about it because [she] would mostly manifest itself by getting silent or getting nervous and changing the topic . . ..."[70]  DSMF ¶ 103; PRDSMF ¶ 103.  They regularly joked together, including one instance where Ms. Wadsworth offered to bake cookies for Mr. Cavanaugh if he would cancel school (which he did not have the authority to do).  DSMF ¶¶ 97-100; PRDSMF ¶¶ 97-100.

In the beginning of her senior year, Ms. Wadsworth started hearing more and more rumors in school about her relationship with Mr. Cavanaugh and, at this point in time, she described feeling anxious, confused, and mad at herself for letting the rumors affect her because she believed at the time that Mr. Cavanaugh had nothing but genuine intentions.  DSMF ¶ 93; PRDSMF ¶ 93.  Although Ms. Wadsworth was at times initially uncomfortable with some of the topics of conversation between them, she specifically did not want to change the dynamic of her relationship[71] with Mr. Cavanaugh, explaining:

> [A]t the time he was one of the only people that I felt that I could rely on and I didn't want to mess that up by saying that I'm uncomfortable [talking about certain topics].  I remember thinking through my head that there are certain times where I should say that I don't want to talk about this or I should not engage in this and probably shouldn't be talking about this, and felt that it got a little too far and then I was thinking about several options and that if I told him that it made me

---

[70]     Mr. Cavanaugh's proposed DSMF ¶ 105 asserts that Ms. Wadsworth "does not recall ever saying she was uncomfortable with any particular topic."  He appears to be relying on her testimony that she was not "super blatant" about expressing discomfort, but she also describes that she "definitely" expressed discomfort with sexual topics several times and "he would be asking me whether or not I was uncomfortable, and a lot of the times I would say that I don't want to talk about this kind of stuff and I'm not used to talking about this kind of stuff" before Mr. Cavanaugh would convince her to continue.  *Wadsworth Dep. Vol. I* at 149:9-16.  The Court omits DSMF ¶ 105 as contradicted by the record.

[71]     Mr. Cavanaugh's proposed DSMF ¶ 106 asserts only "[n]or did [Ms. Wadsworth] wish to change the dynamic of their relationship."  The Court omits DSMF ¶ 106 as redundant to DSMF ¶ 96.

feel uncomfortable, that would change our dynamics a lot and if I made it a big deal how is that going to affect school and feel awkward to go to school and how can you ignore the principal in the school and how is it going to make school awkward.  So, instead of telling him that he was making me feel uncomfortable, I would just find other ways to do it and just not answer and say that I was at practice or doing homework or I was busy and just home that the conversation would change from there or sometimes I would engage because it felt like a joke and he made me feel like it was a joke, and that it was okay to talk about it.

DSMF ¶ 96; PRDSMF ¶ 96.  Their joking relationship continued even as rumors spread amongst staff members or students about their relationship, with Ms. Wadsworth describing:

A lot of jokes.  We joked about particularly when rumors started to spread about when other teachers had made comments about and circulating around the school with other staff members or students about the effects that I have on Mr. Cavanaugh and our relationship, and I remember that we talked about privacy and if I felt that we had that kind of relationship and he assured me several times and that people say these things but that I know that he sees me like a daughter and not every other man sees it that way, but he's one of them and then we turned it into a joke and that, oh, everyone was saying that I get everything that I want, and I just started owning it that, yep, I get everything.

A lot of things turned into jokes that didn't start off as jokes.  We would talk about my sexual activities with other boys or orgasms and other sexual things with boys or sex in general, and it started off as talking about it and a lot of times I would get off of that conversation in order to make light of it that it would turn into a joke to the point where I started to feel more comfortable talking about it because it was more like a joke to me and it seemed very normal when I didn't have a positive home and someone turning it into something that could be talked about, and when I feel uncomfortable he would start to turn it into a joke and I felt like it was just joking, but it was like a teenage friend that I was talking to.

Yes, he had characterized it as playful banter and when I worked for him at his office and there were certain topics that were brought up that at first were not jokes and he was educating me on things, and he said that my parents sheltered me too much and that I should know these things and that it would hurt me in the future to not know these things,

and so he wanted to educate me on all of this stuff and I definitely got closed off of those conversations a lot because I wasn't used to talking about sex so openly especially with an adult.  I never really talked about sex with an adult, and so I referred to other things by not their name, and so I didn't say sex, I said it or I didn't even call my period my period, I called it another name for it, and so he told me don't call it, refer to it as sex or intercourse or he would turn it into a joke like the things that I would call like instead of saying my period, I would say my lady friend, and it was just less uncomfortable. I don't know why it was less uncomfortable but a lot of things to do with my body and he would turn that into a nickname and called me lady friend.  So, a lot of the conversations started out not as jokes and then if I would be uncomfortable that they were turned into a joke so that I would feel comfortable.[72]

DSMF ¶ 107; PRDSMF ¶ 107.

Ms. Wadsworth and Mr. Cavanaugh continued to communicate regularly during her senior year, until the time he was placed on leave with the school.  DSMF ¶ 108; PRDSMF ¶ 108.  At no point prior to the investigation did Ms. Wadsworth report to Mr. Cavanaugh that she explicitly felt "abused" or "harassed" by his behavior.[73]  DSMF ¶ 114; PRDSMF ¶ 114.

---

[72]    Ms. Wadsworth qualifies DSMF ¶ 107 to clarify that she was initially uncomfortable discussing these topics until Mr. Cavanaugh turned it into a joke.  PRDSMF ¶ 107.  The Court rejects this qualification as redundant.  *See* DSMF ¶ 107 (including her testimony that "a lot of times I would get off of that conversation" because she was uncomfortable but "when I [felt] uncomfortable he would start to turn it into a joke").

Admitting this lengthy excerpt also resolves similar disputes over DSMF ¶¶ 92, 94-95, 97, 101, 104, 113, and 145, where both parties offer competing characterizations of Ms. Wadsworth's testimony describing their relationship.  *See* DSMF ¶¶ 92, 94-95, 97, 101, 104, 113, 145; PRDSMF ¶¶ 92, 94-95, 97, 101, 104, 113, 145.  The testimony underlying those assertions is largely, if not entirely, included in DSMF ¶ 107.  *Compare, e.g.*, DSMF ¶ 102 (Ms. Wadsworth "would talk about these topics to Cavanaugh, testifying in her deposition that there was no adult in her life that had spoken to her about these things to educate her or make her feel comfortable talking about such matters") *with* DSMF ¶ 107 (explaining how she had "never really talked about sex with an adult").

The Court finds redundant the parties' competing characterizations, attempting to spin Ms. Wadsworth's testimony in their favor, where the underlying testimony is already admitted and—except where otherwise noted—omits DSMF ¶¶ 92, 94-95, 97, 101, 104, 113, and 145.

[73]    Ms. Wadsworth qualifies DSMF ¶ 114 to assert that, while she never used the specific terms "abuse" or "harassment," she often informed Mr. Cavanaugh that his continued discussion of sexual topics made her uncomfortable.  PRDSMF ¶ 114.  The record reveals a disputed issue of fact as to

Ms. Wadsworth never had a physical relationship with Mr. Cavanaugh, and he never touched her inappropriately or sexually in any way. DSMF ¶¶ 158-59; PRDSMF ¶¶ 158-59. The fact that Mr. Cavanaugh never touched her inappropriately or sexually, or that they never had any physical relationship despite having worked alone together or in private scenarios deepened Ms. Wadsworth's confusion about the relationship.[74] DSMF ¶ 160; PRDSMF ¶ 160. At the time, she questioned her relationship with Mr. Cavanaugh and knew there were things he said that made her feel uncomfortable, but he told her that he just thought of her as a daughter—an assertion reiterated by Mr. Nguyen—and made it seem like the it was normal to have the conversations that made her uncomfortable. *Id.* Because Ms. Wadsworth believed many teachers and administrators at the school knew about the relationship and were not concerned, she felt like she was overthinking things and felt guilty for making it out to be something that it was not. *Id.* Regarding Mr. Cavanaugh not attempting to touch her inappropriately, she stated:

> [T]hat's exactly why I thought that I was overthinking it and that this is something other than genuine, like maybe it was progressive or something and was like, no, he wouldn't do that, I can trust him, and it just went on and he made a lot of comments about my physical appearance and always talking about, but never any physical manifestation of it and was like, okay, this is something that I'm overthinking, we've been alone together and I can trust him and I know that I can trust him and that's how I felt.

*Id.*

---

whether those statements could be considered reporting feeling harassed, and the Court modified DSMF ¶ 114 to reflect only that Ms. Wadsworth did not use the terms "harassment" or "abuse."

[74]   Ms. Wadsworth qualifies DSMF ¶ 160 to clarify that the confusion Mr. Cavanaugh references involved far more than just Mr. Cavanaugh not attempting to touch her sexually. PRDSMF ¶ 160. The Court accepts these qualifications as relevant and supported by the record.

Ms. Wadsworth's opinion on the propriety of Mr. Cavanaugh's behavior has changed since 2018, and she only now fully "understands" the nature of his behavior and "[has] looked at it for what it is."[75] DSMF ¶ 157; PRDSMF ¶ 157. Ms. Wadsworth did not experience distress while communicating with Mr. Cavanaugh or as an immediate result of their communications as they were occurring and stated that after the investigation had commenced:

> [People were] telling me that the relations was something that I believed it was otherwise and I had to reread [the texts] to see if I could understand what they were talking about, and then that's when I became embarrassed and uncomfortable and reread them and figured out that maybe they are right and that this is not what I thought it was, and I felt really stupid and angry and how do you not notice when you look at those, and I was embarrassed when I looked at them.[76]

DSMF ¶ 155; PRDSMF ¶ 155.

## C.   The Investigation Into Andrew Cavanaugh

### 1.   Ms. Kenniston's Report and the Law Enforcement Investigation

At some point while Mr. Cavanaugh was still an Assistant Principal—thus, in 2015, at the latest—he learned from a male student, that another student (not Ms. Wadsworth) had sent nude photos to a fellow student and that the photos were potentially published to an internet website that collected such photos of nude Maine high school girls.[77]   DSMF ¶ 124; PRDSMF ¶ 124.   At that time, Mr. Cavanaugh

---

[75]   Ms. Wadsworth offers qualifications similar to those the Court admitted in the previous paragraph.  PRDSMF ¶ 160.  The Court rejects them as moot.

[76]   Ms. Wadsworth qualifies DSMF ¶ 155 to clarify that she was often uncomfortable.  PRDSMF ¶ 155.  The Court rejects this qualification because it is already well-established in the record and, regardless, is beyond the scope of the fact asserted.

[77]   Mr. Cavanaugh asserts that this incident occurred in 2017, but Ms. Wadsworth objects that he testified that he became aware of the website when he was still an Assistant Principal.  PRDSMF ¶ 124.  The record supports Ms. Wadsworth's qualified response,  and the Court alters DSMF ¶ 124 to

reported the internet website to Waldoboro Police Chief William Labombarde.[78] DSMF ¶ 127; PRDSMF ¶ 127.  Several years later, in 2017, Mr. Cavanaugh asked Ms. Wadsworth if she had sent nude photos to anyone, expressing concern that if she had taken nude photos, they could be published, and he did not want her to be involved in those matters.[79]  DSMF ¶¶ 125-26; PRDSMF ¶¶ 125-26.

After learning that Mr. Cavanaugh had asked Ms. Wadsworth if she had ever sent nude photos to other students, Ms. Kenniston called the police.[80]  DSMF ¶ 128; PRDSMF ¶ 128; PSAMF ¶ 120; DRPSAMF ¶ 120.  The police came to the Kenniston home and Ms. Kenniston, who paid for the phone, took it from Ms. Wadsworth and submitted it to the police.  DSMF ¶ 129; PRDSMF ¶ 129.  Ms. Wadsworth was mad that Ms. Kenniston submitted her phone to the police.  *Id.*  The entirety of Ms. Wadsworth's communications with Mr. Cavanaugh occurred prior to November 3, 2017, including all text messages in the record.  DSMF ¶ 130; PRDSMF ¶ 130.

On November 5, 2017, Ms. Kenniston submitted a statement to Detective Donald Murray of the Knox County Sheriff's Office following a meeting with him during which she expressed her concerns regarding the relationship between Ms.

---

reflect that the incident took place before Mr. Cavanaugh became Principal.  *See Joint R. Materials,* Attach. 10*, Dep. of Andrew Cavanaugh* at 138:9-22 ("at the time I talked to the principal about it . . . [a]t the time I think I was the assistant").

[78]     Mr. Cavanaugh's proposed facts blur the timeline and suggest that he discovered the website and reported it to police around the same time as he mentioned it to Ms. Wadsworth—eliding a time gap of multiple years.  The Court modified DSMF ¶ 127 to clarify that Mr. Cavanaugh reported the website to police around the time he first discovered it.

[79]     Ms. Wadsworth qualifies DSMF ¶ 126 to assert additional facts about the conversation.  DSMF ¶ 126.  The Court finds the characterization that Mr. Cavanaugh expressed concern—it is for the factfinder to determine whether that concern is genuine—is fair and rejects the qualifications as beyond the scope of the facts asserted.

[80]     Ms. Wadsworth qualifies DSMF ¶ 129 to assert additional facts about the conversation.  DSMF ¶ 129.  The Court rejects this qualification as beyond the scope of the facts asserted.

Wadsworth and Mr. Cavanaugh.  DSMF ¶ 132; PRDSMF ¶ 132.  Law enforcement officials investigated Mr. Cavanaugh's behavior but confirmed that they did not find probable cause to charge Mr. Cavanaugh for any crime relating to his conduct with Ms. Wadsworth.[81]  DSMF ¶¶ 161-64; PRDSMF ¶¶ 161-64.

### 2.    RSU 40's Investigation

On November 2, 2017, Superintendent Nolan received a call from the police regarding concerns about the messages exchanged by the Ms. Wadsworth and Mr. Cavanaugh.  DSMF ¶ 131; PRDSMF ¶ 131.  He then met with Mr. Cavanaugh, who stated he was simply trying to assist Ms. Wadsworth in dealing with her difficult home life.  DSMF ¶¶ 133-34; PRDSMF ¶¶ 133-34.  In investigating the allegations, Mr. Nolan reviewed the school's harassment policy titled, "Harassment and Sexual Harassment of Students" and made the following notes: "Interfering, pulling out of class, late nights, unwelcome, asks, shouldn't have asked."  PSAMF ¶ 120; DRPSAMF ¶ 120.  The policy notes "sexual harassment includes but is not limited to . . . gestures, comments, or other physical, written, graphic, electronic or verbal conduct that is gender-based that interferes with a student's education."[82]    PSAMF ¶¶ 7, 121;

---

[81]    Ms. Wadsworth qualifies DSMF ¶¶ 161-64 to offer objections relating to Mr. Cavanaugh's unrelated criminal charges and the adequacy of the investigation.  PRDSMF ¶¶ 161-64.  She does not, however, contest the underlying assertion—that law enforcement investigated the allegations but ultimately did not charge Mr. Cavanaugh—and the Court rejects her qualifications as beyond the scope of the facts asserted.

[82]    The adequacy (or inadequacy) of the District's sexual harassment policies and trainings was central to Ms. Wadsworth's claims against RSU 40 but is largely irrelevant to her claims against Mr. Cavanaugh.  Mr. Cavanaugh does not assert as a defense that he either harassed Ms. Wadsworth or failed to report his own harassment because he was inadequately trained or because the District's reporting policy was flawed.  Instead, he maintains that he simply did not believe that he was sexually harassing Ms. Wadsworth.  For those reasons and the reasons discussed in footnote 4, the Court will omit the majority of PSAMF ¶¶ 7-20, admitting only assertions that relate to the claims against Mr. Cavanaugh.

DRPSAMF ¶¶ 7, 121; DSMF ¶ 7; PRDSMF ¶ 7.  In investigating the complaints against Mr. Cavanaugh, Superintendent Nolan made these notes in an effort to figure out how the situation aligned with the school's policies.[83]  PSAMF ¶ 122; DRPSAMF ¶ 122.  Additionally, Mr. Nolan, testifying on behalf of the School, stated under oath that knowledge of: an administrator excusing a student from class would raise "red flags" regarding Mr. Cavanaugh's behavior; a school principal providing money to the attendance secretary to pay for Plaintiff's prom ticket or providing money to the attendance secretary money in an envelope to give to Plaintiff would raise "concerns"; a principal lending or giving a car to a student would be a "gray[] area"; and a school administrator making an appointment for a student to take birth control would be "highly unusual.[84]  PSAMF ¶ 123; DRPSAMF ¶ 123.

Mr. Nolan went on to testify that individually, several of the facts asserted during the investigation would have potentially given him a reason to investigate Mr. Cavanaugh, including: the appointment about birth control, the fact that Mr. Cavanaugh had provided a car to a student, the fact that Mr. Cavanaugh called a student "cupcake," and the fact that Mr. Cavanaugh had seen nude photos of a student.[85]  PSAMF ¶ 124; DRPSAMF ¶ 124.

---

[83]    Mr. Cavanaugh qualifies PSAMF ¶ 122, objecting that "[t]o the extent that the statement of this paragraph infers Defendant Cavanaugh engaged in sexual harassment, the same is denied." DRPSAMF ¶ 122.  The summary judgment record consists of factual assertions, not inferences.  Where a factual assertion is relevant and supported by the record and Mr. Cavanaugh's only objection is to what that fact may infer, the Court overrules the objection and admits the fact.  *See* DRPSAMF ¶ 122-24.

[84]    The Court modified PSAMF ¶ 123 slightly to reflect Mr. Nolan's deposition testimony.

[85]    Mr. Cavanaugh incorporates ¶ 122 of RSU 40's DRPSAMF to object to PSAMF ¶ 124. DRPSAMF ¶ 124.  The incorporated paragraph responds to a different assertion, but the Court assumes that Mr. Cavanaugh meant RSU 40's DRPSAMF ¶ 124, which qualifies PSAMF ¶ 124 to note that Mr. Nolan was answering a question about whether these reasons would *potentially* give rise to

After resigning from his position as a result of the investigation into his behavior (and in lieu of being fired), Mr. Cavanaugh returned his school-issued MacBook, but it was missing the hard-drive.[86]   PSAMF ¶ 125; DRPSAMF ¶ 125; DSMF ¶ 142; PRDSMF ¶ 142.  In order to remove the hard-drive, a special tool is required.[87]   PSAMF ¶ 126; DRPSAMF ¶ 126.  As a result, Mr. Cavanaugh was charged with theft by unauthorized taking and transfer for removing the hard-drive.[88]   PSAMF ¶ 127; DRPSAMF ¶ 127.  Mr. Cavanaugh also purchased a new phone in December 2017 and returned his previous phone to Walmart the following summer.[89]   PSAMF ¶ 128; DRPSAMF ¶ 128.

---

the need to investigate Mr. Cavanaugh.  The Court slightly altered PSAMF ¶ 124 to include that addition.

[86]      Mr. Cavanaugh qualifies PSAMF ¶ 125 to object that it contains inadmissible evidence—for reasons unexplained—and that it is not relevant to the theory pleaded.  DRPSAMF ¶ 125.  To the extent that the Court views the former objection as a hearsay objection, it concludes that Chief Labombarde charged Mr. Cavanaugh with theft for removing the hard-drive.  *See* PSAMF ¶ 127; DRPSAMF ¶ 127.  The record does not specify the evidence supporting that charge or whether Mr. Cavanaugh was convicted, but the Court finds there to be at least a question of fact as to whether Chief Labombarde's testimony was sufficiently supported by his own personal knowledge as to be admissible and overrules the hearsay objection.

To the extent that Mr. Cavanaugh contends that the assertion he refused to return the hard-drive is irrelevant, the Court disagrees.  A reasonable juror could find—given the thousands of digital communications he exchanged with Ms. Wadsworth and his admission that he had visited a website containing photos of nude high school students—that Mr. Cavanaugh removed his hard-drive to destroy potentially incriminating evidence.  The Court overrules the objection and admits PSAMF ¶ 125.

[87]      Mr. Cavanaugh qualifies PSAMF ¶ 126 to raise the same objections as in DRPSAMF ¶ 125, adding also that there is no evidence Chief Labombarde is competent to testify to technical knowledge relating to computers.  DRPSAMF ¶ 126.  Again reserving judgment on the foundation of Chief Labombarde's testimony in the absence of information about the criminal investigation, the Court overrules the objections for the reasons discussed in the previous footnote and admits PSAMF ¶ 126.

[88]      Mr. Cavanaugh offers the same objections as to the other assertions about the hard-drive and the Court overrules them for the same reasons.

[89]      Mr. Cavanaugh qualifies PSAMF ¶ 128 to contend that the record does not support Ms. Wadsworth's assertion that "Mr. Cavanaugh destroyed or turned in his cellular phone so it could not be used against him."  DRPSAMF ¶ 128.  The Court accepts the qualification and modified PSAMF ¶ 128 to reflect his deposition testimony.

During the investigation into Mr. Cavanaugh, Chris MacLean,[90] an attorney representing him with regard to the school board investigation, went on school property to speak with Ms. Wadsworth while the investigation was pending.[91] PSAMF ¶ 129; DRPSAMF ¶ 129.  This encounter with the attorney occurred after Mr. Cavanaugh was instructed not to go to the school."[92]  PSAMF ¶ 130; DRPSAMF ¶ 130.  Ms. Wadsworth got into the attorney's car in the school parking lot and the attorney encouraged Ms. Wadsworth to sign an affidavit supporting Mr. Cavanaugh, repeatedly stating "Mr. Cavanaugh is a stand-up guy, wouldn't you agree?"[93]  PSAMF

---

[90]    PSAMF ¶ 129 and DRPSAMF ¶ 129 misspell Christopher MacLean's name as McLean.  The Court sua sponte corrected the spelling.  *See Sparks v. Mills*, 2:20-cv-00190-LEW, 2022 U.S. Dist. LEXIS 151730, at *1 (D. Me. Aug. 24, 2022).

[91]    Mr. Cavanaugh qualifies PSAMF ¶ 129 to admit the factual assertions but contends it contains conclusory statements.  DRPSAMF ¶ 129.  The Court omits the reference to "the fallout of" the investigation and admits the remainder of PSAMF ¶ 129.

[92]    Mr. Cavanaugh objects that the assertion is unsupported by the evidence, irrelevant, and "is inadmissible pursuant to Fed. R. Civ. P. 609."  DRPSAMF ¶ 130.  To the extent he objects that the record is not clear whether this encounter occurred before or after Mr. Cavanaugh was instructed not to go to the school, the Court disagrees.  Ms. Wadsworth's deposition references "around the time of September through November of 2017," *Wadsworth Dep. Vol. I* at 181:14-15, as a time frame.  Superintendent Nolan first called Mr. Cavanaugh about the allegations relating to Ms. Wadsworth on November 5 and informed him during that call "do not report to school," as a standing directive.  *Nolan Dep.* at 190:14-191:10.  Given that Mr. Cavanaugh was immediately banned from school upon learning of the investigation, there is no evidence in this record that he would have retained an attorney about this issue and had that attorney seek out Ms. Wadsworth before Superintendent Nolan issued this "standing directive."

Additionally, to the extent Mr. Cavanaugh argues the assertion is irrelevant, this assertion would allow a factfinder to conclude that even after being banned from school, Mr. Cavanaugh employed an attorney to convince Ms. Wadsworth into recanting and/or supporting him, which could have increased her emotional damages.  Finally, Mr. Cavanaugh contends that the assertion "is inadmissible pursuant to Fed. R. Civ. P. 609."  DRPSAMF ¶ 130.  The Court assumes that he meant to refer to Federal Rule of Evidence 609, but, regardless, the objection is irrelevant because that rule pertains to impeachment by a criminal conviction.  The Court admits PSAMF ¶ 130 as supported by the record.

[93]    Mr. Cavanaugh denies PSAMF ¶ 131, objecting that Ms. Wadsworth intended to sign the affidavit but could not because she was a minor.  DRPSAMF ¶ 131.  The Court overrules the objection as beyond the scope of the fact asserted.

Mr. Cavanaugh also denies PSAMF ¶ 132, objecting that it is irrelevant and inadmissible hearsay.  The Court overrules the relevance objection for the reasons stated in the previous footnote.  The Court also overrules the hearsay objection because the attorney's repeated statements to Ms. Wadsworth that Mr. Cavanaugh is "a stand-up guy" are not offered for the truth of the matter asserted (Ms. Wadsworth is plainly not offering this evidence as proof that Mr. Cavanaugh is a stand-up guy)

¶¶ 131-32; DRPSAMF ¶¶ 131-32.   Ms. Wadsworth never signed the proposed affidavit.[94] PSAMF ¶ 133; DRPSAMF ¶ 133.

A day or two after the police came to the Kenniston home, Ms. Wadsworth and Mr. Nguyen met to follow up regarding the allegations against Mr. Cavanaugh.[95,96] DSMF ¶ 135; PRDSMF ¶ 135.  Ms. Wadsworth stated that nothing physical happened between her and Mr. Cavanaugh, that he had never asked for inappropriate photos, and that he had never came on to her.[97]   DSMF ¶ 136; PRDSMF ¶ 136.   Ms. Wadsworth was confused and did not know if the relationship was genuine, but at the time—relying on Mr. Nguyen's and Mr. Cavanaugh's assurances—Ms. Wadsworth believed her relationship with Defendant Cavanaugh was genuine and she trusted him.[98]  DSMF ¶ 138; PRDSMF ¶ 138.

---

but for their impact on her.  FED. R. EVID. 801(c)(2) ("'Hearsay' means a statement that . . . a party offers to prove the truth of the matter asserted in the statement").  The Court admits PSAMF ¶¶ 131-32.

[94]    Mr. Cavanaugh offers the same objection as in DRPSAMF ¶ 131 and the Court overrules it for the same reasons.

[95]    Ms. Wadsworth admits the substance of DSMF ¶ 135 but qualifies it to assert numerous details about the conversation.  PRDSMF ¶ 135.  The Court finds DSMF ¶ 135 to fairly characterize the record and rejects the qualifications as beyond the scope of the fact asserted.

[96]    Ms. Wadsworth's proposed PSAMF ¶¶ 134-50 relate almost entirely to Mr. Nguyen's purported misconduct during the investigation.  As the Court explained in footnote 4, these assertions may be relevant to Ms. Wadsworth's claims against Mr. Nguyen but—as she has not alleged that Mr. Cavanaugh in any way controlled or directed Mr. Nguyen's actions—they are generally not relevant to her claims against Mr. Cavanaugh.  The Court views Mr. Nguyen's conduct as relevant where the pressure he put on Ms. Wadsworth explains her actions during the investigation but otherwise omits PSAMF ¶¶ 134-50 for the reasons explained in footnote 4.

[97]    Mr. Cavanaugh's proposed DSMF ¶ 137 asserts that Ms. Wadsworth had never reported any sexual harassment or abuse.  The Court finds that Ms. Wadsworth's complaints to Mr. Nguyen about Mr. Cavanaugh buying her feminine hygiene products and calling her cupcake create a dispute of material fact about whether she reported harassment and omits DSMF ¶ 137 as contradicted by the record.

[98]    Ms. Wadsworth qualifies DSMF ¶ 138 to add context about why she trusted Mr. Cavanaugh at the time.  PRDSMF ¶ 138.  The Court accepts these qualifications as relevant and supported by the record.

During a meeting with Ms. Philbrook, Mr. Nolan and Ms. Pease, Ms. Wadsworth defended Mr. Cavanaugh.  DSMF ¶ 139; PRDSMF ¶ 139.  Mr. Nguyen suggested that Ms. Wadsworth write a letter or sign an affidavit to help Mr. Cavanaugh and defend him.[99]   DSMF ¶ 140; PRDSMF ¶ 140.  At the time, under repeated urging from Mr. Nguyen, Ms. Wadsworth stated that she was confused about whether Mr. Cavanaugh had done anything wrong, and then stated that she was willing to sign an affidavit defending him but could not because she was a minor.[100]  DSMF ¶ 141; PRDSMF ¶ 141; PSAMF ¶¶ 140-41; DRPSAMF ¶¶ 140-41.  Ms. Wadsworth then indicated to Mr. Nguyen that she still wanted to defend Mr. Cavanaugh but she was afraid to stand up to her parents.[101]  DSMF ¶ 142; PRDSMF ¶ 142.  Again in response to Mr. Nguyen's urging, Ms. Wadsworth agreed with his statement that Mr. Cavanaugh viewed her as a daughter, and she believed Mr. Cavanaugh was helping her.[102]   DSMF ¶ 143; PRDSMF ¶ 143.  After Mr. Cavanaugh's common law wife, Deborah Ecker McFarland berated Ms. Wadsworth and blamed her for Mr. Cavanaugh being investigated, Ms. Wadsworth responded by

---

[99]   Ms. Wadsworth admits the substance of DSMF ¶ 140 but qualifies it to assert additional details about the conversation and the wording of the proposed affidavit.  PRDSMF ¶ 140.  The Court finds DSMF ¶ 140 to fairly characterize the record and rejects the qualifications as beyond the scope of the fact asserted.  *See* PSAMF ¶ 131 (Ms. Wadsworth's description of the affidavit, which the Court has admitted in full).

[100]  Ms. Wadsworth qualifies DSMF ¶ 141 to add that she expressed confusion but eventually agreed after urging from Mr. Nguyen.  PRDSMF ¶ 141.  The Court accepts these qualifications as relevant and supported by the record.

[101]  Ms. Wadsworth offers the same qualifications as in PRDSMF ¶ 141.  The Court rejects them as moot after having included them in the previous sentence.

[102]  Ms. Wadsworth again offers similar qualifications asserting that her statements came in response to Mr. Nguyen's urging.  PRDSMF ¶ 143.  The Court views the context of this conversation as already well-established but slightly modified DSMF ¶ 143 to reiterate that Mr. Nguyen was urging her to support Mr. Cavanaugh.

apologizing and accepting blame.[103]  DSMF ¶ 144; PRDSMF ¶ 144; PSAMF ¶ 142; DRPSAMF ¶ 142.

### D.   Adrianna Wadsworth's Mental Health

Ms. Wadsworth has experienced anxiety and depression, which she relates in part to the actions of Mr. Cavanaugh.[104]  PSAMF ¶ 151; DRPSAMF ¶ 151.  In high school, Ms. Wadsworth's depression and anxiety affected her at school because she did not want to go to class anymore, and she would cry in the morning on the way to school and on her way home from school.  PSAMF ¶ 152; DRPSAMF ¶ 152.  Ms. Wadsworth began going to counseling in April 2018.  PSAMF ¶ 153; DRPSAMF ¶ 153; DSMF ¶ 156; DRPSAMF ¶ 156.  Ms. Wadsworth continues to suffer from anxiety and has trouble in school when dealing with male professors.[105]  PSAMF ¶ 154; DRPSAMF ¶ 154.

### E.   Adrianna Wadsworth's Later Achievements

---

[103]   Ms. Wadsworth qualifies DSMF ¶ 143 to add nearly a full page of explanation about how her statements came in response to Ms. McFarland's pressure.  PRDSMF ¶ 143.  The Court accepts these qualifications as relevant and supported by the record and modified DSMF ¶ 143 to reflect the context of Ms. Wadsworth's statements.

[104]   Mr. Cavanaugh qualifies PSAMF ¶ 151 to object that Ms. Wadsworth's view of Mr. Cavanaugh's behavior has changed over time and that she did not seek any mental health treatment until April 2018.  DRPSAMF ¶ 151.  The Court overrules both objections as beyond the scope of the facts asserted and notes that Ms. Wadsworth asserts in her own statement of material facts that she first sought counseling in April 2018.  PSAMF ¶ 153; DRPSAMF ¶ 153.  Mr. Cavanaugh offers these same objections to PSAMF ¶¶ 151-54 and each time the Court overrules them for the same reasons.

[105]   Mr. Cavanaugh incorporates RSU 40's qualification to PSAMF ¶ 154, which objected that the cited testimony does not support the assertion that Ms. Wadsworth "continues to suffer from anxiety." DRPSAMF ¶ 154 (incorporating RSU 40's DRPSAMF ¶ 154).  However, when asked whether her anxiety has "improved as [she has] gone on in [her] college career in terms of having a comfort level dealing with all of [her] professors," Ms. Wadsworth responded "[d]efinitely not." *Wadsworth Dep. Vol. II* at 12:13-16.  The record reveals support for the assertion, and the Court overrules the objection and admits PSAMF ¶ 154.

Ms. Wadsworth completed her senior year of high school, graduated salutatorian as second in her class, and is proud of that accomplishment. DSMF ¶¶ 174, 153; DRPSAMF ¶¶ 147, 153. Over her junior and senior years of high school she: participated in soccer, cheerleading, softball, and track; received an all-conference and a GPA award in cheerleading; was on the student council and in the National Honor Society and participated in PAWS, math team, and the debate team; and went to parties and socialized regularly at school and sporting events, spending time with her friends and with the Kennistons. DSMF ¶¶ 148-152; DRPSAMF ¶¶ 148-152. She went on to complete her undergraduate studies and is currently attending law school. DSMF ¶ 154; DRPSAMF ¶ 154.

## III.   THE PARTIES' POSITIONS

### A.   Andrew Cavanaugh's Motion for Summary Judgment

Pursuant to Federal Rules of Civil Procedure 56, Mr. Cavanaugh asks this Court to grant summary judgment in his favor and against Adrianna Wadsworth on all counts pleaded against him in the Amended Complaint: the § 1983 (Count II) and state law tort (IV-VI) claims. *Def.'s Mot.* at 1-2. Mr. Cavanaugh contends that Ms. Wadsworth has failed to state a cognizable constitutional claim on either substantive due process or equal protection grounds, that he is protected by qualified immunity and intentional act immunity, and that her tort claims fail on the merits because she has not established the required elements. *Id.* at 2-19.

#### 1.   The Section 1983 Claims

The bulk of Mr. Cavanaugh's motion argues that the Court should grant summary judgment in his favor on Ms. Wadsworth's constitutional claims. *Id.* at 2-14. He notes at the outset that "to state a claim under § 1983, a plaintiff must allege (1) the violation of a right protected by the Constitution or laws of the United States and (2) that the perpetrator of the violation was acting under color of law." *Id.* at 2 (citations omitted). Mr. Cavanaugh submits that Ms. Wadsworth's "equal protection and bodily integrity claims are both deficient and must be dismissed as a matter of law." *Id.* at 3.

### a.   The Equal Protection Claim

Mr. Cavanaugh notes that "[t]his Court found at the motion to dismiss stage that Plaintiff's equal protection claim against Defendant Nguyen fell far below the requirement that the plaintiff show specific comparable and specific instances of disparate treatment" and offers that "Plaintiff's equal protection claim against Defendant Cavanaugh is similarly deficient." *Id.* He argues that "to state a claim under Section 1983 for an alleged equal protection violation, a plaintiff 'must allege facts indicating that, compared with others similarly situated, [she] was selectively treated based on an impermissible consideration'" *id.* at 4 (quoting *Alston v. Spiegel*, 988 F.3d 564, 574-75 (1st Cir. 2021)), but that Ms. Wadsworth "does not mention any other students Defendant Cavanaugh interacted with or treated differently, nor did she engage in any such discovery." *Id.* at 3. Mr. Cavanaugh adds that Ms. Wadsworth "must also show that the defendant acted with discriminatory purpose" or intent. *Id.* at 4 (citations omitted).

48

In sum, Mr. Cavanaugh contends that Ms. Wadsworth's "equal protection claim fails as she has not and cannot show any deprivation of her rights under the equal protection clause" because "[t]here is no indication that [she] was treated differently than similarly situated persons or due to 'impermissible considerations,' such as an intent to injure her or punish the exercise of her constitutional rights." *Id.* He characterizes their relationship as "a friendship" and submits that "[t]here is no indication or evidence that such a relationship constituted a discriminatory purpose" or "impacted her schooling." *Id.* at 5-6.  Mr. Cavanaugh concludes that "as [Ms. Wadsworth's] equal protection claim against Defendant Nguyen fell far below the requirements of such a claim, so too does her equal protection claim against Defendant Cavanaugh." *Id.* at 7.

### b.    The Substantive Due Process Claim

Mr. Cavanaugh states that Ms. Wadsworth alleges an infringement of her right to bodily integrity and acknowledges that such a right is constitutionally protected but contends "a student's due process rights can be violated as pertaining to physical abuse, not verbal harassment." *Id.* (citations omitted).  He submits that "[t]here is no body of law upon which it would be clear to a reasonable official that one could violate a constitutional right to bodily integrity without engaging in any physical acts which actually violate a person's bodily integrity." *Id.* at 8.  Thus, in his view, because Ms. Wadsworth has "admitted there was no physically inappropriate contact or sexual relations of any kind between herself and Defendant Cavanaugh"

her "claim of a constitutional violation based upon a violation of her bodily integrity must be dismissed." *Id.*

### c. Qualified Immunity

Next, Mr. Cavanaugh submits that—even if the Court denies summary judgment on the merits of the constitutional claim—he is nonetheless "qualifiedly immune from liability under 42 U.S.C. § 1983," which "protects government officials from liability for civil damages for actions taken under color of state law." *Id.* at 9 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). An official is entitled to qualified immunity if a court determines that either: (1) "the facts alleged or shown by the plaintiff" do not "make out a violation of a constitutional right"; or (2) "the right" the plaintiff's suit is based on was not "'clearly established' at the time of the defendant's violation." *Id.* (quoting *Pollack v. Regional Sch. Unit 75*, 12 F. Supp. 3d 173, 194-95 (D. Me. 2014)).

Mr. Cavanaugh cites several cases holding that physical sexual abuse constituted a conscience-shocking constitutional violation, as well as several cases holding that verbal abuse alone did not rise to the level of a constitutional deprivation. *Id.* at 10-11 (collecting cases). He argues that this case falls in the latter category because Ms. Wadsworth "never accused Defendant Cavanaugh of sexual harassment, physical or otherwise." *Id.* at 11. Mr. Cavanaugh contends that "it cannot be stated that the contours of the right in question were sufficiently clear, as to establish that Defendant Cavanaugh knew he was engaging in a violation of the Plaintiff's rights under the equal protection clause or [right] to bodily integrity under

the Fourteenth Amendment." *Id.* Additionally, he submits that, to the extent Ms. Wadsworth claims Mr. Cavanaugh denied her the benefits of an education, that contention is wholly unsupported by the evidence. *Id.* at 12.

Mr. Cavanaugh concludes that, even if "the contours of the right are found to be sufficiently clear, a reasonable defendant in his position would not be aware he was violating the Plaintiff's rights," and therefore he "is entitled to qualified immunity from the Plaintiff's § 1983 claim." *Id.*

### d.     Acting Under the Color of Law

Mr. Cavanaugh next submits that Ms. Wadsworth's "Section 1983 claims fail because the actions she complains of as against Defendant Cavanaugh were not performed under color of law." *Id.* at 14.  He asserts that "[a] teacher who meets a student at school, but who does not commit an act of sexual abuse or misconduct during a period when the teacher is actively engaged in teaching that student, does not act under color of state law." *Id.* at 13-14 (collecting cases).  In his interpretation of Ms. Wadsworth's allegations, the comments Mr. Cavanaugh made and the nicknames he called her in school do not rise to the level of a constitutional violation, and the remainder of her allegations "occurred in private or over text message, not in the context of her schooling" and were therefore not performed under the color of law, defeating her § 1983 claims. *Id.* at 14.

### 2.     The State Law Tort Claims

### a.     Intentional Infliction of Emotional Distress

Mr. Cavanaugh first argues that he is immune from liability on Ms. Wadsworth's intentional infliction of emotional distress (IIED) claim. *Id.* at 15. He submits that "[s]uch a claim is barred by the Maine Tort Claims Act," which provides that "employees of governmental entities shall be absolutely immune from personal civil liability for . . . [a]ny intentional act or omission within the course and scope of employment; provided that such immunity does not exist in any case in which an employee's actions are found to have been in bad faith." *Id.* (quoting 14 M.R.S. §§ 8111). Mr. Cavanaugh contends that he did not act in bad faith and thus is immune from liability. *Id.*

Alternatively, Mr. Cavanaugh asserts that Ms. Wadsworth's IIED claim fails on the merits. He contends that:[106] (1) he did not act to intentionally inflict emotional distress; (2) it is unlikely a jury could find that the Defendant's behavior was "conduct so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community"; (3) Ms. Wadsworth's emotional distress was instead caused by other persons; and (4) her testimony "is clearly at odds with her claim to have suffered severe emotional distress that no reasonable person should be expected to endure." *Id.* at 16-17.

---

[106]   In Maine, the four elements required to establish an IIED claim are:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from her conduct; (2) the conduct was so "extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community"; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was "so severe that no reasonable [person] could be expected to endure it."

*Curtis v. Porter*, 784 A.2d 18, 20 (Me. 2001).

### b.    Negligent Infliction of Emotional Distress

Next, Mr. Cavanaugh asserts that he is entitled to summary judgment on Ms. Wadsworth's claim for negligent infliction of emotional distress (NIED).  He notes that "[t]he Supreme Judicial Court has recognized very limited circumstances in which a negligent infliction claim may be brought," including "circumstances in which a special relationship exists between the actor and the person emotionally harmed . . . [or] when the wrong-doer has committed another tort."  *Id.* at 18 (citing *Curtis*, 784 A.2d at 25).  Mr. Cavanaugh submits that he has not committed another underlying tort and that no special relationship existed, and therefore Ms. Wadsworth cannot sustain a NIED claim against him.

### c.    Negligence

Finally, Mr. Cavanaugh contends that he is entitled to summary judgment on the negligence claim.  As he interprets the Amended Complaint, Ms. Wadsworth's "claim against Defendant Cavanaugh for negligence does not appear to implicate him at all; it is Defendant Nguyen who is cited as allegedly breaching his duty, leading to the cause of alleged damages in negligence."  *Id.* at 19.  Mr. Cavanaugh suggests that Ms. Wadsworth instead alleges that he acted intentionally and that there are no facts supporting "a viable claim of negligence against Defendant Cavanaugh."  *Id.*

### B.    Adrianna Wadsworth's Opposition

Ms. Wadsworth submitted an omnibus opposition memorandum responding to all three defendants' motions to dismiss.  The Court recounts here only the arguments relating to the Mr. Cavanaugh's motion.  Ms. Wadsworth responds that she has

sufficiently established substantive due process and equal protection violations, Mr. Cavanaugh is not entitled to qualified immunity or intentional act immunity, and there are at least disputed issues of material facts on all necessary elements of her tort claims. *Pl.'s Opp'n* at 34-41, 52-58.

### 1. The Section 1983 Claims

#### a. Equal Protection Claim

Ms. Wadsworth begins by noting that to state a claim for an equal protection violation, a plaintiff must "allege facts indicating that, 'compared with others similarly situated, the plaintiff was selectively treated . . . based on impermissible considerations such as . . . intent to inhibit or punish the exercise of constitutional rights.'" *Id.* at 34 (quoting *Barrington Cove Ltd. P'ship v. R.I. Hous, & Mort. Fin. Corp.*, 246 F.3d 1, 7 (1st Cir. 2001)).  She submits that "under the Fourteenth Amendment, individuals have a right to bodily integrity" which "protects a student's right to be free from sexual abuse <u>and harassment</u> by teachers at a public school." *Id.* at 35 (citations omitted) (emphasis in *Pl.'s Opp'n*).

She first responds that Mr. Cavanaugh's contention that he was not acting under the color of law is "specious" because he was acting "under the guise of [his] authority as School principal." *Id.* at 35-36.  Next, Ms. Wadsworth asserts that "[t]his Court has already found, in its Motion to Dismiss rulings, that sexual harassment can implicate the substantive due process rights as an infringement of bodily integrity of a student when the sexual harassment is perpetrated by a teacher" and thus "the Court is left to determine whether there was any discriminatory intent on

54

the part of Mr. Cavanaugh, and then determine whether qualified immunity applies. *Id.* at 36-37 (citation omitted). She contends that "[t]here is certainly a factual question surrounding whether Mr. Cavanaugh treated Ms. Wadsworth differently because of her gender" and concludes that "ample disputed facts exist to create a triable issue as to Ms. Wadsworth's equal protection claims." *Id.* at 37-38.

### b.    Substantive Due Process Claim

Ms. Wadsworth frames her substantive due process claim against Mr. Cavanaugh as a state-created danger claim.[107]  *Id.* at 38. She asserts that he "took various affirmative actions with respect to Ms. Wadsworth that created danger to Ms. Wadsworth, who was a minor child under his protection and authority by right of his role as the School principal." *Id.* Because "these acts were directed at and affected only Ms. Wadsworth . . . prongs two and three"—that the acts enhanced a danger

---

[107]    Ms. Wadsworth's state-created danger claim may technically fit within the First Circuit's description of what a plaintiff must prove to make out a state-created danger claim. *Compare Pl.'s Opp'n* at 38-40 *with Irish*, 979 F.3d at 75. However, the state-created danger doctrine is generally employed to attach liability to a government actor who enabled a violation by a third-party; not against the government actor who caused the harm directly. *See Irish*, 979 F.3d at 74 (quoting *Coyne v. Cronin*, 386 F.3d 280, 287 (1st Cir. 2004)) ("This court has stated that in order to be liable under the state-created danger doctrine, the defendant must 'affirmatively act[] to increase the threat to an individual of third-party private harm'"). A state-created danger claim requires an underlying substantive due process violation but also imposes additional elements that a plaintiff must establish. *See id.* at 75. If the state law enforcement officers in *Irish* had directly caused harm by their own actions (which they did not), Ms. Irish would not have had to resort to a state-created danger theory to make out a direct claim against them.

Ms. Wadsworth's state-created danger theory fits her § 1983 claim against Mr. Nguyen, because she alleges that he enabled Mr. Cavanaugh without perpetrating the harassment himself. The Court, however, interprets Ms. Wadsworth's Amended Complaint to allege against Mr. Cavanaugh a direct substantive due process violation that does not require the additional elements of a state-created danger. *Am. Compl.* ¶ 175; *see also Def.'s Mot.* at 7-8 (arguing that Ms. Wadsworth's substantive due process claim must fail, without mentioning the state-created danger theory). Regardless, whether Ms. Wadsworth's claim against Mr. Cavanaugh is framed as a direct substantive due process violation or as a state-created danger does not ultimately affect the Court's decision because she cannot establish the underlying substantive due process violation essential to either claim.

specific to the plaintiff and caused the plaintiff's harm[108]—"are also met." *Id.* at 39. Finally, she concludes "that a jury can certainly find that Mr. Cavanaugh's actions shock the conscience," given that she "need only show that there are material facts in dispute as to whether or not Mr. Cavanaugh acted with deliberate indifference." *Id.* In her view, he "groomed Ms. Wadsworth, a minor, for sexual harassment; continuously engaged in sexualized and otherwise inappropriate speech and conduct that made her uncomfortable, and when confronted with his wrongdoing, took affirmative steps to isolate Ms. Wadsworth from her support network (her parents) and to cover up his own abhorrent and illegal behavior." *Id.* Ms. Wadsworth submits that "[i]f that is not conscience shocking, nothing is; but at the very least, the actions were deliberately indifferent" and asserts that because "Mr. Cavanaugh's decisions caused Ms. Wadsworth to continue undergoing harassment," he is not entitled to summary judgment on her substantive due process claim. *Id.* at 39-40.

### c.   Qualified Immunity

Ms. Wadsworth next contends that, assuming she suffered a constitutional violation, Mr. Cavanaugh is not entitled to qualified immunity. In her view, the "only question is whether a reasonable defendant would have known that Mr. Cavanaugh

---

[108]   To make out a state-created danger claim in the First Circuit, the plaintiff must establish:

> (1) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff;
> (2) that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public;
> (3) that the act or acts caused the plaintiff's harm; and
> (4) that the state actor's conduct, when viewed in total, shocks the conscience.

*Irish*, 979 F.3d at 75.

was violating Ms. Wadsworth's rights by sexually harassing her, and that a reasonable defendant would understand Mr. Cavanaugh's conduct violated Ms. Wadsworth's rights." *Id.* at 40.  She states that Mr. Cavanaugh "was the School's affirmative action coordinator" and presumably knew that "the School's sexual harassment policy included in its definition of sexual harassment actions such as comments or gestures that could make a person feel uncomfortable. *Id.* She submits that, even with that knowledge, "he was having explicit sexual conversations with a 16 year old student at his school" despite "constantly being asked to reign in his relationship with Ms. Wadsworth" and that these facts ultimately "create large enough issues of material fact to preclude the entry of summary judgment." *Id.* at 40-41.

### 2.   The State Law Tort Claims

### a.   Maine Tort Claims Act Immunity

First, Ms. Wadsworth argues that Mr. Cavanaugh's position that he is entitled to immunity because he was acting under his authority as principal is "an absurd proposition given the evidence produced in discovery." *Id.* at 52.  She counters that "Mr. Cavanaugh's actions toward Ms. Wadsworth could not possibly be considered authorized by his employment, and as noted above, governmental employees are not entitled to immunity for intentional actions undertaken in 'bad faith.'" *Id.* at 52-53. Ms. Wadsworth asserts that while Mr. Cavanaugh "alleges that he was simply trying to help Ms. Wadsworth in the course of his employment as the School principal, there is no plausible, non-sexually related explanation as to why he would try to convince

her to be on birth control, ask her about sexual experiences, and ask her to send scandalous photos to him." *Id.* at 53-54. She concludes that "[c]learly, any conduct that sexualizes a minor student would be outside the scope of a principal's employment duties, and for personal gain only" and "[a]t a minimum, there are substantial issues of material fact that preclude summary judgment on this issue." *Id.* at 54.

### b.   Intentional Infliction of Emotional Distress

Next, Ms. Wadsworth counters that she "has a valid claim against Mr. Cavanaugh for intentional infliction of emotional distress, and summary judgment is inappropriate because there are substantial disputed issues of material fact." *Id.* Recounting the four required elements as stated in *Curtis*,[109] Ms. Wadsworth submits that: (1) it would be absurd for Mr. Cavanaugh to suggest that he did not know his actions would cause Ms. Wadsworth emotional distress; (2) Mr. Cavanaugh's conduct was outrageous and exceeded all bounds of decency; (3) the record shows that Ms. Wadsworth suffered depression, anxiety, and panic attacks as a result of his harassment; and (4) her distress was so severe that no one should have to endure it. *Id.* at 55-56. Because—in Ms. Wadsworth's view—she "has alleged sufficient facts to support her claim for intentional infliction of emotional distress . . . summary judgment is inappropriate." *Id.* at 56.

### c.   Negligence and Negligent Infliction of Emotional Distress

---

[109]     *See* footnote 106.

Finally, Ms. Wadsworth asserts that, contrary to Mr. Cavanaugh' contentions, "it is clear that [he] owed a duty of care to [her]." *Id.* at 57. She focuses on the fact that "[a]s part of [his] position, Mr. Cavanaugh was responsible for reporting to the superintendent and investigating complaints of harassment." *Id.* Ms. Wadsworth contends that "[t]hroughout Ms. Wadsworth's junior and senior years of high school, she reported to Mr. Cavanaugh that she was uncomfortable with him speaking about sex-based topics with her" and that "Ms. Wadsworth's complaints of discomfort should have immediately prompted Mr. Cavanaugh to begin an investigation into his own actions, or report them to the superintendent." *Id.* at 58. She concludes that "Mr. Cavanaugh had a duty to Ms. Wadsworth to investigate her complaints [but] failed to do so, and instead continued to sexually harass her on a daily basis," and therefore "there are significant issues of material fact as to Ms. Wadsworth's damages and Mr. Cavanaugh's breach of duty, which preclude summary judgment." *Id.*

### C.   Andrew Cavanaugh's Reply

In reply, Mr. Cavanaugh argues that Ms. Wadsworth has not established a substantive due process violation because she admits that her bodily integrity was not violated. *Def.'s Reply* at 1. He adds further that he is entitled to qualified immunity because "[t]here is no body of law upon which it would be clear to a reasonable official that one could violate a constitutional right to bodily integrity without engaging in any physical acts which actually violate a person's bodily integrity." *Id.* at 2. Next, Mr. Cavanaugh argues that the state-created danger theory in inapplicable because Ms. Wadsworth "alleges that Defendant Cavanaugh was *the*

person that caused her alleged injury, not a state actor who engaged in an affirmative act that create or enhanced the danger of private violence." *Id.* at 3 (emphasis in *Def.'s Reply*).

Regarding Ms. Wadsworth's tort claims, Mr. Cavanaugh contends that she has not effectively countered his immunity claim because she "has not elicited any facts showing that Defendant Cavanaugh acted in bad faith." *Id.* at 5-6.

## IV.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d

1113, 1116 (1st Cir. 1993)).  Then, a "court views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)).  "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## V.   DISCUSSION

### A.   Section 1983 Claims

Section 1983 provides that:

> [e]very person who, under color of [law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ..

42 U.S.C. § 1983.  Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 389-94 (1989).  A § 1983 cause of action has two elements. First, a plaintiff must show deprivation of a federally protected right, privilege, or immunity and a causal connection between the conduct complained of and the deprivation. *See Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 559 (1st Cir. 1989).

Second, a plaintiff must establish that "the perpetrator of the violation was acting under color of law." *Cruz-Erazo v. Rivera-Montañez*, 212 F.3d 617, 621 (1st Cir. 2000).

### 1.    Substantive Due Process Violation

Ms. Wadsworth identifies a federal right: the right to be free from intrusions into her bodily integrity. *Pl.'s Opp'n* at 35; *see Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 65 (D. Me. 1999) ("It is well recognized that students have a fundamental right to bodily integrity that includes the right to be free from sexual abuse"). She also asserts a deprivation of that right: Mr. Cavanaugh's "repeated, demanding sexual harassment . . .." *Order on Mot. to Dismiss* at 26; *Pl.'s Opp'n* at 35-36. Mr. Cavanaugh disagrees, countering that "a student's due process rights can be violated as pertaining to physical abuse, [but] not verbal harassment," "[a]ll such [§ 1983] cases involve a state actor committing physical acts of abuse," and "[t]here is no body of law upon which it would be clear to a reasonable official that one could violate a constitutional right to bodily integrity without engaging in any physical acts which actually violate a person's bodily integrity." *Def.'s Mot.* at 7-8.

Based on the existing law within the First Circuit, the Court cannot conclude that a reasonable factfinder would be able to find that Mr. Cavanaugh's non-physical harassment violated Ms. Wadsworth constitutional right to bodily integrity in a manner sufficiently conscience-shocking to sustain a § 1983 claim.[110]

---

[110]    The Court is duty-sworn to apply the law of the United States Supreme Court and the First Circuit to the facts in this case. *Carson v. Makin*, 142 S. Ct. 1987, 1995 (2022) ("Applying Circuit precedent . . . , the District Court rejected petitioners' constitutional claims and granted judgment to the commissioner"); *Eulitt v. Me. Dep't of Educ.*, 386 F.3d 344, (1st Cir. 2004) ("Until a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority").

To set out a substantive due process claim, a plaintiff challenging specific acts of state officials must "show *both* that the acts were so egregious as to shock the conscience *and* that they deprived him of a protected interest in life, liberty, or property." *Pagan v. Calderon*, 448 F.3d 16, 32 (1st Cir. 2006) (emphasis in *Pagan*); *see also Rivera*, 402 F.3d at 33–34 (1st Cir. 2005) ("In order to establish a substantive due process claim, the plaintiff must first show a deprivation of a protected interest in life, liberty, or property.  It is not enough to claim the governmental action shocked the conscience" because "[t]he implication of a fundamental right is a threshold requirement for establishing a due process violation") (citations omitted).  While "the cases in which [the First Circuit has] found governmental conduct to shock the conscience have often involved state action that was highly physically intrusive," it has "pointedly left open the possibility that verbal or other less physical harassment . . . might rise to a conscience-shocking level." *Cruz-Erazo*, 212 F.3d at 622.

---

This area of law may be ripe for reexamination as to whether pervasive, non-physical sexual harassment may be as harmful to the victim's constitutional right to bodily integrity as some forms of physical abuse.  In the tort area, the law was slow to acknowledge that purely psychological injuries should be treated like physical injuries, subject to the same standards of proof.  In Maine, for example, the Law Court held in 1880 that "mental suffering alone, unattended by any injury to the person, caused by simple actionable negligence" was not compensable. *Wyman v. Leavitt*, 71 Me. 227, 230 (1880).  The doctrine developed to permit recovery for "objectively manifested" emotional suffering without discernible trauma caused by negligence, then to adopt the theory of negligent infliction of emotional distress when manifested as a physical impact, and finally to drop the physical injury requirement and permit recovery for emotional suffering alone. *Gammon v. Osteopathic Hosp. of Maine, Inc.*, 534 A.2d 1282, 1284 (Me. 1987) (describing the law's development on "mental suffering alone" torts in Maine from 1880 onward).

Here, a high school principal engaged in prolonged, pervasive, and persistent sexual harassment of a teenage girl under his authority, who was struggling with a difficult family situation, and his actions were bound to cause confusion, emotional distress, worry, and other significant psychological harms.  If Mr. Cavanaugh had even momentary sexual contact with Ms. Wadsworth, the Court could apply an entirely different analysis to the case.  Without diminishing the impact of physical sexual contact, it strikes the Court that the current state of the law artificially diminishes the impact of psychological sexual harassment.

"It is well recognized that students have a fundamental right to bodily integrity that includes the right to be free from sexual abuse." *Doe,* 66 F. Supp. 2d at 65. As Mr. Cavanaugh observes, however, cases of sexual harassment amounting to a constitutional deprivation have <u>uniformly</u> involved at least some form of physical sexual contact. *See Def.'s Mot.* at 8. Ms. Wadsworth responds only that the Fourteenth Amendment right to bodily integrity "protects a student's right to be free from sexual abuse <u>and harassment</u> by teachers at a public school." *Pl.'s Mot.* at 35 (citing *B.W. v. Career Technology Center of Lackawanna County*, 422 F. Supp. 3d 859, 888-89 (M.D. Pa. 2019) and *Doe v. Boyertown Area Sch. Dist.*, 10 F. Supp. 3d 637, 650 (E.D. Pa. 2014)) (emphasis in *Pl.'s Mot.*). But, unlike Ms. Wadsworth, the plaintiffs in those cases alleged <u>physical</u> abuse. *See B.W.,* 422 F. Supp. 3d at 872-873 (students were "sexually assaulted and abused by a teacher" who "constantly engaged in inappropriate and unwanted physical contact with his students"); *Boyertown,* 10 F. Supp. 3d at 650 (plaintiff's allegation of having suffered a sexual assault was sufficient to constitute a violation of her Fourteenth Amendment rights).

The Court has not identified any authority supporting the proposition that non-physical harassment alone can violate the right to bodily integrity or shock the conscience.[111] Neither party disputes that under First Circuit caselaw physical sexual abuse will generally violate the right to bodily integrity in a manner that

---

[111]   During oral argument, the Court challenged Ms. Wadsworth's counsel to cite one case where a court has found that a § 1983 action based on sexual harassment was viable if there was no allegation of physical contact. Consistent with the Court's research and the parties' submissions, Ms. Wadsworth's attorney was unable to cite one case as authority for the proposition that a § 1983 sexual harassment claim may proceed without some physical contact.

shocks the conscience. *See, e.g., Doe,* 66 F. Supp. 2d at 65. First Circuit caselaw examining non-physical harassment, however, has primarily focused on verbal abuse or other misconduct by police or prosecutors that was manipulative or threatening and found the conduct not to be conscience-shocking. *See Cruz-Erazo*, 212 F.3d at 622-23 (discussing cases); *Spencer v. Doran*, No. 18-CV-1191-LM, 2020 LEXIS 150728, at *18-19 (D.N.H. Aug. 20, 2020) (same).

Out-of-circuit caselaw focusing on non-physical abuse in a school setting has generally considered verbal abuse by teachers that was inappropriate and often extraordinarily cruel yet did not shock the conscience or deprive the student of a protected constitutional right. *See, e.g., Abeyta By & Through Martinez v. Chama Valley Ind. Sch. Dist., No. 19*, 77 F.3d 1253, 1255–57 (10th Cir. 1996) (teacher repeatedly calling sixth-grade student a "prostitute" in front of her class did not rise to a substantive due process violation and the Court noted that "[w]e have found no case in a school context that held conduct falling shy of sexual molestation or assault constitutes constitutionally actionable sexual harassment"); *Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir. 2000) (dismissing verbal-abuse substantive due process claim against elementary school teacher "accused of yelling and screaming at students, using foul language, . . . calling students 'stupid,' and referring to students as 'bimbos,' 'fatso,' and 'welfare bunch'"); *Costello v. Mitchell Pub. Sch. Dist. 79*, 266 F.3d 916, 921 (8th Cir. 2001) (teacher calling student "retarded," "stupid," and "dumb," in front of her classmates on a daily basis did not amount to a constitutional violation).

Mr. Cavanaugh's pattern of sexual harassment of Ms. Wadsworth does not line up neatly with any of these cases.  To sustain her § 1983 claim, Ms. Wadsworth must "show *both* that the acts were so egregious as to shock the conscience *and* that they deprived [her] of a protected interest in life, liberty, or property." *Pagan*, 448 F.3d at 32 (emphasis in *Pagan*).  While it may be axiomatic that sexual abuse so harmful that it deprives the victim of her constitutional right to bodily integrity is inherently conscience-shocking, the Court has not identified any authority—in this Circuit or any other—suggesting either that non-physical harassment like the type in this case violates a plaintiff's right to bodily integrity or that such abuse shocks the judicial conscience.  The Court must apply the law as it finds it exists today, and thus concludes that it would be a bridge too far to hold for the first time, absent any supporting authority, both that Mr. Cavanaugh's non-physical harassment violates Ms. Wadsworth's right to bodily integrity and also that it shocks the conscience.

For this reason, the Court must find that no reasonable jury could conclude that Mr. Cavanaugh's conduct deprived Ms. Wadsworth of her constitutional right to bodily integrity and the Court is compelled to reject Ms. Wadsworth's § 1983 substantive due process claim.

## 2.  Qualified Immunity

Even if the Court had found that Mr. Cavanaugh's conduct deprived Ms. Wadsworth of her constitutional right to bodily integrity, Ms. Wadsworth's claim would still fail because Mr. Cavanaugh would be entitled to qualified immunity on her § 1983 claim.

"[T]he qualified immunity inquiry is a two-part test.  A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  "[T]he second, 'clearly established' step of the qualified immunity analysis . . ., in turn, has two aspects." *Id.* at 269.  "The first sub-part requires the plaintiff to identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." *Alfano v. Lynch*, 847 F.3d 71, 75 (1st Cir. 2017) (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999)).  For the second, the Court must ask "whether a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights." *Id.*  The Supreme Court has instructed that "this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson*, 555 U.S. 223).

The Court finds the first part of the test to be insurmountable for Ms. Wadsworth.  Even assuming the Court had held that Mr. Cavanaugh's conduct violated her right to bodily integrity in a manner that shocked the conscience, at the time the events of this case occurred, no court—at least that this Court or Ms. Wadsworth has been able to identify—had held that any form of non-physical sexual

harassment alone was sufficient to sustain a substantive due process violation, much less harassment that resembled Mr. Cavanaugh's.  The "contours of that right"—at least as it pertains to non-physical harassment—could not be considered "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Maldonado*, 568 F.3d at 268-69.

Even if Ms. Wadsworth had been able to establish a substantive due process violation, Mr. Cavanaugh would be entitled to qualified immunity on her § 1983 claim.  Accordingly, the Court grants the motion for summary judgment in favor of Mr. Cavanaugh as to Ms. Wadsworth's § 1983 substantive due process claim.

### B.    Equal Protection Claim

### 1.    Equal Protection Violation

"[Section] 1983 equal protection claims may be brought against individuals as well as municipalities . . .." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) (citing *West v. Atkins*, 487 U.S. 42, 48-51 (1988)).  "To state an equal protection claim, the plaintiff must 'show that the parties with whom he seeks to be compared have engaged in the same activity vis-à-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile.'" *Raymond v. Me. Sch. Admin. Dist. 6*, No. 2:18-cv-00379-JAW, 2019 U.S. Dist. LEXIS 80868, at *21 (D. Me. May 14, 2019) (quoting *Cordi-Allen v. Conlon,* 494 F.3d 245, 251 (1st Cir. 2007)).  "[A] plaintiff needs to allege facts showing that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such

as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Davis v. Coakley*, 802 F.3d 128, 132-33 (1st Cir. 2015) (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995)). The plaintiff must "identify and relate *specific instances*" of the defendant treating similarly situated persons differently, "instances which have the capacity to demonstrate that [plaintiffs] were singled . . . out for unlawful oppression." *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006) (alterations and emphasis in original) (quoting *Rubinovitz*, 60 F.3d at 910). The plaintiff must also show that the defendant acted with a discriminatory intent. *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 896.

In the Court's Order on Mr. Nguyen's motion to dismiss—cited here by both parties—the Court found that Ms. Wadsworth had not adequately pleaded an Equal Protection claim against Mr. Nguyen. *Order on Nguyen Mot. to Dismiss* at 38-41. The Court noted that a District of Maine court recently dismissed an equal protection claim against a school department in a Title IX case because "[t]he complaint d[id] not allege either that [the student] was treated differently than other similarly situated students with disabilities, or that the School Department's actions were based on the types of impermissible considerations described" in *Davis*. *Id.* at 39 (quoting *McCann, on behalf of J.M. v. York School Department*, 365 F. Supp. 3d 132, 147 (D. Me. 2019)). The Court found that, as in *McCann*, "Ms. Wadsworth's Amended Complaint does not allege that Mr. Nguyen treated Ms. Wadsworth differently than any other students" and did "not mention any other students Mr. Nguyen interacted with, so it falls far below the requirement that the plaintiff show specific instances of

disparate treatment." *Id.* at 40. The Court also found Ms. Wadsworth's claim deficient because "she attempts to hold Mr. Nguyen liable for the alleged actions of Mr. Cavanaugh" yet "no facts establish that Mr. Nguyen had any control over Mr. Cavanaugh, the principal." *Id.*

The analysis differs greatly for the claims against Mr. Cavanaugh. Again, Ms. Wadsworth must "allege facts showing that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Davis*, 802 F.3d at 132-33 (quoting *Rubinovitz*, 60 F.3d at 910). While Ms. Wadsworth faced the barrier of showing that Mr. Nguyen controlled the actions of Mr. Cavanaugh, the harasser, that obstacle is removed for the claims directly against Mr. Cavanaugh. She must show that she was (1) selectively treated compared with others similarly situated and (2) that such treatment was based on impermissible considerations.

### a.   Selective Treatment

An individual is "similarly situated" to others for equal protection purposes when "a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Id.* at 133 (quoting *Barrington Cove Ltd. P'ship v. Rhode Island Hous. & Mortgage Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001)). The First Circuit has explained that "[e]xact correlation is

neither likely nor necessary, but the cases must be fair congeners.  In other words, apples should be compared to apples." *Id.*

This hurdle has often proven insurmountable for student victims of sexual harassment attempting to hold liable school officials or entities for failing to prevent or report the harm.  Ms. Wadsworth's unsuccessful Equal Protection claim against Mr. Nguyen provides a representative example of the challenges such plaintiffs face. There, the gravamen of her claim against Mr. Nguyen was that he failed to prevent or report Mr. Cavanaugh's harassment.  Assuming that Mr. Nguyen handled her complaints poorly, for an Equal Protection claim to lie against him, the Court would need some evidence that Mr. Nguyen handled differently the complaints of a student similarly situated to Ms. Wadsworth—thereby raising the question of whether that differential treatment was due to an impermissible consideration, like the student's gender.

In these cases against officials for failing to prevent harassment, however, the similarly situated student(s) will generally only be other students who have also reported similar harassment to the same defendant—a narrow and often nonexistent cohort.  If Ms. Wadsworth had asserted that Mr. Nguyen had promptly reported a male student's complaints of harassment by Mr. Cavanaugh, the Court could then inquire whether this differential treatment was motivated by the impermissible consideration of gender.  If, however, the record reveals no evidence that Mr. Nguyen handled any other similar complaints, the Court has no benchmark against which to judge whether he inadequately responded to Ms. Wadsworth's complaints, and thus

cannot determine whether his response to her was motivated by an impermissible consideration. Ultimately, Ms. Wadsworth's claim against Mr. Nguyen failed because she did "not mention any other students Mr. Nguyen interacted with" and thus "[did] not allege that Mr. Nguyen treated Ms. Wadsworth differently than any other students." *Order on Nguyen Mot. to Dismiss* at 40.

In the First Circuit, this high bar has regularly stymied plaintiffs attempting to hold school officials or entities liable for failing to prevent harassment by another teacher or student. *See, e.g.*, *McCann*, 365 F. Supp. 3d at 147 ("[t]he complaint d[id] not allege either that [the student] was treated differently than other similarly situated students with disabilities, or that the School Department's actions were based on . . . impermissible considerations"); *Harrington v. City of Attleboro*, 172 F. Supp. 3d 337, 346 (D. Mass. 2016) ("Plaintiffs, however, fail to allege any facts or argue in their opposition that [defendants] treated the harassment of [the victim] by her peers differently than that of any other student, let alone that such treatment was because of her membership in a protected class"); *Thomas v. Town of Chelmsford*, 267 F. Supp. 3d 279, 303 (D. Mass. 2017) (concluding that "[t]he plaintiffs do not show any similarly situated comparator" because "[t]he plaintiffs' equal protection claim is based entirely on how school officials might have treated a hypothetical, similarly situated female rape victim" and "[s]uch conjecture does not suffice to state an equal protection claim"); *Doe v. Town of Stoughton*, No. CIV.A. 12-10467-PBS, 2013 U.S. Dist. LEXIS 173030, at *13 (D. Mass. Dec. 10, 2013) ("[t]o the extent Plaintiff asserts that [the defendant] is a mandated reporter who failed to report [the perpetrator's]

72

felonious actions . . . Plaintiff does not allege that in other circumstances similarly situated students were treated differently than her); *Pollard v. Georgetown Sch. Dist.*, 132 F. Supp. 3d 208, 223 (D. Mass. 2015) (although [plaintiff] alleges that the District afforded [the victim] a lower level of protection compared to 'other students,' she never alleges any facts to establish that these students are similarly situated"). The caselaw is much less established, however, for claims where the student-victim sues the teacher-harasser directly, rather than the person(s) who failed to prevent the harassment.

It strikes the Court that the "similarly situated" analysis must be framed differently for such cases. "It is axiomatic that the liability of persons sued in their individual capacities under section 1983 must be gauged in terms of their own actions." *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999). When the allegation is that the defendant failed to report or prevent the victim's harassment due to an impermissible consideration, the plaintiff must show that he treated another similarly situated complainant differently to establish a benchmark. For a defendant like Mr. Nguyen, there is no way to assess whether he treated other complainants differently without evidence that he was aware of another complaint. Yet when the claim is brought against the alleged perpetrator directly, the question is not whether he treated *this* victim differently from another victim of harassment; instead, it is whether he harassed the victim due to an impermissible consideration.

In other words, a non-harassing defendant is gauged in terms of whether he handled this complaint differently than others, and so the Court generally needs

another complaint to compare.  By contrast, a perpetrator-defendant is gauged on why he harassed the plaintiff (but presumably not every other student), and it would take a bizarre interpretation of the Equal Protection Clause to require a plaintiff to provide two victims of the perpetrator's harassment for the Court to weigh whether and why he harassed one more severely than the other. The similarly situated benchmark is thus a student the perpetrator did not harass.

The Court finds Ms. Wadsworth to have met that burden at the summary judgment stage.  She alleges that Mr. Cavanaugh sexually harassed her and treated her differently because of her gender.  *Pl.'s Opp'n* at 37.  In the Court's view, her similarly situated comparators would thus be male students at MVHS, also under Mr. Cavanaugh's authority as principal.

There is no bright line for exactly what level of specificity is required, but "[e]xact correlation is neither likely nor necessary" and instead the standard is whether "a prudent person" would "think them roughly equivalent and the protagonists similarly situated."  *Davis*, 802 F.3d at 133 (quoting *Barrington*, 246 F.3d at 8).  MVHS is a coeducational school with numerous male and female students under Mr. Cavanaugh's authority as principal.  In the Court's view, any male classmate of Ms. Wadsworth would qualify as a "fair cogener[]" and it would be unnecessarily formalistic to require her to identify a specific male classmate and establish that he was not harassed by Mr. Cavanaugh.

Nevertheless, even if the Court were to apply that demanding level of specificity, it appears that such a classmate has been identified.  The record includes

74

the deposition testimony of Brent Stewart, a MVHS classmate and friend of Ms. Wadsworth's. *See Joint R. Materials*, Attach. 24, *Dep. of Brent Stewart*. As with Ms. Wadsworth, Mr. Cavanaugh had the authority to spontaneously "pull" Mr. Stewart "into his office in the middle of the day" for a meeting, but only did so on one occasion—to "ask like how [Ms. Wadsworth] was doing." *Id.* at 22:14-23:12. There is no suggestion that Mr. Cavanaugh ever harassed Mr. Stewart, a male classmate "similarly situated" to Ms. Wadsworth.[112] Ms. Wadsworth has thus sufficiently established similarly situated comparators in Mr. Stewart and the rest of her male MVHS classmates.

### b.     Impermissible Considerations

The next step of the analysis is to assess whether Mr. Cavanaugh treated Ms. Wadsworth differently from her comparators "based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Davis*, 802 F.3d at 132-33 (quoting *Rubinovitz*, 60 F.3d at 910). Discrimination on the basis of sex violates the equal protection clause if such discrimination does not "serve important governmental objectives" and is not "substantially related to achievement of those objectives." *Lipsett*, 864 F.2d at 896 (quoting *Davis*, 442 U.S. at 234-35).

In *Forrest v. Brinker International Payroll Company, LP*, 511 F.3d 225 (1st Cir. 2007), the First Circuit considered a defendant's contention that the alleged

---

[112]     There are likewise no allegations that Mr. Cavanaugh harassed any other student. The teachers' email complaining about him pulling her out of class, Officer Spear's "pervert principal" email, and the school and law enforcement investigations all related to his behavior with Ms. Wadsworth, not with any other student(s).

harassment of the perpetrator's former romantic partner "could not have been motivated by the victim's sex because it was instead motivated by a romantic relationship gone sour." *Id.* at 229. The panel flatly rejected this argument as a "false dichotomy," reasoning that:

> Presumably the prior relationship would never have occurred if the victim were not a member of the sex preferred by the harasser, and thus the victim's sex is inextricably linked to the harasser's decision to harass. To interpret sexual harassment perpetrated by a jilted lover in all cases not as gender discrimination, but rather as discrimination on the basis of the failed interpersonal relationship . . . is as flawed a proposition under Title VII as the corollary that ordinary sexual harassment does not violate Title VII when the [ ] asserted purpose is the establishment of a new interpersonal relationship. Whether a harasser picks his or her targets because of a prior intimate relationship, desire for a future intimate relationship, or any other factor that draws the harasser's attention should not be the focus of the Title VII analysis. Instead, improper gender bias can be inferred from conduct; if the harassing conduct is gender-based, Title VII's requirement that the harassment be based upon sex is satisfied.

*Id.* at 229 (citations and internal quotation marks omitted); *see also Charette v. St. John Valley Soil & Water Conservation Dist.*, No. 1:17-cv-35-GZS, 2017 U.S. Dist. LEXIS 94433, at *39 (D. Me. June 20, 2017) (analytical framework for discriminatory intent is the same in the Title VII and Equal Protection contexts). To the degree that—as the Court has discussed—a factfinder could reasonably construe Mr. Cavanaugh's behavior as harassment in the sexual infatuation with Ms. Wadsworth, that factfinder could infer that presumably it "would never have occurred if the victim were not a member of the sex preferred by the harasser, and thus the victim's sex is inextricably linked to the harasser's decision to harass." *Id.*

Additionally, many of Mr. Cavanaugh's actions appear to be gender-based. He persistently called Ms. Wadsworth "princess," "Sports Illustrated swimsuit model," "ladytime," (a reference to her menstruation as her "ladytime"), and "cupcake." He gave her a gift of tampons and repeatedly suggested—and made an appointment—for her to get birth control. He also asked her about her sexual relationships with boys, whether she was having orgasms, her lacey shorts, and to send him "scandalous" photos of her in a bikini at the beach. Viewed in combination, the Court finds that a reasonable juror could conclude on this record that Mr. Cavanaugh's harassment was motivated by the impermissible consideration of Ms. Wadsworth's gender.

### c.   Acting Under Color of Law

Mr. Cavanaugh also argues that Ms. Wadsworth's § 1983 claims must fail because he was not acting under the color of law. *Def.'s Mot.* at 13-14. The Court finds this defense unavailing.

To sustain a § 1983 claim, plaintiffs generally need to show not only a violation of a constitutional right, but also that the deprivation was committed by a person acting under the color of state law. *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d at 66 (citing *West v. Atkins*, 487 U.S. 42, 48, (1988)). Mr. Cavanaugh relies on *Doe* and two out-of-circuit cases it cited where a teacher's (or former teacher's) conduct has not been considered to be acting under the color of law. *Def.'s Mot.* at 13-14. All are easily distinguishable.

77

In *Doe*, the misconduct "occurred off school grounds on a Saturday night, when school was not in session" and "because Doe did not have [the perpetrator] as a teacher prior to December 7, 1996 and had not really had any opportunity to interact with her at the school, it cannot be said that [the perpetrator] befriended Doe while acting in a teaching capacity." 66 F. Supp. 2d at 67. Here, however, some of the complained of conduct—including Mr. Cavanaugh regularly pulling Ms. Wadsworth out of class to meet in his office—clearly occurred while school was in session, and the record does not make clear which text messages were exchanged in school versus out of school. Additionally, the factfinder could easily conclude that, unlike the perpetrator in *Doe*, Mr. Cavanaugh befriended Ms. Wadsworth in his capacity as principal.

The other two cases, *D.T. v. Independent School District*, 894 F.2d 1176 (10th Cir. 1990) and *Becerra v. Asher,* 105 F.3d 1042 (5th Cir. 1997) are similarly inapposite. In *D.T.*, the abuse occurred during fundraising efforts for a private basketball camp and there was "absolutely nothing in the record demonstrating that the School District had any control over [the teacher] during the summer months" when the abuse occurred. *D.T.,* 894 F.2d 1177. As discussed in the previous paragraph, there are at the very least disputed issues of material act regarding whether key elements of Mr. Cavanaugh's misconduct occurred during the school year. In *Becerra*, the teacher had molested a student in his home after the student was no longer enrolled in the school. 105 F.3d at 1044. Ms. Wadsworth, by contrast, was at all relevant times enrolled at MVHS with Mr. Cavanaugh as her principal.

The Court concludes that a reasonable juror could find that Mr. Cavanaugh was acting under color of law in his harassment of Ms. Wadsworth.

### 2.    Qualified Immunity

The most challenging question of the equal protection analysis is whether, even if he violated Ms. Wadsworth's Equal Protection rights, Mr. Cavanaugh is nonetheless entitled to qualified immunity.  The Court concludes that he is.

Even if Ms. Wadsworth has shown a violation of her Equal Protection rights, she cannot show that this right was "clearly established" with sufficient specificity required by the second prong of the qualified immunity analysis.  The first sub-part of this prong "requires the plaintiff to identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." *Alfano*, 847 F.3d at 75 (quoting *Wilson*, 526 U.S. at 617).

The Supreme Court instructs that "clearly established law should not be defined at a high level of generality" and "the clearly established law must be particularized to the facts of the case."  *White v. Pauly*, 580 U.S. 73, 79 (2017) (citations and internal quotations omitted).  While qualified immunity does not require "a case directly on point" for law to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate" and thus, "[p]ut simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citations and internal quotations omitted).

"[W]hen a defendant invokes qualified immunity, the burden is on the plaintiff to show the inapplicability of the defense." *Rivera-Corraliza v. Morales*, 794 F.3d 208, 215 (1st Cir. 2015) (citing *Quintero de Quintero v. Aponte-Roque*, 974 F.2d 226, 228 (1st Cir. 1992)). Mr. Cavanaugh has invoked qualified immunity, but Ms. Wadsworth has not met her burden. She submits that "[p]rovided this Court agrees that a Constitutional violation occurred . . . the only question is whether a reasonable defendant would have known that Mr. Cavanaugh was violating Ms. Wadsworth's rights by sexually harassing her, and that a reasonable defendant would understand Mr. Cavanaugh's conduct violated Ms. Wadsworth's rights." *Pl.'s Opp'n* at 40. But that contention skips entirely over the critical second prong of the qualified immunity analysis—assessing whether that right was "clearly established" at the time. Ms. Wadsworth offers no First Circuit caselaw—and the Court has not identified any— holding that a teacher's non-physical sexual harassment of a student violates her Equal Protection rights, where the conduct does not involve hostility or direct sexual advances. While "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, Ms. Wadsworth has not met her burden "to identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." *Alfano*, 847 F.3d at 75 (quoting *Wilson*, 526 U.S. at 617). Mr. Cavanaugh is entitled to qualified immunity and the Court must award summary judgment in his favor on Adrianna Wadsworth's Equal Protection claim.

### C.     State Law Tort Claims

Ms. Wadsworth has asserted three state law tort claims against Mr. Cavanaugh: intentional infliction of emotional distress (Count IV); negligent infliction of emotional distress (Count V); and negligence (Count VI). *Am. Compl.* ¶¶ 189-208.

### 1.     Intentional Infliction of Emotional Distress

### a.     Maine Tort Claims Act Immunity

First, Mr. Cavanaugh argues that he is entitled to immunity for the IIED claim pursuant to the Maine Tort Claims Act (MTCA). *Def.'s Mot.* at 15. Although the MTCA provides for several types of absolute immunity, in this motion, Mr. Cavanaugh asserted his immunity from suit under only so-called intentional act immunity.[113] *Morgan v. Kooistra*, 2008 ME 26, ¶ 20, 941 A.2d 447. Claims of absolute immunity are affirmative defenses under § 8111(1). *See Miller v. Szelenyi*, 546 A.2d 1013, 1020 (Me. 1988) ("Immunity under section 8111(1)(C) is an affirmative defense"). This is not a close call. To meet the requirements for intentional act immunity, Mr. Cavanaugh must demonstrate that his actions "were intentional, they

---

[113]     Intentional act immunity under 14 M.R.S. § 8111(1)(E) is distinct from discretionary act immunity under 14 M.R.S. § 8111(1)(C). *Morgan v. Kooistra*, 2008 ME 26, ¶ 20, 941 A.2d 447. In proceeding with his motion for summary judgment, Mr. Cavanaugh has not asserted discretionary act immunity under § 8111(1)(C).

In his answer to the amended complaint, Mr. Cavanaugh raised § 8111(1)(C), discretionary function immunity, as his eighth affirmative defense. *Def., Andrew Cavanaugh's Answer to Pl.'s Am. Compl.* at 16 (ECF No. 17) ("The Defendant is immune from liability by operation of 14 M.R.S.A. § 8111(1)(C)"). Shifting subsections in his motion for summary judgment, Mr. Cavanaugh is demanding summary judgment based on the application of § 8111(1)(E), not § 8111(1)(C). *Def.'s Mot.* at 15 (quoting § 8111(1)(E)). Ms. Wadsworth has not claimed that Mr. Cavanaugh waived intentional act immunity by failing to raise it in his amended answer. As the Plaintiff has not raised the issue, the Court will not address it sua sponte.

were within the scope of [his] employment," and that they were not undertaken "in bad faith." *Day's Auto Body, Inc. v. Town of Medway*, 2016 ME 121, ¶ 21, 145 A.3d 1030.  Here, there is no claim that Mr. Cavanaugh acted unintentionally.

Regarding the "scope of employment" requirement, "[c]onduct that is within the scope of employment is the type of conduct the employee was hired to perform; occurs within the time and space of the employment; and is undertaken, at least partially, to serve the employee's master." *Morgan*, 2008 ME 26, ¶ 20 (citations omitted).  "Actions that are not work-related do not fall within this category" and "[a]n employee who acts in bad faith loses this immunity." *Id.*  The Court cannot seriously credit Mr. Cavanaugh's assertion that some of his actions—including texting an underage student, presumably off campus, to send him "only . . . the scandalous" photos of her in her bikini or to put on "her Mickey Mouse negligee," PSAMF ¶¶ 80, 89; DRPSAMF ¶¶ 80, 89—could possibly be considered "the type of conduct the employee was hired to perform" or "undertaken to serve the employee's master," RSU 40.  *Morgan*, 2008 ME 26, ¶ 20.

Mr. Cavanaugh's last argument is that he was not acting in bad faith.  *Def.'s Mot.* at 15.  *See Lyons v. City of Lewiston*, 666 A.2d 95, 101-02 (Me. 1995) (affirming a summary judgment in favor of a government-employee defendant where the record revealed no genuine dispute as to whether the defendant acted in bad faith).  Here, there is a palpable genuine issue of material fact as to whether a reasonable factfinder could conclude that Mr. Cavanaugh's actions toward Ms. Wadsworth were in bad faith.  Therefore, Mr. Cavanaugh has not sustained his burden to demonstrate that

there is no genuine issue of material fact as to whether he is entitled to intentional acts immunity under 14 M.R.S. § 8111(1)(E).   The Court denies his motion for summary judgment on MTCA immunity grounds.

### b.    The Merits of the Claim

Mr. Cavanaugh also argues that he is entitled to summary judgment on Ms. Wadsworth's IIED claim because she has not established any of the required elements. *Def.'s Mot.* at 15-17.  The Court disagrees.

In Maine, the four elements required to establish an IIED claim are:

(1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from her conduct; (2) the conduct was so "extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community"; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was "so severe that no reasonable [person] could be expected to endure it."

*Curtis*, 784 A.2d at 20.  Beginning with the first element, Mr. Cavanaugh submits that he "did not act to intentionally or recklessly inflict emotional distress" and instead Ms. Wadsworth's "life at home was troubled, abusive and [he] tried to assist her." *Def.'s Mot.* at 16.

In its analysis of Ms. Wadsworth's substantive due process claim, the Court has discussed its views of—and how a reasonable juror could view—Mr. Cavanaugh's conduct.  The Court does not find it necessary to repeat that analysis in full but reiterates its conclusion that a reasonable factfinder could conclude that this prolonged, pervasive, and persistent sexual harassment of a teenage girl struggling with a difficult family situation by an older, trusted male authority figure was bound

to cause confusion, emotional distress, worry, and other significant psychological harms deeply damaging to Ms. Wadsworth.  The record reveals that she was forced to endure false rumors that she "was only second in [her] class because of the sexual relations that [she] was having with the principal" and that she had sexually transmitted diseases.  *Wadsworth Dep. Vol. I* at 120:20-24.  She began to cry in the morning on the way to school and on her way home from school, was diagnosed with depression and anxiety, and even now continues to suffer from anxiety and has trouble in school when dealing with male professors.  PSAMF ¶¶ 152-54; DRPSAMF ¶¶ 152-54.  A reasonable juror could conclude from this record that Mr. Cavanaugh "recklessly inflicted severe emotional distress" upon Ms. Wadsworth.  *Curtis*, 784 A.2d at 20.

The analysis is similar for the next element.  Mr. Cavanaugh contends that his conduct was not "conduct so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community."  *Def.'s Mot.* at 16 (quoting *Curtis*, 784 A.2d at 20).  He adds that one district court has found that "in *most* cases where courts have found a teacher's gender-motivated conduct toward a student sufficiently extreme and outrageous to support such a claim, it included physical abuse."  *Id.* (quoting *Brodeur v. Claremont Sch. Dist.*, 626 F. Supp. 2d 195, 225 (D.N.H. 2009) (emphasis added)).  The Court does not read *Broduer*—a case where the complained-of conduct consisted entirely of "several remarks about [the plaintiff's] buttocks"—to suggest that non-physical harassment can never support an IIED claim; indeed, the district court clarified that

"[t]his is not to say that a student cannot prevail on such a claim as a matter of law if it arises from a teacher's words rather than his actions."  626 F. Supp. 2d at 199, 225.  For the reasons the Court explained in its discussions of the substantive due process claim and the prior IIED element, it concludes that a reasonable juror could find from this record that Mr. Cavanaugh's conduct was sufficiently extreme to support an IIED claim.

For the third element, Mr. Cavanaugh submits that Ms. Wadsworth's emotional distress is attributable not to his conduct but to other traumatic events in her life.  *Def.'s Mot.* at 16-17.  The record at the very least supports a plausible connection between his conduct and Ms. Wadsworth's distress.  Its ultimate attribution is a question for the jury to decide that is not properly disposed of on summary judgment.

Finally, Mr. Cavanaugh contends that Ms. Wadsworth has not "suffered severe emotional distress that no reasonable person should be expected to endure."  *Id.* at 17 (quoting *Curtis*, 784 A.2d at 20).  The Court reiterates its views about the reprehensibility of Mr. Cavanaugh's conduct and the depth of the trauma it was inevitable to inflict on Ms. Wadsworth, concluding that a reasonable juror could find that she has established this element.  The Court denies Mr. Cavanaugh's request for summary judgment as to Ms. Wadsworth's IIED claim.

### 2.   Negligent Infliction of Emotional Distress

Under Maine law, proof of negligent infliction of emotional distress requires plaintiffs to show that (1) the defendant was negligent; (2) the plaintiff suffered

emotional distress that was a reasonably foreseeable result of the defendant's negligent conduct; (3) and the plaintiff suffered severe emotional distress as a result of the defendant's negligence. *Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 129 (1st Cir. 2000) (citations omitted).  Mr. Cavanaugh notes that the Law Court "has recognized very limited circumstances in which a negligent infliction claim may be brought," including "in circumstances in which a special relationship exists between the actor and the person emotionally harmed" or where "the wrong-doer has committed another tort." *Def.'s Mot.* at 18 (citing *Curtis*, 784 A.2d at 25).  Mr. Cavanaugh submits that neither circumstance applies because he has not committed a tort and no special relationship existed between him and Ms. Wadsworth. *Id.*  The Court disagrees on both counts.

The Court finds instructive *Hinkley v. Baker*, 122 F. Supp. 2d 48 (D. Me. 2000). In that decision, Judge Singal noted that, because he had not dismissed the plaintiff's IIED count, the plaintiff "ha[d] also alleged an independent tort . . . which could stand as [an] underlying tort[] in support of her NIED claim." *Id.* at 57.  The Court has denied Mr. Cavanaugh's request for summary judgment on Ms. Wadsworth's IIED claim.  It can thus "stand as [an] underlying tort[] in support of her NIED claim," and Mr. Cavanaugh's argument for summary judgment on her NIED claim fails for that reason alone.

Moreover, Mr. Cavanaugh's argument that no special relationship existed also does not hold water.  Judge Singal in *Hinkley* also found that "a student and her teacher share a unique relationship," *id.* at 56 (collecting cases), and that "[b]ecause

86

of the teacher-student relationship between Plaintiff and Defendant, Plaintiff need not allege or prove a separate, underlying tort to maintain her NIED claim." *Id.; see also New Jersey v. T.L.O.*, 469 U.S. 325, 349-50 (1985) (recognizing a "special relationship between teacher and student", in which the "attitude of the typical teacher is one of personal responsibility for the student's welfare as well as for his education.") (Powell, J., concurring); *Bridges v. MacLean–Stevens Studios, Inc.*, 201 F.3d 6, 11 (1st Cir. 2000) ("Unquestionably, the schools and the students enjoy a special relationship of trust"); *C.B. v. Me. Sch. Admin. Dist. No. 40*, No. 08-57-P-H, 2008 U.S. Dist. LEXIS 58236, at *21 (D. Me. July 29, 2008) (upholding a NIED claim against a teacher and stating that "in [*Hinkley*], the question was specifically whether there is a unique relationship between a teacher and a student that will provide the basis for a tort claim under Maine law, and this court answered that question in the affirmative").  While Mr. Cavanaugh may have been Ms. Wadsworth's principal rather than her teacher, the record reveals that he exercised even more authority over her then a teacher ordinarily would, especially considering that he willingly took on a "father figure" role in her life.  The Court denies his request for summary judgment on Ms. Wadsworth's NIED claim because of the independent tort and because of the existence of a special relationship.

### 3.  Negligence

Finally, Mr. Cavanaugh submits that Ms. Wadsworth's "claim against Defendant Cavanaugh for negligence does not appear to implicate him at all . . . it is Defendant Nguyen who is cited as allegedly breaching his duty" and that "[r]ather,

[Ms. Wadsworth] claims that [Mr.] Cavanaugh acted intentionally" and she has "otherwise failed to offer evidence from which a reasonable jury could conclude that [he] had a duty to [her] in negligence, breached that duty, and caused damages as result of negligent acts." *Def.'s* Mot. at 19.   Ms. Wadsworth counters that Mr. Cavanaugh owed her a duty as her principal and affirmative action coordinator designated to investigate and report complaint of sexual harassment and asserts that, if a duty exists, "the question of whether there was a breach of the standard of care would ordinarily be a question for a fact-finder, not susceptible on this record to summary judgment." *Pl.'s Opp'n* at 56 (quoting *Alexander v. Mitchell*, 2007 ME 108, ¶ 12, 930 A.2d 1016, 1020).   The Court concludes that a reasonable jury could find negligence from these facts.

To establish negligence, a plaintiff must demonstrate: (1) a duty owed to plaintiff by defendant, (2) a breach of that duty, and (3) that the plaintiff was injured as a result of that breach.   *Canning v. Broan-Nutone*, LLC, 480 F. Supp. 2d 392, 410 (D. Me. 2007) (citing *Parker v. Harriman*, 516 A.2d 549, 550 (Me. 1986)).   The Court has already established that Mr. Cavanagh owed Ms. Wadsworth a duty sufficient to sustain her NIED claim and—because the bar is lower for general negligence— affirms that finding for her negligence claim.   *See Curtis*, 784 A.2d at 25 (plaintiffs claiming [NIED rather than general negligence], however, face a significant hurdle in establishing the requisite duty, in great part because the determination of duty in these circumstances is not generated by traditional concepts of foreseeability").

The primary question here is whether Mr. Cavanaugh negligently breached that duty. On this record, a reasonable factfinder could conclude that Mr. Cavanaugh's harassing behavior was intentional misconduct—sending an underage girl sexually explicit text messages despite knowing it was wrong. However, the factfinder could, alternatively, reasonably credit Mr. Cavanaugh's assertions that he truly had Ms. Wadsworth's best interests at heart and the distress he inflicted through his text messages and other actions was primarily accidental or otherwise negligent.

As Ms. Wadsworth has noted, "the question of whether there was a breach of the standard of care would ordinarily be a question for a fact-finder, not susceptible on this record to summary judgment." *Alexander*, 2007 ME 108, ¶ 12, 930 A.2d 1020. On this record, a reasonable juror could conclude that Mr. Cavanaugh breached his duty to Ms. Wadsworth through intentional and/or negligent conduct and that she was harmed as a result. Because the Court does not know how the factfinder will characterize Mr. Cavanaugh's behavior, it does not find it proper to award summary judgment on Ms. Wadsworth's negligence claim.

## VI.    CONCLUSION

The Court GRANTS Andrew Cavanaugh's Motion for Summary Judgment (ECF No. 103) as to Count II of Adrianna Wadsworth's Amended Complaint as it pertains to him. The Court DENIES the motion as to Counts IV-VI.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 30th day of March, 2023